Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| VR GLOBAL PARTNERS, L.P., PATON HOLDINGS LTD., VR CAPITAL GROUP LTD., AND VR ARGENTINA RECOVERY FUND, LTD. <br><br> Plaintiffs, <br><br> - against - <br><br> PHILIP R. BENNETT, WILLIAM M. SEXTON, SANTO C. MAGGIO, JOSEPH J. MURPHY, PHILIP SILVERMAN, ROBERT C. TROSTEN, RICHARD N. OUTRIDGE, TONE GRANT, REFCO GROUP HOLDINGS, INC., THOMAS H. LEE PARTNERS, L.P., THOMAS H. LEE ADVISORS LLC., THL MANAGERS V, LLC., THL EQUITY ADVISORS V, LLP., THOMAS H. LEE EQUITY FUND V, L.P., THOMAS H. LEE PARALLEL FUND V, L.P., THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P., THOMAS H. LEE INVESTORS LIMITED PARTNERSHIP, 1997 THOMAS H. LEE NOMINEE TRUST, THOMAS H. LEE, DAVID V. HARKINS, SCOTT L. JAECKEL, SCOTT A. SCHOEN, AND GRANT THORNTON LLP <br><br> Defendants. |

'07 CIV 8686

No. 07 Civ. _____

**COMPLAINT**

JURY TRIAL DEMANDED



## COMPLAINT

1.      VR Global Partners, L.P., ("VR Global"), Paton Holdings Ltd. ("Paton"), VR

Capital Group Ltd. ("VR Capital"), and VR Argentina Recovery Fund, Ltd. ("VR Argentina")

(collectively "Plaintiffs", "VR" or "VR Entities") make the allegations herein based upon their

own knowledge and belief, together with information obtained by Plaintiffs' counsel.  The

information obtained by Plaintiffs' counsel arises from a review of, among other things:

(a)  the filings by Refco Inc. (collectively with its direct and indirect

subsidiaries "Refco"[1]) with the United States Securities and Exchange

Commission ("SEC");

(b)  the voluminous filings, documents and testimony produced pursuant

to Refco's proceedings under Chapters 7 and 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court of the

Southern District of New York (the "Bankruptcy Cases") (assigned to

the Honorable Judge Robert Drain and jointly administered under the

caption "In re Refco Inc., et al., Case No. 05-60006 (RDD)");

(c)  Refco's internal files, including books and records, corporate minutes

and employee emails;

(d)  documents produced in response to subpoenas issued pursuant to Rule

2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") in the Bankruptcy Cases;

---

[1] Prior to the formation of Refco Inc., the parent entity was Refco Group Ltd.  The defined term Refco will be used to include both RGL and Refco Inc., as the successor parent-level entity, collectively with its direct and indirect subsidiaries.

(e)  the Final Report of the Court-appointed Independent Examiner in the
Bankruptcy Cases (the "Examiner's Report") with supporting
exhibits;

(f)  the Third Superseding Indictment in *U.S. v Phillip R. Bennett, et al.*,
No. S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan 16, 2007);

(g)  select interviews with employees and former employees of Refco; and

(h)  other relevant public documents.

## I.  INTRODUCTION

2.      This action arises out of two related fraudulent schemes perpetrated by certain
defendants named in this complaint.  The two schemes each constitute deceptive conduct that is
actionable under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules
promulgated thereunder by the Securities and Exchange Commission ("SEC").  In addition, in
connection with these schemes, certain of the defendants named herein made untrue statements
of material facts or omitted to state material facts necessary in order to make the statements
made, in the light of the circumstances under which they were made, not misleading, which
statements and omissions are also actionable under the Exchange Act and the SEC rules
promulgated thereunder.

**A.      Overview Of The RCM Securities Scheme**

3.      The defendants named in this complaint (the "Defendants") perpetrated a
fraudulent and deceptive scheme (the "RCM Securities Scheme") through which they converted
for their own benefit customer securities owned by Plaintiffs and other customers of Refco
Capital Markets Ltd. ("RCM").

4.      RCM agreed, and otherwise led Plaintiffs to believe, that the securities owned by
Plaintiffs would be safeguarded by RCM in non-discretionary trading accounts that Plaintiffs

2

maintained with RCM. Instead, at the direction of the Refco officer defendants named in this complaint (the "Officer Defendants"), without Plaintiffs' knowledge and contrary to representations that were made to Plaintiffs, Plaintiffs' securities were stolen from these accounts.

5.    On an almost daily basis, Refco senior management, including the Officer Defendants, directed Refco employees to sell, or cause to be sold – through hypothecations or subject to agreements to repurchase ("Repos") – securities owned by Plaintiffs and other RCM customers that had been entrusted to RCM. The sales of these securities took place without Plaintiffs' knowledge, authorization or consent. This unauthorized sale of customer securities was not disclosed to securities customers in the customer statements, or in the annual financial reports provided to Plaintiffs. As a stockbroker, RCM was obligated to hold Plaintiffs' and other customers' securities in safekeeping. Instead, at the direction of the Officer Defendants, Refco raided the RCM customer accounts and not only converted Plaintiffs and other customers' securities to cash without the customer's authorization, but then used the proceeds to finance Refco's daily operations, trading losses, and significant acquisitions.

6.    Neither Refco nor any of the named Defendants had any right to use customer securities for their own benefit. Had the Defendants advised Plaintiffs that their securities were being sold for Refco's benefit, through hypothecations or pursuant to Repos, Plaintiffs could have, and would have, demanded compensation or collateral commensurate with the increased risk to which they were being unknowingly exposed, as lenders of securities routinely do when their securities are borrowed. Alternatively, RCM customers could have chosen to entrust their securities to a secure and faithful custodian instead of RCM.

3

**B.    The RCM Securities Scheme Was Fraudulent In Several Respects**

7.    Defendants' deception regarding their conversion of securities was an essential element of the RCM Securities Scheme. The RCM Securities Scheme continued unabated only because of fraudulent misrepresentations made to Plaintiffs and other RCM customers.

8.    Defendants' conduct was contrary to written and oral representations that Refco representatives made to Plaintiffs and other RCM customers over the course of the customer relationship, that the securities would be held in safekeeping in custodial accounts maintained by RCM. The Plaintiffs and other RCM customers routinely deposited and held securities in their RCM accounts believing that RCM was acting as a custodian for those securities. The truth was just the opposite. RCM was, in fact, placing those securities at risk by converting them and upstreaming the proceeds through intercompany transfers (the "Intercompany Loans") to various Refco entities and "booking" only worthless receivables in return.

9.    Because RCM was purporting to provide custodial services to Plaintiffs and other RCM customers by holding securities for safekeeping, it owed fiduciary duties to its customers with respect to those custodial services as Bankruptcy Judge Drain stated following a six day trial in connection with the Bankruptcy Cases. Defendants caused RCM to violate this fiduciary duty both by: (1) failing to disclose the existence of the fraudulent scheme; and (2) perpetrating the scheme.

10.    In addition, Defendants' conversion of the securities was contrary to the terms of Plaintiffs' customer agreements with RCM and its sister company Refco Securities, LLC ("RSL"), which provided that RCM and RSL were not permitted to effect any transaction in customer securities without the customers' authorization. As found by Judge Drain, those agreements gave RCM and RSL no authority to sell, hypothecate or otherwise use securities held in Plaintiffs' accounts, except to the extent that Plaintiffs had a margin balance, and even then

4

only in limited circumstances. Through the fraudulent scheme, Defendants caused RCM to breach the customer agreements while hiding that breach from Plaintiffs.

11.     In furtherance of this deception, RCM routinely provided Plaintiffs and other RCM customers with paper and online account statements identifying the securities purportedly held in custody in their accounts. These account statements were false and deceptive because, as a result of the fraudulent scheme, customer securities were not kept in safekeeping in the customers' accounts as represented by the account statements, but instead were routinely sold by RCM, so Refco could use the proceeds to sustain Refco's business operations and fund its acquisitions.

12.     The RCM Securities Scheme would not have worked unless it remained hidden from Plaintiffs. Plaintiffs and other RCM customers received no compensation for the risk to which they were exposed by the fact that their securities were converted from their accounts. No rational customer would have left his securities in what was purported to be a custodial account had RCM truthfully disclosed that it was converting those securities to cash and using the proceeds.

13.     The Defendants recognized that, had they disclosed RCM's practices, customers would have entrusted their securities to other financial institutions at which the customers would not have been exposed to the same risks. The Defendants also knew that truthful disclosure of RCM's practices would have jeopardized the lucrative payouts that they hoped to obtain as a result of liquidity events, such as a leveraged buyout of Refco and a successful initial public offering ("IPO"). Accordingly, the Defendants at all times fraudulently concealed RCM's practices.

NY2:#4755710

14.     Only after Refco (including the subsidiary RCM) filed for bankruptcy on October 17, 2005 did a series of disclosures concerning its financial condition and practices for the first time reveal to Plaintiffs and other RCM customers that the Defendants were financing the activities of the various Refco companies by engaging in unauthorized sales, through hypothecations or subject to Repos, of billions of dollars of customer securities held in the custody of RCM. Such transactions were executed to benefit the Defendants with no corresponding benefit to Plaintiffs and other RCM customers, and were done without the Plaintiffs' knowledge, authorization or consent.

**C.     The RCM Securities Scheme Was Known To All Defendants**

15.     Although the RCM Securities Scheme remained hidden from Plaintiffs and other customers of RCM, it was well-known to the Defendants. The fraudulent scheme was so fundamental to the operation and financing of Refco and its ability to proceed with a number of major corporate transactions during the relevant period that it required the participation of, and had to have been apparent to, all of the Defendants. In light of the sheer size and number of the Intercompany Loans from RCM to other Refco entities, the RCM Securities Scheme would have been known to anyone who was managing or controlling the Refco entities in a non-reckless manner. Indeed, during the relevant period, the amounts stolen from RCM customer accounts dwarfed Refco's total capital. The fraudulent RCM Securities Scheme was so vital to the entire operation of Refco that, without continued fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue to function, attract and maintain its securities customer base, or complete major acquisitions.

16.     Thomas H. Lee Partners, L.P ("THL") and related entities took control of Refco as a result of their August 2004 leveraged buyout of Refco (the "LBO"). Following the LBO, THL and those related entities and THL officers named as defendants in this complaint (the

6

"THL Defendants") had access to all material facts concerning the RCM Securities Scheme alleged herein. In light of their access to Refco books and records that include documentary evidence of the fraud, their control over Refco, their Management Agreement with Refco pursuant to which the THL Defendants were paid over $30 million, the sheer size and number of the Intercompany Loans made in furtherance of RCM Securities Scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Defendants would not have known about the misuse of the RCM customer assets over the course of the fifteen months they controlled Refco prior to Refco's bankruptcy.

17.     The fraudulent RCM Securities Scheme began prior to the LBO. Following the LBO, however, during the period in which the THL Defendants controlled and directed Refco and its affairs, the RCM Securities Scheme was not only allowed to continue, but it substantially increased in size.

18.     As described in more detail below, even before their investment in Refco, the THL Defendants learned of Refco's checkered past through numerous examples of the legal and regulatory problems faced by the company. Thus, even as early as the LBO, the THL Defendants were attuned to potential red flags within Refco.

19.     Any suspicion that the THL Defendants had of irregularities prior to the LBO was confirmed after they took control of Refco. For example, shortly after the LBO, the THL Defendants learned of significant deficiencies in the auditing of the company conducted by Defendant Grant Thornton LLP ("Grant Thornton"). Nevertheless, the THL Defendants determined not to change auditors because doing so might have delayed the profitable sale of THL's equity in Refco.

7

20.    RCM's sister corporation, RSL, was a United States registered and regulated broker-dealer.  Both RCM and RSL were parties to the customer agreements entered into by Plaintiffs.

21.    RCM's business was operated on a daily basis from Refco's offices in New York, New Jersey, and Miami by employees who acted jointly for RCM and RSL.  It was in those offices that trades were regularly executed and/or cleared and settled on behalf of RCM customers and where, on an almost daily basis, employees who acted for both RCM and RSL were directed by Refco senior management, including the Officer Defendants, to sell or cause to be sold, through hypothecation or pursuant to Repos, RCM customers' securities.  The sales of securities entrusted to RCM by the Plaintiffs were effected without Plaintiffs' knowledge, authorization or consent.  The proceeds of the Repos were then siphoned out of RCM and used to make "loans" to other Refco entities that lacked the intention and/ or the financial wherewithal to repay those loans.

22.    RSL was required under federal law to comply with net capital and segregation rules that did not permit the fraudulent conversion of customer securities being held in customer accounts.  Under federal law, RCM was likewise subject to such rules and regulations, whether or not RCM was required to be a registered broker-dealer (as in fact RCM was, but falsely at times may have claimed it was not) and whether or not it was incorporated in a foreign country. RCM's securities customers had no reason to suspect that RCM was, as a matter of course, converting RCM customer securities to Refco's own use in violation of RCM's and RSL's agreements with, and representations to, RCM customers, as well as in violation of federal and state law.

**D.    Each Defendant Had A Motive To Participate In The RCM Securities Scheme**

23.    Each Defendant not only had knowledge of the RCM Securities Scheme, but also had a clear motive for participating in the RCM Securities Scheme. For the Officer Defendants, their ultimate goal was to present Refco as more profitable and successful than it was in order to monetize and cash out their interests in the company for more than they were worth. To accomplish this objective, they needed to present Refco as a financially strong and healthy company, with high profitability, high growth rates, a low-risk business model, excellent liquidity, strong credit ratings, and the ability to satisfy its substantial working capital needs and growth objectives from what it called its legitimate cash flow and available funds. The RCM Securities Scheme alleged herein was critical to the Officer Defendants' ability to represent Refco in such positive light.

24.    The THL Defendants had their own motive for participating in the RCM Securities Scheme. THL and related entities obtained a controlling stake in Refco in August 2004 and, as of that date, the THL Defendants were control persons over RCM and related Refco entities. As discussed below, the THL Defendants knew, or were reckless in not knowing, of the existence of the RCM Securities Scheme. From the moment they invested in Refco, the THL Defendants were driven to take the company public as quickly as possible to secure for themselves a huge financial windfall. To avoid any delay in a lucrative IPO, the THL Defendants allowed the RCM Securities Scheme described herein to continue (and even expand in size), and to remain hidden from RCM's customers, creditors, regulators and the public. The THL Defendants allowed the deception of Plaintiffs and other RCM customer to continue under their control so as not to undermine their objective of securing for themselves a substantial payday by taking the company public as quickly as possible. Indeed, the THL Defendants and

9

their affiliates received approximately $223.5 million as selling shareholders and otherwise when the company went public.

25.     In addition to the significant financial gain to be made from an IPO, the THL Defendants had a further motive to allow the RCM Securities Scheme to continue unabated. The THL Defendants were preparing to raise a new multi-billion dollar private equity fund for which they hoped to raise approximately $7.5 billion from institutional investors. They knew that a profitable IPO in Refco – which could take place only if the RCM Securities Scheme continued and remained undetected by the public – was critical to create a favorable recent track record that they could then use to market their new fund.

26.     Grant Thornton's complete audit failure, including its decision to rely on unverified representations of management and to ignore innumerable red flags that would have triggered a high degree of skepticism and should have caused it to conduct a rigorous examination of Refco's books and records, indicates that Grant Thornton and Grant Thornton's lead engagement partner, Mark Ramler, compromised their independence and made the conscious decision to conceal the massive ongoing fraud in order to keep their marquee client happy.

27.     The motivation for Grant Thornton (and Ramler in particular) to do so was obvious – Refco was an extremely valuable account (resulting in approximately $10 million in fees for Grant Thornton from 2002 through 2005) that Ramler himself managed. Keeping the account through a successful IPO would constitute a coup both for Grant Thornton and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Officer Defendants to cash out, Grant Thornton regularly issued unqualified audit opinions, having utilized audit procedures that amounted to no audit at all.

NY2:#4755710

E.    **The RCM Securities Scheme Caused Plaintiffs' Losses**

28.    As a result of the Defendants' fraudulent conversion of Plaintiffs' securities, Plaintiffs in fact held nothing more than an "IOU" from RCM purportedly to repay an amount equal to the value of the customer securities that Plaintiffs delivered to RCM to be held in custody in their accounts, rather than the securities themselves as Plaintiffs were led to believe. Because of the RCM Securities Scheme, when Refco, including RCM, filed for bankruptcy, Plaintiffs and other RCM customers were left with massive losses resulting directly from the fraudulent conversion of their securities.

29.    Plaintiffs' losses would have been avoided, or significantly reduced, had customer securities actually been held at RCM, as Plaintiffs understood to be the case, rather than having been converted pursuant to the RCM Securities Scheme.

F.    **The RGHI Scheme**

30.    In addition to the RCM Securities Scheme to convert customer securities to finance Refco's operations, Bennett, Grant, Maggio and Trosten (the "Bennett Co-Conspirators") perpetrated another related scheme to improve falsely the appearance of Refco's financial condition (the "RGHI Scheme"). Rather than properly recognize certain customer trading losses, operating expenses, and other items that would have negatively affected Refco's financial position had they been properly recorded, these items were instead recorded as additions to a debt owed by Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled at times by Defendants Bennett and Grant, to certain Refco entities (collectively, the "RGHI Receivable"). Because RGHI's principal asset was its interest in Refco, the RGHI Receivable was largely if not wholly uncollectible.

31.    The Bennett Co-Conspirators, assisted by certain third parties, then engaged in a series of transactions (collectively the "Round-Trip Loans" or "RTLs") at the end of reporting

11

periods that temporarily hid the magnitude and related-party nature of the substantial RGHI

Receivable. The RGHI Scheme, through the use of the Round-Trip Loans, had the effect of,

among other things, hiding from the public and from RCM customers, the significant debt, in the

form of the RGHI Receivable, owed by RGHI to Refco, much of which debt was owed to RCM.

**G.     Refco's False And Deceptive Financial Statements**

32.     As discussed above, in making the decision to place securities in customer

accounts with RCM for safekeeping, and then to leave those securities in those accounts with

RCM, Plaintiffs relied on the terms of their customer agreements with Refco, and other

representations, and on the conduct of the Defendants, which assured Plaintiffs that RCM would

hold Plaintiffs' securities as a custodian. In addition, Plaintiffs also relied on RCM's and Refco's

audited financial statements for the years 2001 to 2005 in determining, and continuing, to place

and entrust their securities for safekeeping with RCM. Based on those financial statements,

Plaintiffs were led to believe that RCM was a financially sound company, and that Refco as a

whole was a financially sound group. Thus, these financial statements convinced Plaintiffs that

they would have the additional protection of RCM's credit in the event that anything were to

happen to Plaintiffs' securities.

33.     The audited financial statements reviewed and relied upon by Plaintiffs were false

and misleading in a number of material ways. The RCM financial statements did not disclose,

among other things:

>    (1)     the fraudulent conversion of RCM customer securities;
>
>    (2)     that Defendants were causing RCM to upstream or sidestream the
>            resulting proceeds in the form of the Intercompany Loans to other Refco
>            entities that: provided no assurances of their ability, intent, or obligation
>            to repay the funds on demand or otherwise; had provided no security for
>            the funds; and lacked the financial wherewithal to repay the funds on
>            demand or otherwise;

(3)   that RCM was owed part of the massive, uncollectible RGHI Receivable, which had been created by the Bennett Co-Conspirators to inflate falsely the appearance of Refco's financial position; or

(4)   that RCM was being used as a conduit through which the Bennett Co-Conspirators, aided by others, were perpetrating the RGHI Scheme to conceal the RGHI Receivable at key reporting periods.

34.   The Refco financial statements reviewed and relied upon by Plaintiffs were also false and misleading because, like the RCM financial statements, they too failed to disclose any of the material facts listed above.  Moreover, both the RCM financial statements and the Refco financial statements failed to disclose that many Refco entities that had received Intercompany Loans from RCM were unable to repay those loans in whole or in part because, *inter alia*, those debts were backed by the RGHI Receivable that Refco could not collect from RGHI, and Refco entities' own financial position was artificially inflated by the RGHI Scheme.

35.   Had RCM's or Refco's audited financial statements properly disclosed the existence of any one of:  the fraudulent conversion of customer securities, the existence of huge unsecured and largely uncollectible Intercompany Loans from RCM to Refco affiliates, the uncollectible related-party RGHI Receivable, or the fraudulent RTLs, Plaintiffs would not have entrusted their securities to Refco for safekeeping and Plaintiffs' securities would not have been fraudulently converted pursuant to the Defendants' RCM Securities Scheme.

**H.**   **Grant Thornton's Role in the Fraud**

36.   The RGHI Scheme, encompassing the RGHI Receivable and RTLs which sought to disguise the RGHI Receivable, was hidden from the public by the Bennett Co-Conspirators, but was known to, or recklessly disregarded by, the other Defendants, including Grant Thornton. Indeed, after Refco hired a new Controller to oversee RCM's finances on an interim basis, it took him only a few weeks to discover and reveal the RGHI Scheme.  By contrast, Grant Thornton had been Refco's independent auditor since 2002, with full access to all Refco's books and

13

records and a duty to ensure the accuracy of Refco's financial statements. Ramler had overseen

Refco's audits since 1992 at his previous firm, the now-defunct Arthur Andersen. For all those

years, Ramler and Grant Thornton turned a blind eye to the RGHI Scheme that the new

Controller found with little difficulty.

37.     Grant Thornton's auditing failures directly caused the damages suffered by

Plaintiffs. Had Grant Thornton properly performed its audit function in accordance with

Generally Accepted Auditing Standards ("GAAS"), it would have easily uncovered both the

RCM Securities Scheme and the RGHI Scheme alleged herein. Grant Thornton's auditors,

including Ramler, who knew of the RGHI Receivable, the RTLs, and other suspicious

transactions, would have recognized the RGHI Receivable and the massive end of period RTLs

for what they were – blatant financial manipulations. Further, if Grant Thornton had properly

performed its audit function, RCM's and Refco's audited financial would have disclosed the

conversion of RCM customer securities for Refco's own use, the existence of huge unsecured

and largely uncollectible Intercompany Loans from RCM to Refco affiliates, the uncollectible

related-party RGHI Receivable, and the fraudulent RTLs. Disclosure of any one of these would

have placed Plaintiffs on notice of the frauds at Refco and Plaintiffs would not have entrusted

their securities to Refco for safekeeping.

38.     In order to perpetuate the fraudulent schemes, in each of its audits for Refco and

for RCM, Grant Thornton ignored the minimum acceptable standards of professional conduct,

including but not limited to the GAAS provisions, and did not prepare Refco's financial

statements in accordance with Generally Accepted Accounting Principles ("GAAP").

Accordingly, Grant Thornton's unqualified audit opinions contained false and misleading

statements in that they represented that they conducted an audit in accordance with GAAS, when

14

Grant Thornton knew it had not done so, and Grant Thornton represented that the financial statements were presented fairly in accordance with GAAP when Grant Thornton knew that they were not. But for Grant Thornton's deliberate audit failures and false and misleading audit opinions, the Officer Defendants, and others acting in concert or participation with them, would not have been able to loot RCM customer accounts, including those of the Plaintiffs.

39.    Had Grant Thornton performed its audits with the appropriate degree of diligence and professional skepticism, Grant Thornton would have uncovered the fraudulent schemes alleged herein, and would have prevented the damage inflicted on Plaintiffs and other RCM customers.

40.    Auditors are not permitted to accept corporate assurances at face value; if the opposite were true, and if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit. For that reason auditors must conduct themselves at all times with a high degree of professional skepticism and independent judgment. In auditing Refco, Ramler, throughout his tenure both at Arthur Andersen and at Grant Thornton, consistently failed to act with the requisite degree of professional skepticism. Ramler not only chose to take Bennett and other Refco employees at their word – he personally vouched for their trustworthiness and veracity.

41.    Grant Thornton also failed to perform sufficient fieldwork by neglecting to obtain competent evidentiary material to afford a reasonable basis for forming an opinion regarding RCM's and Refco's financial statements. Essentially all of Refco's records, including records evidencing the RCM Securities Scheme and the RGHI Scheme, were within the possession of numerous Refco entities and employees, and were readily available to Grant Thornton. Yet Grant Thornton failed to inspect these documents. Similarly, account statements for RCM and

15

RCC accounts held by Refco entities, or by its RTL counterparties, were not analyzed, despite the fact that they were available to Grant Thornton.

42.    Similarly, Grant Thornton failed to satisfy itself that Refco had implemented adequate safeguards, procedure and controls, as is required by GAAS. GAAS specifically identifies a number of "red flags" that Grant Thornton knew were present in this case, including without limitation:

- significant related-party transactions totaling hundreds of millions of dollars annually;

- strong pressures to perpetrate fraud, since Bennett, Maggio, and those acting in active concert or participation with them had confessed a desire to Ramler to maintain Refco's value for a personally enriching sale of the company in the near future;

- weaknesses in internal control, including numerous undocumented intercompany transfers; and

- unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation or any record of a receivable at other Refco entities.

Yet Grant Thornton chose not to take appropriate precautions, completely failing to obtain and analyze supporting materials, verify management representations, or investigate large and complex intercompany and related-party transactions, particularly those near the close of reporting periods.

43.    Grant Thornton's failure to scrutinize numerous intercompany and related-party transactions involving Refco, its affiliates, entities controlled by the Officer Defendants, and those acting in concert or participation with them violated numerous applicable professional standards, including standards that caution that related-party transactions – which cannot be presumed to be carried out on an arm's-length basis – must be thoroughly examined and substantiated. Moreover, Grant Thornton failed to follow applicable professional standards that

16

require scrutiny of ostensibly third party transactions that can be used to obscure or conceal

related-party transactions.  At a minimum, the frequent, large-value, round-dollar, risk-free loans

that Refco repeatedly engaged in at the end of every financial year (and after 2004, every

financial quarter) were just such transactions, and a proper analysis of these transactions as

required by professional obligations would have revealed the fraud.  With respect to these

transactions, Grant Thornton was required to take the following steps, including but not limited

to:

(a)     understanding the business purpose for the transactions;

(b)     ascertaining the financial capability of other parties to repay balances
        owed;

(c)     reviewing the agreements and other pertinent documents associated with
        the transactions; and

(d)     inspecting or confirming information and obtaining satisfaction
        concerning collateral for the transactions.

None of these steps were taken for the RGHI Receivable or the RTLs, despite the fact that the

RTLs were unusual and large-scale transactions repeatedly timed to coincide with the close of

every financial period, and despite the fact that they lacked a legitimate business purpose.

44.     Grant Thornton further failed to implement procedures analyzing intercompany

and related-party transactions and disclosing the details associated with those transactions,

including the likelihood that the RGHI Receivable and the funds upstreamed from RCM would

or could be repaid in the future.  Applicable professional standards required Grant Thornton to

test the trustworthiness of these transactions and evaluate the probability that large and

outstanding receivable balances could be collected.  Yet those steps were not taken, allowing the

Officer Defendants, and others acting in concert with them, to continue to inflate Refco's

financial statements falsely and to continue looting RCM customer accounts, all the while hiding

17

that conduct from Plaintiffs despite Plaintiffs' review of RCM's and Refco's purportedly audited financial statements.

## II.    JURISDICTION AND VENUE

45.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act 1934 [15 U.S.C. §§ 78j(b) and 78t(a)] (the "Exchange Act") and Rules 10b-5 and 10b-16 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

46.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The Plaintiffs are residents of a foreign country.  Nevertheless, substantial acts – if not all of the acts — in furtherance of the fraud alleged herein were committed in the United States.  Additionally, THL, as well as many of its subsidiaries, and each of Defendants Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen, filed proofs of claim in this judicial district related to their involvement with Refco.[2]  By doing so, the THL Defendants submitted themselves to the jurisdiction of this Court.

47.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) in that Refco is, and was, headquartered, and many of the acts and transactions alleged herein occurred in substantial part, in this judicial district.

48.    In connection with the wrongs alleged herein, the Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

---

[2] The entities and persons filing proofs of claim include THL., THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, the 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

### III.    PARTIES

**A.    VR**

49.    <u>VR.</u>  The VR Entities are private investment funds.  Plaintiff VR Global is a limited liability partnership, registered in Grand Cayman.  Plaintiff VR Capital is a limited liability company, registered in Grand Cayman.  Plaintiff Paton is a limited liability company, registered in Grand Cayman.  Plaintiff VR Argentina is a limited liability company, registered in Grand Cayman.  VR maintained the following accounts at RCM:

- VR Capital: RCM account number 10010213.

- VR Argentina: RCM account number 10011096.

- VR Global: RCM account number 10011765.

- Paton: RCM account number 10015030.

**B.    Certain Refco Entities And Affiliates**

50.    <u>Refco Group Ltd., LLC.</u>  Refco Group Ltd., LLC ("RGL") was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

51.    <u>New Refco Group Ltd., LLC.</u>  New Refco Group Ltd., LLC ("New Refco") was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  New Refco filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

52.    <u>Refco Inc.</u>  Refco Inc., the corporate parent of both RGL and RCM, was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.

19

Refco Inc. filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution and clearing services for exchange-trade derivatives, and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 Initial Public Offering ("IPO"), and was the issuer of the stock sold pursuant to the August 2005 IPO.

53.     Refco Capital LLC.  Refco Capital LLC ("RCC"), an indirect RGL subsidiary, was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281. RCC filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005. RCC functioned as the "treasury" and "disbursing agent" for all of Refco; it collected the proceeds from the fraudulent conversion of RCM customer assets and distributed them to other Refco entities as needed. As detailed below, virtually all of the transfers of RCM customer assets to RCC were documented as a series of purported "loans" from RCM to Refco Global Finance Ltd. In fact, the funds obtained from RCM's unauthorized selling, through hypothecations or pursuant to Repos, of RCM customer securities, were siphoned out of RCM and transferred to other Refco entities, including RCC. Using the proceeds of the unauthorized sale of RCM customer securities, RCC in turn made purported "loans" to other Refco entities that were then used, *inter alia*, to pay operating expenses of various Refco companies, advance margin loans to customers of RSL and Refco LLC, pay down RGL's revolving bank facilities and fund major business acquisitions for Refco affiliates. In this way, RCC functioned as a conduit of improperly converted funds from RCM, using those funds to make "loans" to other Refco entities that could not repay them.

54.    Refco Global Finance Ltd. Refco Global Finance Ltd. ("RGF"), a wholly owned subsidiary of Refco, was organized under the laws of Delaware. At all relevant times, RGF had its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281. RGF filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

55.    Refco Capital Markets Ltd. Refco Capital Markets Ltd. ("RCM") was a company organized under the laws of Bermuda. At all relevant times, RCM had its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281. RCM filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005. RCM was a securities broker and foreign exchange broker and one of the three principal operating subsidiaries of Refco. RCM traded in over-the-counter derivatives and other financial products on behalf of its clients. Although RCM was organized under the laws of Bermuda, it had no significant operations in Bermuda. RCM closed its Bermuda office in 2001 and, since that time, its presence in Bermuda has been limited to a mailbox address. As alleged below, at all times during the relevant period RCM and its registered representatives used U.S. jurisdictional means to effect and induce securities transactions with RCM customers pursuant to Section 15 of the Exchange Act [15 U.S.C. §78o(a)].

56.    Refco Securities, LLC. Refco Securities, LLC ("RSL"), a wholly owned subsidiary of Refco, is a Delaware limited liability company and registered broker-dealer with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281. As alleged below, at all times during the relevant period RSL and its registered representatives used U.S. jurisdictional means to effect and induce securities transactions with RCM customers pursuant to Section 15 of the Exchange Act. Many

21

Refco employees alternatively acted on behalf of RCM or RSL in the course of their daily activities at Refco.

57.    Refco LLC.  Refco LLC , a wholly owned subsidiary of Refco, is a Delaware limited liability company and registered broker-dealer with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.  Refco LLC was a registered Futures Commission Merchant.  Refco LLC improperly received benefits from the sale of RCM customer assets through the illegal scheme described herein.

58.    Defendant Refco Group Holdings, Inc.  Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant.  In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI.  From 1999 until the LBO, RGHI had a 90% interest in RGL (the principal Refco holding company before the LBO) and was the controlling shareholder of RGL.

59.    Set out below is an organizational chart of Refco demonstrating the relationships of the relevant Refco entities:



C.    **The Officer Defendants**

60.    Defendants Philip R. Bennett, Tone N. Grant, Santo C. Maggio, Joseph J. Murphy, William M. Sexton, Philip Silverman, Robert C. Trosten and Richard N. Outridge (the "Officer Defendants") played key roles by virtue of their executive positions with Refco, and their direct involvement in Refco's day-to-day operations, including its finance and accounting functions.

61.    <u>Defendant Philip R. Bennett.</u>  Philip R. Bennett ("Bennett") was the highest ranking corporate officer at Refco.  Bennett was President, Chief Executive Officer ("CEO") and Chairman of RGL from September 1998 until he was forced to resign following the disclosure of massive fraud at Refco in October 2005.  He also served as President, CEO and Chairman of Refco Inc., and as President and CEO of New Refco, at all relevant times.  Bennett controlled Refco by virtue of being one of Refco's largest shareholders.  From August 2004, Bennett owned approximately 43% of the equity interests of Refco through RGHI, an entity he owned and controlled.  Following the August 2005 IPO, Bennett owned 33.8% of Refco's outstanding common stock through RGHI and another entity, The Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust").  Among his other positions within Refco, Bennett served on the Refco board's compensation committee and acted as a director and officer of RCM at all relevant times.  Bennett therefore owed fiduciary duties both to RCM and to RCM's securities customers and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to RCM's customers.  Prior to becoming CEO of RGL in 1998, Bennett held the position of Chief Financial Officer ("CFO") since 1983, having joined RGL in 1981.  Bennett directly conceived, orchestrated and supervised the illegal theft of RCM customer assets alleged herein.  He is currently under indictment in the United States District Court for the Southern District of New York, charged with, inter alia, securities fraud, wire fraud,

bank fraud, money laundering, false filing with the SEC and material misstatements to auditors, as a result, in part, of acts alleged herein.[3]

62.     Defendant Tone N. Grant.  Tone E. Grant ("Grant") joined RGL in 1981.  From 1997 through 1998, Grant was President and CEO of RGL.  Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco.  From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI.  In or around August 2004, concurrently with the LBO, Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI.  Grant is currently under indictment in the United States District Court for the Southern District of New York, charged with, inter alia, securities fraud, wire fraud, bank fraud, and money laundering, as a result, in part, of acts alleged herein.[4]

63.     Defendant Santo C. Maggio.  Santo C. Maggio ("Maggio"), also known as "Sandy" Maggio, joined Refco in 1985, and was Executive Vice President of RGL and President and CEO of RSL since 1991.  Maggio was also President and a member of the board of directors of RCM since 2001 and held various other executive positions with Refco entities until he was forced to resign following the disclosure of massive fraud at Refco in October 2005.  Maggio therefore owed fiduciary duties both to RCM and to RCM's securities customers and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to RCM's customers.  Maggio ran the brokerage operations of RSL and RCM and directly participated in, orchestrated and supervised the fraudulent conversion of RCM customer assets alleged herein.  According to press reports,

---

[3] See Superseding Indictment ("Indict.") in U.S. v. Phillip R. Bennett, et al., No. S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007).

[4] See id.

Maggio is cooperating with the U.S. Justice Department and the SEC in relation, inter alia, to their investigations into various frauds perpetrated during his tenure at Refco.

64.    Defendant Joseph R. Murphy.    Joseph R. Murphy ("Murphy") was Executive Vice President of RGL and responsible for global marketing since 1999.  Murphy was also President of various Refco subsidiaries, including Refco LLC and Refco Global Futures LLC, that were beneficiaries of the fraudulent conversion of RCM customer assets.  Both Refco LLC and Refco Global Futures LLC improperly received transfers of the proceeds from the sale of RCM customer securities pursuant to the RCM Securities Scheme described herein.

65.    Defendant William M. Sexton.    William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer ("COO") of RGL beginning in August 2004, and was responsible for information technology, operations, accounting and finance, credit, margins, and risk control for Refco's futures businesses.  He joined RGL in April 1999 and served as Executive Vice President and COO of Refco LLC, an RGL subsidiary that received illegal transfers of RCM customer assets, from July 2001 until August 2004.

66.    Defendant Philip Silverman.    Philip Silverman ("Silverman") began serving as Secretary of RGL in 1997, and held numerous high-level executive positions within Refco and its subsidiaries, including Controller of RGL.  As Controller, Silverman was directly responsible for overseeing intercompany and related-party transactions (including transactions between RCM and RCC and RCM and Refco Global Finance), the closing of Refco's books, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for Refco.  Silverman was also Controller of RGHI and Secretary of numerous Refco subsidiaries.  Silverman has been a certified public

25

accountant ("CPA") since 1982, was a close confidant of Bennett, and, on information and belief, was Bennett's personal accountant and had principal accounting oversight over RGHI.

67.    Defendant Robert C. Trosten. Robert C. Trosten ("Trosten") was Executive Vice President and CFO of RGL from 2001 until October 2004. Prior to becoming CFO, Trosten was a member of Refco's corporate finance team from 1997 until 2001. He is a CPA. Trosten's responsibilities as CFO of Refco included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level. He was directly responsible for Refco's financial affairs, the adoption and compliance with appropriate accounting policies, and Refco's maintenance of adequate internal financial controls. Refco's SEC filings highlighted Trosten's importance to Refco's success as a central member of its management team. Upon the closing of the LBO, Trosten received two payments totaling approximately $48 million. Trosten resigned two months later, after serving only three years as CFO. Defendants did not publicly disclose the huge payment to Trosten but instead simply announced that Trosten had resigned to "pursue other financial interests." Trosten is currently under indictment in the United States District Court for the Southern District of New York, charged with, inter alia, securities fraud, wire fraud, bank fraud, money laundering, conspiracy to make false filings with the SEC and conspiracy to make material misstatements to auditors, as a result, in part, of acts alleged herein.[5]

68.    Defendant Richard N. Outridge. Richard N. Outridge ("Outridge") was CFO of RCM from early 2004 until August 10, 2005. Outridge joined Refco in June, 2001, as Vice President and Controller of RCM. As CFO of RCM, Outridge was directly responsible for RCM's financial affairs, the adoption of, and compliance with, appropriate accounting policies,

---

[5] *See id.*

and RCM's maintenance of adequate internal financial controls. On information and belief, Outridge was a close confident of Maggio and, along with Maggio, had the most detailed knowledge of RCM's financial practices.

**D.    The THL Defendants**

69.    Defendant Thomas H. Lee Partners, L.P. Thomas H. Lee Partners, L.P. ("THL"), a Delaware limited partnership, is a private equity investment fund headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management. THL's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

70.    THL, founded in 1974, describes itself as "one of the oldest and most successful private equity investment firms in the United States" and holds itself out to the financial community as extraordinarily sophisticated in business and financial matters. THL has invested approximately $12 billion of equity capital in more than 100 businesses with an aggregate purchase price of more than $100 billion. The firm currently manages approximately $20 billion of committed capital. Notable transactions sponsored by THL include Dunkin Brands, Nielsen, Michael Foods, Houghton Mifflin Company, Fisher Scientific, Experian, TransWestern, Snapple Beverage and ProSiebenSat1 Media. THL has also sponsored less successful transactions, including Spectrum Brands Inc., which has lost 90% of its value since March 2005 and bears a $2.5 billion debt load (ten times the value of its market capitalization).

71.    In August 2004, THL and related entities and affiliates purchased a controlling 57% equity stake in Refco for approximately $507 million. As a result, THL and related entities held a majority stake in Refco and had de-facto control over its operations. As detailed below, in addition to having voting control over Refco, THL and related entities had a variety of contractual rights that provided them with additional control over, and access to information about, Refco's affairs. The THL entities involved with Refco transactions include:

27

(a)    Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THL with its principal office in Boston, Massachusetts;

(b)    THL Managers V, LLC ("THL Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts, of which at all times THL was the managing and controlling member;

(c)    Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts, owned and controlled by Equity Advisors V and THL Managers V;

(d)    Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by THL Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

(e)    Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THL;

(f)    Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

(g)    The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

72.    THL, THL Advisors, THL Managers V, Equity Advisors V, Fund V Entities, Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are collectively referred to herein as the "THL Entities." As discussed in more detail below, the THL Entities always acted in concert. They owned a majority stake in Refco from the date of THL's LBO of Refco until Refco's IPO. Additionally, from the date of the LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and exercised discretion over its affairs.

73.    Defendant Thomas H. Lee. Thomas H. Lee ("Lee") was at all relevant times subsequent to the LBO a director of Refco. Lee founded the Thomas H. Lee Company, the

28

predecessor of THL in 1974 and served as its Chairman and CEO since its inception until reportedly leaving that entity after October 2005. As a director of Refco and as Chairman and CEO of THL, Lee was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

74.     Defendant David V. Harkins. David V. Harkins ("Harkins") was at all relevant times subsequent to the LBO a director of Refco. Harkins also served on Refco's nominating and governance committee. Harkins is Vice Chairman and Managing Director of Private Equity Funds of THL, and has also served as President of THL. As a director of Refco and as Chairman and a top executive of THL, Harkins was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

75.     Defendant Scott L. Jaeckel. Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the LBO a director of Refco. Jaeckel also served as Treasurer of New Refco, Treasurer of Refco Finance Holdings, LLC., and Treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of August 2004. Jaeckel is a Managing Director of THL. He previously served as Vice President of THL from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A from Harvard University and has extensive experience in corporate finance, including previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THL, Jaeckel was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

76.     Defendant Scott A. Schoen. Scott A. Schoen ("Schoen") was at all relevant times subsequent to the LBO a director of Refco. Schoen served as President of New Refco, President

of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of August 2004, and sole director of Refco Finance, Inc. He also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THL in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THL from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and was in the private finance department of Goldman, Sachs & Co. before he joined THL. As a director and officer of Refco and a top executive at THL, Schoen was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

77.    The THL Entities together with Defendants Lee, Harkins, Jaeckel and Schoen are collectively referred to herein as the "THL Defendants." At all relevant times subsequent to the LBO, the THL Defendants collectively and as a group managed and controlled Refco. One year after the LBO, the THL Defendants brought Refco public in the August 2005 IPO. The THL Defendants and their affiliates received approximately $223.5 million as selling shareholders and otherwise in the deal, while still maintaining a controlling ownership stake of 42.7% of Refco. In a number of Refco's SEC filings prior to the bankruptcy, the THL Defendants publicly acknowledged being familiar with all aspects of the financial affairs of Refco and its subsidiaries.

**E.    Defendant Grant Thornton**

78.    <u>Defendant Grant Thornton LLP.</u> Grant Thornton LLP ("Grant Thornton") is the Chicago-based United States member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries. Grant Thornton served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("Andersen") in that role. Grant Thornton issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004, and 2005. Grant Thornton also served as the purportedly independent auditor for RCM. Review

of the evidence led the Examiner to conclude that "circumstantial evidence suggests that [Grant Thornton] may have had actual knowledge of the fraud."  Grant Thornton received approximately $10 million from Refco for its services.

## IV.    THE FRAUDULENT SCHEMES

### A.    RCM's Position Within Refco's Operations

79.    Before its collapse in 2005, Refco had three major operating subsidiaries, each of which had its principal place of business in New York:  RSL, a registered broker-dealer; Refco LLC, a regulated futures commission merchant; and RCM, a securities and foreign exchange broker.  In addition to its major operating subsidiaries, Refco also maintained the entity RCC as the "bank", "treasury" or "disbursing agent" for Refco.

80.    At all relevant times, a substantial portion of the funds disbursed by RCC to, or on behalf of, various Refco entities in performing its "bank", "treasury" or "disbursing agent" function for Refco were derived from theft and conversion of assets from the accounts of RCM customers, including the accounts of securities customers.  The proceeds of the converted securities improperly stolen from RCM customer accounts were used for a wide variety of general and specific funding purposes.  All such purposes were completely unrelated to RCM, and none benefited RCM customers in any way.  For instance, the proceeds from the sale of misappropriated RCM customer assets were disbursed by RCC to other Refco entities which in turn used the funds to, among other things, make payroll payments, fund daily operations of other Refco entities, extend margin credit to their own customers, and finance major acquisitions and other substantial transactions entered into by Refco.   If not for the conversion of the customer property improperly stolen from RCM customer accounts, RCC would not have been able to perform its "bank", "treasury" or "disbursing agent" function, and Refco's house of cards

31

would have collapsed for lack of liquidity, as in fact occurred immediately after the fraud at Refco was publicly disclosed in October 2005.

**B.    VR's Accounts With RCM**

81.    VR began as a single fund in May of 1999, with $11 million in assets. From its founding in May 1999 until October 2005, VR grew rapidly and steadily, eventually managing over $1 billion in assets. VR is one of the top-ranked emerging markets funds in the world, achieving a 43% annual compound return for its investors, net of fees, over its six year existence prior to the Refco debacle.

82.    Currently, VR has over 200 individual and institutional investors in its funds. Approximately 20% of VR's assets under management consist of the pension funds of U.S. workers. Many of VR's investors are based in the United States and Western Europe; however, VR's principal office is in Moscow, Russia.

83.    VR opened prime brokerage accounts with Refco starting in September of 2001. Under the relevant customer agreements (described below), RCM was to hold VR's assets and securities on a non-discretionary basis to be traded or otherwise dealt with only in accordance with VR's instructions. VR had previously maintained a custodial account with Bank of Bermuda for prime brokerage services. When VR began operations in May of 1999 as an $11 million fund, few prime brokers were interested in VR's relatively small business. By 2001, VR's assets under management had grown to approximately $100 million and its needs for enhanced execution, clearing and custody services had grown correspondingly.

84.    It was at that time that Adam Weiss, a Refco introducing broker, who worked in Refco's offices in New York, called Richard Deitz, VR's principal. Deitz had heard of Refco as an independent broker. Refco described itself then, and later in its public filings, as follows:

32

[Refco is] a leading independent provider of execution and
clearing services for exchange-traded derivatives and a major
provider of prime brokerage services in the fixed income and
foreign exchange markets. We offer our customers rapid, low-cost
trade execution and clearing services on a broad spectrum of
derivatives exchanges and over-the-counter markets. We serve over
200,000 customer accounts from our 23 locations in 14 countries
with a focus on delivering superior customer service.

Refco Form S-1.

85.     Deitz agreed to meet with Weiss in New York. Weiss' sales pitch focused on

Refco's ability to serve as a prime broker for VR by providing efficient and accurate execution

and clearing services. He also described Refco's business model as a riskless one, in which

Refco simply executed, cleared and financed customer trades in exchange for commissions,

spreads and interest payments. In describing Refco's customer-driven brokerage business, Weiss

said Refco was "just trying to fill them and bill them."

86.     Weiss also explained that Refco's securities financing, or Repo business, was

purely a matched-book – *i.e.*, Refco would lend money to one party in exchange for securities as

collateral and then simultaneously conduct an equal and opposite transaction with a third party.

The net effect of a matched-book business is that the broker does not bear any direct market risk

on the underlying securities used as collateral and simply earns accrual income on the spread

between borrowing and lending rates. The one risk in a matched-book business is that the value

of the collateral security may in rare instances erode very quickly, as occurred during the Russian

default crisis in 1997, with the result that a portion of the loan amount becomes unsecured. To

compensate for this risk, a broker will typically impose a "haircut" in lending money, meaning

that the broker will lend the borrower less than full market value of the collateral, and the loan

agreement will provide that the broker can call for additional margin in the event of a

deterioration in value of the underlying collateral. Weiss assured Deitz that Refco imposed

33

conservative haircuts, which would have further mitigated any risk to Refco's business. Thus, Refco's financing operations appeared to provide high quality, relatively riskless income, consistent with Refco's stated business model.

87.     Refco appeared to be a particularly attractive prime broker for VR because, as Weiss explained, unlike other prime brokers, Refco did not conduct any proprietary trading. This representation was important to VR, because a broker that engages in proprietary trading is inherently taking on more risk than a broker that only executes trades for fees.

88.     Furthermore, proprietary trading may place a prime broker in conflict with its own customers. VR's prime broker sees all of VR's trading activity because the prime broker clears and settles all of VR's trades. It was of particular concern to VR that its prime broker not engage in proprietary trading because VR's investments are the product of much research and diligence and it was important that VR's trading strategies not be compromised.

89.     Following this meeting, VR conducted extensive due diligence before selecting Refco as its prime broker, including a review of Refco and RCM financial statements, because Refco and its affiliates would act as the custodian of VR's securities and VR wanted to make sure that Refco and RCM were secure and creditworthy. As Weiss admitted at his deposition, it was "typical practice" in the industry for brokers to provide securities customers with their financial statements.

90.     VR reasonably relied on the representations made in RCM's and Refco's audited financial statements, which were material to VR's decision to place and maintain their cash and securities with Refco. VR continually received, reviewed and relied upon RCM's and Refco's financial statements from the time VR opened its account with RCM in 2001 until Refco filed for Chapter 11 in October 2005. Based on the material statements contained in RCM's and Refco's

34

financial statements, VR was led to believe that RCM and Refco were financially successful companies. Relying on those financial statements as well as on RCM's representations that it was holding VR's securities as a custodian, VR placed cash and securities in its RCM brokerage accounts and used RCM as its agent to purchase and sell thousands of securities.

91.     Based on VR's review of RCM's and Refco's audited financial statements, Refco appeared to be a very solid institution. RGL's consolidated financial statements for the year ending February 28, 2001 showed assets of more than $18 billion, member's equity of $500 million, cash flow of $114 million, EBITDA of $140 million, and net income of $74.5 million. What the financial statements did not disclose, but should have disclosed, were the fraudulent conversion of customer securities, the Intercompany Loans, or the fact that the company held a massive, uncollectible receivable from a related-party, which was temporarily hidden over certain key reporting periods by the RTLs.

92.     In addition to reviewing RCM's and Refco's financial statements and other public filings, VR's diligence included extensive follow-up discussions with Weiss and others at Refco regarding Refco's business model. In subsequent years, VR continued to review and rely upon RCM's and Refco's annual financial statements and, after Refco became a public reporting entity, to review certain of Refco's SEC filings. From this diligence, VR concluded that Refco was a very solid institution, with minimal risk (and no at-risk proprietary positions), substantial amounts of capital relative to Refco's business needs, and a very simple, riskless business model.

93.     VR also relied upon the financial statements of RGL, RCM and Refco, and daily and monthly customer account statements in believing that its securities were secure with RCM and its affiliates.

94.    In reasonable reliance on the statements of Weiss and others at Refco regarding Refco's low risk business model and the financial statements of RCM and Refco attesting to their seemingly sound financial condition, VR decided to open non-discretionary brokerage accounts at Refco. VR transferred cash and securities into their new accounts at Refco for the purpose of trading in securities.

95.    RCM served as VR's prime broker on a daily basis for over four years. Among other things, RCM cleared, settled, and held in custody securities in relation to literally thousands of trades that VR conducted with other counterparties.

96.    In setting up its accounts, VR understood, based on Refco's representations, that RCM would provide prime brokerage services to VR, which included the clearing, settlement, and financing of securities by RCM on behalf of VR. VR's accounts were non-discretionary accounts. Except in the case of securities purchased on margin – something that VR did only seldomly – RCM was only authorized to handle VR's securities as directed by VR. During periods when VR was not seeking to borrow against shares otherwise entrusted to RCM for safekeeping, it did not need to leave the shares in custody with RCM. Moreover, to the extent that VR obtained credit based on the shares, VR did not need to leave any shares in the custody of RCM beyond the number of shares RCM required as collateral to support the amount that VR wished to borrow on margin. During such periods, VR left securities with RCM in the mistaken belief that such securities were held by RCM in custody for VR.

97.    As VR grew larger, it considered adding additional prime brokers, which would have diluted Refco's share of VR's prime brokerage business. In 2003, Adam Weiss, VR's principal broker at Refco, sought to retain VR's full prime brokerage business and proposed supplemental guarantees from RGL in the amount of $200 million (representing the value at that

36

time of VR's account at RCM) as an inducement for VR to keep its prime brokerage business

entirely with Refco. In reliance upon the supposed financial health of RGL, as represented in its

financial statements, VR accepted the guarantees in 2003 and kept all of its prime brokerage

business with RCM.

98.     Moreover, once VR received its guarantees from RGL, VR had a direct interest in

the financial health of RGL, making its reliance on RGL's financial statements all the more

important.

99.     In the ordinary course of its business, VR would often employ RCM, as its prime

broker, to conduct trades "away" for the VR accounts. Typically, VR would trade "away" by

purchasing a security from a third party, such as Merrill Lynch. Merrill Lynch would provide

VR with a trade confirmation. VR would then send settlement instructions to its prime

brokerage representatives at Refco, specifying the security purchased, the date, the purchase

price and the Euroclear account number for Merrill Lynch to which Refco should send funds in

the amount of the purchase price. Refco would provide VR with a daily statement that would

reflect the transaction in VR's account as pending settlement. After the transaction settled, VR

would receive a statement from Refco reflecting the securities purchased as being in VR's

account, and would also reflect a corresponding debit for the purchase price of the securities.

100.    For each trade "away" that it cleared for VR, Refco assessed a ticket charge.

Refco also frequently took orders for transactions in equity securities and executed those

transactions, charging VR a commission. In other instances, VR would place orders with Refco

to purchase or sell certain fixed income securities, including United States Treasuries and

emerging market debt. For these transactions, in lieu of a commission, Refco would take a small

markup or spread to the market price at the moment the customer placed the trade. Finally, VR engaged in some foreign exchange and repo transactions with Refco.

101.    The securities reflected in VR's account statements belonged to VR. As agent and as custodian of its securities, Refco owed a fiduciary duty to VR with respect to the securities held in safekeeping in VR's account. Based on years of dealing with RCM, VR understood RCM to be acting in a custodial capacity and understood that RCM treated VR as beneficial owner of its securities.

102.    Refco repeatedly represented throughout the course of the brokerage relationship that the securities in VR's account belonged to VR. Indeed, VR received daily and monthly account statements identifying the particular securities that Refco held on behalf of VR. From time to time, VR was required to show proof of its beneficial ownership of the securities in its accounts, such as in restructuring-related exchange offers. In those instances, at VR's request, Refco would sign letters attesting to the fact that VR was the beneficial owner of the securities in question.

103.    Furthermore, Refco often exercised VR's entitlements on behalf of VR and pursuant to VR's instructions, further evidencing to VR that both VR and Refco regarded VR as the beneficial owner of securities held in VR's accounts. For example, on one occasion VR instructed Refco to submit to an exchange offer for certain bonds held in Euroclear and Clearstream accounts, but then later instructed Refco to withdraw the bonds prior to the expiration of the exchange offer. Refco complied, and confirmed that "[y]our bonds are sitting in Refco's account… The consent vote, were [sic] also submitted. Both Clearstream and Euroclear have confirmed receipt of your votes."

104.    From the time it opened its accounts at Refco until at least the October 10, 2005 public announcement of the RGHI Receivable, VR had every reason to believe its cash and securities were safe at Refco. In fact, unbeknownst to VR, during the period during which VR maintained prime brokerage accounts with Refco, its securities were routinely sold by RCM to various third parties through hypothecations and pursuant to Repos, without VR's knowledge, authorization or consent.

105.    VR relied, inter alia, upon Refco's false representations in the customer agreements with VR and the RCM-issued customer statements and trade confirmations in entrusting its securities to RCM and maintaining additional securities with RCM throughout the course of its relationship with Refco. What VR did not know was that Refco's image as a safe and financially sound broker that held customers' securities in safekeeping was actually an elaborate illusion conjured by its dishonest management, with the knowledge of the THL Defendants and Grant Thornton.

## C.    The Customer Agreements

106.    The Plaintiffs each entered into a standard form "Securities Account Customer Agreement" (the "Customer Agreement") with both RCM and RSL. Each of the Plaintiffs correctly understood the Customer Agreement to provide that Plaintiffs would own all fully-paid securities deposited and held in their customer accounts and that those securities could be traded or otherwise dealt with by Refco only in accordance with the Plaintiffs' instructions.

107.    Section A of the five-page Customer Agreement, governed by New York law, is entitled "Authorization" and clearly sets out that Refco is only authorized to deal with a customer's securities in accordance with the instructions of that customer:

> 1.    ***Authority to Act.*** You hereby authorize Refco to purchase, sell, borrow, lend, pledge or otherwise transfer Financial Instruments (including any interest therein) for your account in accordance with your oral or written instructions.

You hereby waive any defense that any such instructions are not in writing as may be required by any law, rule or regulation. The authority hereby conferred shall remain in force until written notice of its revocation is received by Refco. Refco shall be under no duty or obligation to inquire into the purpose or propriety of any instruction given by you and shall be under no obligation concerning the application of any funds delivered to you upon your order. Except to the extent you have expressly authorized someone else to buy, sell and otherwise effect Transactions on your behalf and for your account, all Transactions introduced to Refco by RSL on your behalf and entered into pursuant to this Agreement shall be initiated orally or in writing by you. All securities and other financial instruments delivered by you to Refco shall be in good deliverable form.

108.    The remaining sections B through H of the Customer Agreement are variously titled "Margin", "Prime Brokerage", "Netting", "Default", "Representations and Warranties", "Miscellaneous" and "Law and Jurisdiction". None of these provisions gave Refco the right to sell customers' fully-paid securities entrusted to RCM other than in accordance with those customers' express instructions. To the extent that a customer borrowed funds from RCM and thereby created a margin balance, consistent with industry practice and applicable state and federal law, RCM had the right under the Customer Agreement to hypothecate securities with a value equivalent to the margin balance, but no more than that value (such a right, and the corresponding limitation, is common in the securities industry). Consistent with securities industry practice, and federal regulations with respect to the conduct of broker-dealers, nothing in the Customer Agreement gave RCM the right to take any action with respect to Plaintiffs' fully-paid securities that were held in RCM accounts. Moreover, to the extent that Plaintiffs had a margin balance, RCM's right to use customer securities would have been limited to securities with a value equal to the margin balance and no more.

109.    In connection with Refco's Bankruptcy Cases, Judge Drain reviewed the Customer Agreement during a six day trial in which that agreement and the relationship between RCM and Plaintiffs and other RCM customers was the primary focus. Consistent with Plaintiffs' understanding of the Customer Agreement, Judge Drain held that the Customer Agreement did

40

not give RCM any right to sell or otherwise deal with fully-paid customer securities. Rather,

Judge Drain held that such fully-paid securities belonged to the customers in whose accounts

those securities were reflected and that the Customer Agreement did not give RCM any right to

hypothecate, sell or otherwise use those securities or proceeds from those securities.

Specifically, Judge Drain held:

> [t]he objectors to the motion point to the customer agreement, and in particular,
> Paragraph B of that agreement where they had a margin, to suggest that the
> customers of RCM normally took the risk that RCM could do whatever it pleased
> with the securities and other property that they left with RCM in their customer
> accounts notwithstanding Section A of the customer agreement, quoted above,
> and therefore, that there was no real entrustment. Having read the two paragraphs
> in Section B of the customer agreement, I don't accept that argument.
>
> It appears clear to me from the language of that agreement and those provisions
> that those provisions apply in the situation where customers have engaged in
> margin or financing transactions with RCM or its affiliates and that what the
> customers have given to RCM in those paragraphs is a security interest in their
> property until those transactions are paid off and the debt satisfied…
>
> … So I do not see anything in these two paragraphs that will take the
> moving customer group members out of the notion that they entrusted
> their securities, or cash to purchase securities, with RCM.

110.    Plaintiffs in this action did not have any margin balance at the point in time when

Refco filed for bankruptcy. Accordingly, RCM had no right to do anything with securities that

were held in Plaintiffs' accounts as of that time, except the one thing that RCM had represented it

would do: hold the securities in safekeeping as a custodian for Plaintiffs. As a result, Plaintiffs

were deceived about the treatment of their securities because, unbeknownst to Plaintiffs, RCM

had sold, "repoed" or hypothecated Plaintiffs' securities and use the proceeds for the benefit of

Refco, RCM and the defendants. RCM's theft of Plaintiffs' securities contradicted the terms and

conditions of the Customer Agreement and the understanding that Plaintiffs had justifiably

reached concerning the manner in which their securities were being held.

D.    **The Fraudulent Schemes**

111.    The fraudulent schemes at Refco, although occurring over many years, can be generally classified according to two categories of illegitimate transactions, the common goal of which was to improve Refco's apparent financial condition and to attract more customers to Refco.

112.    First, the Defendants carried out the fraudulent RCM Securities Scheme in order to provide Refco with low-cost supplementary capital, which the Defendants used to sustain and grow Refco's operations. Once the Officer Defendants had directed Refco employees to sell, or cause to be sold, RCM customers' securities, the proceeds were siphoned out of RCM and "upstreamed" to other Refco subsidiaries.

113.    Second, there was extensive inappropriate use of related-party accounts to "slough off" customer losses and other items. Had management appropriately accounted for these losses and other items on the books and records of Refco, Refco's financial results, and Refco's perceived value, would have been negatively affected. To avoid such negative hits to Refco's earnings and balance sheet, and to create a false picture of Refco's financial success, these losses and other items were instead fraudulently transferred off of Refco's book and recorded as a receivable from, or a debt owed by, RGHI to certain Refco entities (collectively, the "RGHI Receivable"). Examples of such activity include:

- Losses incurred by Refco as a result of customer defaults and proprietary trading losses that the Bennett Co-Conspirators transferred to RGHI instead of disclosing the existence of these uncollectible sums;

- Operating expenses incurred by Refco, but improperly recorded on, or moved to, the books of RGHI, by the Bennett Co-Conspirators, thereby decreasing Refco's expenses and increasing RGHI's debt to Refco; and

- The creation of bogus income for Refco by, inter alia, "charging" substantial interest on the debt balances owed by RGHI to Refco.

42

As discussed below, these related-party receivable balances were then kept from public disclosure by means of the "Round-Trip Loans" that had no legitimate business purpose. As defined above, the latter two illegitimate transactions, being the fraudulent creation and subsequent concealment of the RGHI Receivable through the Round Trip Loans, are collectively referred to as the RGHI Scheme.

**1.    The RCM Securities Scheme**

114.    Refco's senior management, including the Officer Defendants, were aware of the substantial need for cash to maintain the appearance that Refco was a fast-growing group of companies and the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what the Defendants described as Refco's "internally generated cash flow and available funds", rather than having to access the capital markets and borrow money. For the THL Defendants, once they had made their investment in Refco as part of the LBO transaction, this deception was critical to their goal of securing for themselves a substantial payday by taking the company public as quickly as possible.

115.    Those cash needs were satisfied largely by the fraudulent conversion of RCM customer securities and by siphoning the resulting funds from RCM to other Refco entities that provided no assurances of their ability, intent, or obligation to repay the funds on demand or otherwise, that had provided no security for the funds, and that lacked the financial wherewithal to repay the funds on demand or otherwise.

116.    Unbeknownst to VR, RCM was not acting as a custodian for the securities that were entrusted to it. Instead, although RCM did not have the legal right to sell, loan, pledge, re-hypothecate or otherwise misappropriate its customers' fully paid securities or other property held in their RCM brokerage accounts, RCM did, in fact, routinely sell, loan, pledge, re-hypothecate or otherwise misappropriate its customers' securities without their knowledge,

43

authorization or consent. As described below, the proceeds of these sales, loans, pledges, re-hypothecations and misappropriations were used to finance the business and acquisitions of other Refco entities and affiliates.

117.    Typically, Refco senior management, including Defendants Maggio and Bennett, and other persons acting on behalf of Refco Global Finance, RCC and RGL, having determined that a further injection of capital was required to meet Refco's operational and funding needs, would direct Refco employees, including Executive Vice President Thomas Yorke, who acted both for RSL and RCM on the so-called Global Execution and Finance Desk, to sell, or cause to be sold, through hypothecation or pursuant to Repos, whatever amount of RCM customer securities was required to raise the required funds. Yorke testified in the Bankruptcy Cases that Refco would sell or re-hypothecate "anything held in a Refco account." Consistent with Yorke's testimony, Refco re-hypothecated customer securities to generate cash that it transferred to other Refco entities for any number of purposes. Moreover, Refco used customer securities in Refco's Euroclear accounts to secure Refco's line of credit with Euroclear.

118.    At all times, VR was unaware that its securities (and the securities of other RCM customers) were being sold without VR's authorization or consent. Yorke testified in the Bankruptcy Cases that RCM's customers were not told that entrusted property was swept from their accounts at RCM to other Refco entities. Given the opportunity to testify that RCM's customers were told that this might happen, Yorke could identify no such communications to customers. Indeed, Yorke testified that he would not have expected RCM's customers to have known "about the inner workings, relative to what the upstream bank was doing, no." Yorke's reference to the "bank" was a reference to RCC.

119.    As part of the RCM Securities Scheme, VR's securities, and those of other RCM customers, were fraudulently converted by RCM, at the direction of Bennett, Maggio, and the other Officer Defendants, to sustain Refco's business operations and acquisitions. The proceeds of the fraudulent conversions were siphoned out of RCM and transferred to other Refco entities, including RCC. RCC then used the funds to make "loans" to other Refco entities that could not repay those "loans." Pursuant to the RCM Securities Scheme, the proceeds of the converted securities improperly stolen from RCM customer accounts were used for a wide variety of general and specific funding purposes. All such purposes were completely unrelated to RCM, and none benefited RCM customers in any way. For instance, the proceeds from the sale of misappropriated RCM customer assets were used, among other things, to make payroll payments and to fund the daily operations of other Refco entities. The proceeds from the sale of misappropriated RCM customer assets were also transmitted to RSL and Refco LLC, where they were used to extend margin credit to customers of those entities.

120.    The proceeds from the fraudulent conversion of RCM customer assets were also used to finance major acquisitions and other substantial transactions entered into by Refco, including two significant transactions that occurred while the THL Defendants were in control of Refco. For example, Refco's purchase of Cargill Investor Services ("Cargill") for $209 million in the summer of 2005 was paid for with stolen RCM customer assets. RCM customer securities were sold and the proceeds were transferred to RCC, which made the Cargill purchase on RGL's behalf. Similarly, in 2005, while the THL Defendants were in control of Refco, RCC loaned $204 million to Suffolk, LLC, the controlling shareholder of the PlusFunds, to finance Suffolk's buyout of PlusFunds. The source of funds for the Suffolk transaction was, in substantial part,

45

RCM customer securities, which were sold to raise the desired funds and then used by RCM's corporate affiliates to make the loan.

121.    At all times, a key motivation behind the conception and continuation of the RCM Securities Scheme was to enable the Defendants to paint a rosy picture of a financially sound and stable Refco that would allow it fraudulently to attract more customers to open and maintain securities accounts with Refco. The more cash and securities that Refco managed on behalf of its securities customers, the more attractive Refco would be to the market when the Officer Defendants and THL Defendants decided to cash out their interests in Refco.

122.    Rather than holding customer securities at RCM or engaging in transactions pursuant to customer instructions with appropriate regard for the legitimate and reasonable interests and expectations of RCM's customers, the Officer Defendants, who had clear conflicts of interest and divided loyalties, caused customer securities to be converted fraudulently and the proceeds to be "upstreamed," "side-streamed," and "down-streamed" to other Refco entities to sustain Refco's business operations and acquisitions. These transfers, which purportedly took the form of intercompany "loans", occurred without any loan documentation between RCM, RCC and the Refco entities that received assets that had been wrongfully siphoned from the accounts of RCM customers. The purported "loans" of RCM customer funds to other Refco entities for purposes unrelated to the business of RCM and without benefit to RCM reflected blatant and undisclosed conflicts of interest by the Officer Defendants, and were made:

    (a)    without the knowledge, authorization or consent of the RCM customers who owned the securities;

    (b)    without compensation, security, or collateral to the RCM customers who owned the securities;

    (c)    without assurances that the resulting funds would or could be repaid on demand or at all by the Refco entities that received them;

46

(d)    without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM or RCM's customers of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

(e)    to other Refco entities that in fact lacked the intent and/ or the financial wherewithal to repay the siphoned funds on demand or at all;

(f)    for the purpose of enriching the Officer Defendants;

(g)    for the purpose of enriching the THL Defendants; and

(h)    in transactions that provided no benefits to the affected RCM customers and in which the legitimate and reasonable interests and expectations of the RCM customers were entirely ignored.

123.    The purported "loans" made with the proceeds of the fraudulent conversion of RCM customer securities were uncollectible because the Refco entities to which the loans were made lacked the financial ability or intention to repay them.  RCM received no margin, collateral or security and the loans were improperly and fraudulently documented.  RCM did not receive security interests in any of the assets (such as Cargill) that were purchased with the transferred funds.  The monies were simply transferred to and spent by RCM's corporate affiliates.

124.    The transfer via Intercompany Loans of capital obtained through the unauthorized sale of customer securities, from RCM to RCC and then to other Refco entities, was accepted as a regular business practice within Refco.  The Intercompany Loans were critical elements of Refco's ability to finance its operations and its acquisition plans.  The practice was approved and executed by senior management of Refco and was known to, or recklessly disregarded by, the THL Defendants and each of the Officer Defendants.  According to one executive responsible for effecting the fraudulent transactions with RCM customer securities, employees involved in the transfer of capital made no effort to hide the practice within Refco.  Instead, the practice was discussed openly among relevant members of Refco management with the constant flow of additional capital being essential to the continued operation of Refco.  As of October 2005, RCM

had more than $2.4 billion of outstanding, undisclosed and uncollectible intercompany receivables as a result of the fraudulent conversion of entrusted customer securities and the distribution of the resulting funds through Intercompany Loans to certain other Refco entities that did not have the intention and/ or financial wherewithal to repay such loans. RCM's customers were left with losses of more than $2 billion as a result of these fraudulent transactions.

125.   Refco fraudulently induced VR to deposit cash and securities with RCM by supplying VR with bogus financial statements that failed to disclose the RCM Securities Scheme and that were also falsely dressed-up as a result of the RGHI Scheme. As a result of both of these fraudulent schemes, and the accompanying false and misleading statements made to VR and other securities customers, Refco was able to grow its brokerage business and generate additional commissions and spreads from the increasing volume of customer transactions. As this brokerage business grew, the equity value of the Officer Defendants and the THL Defendants also grew until they ultimately cashed out their stakes at the LBO and/or the IPO.

**2.     The Creation Of The RGHI Receivable Pursuant To The RGHI Scheme**

**a.     Trading Losses**

126.   One early aspect of the RGHI Scheme involved the improper concealment by the Bennett Co-Conspirators of hundreds of millions of dollars in customer and proprietary trading losses in the late 1990's, including hundreds of millions in losses that were incurred during the Asian debt crisis in 1997 and 1998. Beginning in or around 1997, certain Refco customers, to whom Refco had extended credit to purchase securities, incurred heavy trading losses in the Asian financial crisis and could not repay the loans extended to them by Refco (the "Asian Losses").

48

127.    The Bennett Co-Conspirators failed to properly account for the Asian Losses, which appeared on Refco's books as customer receivables. The sums due from the customers were uncollectible; accordingly, Refco should have written the customer receivables off as bad debts and reduced its operating income accordingly. Instead, the Bennett Co-Conspirators engaged in financial statement manipulation, transferring the amount of uncollectible customer receivables to an RGHI account at Refco, thereby increasing the RGHI Receivable. As a result, a charge to Refco's operating results was avoided and the Refco customer losses were alchemized into an amount due from RGHI, *i.e.*, the RGHI Receivable.

128.    Also in 1997, certain Refco customers in the United States to whom Refco had extended credit — entities associated with Victor Niederhoffer — lost more than $90 million in trades ("Niederhoffer Losses") on the Chicago Mercantile Exchange ("CME"). When those customers could not meet the margin requirements, Refco took out an intra-day loan from a financial institution to meet the margin call at the CME and then used funds taken from customers of other Refco entities to repay the loan. Refco then entered into settlement agreements with the Niederhoffer entities pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco.

129.    Like the Asian Losses, the Niederhoffer Losses were uncollectible — indeed the settlement agreements released the Niederhoffer entities from liability — and should have been written off in Refco's operating results as a bad debt expense. Instead, approximately $71 million of the Niederhoffer Losses were "sold" or transferred to an RGHI subsidiary and then further transferred to RGHI's account at Refco. Thus, like the Asian Losses, the uncollectible Niederhoffer Losses were transformed from bad debts into what appeared on Refco's books as the RGHI Receivable.

NY2:#4755710