130.    Refco also suffered substantial losses in excess of $40 million during this period from its own proprietary trades, *i.e.*, trades carried out on its own behalf, which losses were also improperly concealed rather than being written off.  Like the Niederhoffer Losses, rather than being written off in Refco's operating results, these losses — some of which were associated with the decrease in value of Russian bonds in 1998 — were "sold" or transferred to an RGHI subsidiary.

### b.    Hiding Operating and Other Expenses

131.    In addition to the Asian Losses and other trading losses, the Bennett Co-Conspirators also artificially inflated the appearance of Refco's financial results by inappropriately recording over a hundred million dollars in Refco expenses and other transactions on RGHI's books.  This conduct resulted in the improper reduction of Refco's expenses with a corresponding increase to the RGHI Receivable, *i.e.*, increasing RGHI's purported indebtedness to Refco.

132.    In many instances, the Bennett Co-Conspirators would cause a Refco entity to make a cash payment for an expense, or credit (reduce) an expense item that was to be transferred to RGHI, and record a resulting receivable from RGHI.  At the same time, RGHI would record an expense and a resulting payable to Refco.  For example, between 2000 and 2005, tens of millions of dollars in computer expenses were transferred from Refco to RGHI.  Further, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco.  The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco.  On Refco's books, the amount of the RGHI Receivable was increased by $6.5 million.

NY2:#4755710

### c.    Phantom Income

133.    The Bennett Co-Conspirators also artificially inflated Refco's financial results by creating hundreds of million of dollars of phantom income from RGHI.  The Bennett Co-Conspirators substantially inflated Refco's income by recording significant interest income from RGHI accruing on the fraudulently created receivable balance.  This was bogus income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable.  For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal."  The $62.75 million of interest had been recorded as income by Refco.

134.    The Bennett Co-Conspirators also caused Refco to inflate its income as a result of "transactions" with RGHI.  On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Bennett Co-Conspirators of income at Refco.  The description of the transaction on the account statement said only "Transfer" for each item.  This practice served as a significant source of Refco's income and continued after the LBO, while THL was in control of Refco.

### 3.    The Round Trip Loan Element Of The RGHI Scheme

135.    By July 2004, the balance of the RGHI Receivable had grown to over $1 billion. A large receivable owed to Refco by a related-party (RGHI), owned by Refco's current and former CEO, would have to be disclosed on Refco's financial statements and would have revealed that in fact Refco was not as financially secure as it appeared to be.  Instead of accurately reflecting Refco's true financial position, however, the Bennett Co-Conspirators went to great lengths to mask the poor financial health of Refco from Refco's customers, such as VR.

NY2:#4755710

136.    To conceal the magnitude and related-party nature of the RGHI Receivable, the Bennett Co-Conspirators devised and implemented a series of sham "loans" -- the RTLs -- timed to straddle Refco's financial reporting and audit periods.  Like a street-corner shell game, this financial sleight-of-hand enabled the Bennett Co-Conspirators to transfer temporarily massive amounts of uncollectible related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries (including RCM), RGHI, and several third party Refco customers (or their affiliates) that agreed to serve, for a fee, as conduits in the deceptive RTLs.

137.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, starting just before the LBO in 2004, at the end of each fiscal quarter) to temporarily "pay-down" the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third party customer of Refco.  In order to further conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third party receivables.

138.    Hiding the debt in this manner allowed the Bennett Co-Conspirators and others to avoid disclosing Refco's massive trading losses and certain of Refco's operating expenses, thereby concealing Refco's true financial condition.  This, in turn, allowed the Bennett Co-Conspirators and others to overstate Refco's financial condition and related operating results, understate its operating expenses, and fraudulently continue to project to the public a false impression of financial health and strength -- falsely securing customer confidence and ensuring continued deposits of cash and securities from customers such as VR, which the Officer Defendants and others intended to, and ultimately did, loot.

139.    The first move in the shell game that was the RGHI Scheme was to cause Refco's losses and uncollectible obligations to be secretly transferred to RGHI resulting in the massive

52

related-party receivable owed by RGHI. Although some of the trading losses were permanently parked at RGHI, others were held at Refco and only moved off Refco's books and booked as an RGHI Receivable at the end of each relevant reporting or audit period.

140.    At the end of every relevant reporting and audit period, a Refco entity (typically RCM) would extend a "loan" for an amount up to $720 million to a third party with no apparent relation to Refco, Bennett or RGHI. That third party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco). The RTL was completed when RGHI used the "loan" from the third party to pay down the debt it owed to Refco (typically via a book credit to one of RGHI's accounts at Refco). Thus, pursuant to the RGHI Scheme, on Refco's financial statements, the RGHI Receivable was transformed into a payable or a loan owed to Refco from an unrelated third party.

141.    Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process. The temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the third party, and the third party in turn paid back the money it had borrowed from Refco (keeping as a fee the spread between the interest charge on the "loan" made to RGHI by the third party and the loan made to the third party by Refco). Once the transaction was unwound, the RGHI Receivable was restored to its full value. This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; with no actual transfer of funds occurring other than the payment of the fees to the third party.

142.    In return for agreeing to participate in the RTLs and to conceal the related-party nature of the RGHI Receivable, the third parties received payment of the "spread" between the interest rates of the two "loans." The Bennett Co-Conspirators generally caused RCM to make

these payments to the third parties, even though RCM obtained no benefit from the RTLs. In this manner, for example, one third party received at least $1.1 million in interest charges as a reward for his participation in the RGHI Scheme.

143.    In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL.

144.    The Bennett Co-Conspirators, with the active assistance of others, engaged in these RTLs at least 18 times from 2000 through 2005, and, with one exception, always at the end of a fiscal quarter or year end period.

145.    The RTLs included, at the least, the following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund, Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| 2000 TOTAL | | | $310,000,000 |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| 2001 TOTAL | | | $450,000,000 |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| 2002 TOTAL | | | $625,000,000 |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| 2003 TOTAL | | | $650,000,000 |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| 2004 TOTAL | | | $3,000,000,000 |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| 2005 TOTAL | | | $1,215,000,000 |

NY2:#4755710

146.    In addition, during the same period, Refco engaged in additional wire transfer RTLs. These loans involved wire transfers of funds from a non-Refco entity to RGHI in late February (just prior to each relevant fiscal year end), with those transactions being subsequently reversed in early March.

147.    In this manner, at the end of each relevant reporting year, and later reporting quarter, the Bennett Co-Conspirators together with others perpetrated the RGHI Scheme and effectively concealed the RGHI Receivable, causing Refco's financial statements to suggest falsely that RGHI was actively paying down the amount of the receivable. This process misrepresented the true value of the RGHI Receivable on each financial statement at the relevant reporting periods and concealed Refco's massive trading losses.

148.    In this way, the RGHI Scheme was set up and continued by the Bennett Co-Conspirators, to manipulate Refco's balance sheets in a manner that concealed Refco's massive related-party receivable from innocent Refco's customers, other creditors and from potential purchasers of the company.

**E.    The RCM Securities Scheme Was Hidden From VR**

149.    The Officer Defendants' ultimate goal of cashing out of Refco, in whole or in part, through one or more liquidity events depended on the fraudulent conversion of customers' securities to fund Refco's business and for other purposes. Similarly, the THL Defendants' motivation to reap substantial profits from taking the company public as quickly as possible required theft of RCM customers' securities through the RCM Securities Scheme described herein.

150.    The Officer Defendants recognized that Refco's business faced inherent reputational risks and that customers would not place securities in their accounts with RCM if

they did not believe that RCM was financially healthy and strong and was a safe entity to which customers could entrust their securities for specific, limited purposes – a fact that was confirmed by the "run" on RCM precipitated by the belated public disclosure of Refco's pervasive fraud in October 2005.

151.    Accordingly, the Officer Defendants needed to, and did, commit fraud in order to keep RCM's customers in the dark and RCM's doors open long enough so that they could continue to siphon funds from RCM customers' property until they could find a way to sell some or all of their interests in Refco.

152.    By allowing and causing RCM to use U.S. jurisdictional means to induce and effect transactions in securities, and by falsely presenting RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their securities for specific, limited purposes, the Officer Defendants enabled RCM to attract a substantial volume of business from securities customers, including VR. As a result, billions of dollars worth of securities entrusted to RCM by its customers were made available for fraudulent conversion, and Refco's business operations and acquisitions could be sustained by the proceeds. The false picture of financial health and strength to which these activities contributed was in turn used by the Defendants to enable them to cash out their interests in Refco.

153.    In the course of the Refco Bankruptcy Cases, Judge Drain concluded, following analysis of the Customer Agreements, that the relationship between RCM and its customers was a fiduciary one with respect to the securities that were deposited and held in accounts at RCM. After a factual hearing, Judge Drain found that RCM customers had entrusted their securities to RCM, and that a fiduciary duty existed with respect to that entrustment of securities. Judge Drain went on to find:

NY2:#4755710

> [T]he customers had every reasonable indication that they did own
> the securities [held by RCM on behalf of RCM customers],
> although if they were trading on margin RCM would have a
> collateral security interest in them for the margin loan, and it was
> reasonable for them to expect that those securities or infungible
> like property would be returned to them on their instruction.

154.    In these circumstances, RCM, acting in relevant respects as a fiduciary, was not

authorized to sell customer securities entrusted to it as a custodian. Further, in its capacity as a

fiduciary, RCM had an affirmative obligation to inform its customers of material facts relating to

the customer securities entrusted to RCM by its customers. RCM's practice of selling customer

securities and up-streaming and side-streaming the proceeds to Refco entities that did not have

the intent and/ or financial wherewithal to repay those funds without the requisite authorization

of those customers was clearly a material fact that RCM was under an affirmative obligation to

disclose.

155.    Refco and the Defendants knew that if they had disclosed RCM's practices to

RCM's customers, those customers likely – and in the case of VR, certainly -- would have

withdrawn their securities from RCM and instead entrusted their securities to other financial

institutions where the securities would not have been subject to the same risks. Such a

withdrawal of securities would have threatened Refco's continued existence because the

availability of the proceeds of the sale of customer securities was essential to Refco's ability to

finance its own activities.

156.    Accordingly, the Defendants at all times acted in a manner to conceal RCM's

practices from its customers.

F.    **The RCM Securities Scheme Was Perpetuated By Misleading Account Statements
And Non-Disclosures**

157.    The customer account statements that VR and other RCM customers received at

least monthly contained lists of securities purportedly held in their accounts under the legend

"SECURITY POSITIONS IN YOUR ACCOUNT". These account statements were intended to lead RCM customers to believe that their securities were held in their accounts when, in truth, the Defendants treated those securities as RCM's property that could be sold to finance the business activities of other Refco entities.

158.    The way in which the RCM account statements reported Plaintiffs' margin financing transactions and the apparent treatment of securities posted as collateral in connection therewith, furthered the deceit. When a RCM customer borrowed money on margin against securities, the number of securities reported in "SECURITY POSITIONS IN YOUR ACCOUNT" would be reduced by the amount of securities posted as collateral. The type and amount of securities posted by the customer and held by RCM as collateral against the margin loan would instead appear on the account statements listed under the legends "ACCOUNT ACTIVITY" and "OPEN FINANCING TRANSACTIONS". As a customer paid off the margin loan, the account statements would report that the some or all of the securities posted as collateral were returned to the customer. That is, the statements would evidence a proportionate reduction in the quantity of securities that RCM held as collateral against the remaining loan balance in the "OPEN FINANCING TRANSACTIONS" section, and would reflect a corresponding increase in the quantity of securities in the "SECURITY POSITIONS IN YOUR ACCOUNT". This reporting of the margin financing transactions clearly demonstrated to Plaintiffs that once they had paid off a margin loan in whole or in part, RCM would return to the Plaintiffs' account the corresponding securities pledged as collateral against that loan and would then hold those securities for Plaintiffs in custody. This reporting of the margin financing transactions was, therefore, also entirely consistent with the Customer Agreement.

NY2:#4755710

159.    The RCM account statements were false and deceptive because RCM, in fact, treated *all* customer securities in its possession as its own property that could be sold to finance the business activities of Refco's affiliated companies, not only those securities held by RCM as collateral against a loan balance, as was falsely represented by the account statements.

160.    Because RCM enabled customers regularly to check their account statements and made them available online, VR and other RCM customers were led to believe that they were informed of every transaction made with respect to those securities entrusted to RCM.  As Judge Drain noted:

> [T]he customer statements which [RCM customers] received on a monthly basis … showed the customers' orders being fulfilled and showed them being fulfilled in a way that reflected their ownership of the securities.

161.    RCM further concealed the fraudulent RCM Securities Scheme from its customers through its failure to comply with SEC Rule 10b-16.

162.    Pursuant to SEC Rule 10b-16, RCM was obligated to provide express notice to its customers of the "nature of any interest or lien retained by RCM in the security held as collateral." Specifically, Rule 10b-16 provides:

> It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:
> Is given or sent at the time of opening the account, a written statement or statements disclosing
> *          *          *          *
> 1.      the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required
> 2.      Is given or sent a written statement, or statements, at least quarterly, for each account in which credit was extended, disclosing
>> i.      the balance at the beginning of the period; the date, amount and a brief description of each debit and credit entered during such period; the closing balance; and, if interest is charged for a period

59

different from the period covered by the statement, the balance as of the last day of the interest period

163.    RCM failed to provide the disclosures required by Rule 10b-16.  VR was provided with neither a written statement disclosing the nature of any interest or lien retained by RCM in the security held as collateral nor quarterly statements describing each debit and credit entered during such period.  Had the Defendants caused RCM to comply with the requirements of 10b-16, VR and other RCM customers would have become aware of RCM's misuse of its customers' securities.  Instead, the Defendants hid the RCM Securities Scheme from RCM's customers.

**G.    The RCM Securities Scheme Violated Regulatory Requirements**

164.    Had the Defendants properly safeguarded RCM customers' funds and securities as they were obligated to do under applicable U.S. regulatory requirements and in accordance with applicable New York law and their fiduciary obligations, the fraudulent RCM Securities Scheme would not have been possible and the Defendants could not have effected RCM's conversion and theft of RCM customer assets.

165.    Broker-dealers operating within the U.S. are subject to a comprehensive regulatory regime consisting of numerous U.S. regulations and supervisory structures intended to protect investors.  Foremost among those regulatory requirements are Rule 15c3-1 (17 CFR 240.15c3-1), which requires broker-dealers to maintain sufficient capital to operate safely, and Rule 15c3-3 (17 CFR § 240.15c3-3), which requires broker-dealers to protect and segregate certain customer funds and securities.

166.    Brokers and dealers engaging in international activities from within the U.S. are not exempt from U.S. regulation.  The SEC has determined that the definitions of "broker" and "dealer" do not refer to nationality and that the scope of these definitions includes both domestic

60

and foreign persons performing activities described in Section 15(a) of the Exchange Act (15

U.S.C. § 78o(a)), which include making any use of U.S. jurisdictional means to induce or effect

transactions in securities. Under this approach, all broker-dealers physically operating within the

United States that effect, induce, or attempt to induce any securities transactions, even if these

activities are directed only to foreign investors outside the United States, are required to comply

with regulatory requirements such as 15c3-1 and 15c3-3.

167.    Under Rule 15c3-3, broker-dealers must obtain and maintain physical possession

or control over all fully paid securities and excess margin securities carried for the account of

customers. This rule is a critical deterrent against the misuse and misallocation of customer

funds and securities. Rule 15c3-3 restricts a broker-dealer's ability to place customer monies and

securities at the risk of the broker-dealer's business.

168.    As a United States registered and regulated broker-dealer, RSL was required to

comply with both Rule 15c3-3 and 15c3-1. Likewise, whether or not RCM was required to be a

United States registered broker-dealer (which Defendants knew, or were reckless in not knowing,

RCM was required to be), RCM was also required to comply with both of these rules.[6]

169.    Plaintiffs had every reason to believe that both RSL and RCM would comply with

these provisions of federal law. This was the case whether or not RCM was U.S. registered and

whether or not it was incorporated overseas. At no time did any Refco representative ever

inform Plaintiffs that either RSL or RCM were not complying with either Rule 15c3-3 and 15c3-

1 as they were obligated to. To the extent that Refco may have represented to some customers

that RCM was not subject to U.S. registration requirements, at no time did any Defendant advise

---

[6] Securities and Exchange Commission Release No.34-27017, Registration Requirements for Foreign Broker
Dealers RIN:3235-AD27, July 11, 1989.

61

Plaintiffs that such a lack of registration would permit (which it did not) RCM to convert customer securities to its own use.

170.     Under the control of the Defendants, Refco blurred the corporate forms of RSL and RCM to the point that they had no meaningful independent existence from one another. From at least 2001, RCM had no employees in Bermuda. Rather, RCM operated solely from the U.S. through a sales force of account officers and brokers employed by RSL. These account officers and brokers all carried business cards that identified them as RSL officers and employees. Likewise, all back office functions of RCM were also performed from Refco's office in New Jersey. RCM and RSL shared the same leadership, the same workforce, the same sales force, the same account officers, the same trading desk and the same back offices, as well as the same types of business forms (including customer agreements, trade confirmations, and customer account statements) and the same office space. Both entities effected securities transactions for their customers. Both RCM and RSL were run by the same person – Defendant Maggio. In sum, all of the Defendants, including the THL Defendants, knew or were reckless in not knowing, that RCM had no independent existence of its own.

171.     RSL maintained the following Euroclear-numbered accounts: 92917, 99099, and 10190. Euroclear required that RSL maintain a line of credit in order to clear trades in these accounts. Ignoring corporate distinctions, RSL secured its Euroclear lines of credit with collateral from RCM customer accounts. Until October 2005, Euroclear was under the mistaken belief that the securities held in accounts 92917 and 99099 were securities that were proprietary to RSL. In that month, however, Euroclear learned that some securities in those accounts were actually customer securities, and therefore could not permissibly be pledged as collateral to maintain RSL's line of credit. Euroclear therefore requested that Refco open a new account

(account 11982) containing segregated customer securities. Refco then moved hundreds of millions of dollars of customer securities into that account, without regard to any instructions from the beneficial owners of those securities, the RCM customers.

172.    In fact, RSL, and not RCM, was the sole legal owner with authority over Refco's Euroclear and DTC accounts. But Refco created an internal fiction that its securities customers placed trades with RCM, who in turn, relied upon RSL to effect those transactions. As discussed above, however, this theoretical construct did not absolve Refco from its duties under the securities regulations, and internally designated "RCM accounts" should have been treated in accordance with the same regulatory requirements that Refco applied to internally designated "RSL accounts."

173.    RCM and RSL conducted their activities using the mails and instrumentalities of interstate commerce to, among other things, induce RCM customers to conduct business with RCM so that RCM could thereafter convert those customers' securities and place them at risk by selling them for RCM's account without the customers' knowledge, authorization or consent.

174.    To the extent that RCM had any independent existence separate and apart from RSL, RCM was clearly physically operating within the United States to effect, induce, and attempt to induce securities transactions. Accordingly, at all times, Defendants (including the THL Defendants) knew, or were reckless in not knowing, that both RCM and RSL were subject to the relevant regulations promulgated under Section 15(a) of the Exchange Act, including Rule 15c3-3, which requires broker-dealers to protect and segregate certain customer funds and securities. Given the interconnection between RSL and RCM, RSL was also responsible to ensure that RCM's business was operated in accordance with applicable state and federal law and that RCM customers' funds and securities were protected and segregated at all times.

175.    Indeed, during the relevant period, Refco's counsel, Mayer, Brown, Rowe & Maw

LLP ("Mayer Brown"), expressed the view in a draft memorandum that

(a)    RCM would be deemed to be engaging in "significant" conduct in the U.S.

and could not properly claim to be exempt from the regulatory

requirements of U.S. law;

(b)    RCM did not maintain any personnel or operations in Bermuda and all

RCM's functions and operations were performed by RSL personnel within

the U.S.;

(c)    RSL negotiated and executed all RCM's transactions in the U.S. without

any need for further approval by RCM;

(d)    RCM did not possess any operations or facilities by which RCM could

conduct its own transactions and activities;

(e)    RCM was not a "foreign broker-dealer" but a broker-dealer resident in the

U.S. and therefore unable to rely on the exemption from U.S. registration

provided by SEC Rule 15a-6(b)(3); and

(f)    With RCM being subject to U.S. federal securities laws, RCM should

consider terminating its securities related activities and transferring its

securities trading operations and customers to RSL.

176.    In sum, to the extent that the Defendants sought any legal advice from Refco's

principal outside counsel or other knowledgeable legal counsel, they knew that RCM's business

model was illegal.  To the extent that any of the Defendants failed to seek such advice they were

consciously avoiding the truth.

177.    To the extent that any RCM customer had entered into any agreement inconsistent

64

with these requirements of the federal securities laws, such agreement would have been void by

reason of Section 29 of the Exchange Act, which provides in pertinent part:

    a.     Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

    b.     Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void

        1.     as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and

        2.     as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation... .

178.  Had the Defendants caused RCM and RSL to properly safeguard RCM customer

accounts in accordance with U.S. regulatory requirements to which they were subject, including

the segregation rules, the RCM Securities Scheme alleged herein would not have been possible.

The Defendants were able to effect their conversion and theft of RCM customer assets only as a

result of RCM and RSL's failure to comply with applicable U.S. broker-dealer laws and rules

that were enacted to prevent the very type of conversion and theft of customer property that

occurred here.

179.  Neither RCM, Refco nor any of the Defendants ever disclosed to Plaintiffs that

RCM and RSL were not properly protecting RCM customer assets and so were failing to comply

with applicable U.S. broker-dealer laws and rules.  Had Plaintiffs been advised of RCM's and

RSL's business practices, including their failure to comply with U.S. laws requiring segregation

of customer securities, Plaintiffs would not have left their fully-paid securities in the custody of RCM.

## V.    THE FINANCIAL STATEMENT FRAUD

180.    As alleged above, prior to engaging Refco as its prime broker, VR reviewed audited financial statements provided by Refco, including the consolidated financial statements for RGL and the stand alone financial statements for RCM, both of which had been audited by Grant Thornton. Prior to the LBO, Refco had no publicly-traded debt or equity. And prior to the LBO, Refco's equity was completely held by the Bennett-controlled RGHI and the Austrian bank BAWAG, a participant in RTLs that held a 10% disclosed equity interest in Refco and an equity-like interest that was not disclosed.

181.    A primary objective of both fraudulent schemes described herein was to create false financial statements in order to give customers, potential customers, and transaction counterparties comfort that Refco was financially sound. Such comfort allowed Refco to continue to attract sufficient customer securities to RCM to supply the capital needed to fund Refco's operations and pay enormous dividends, while pumping up the value of the equity stake held by its shareholders, which they intended to monetize through one or more liquidity events.

182.    While RCM's management was providing financial statements showing a sound, healthy enterprise, the reality was that RCM's primary reason for existence in the Refco family was to provide capital to the rest of Refco, by misappropriating it from customer accounts. Another reason for RCM's existence was, pursuant to the RGHI Scheme, to house part of the RGHI Receivable and to act as a conduit through which to facilitate the RTLs.

## A.    RCM's False Financial Statements

183.    As a result of the fraudulent schemes described herein, Refco's Consolidated Financial Statements for the fiscal years ended 2001 to 2005 contained many untrue statements

of material facts and omissions of material facts required or necessary to make the statements

therein not misleading. Because RCM was one of the integral conduits through which the

Defendants operated their fraudulent schemes, *i.e.*, RCM housed at least a portion of the RGHI

Receivable, was party to the RTLs, and, unbeknownst to RCM customers their securities were

being used to finance the activities of Refco affiliated entities, RCM's Consolidated Financial

Statements for the fiscal years ended 2001 to 2005 (collectively, the "RCM Financial

Statements") also contained many untrue statements of material facts and omissions of material

facts required or necessary to make the statements therein not misleading.

184.    Indeed, as a direct result of the RCM Securities Scheme and the RGHI Scheme,

the RCM Financial Statements were misstated and were misleading in at least the following

four ways.

**1.    The RCM Financial Statements Failed to Disclose Material Related-Party Transactions**

185.    For fiscal years 2001 through 2005, a portion of the RGHI Receivable was housed

in RGHI's account at RCM. The RCM Financial Statements for a number of those fiscal years,

however, failed to disclose that a related-party, namely RGHI, was purportedly indebted to RCM

for the bulk of each year in material amounts ranging from approximately $125 million to more

than $525 million.

186.    The RCM Financial Statements also failed to disclose that, as part of the RGHI

Scheme, the material portion of the RGHI Receivable housed in RGHI's account at RCM was

temporarily transformed over the fiscal year-end period (along with the rest of the RGHI

Receivable) into what appeared to be a debt owed to RCM by a third party RCM customer

unrelated to Refco.

187.    Nor did the RCM Financial Statements disclose that the Bennett Co-Conspirators

were facilitating the RGHI Scheme through RCM by causing RCM to extend "loans" with no

business purpose to RCM customers (the RTL Participants) who in turn would extend a "loan" in

the same amount to RGHI to enable RGHI to appear to temporarily pay down the RGHI

Receivable over the fiscal year-end. Moreover, the RCM Financial Statements failed to disclose

that the RTL Participants did not provide any collateral for the multi-hundred million dollar loans

they received from RCM and in the majority of cases, the RTL Participants did not have the

financial wherewithal to repay those loans to RCM. Further, without the loans from RCM, most

RTL Participants did not have the ability to extend multi-hundred million dollar "loans" to

RGHI.

**2.     RCM's Financial Statements Were Inflated Because RGHI's Debt to RCM was Not Collectible**

188.     The RCM Financial Statements reported the following balances as RCM's total

assets, total liabilities, stockholder's equity and net income (in millions):

| | Fiscal Year Ended February 28/29 | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Total Assets | $  3,061 | $  3,967 | $  3,672 | $  4,269 | $  8,643 |
| Total Liabilities | $  2,881 | $  3,698 | $  3,313 | $  3,795 | $  8,033 |
| Stockholder's Equity | $  180 | $  268 | $  359 | $  475 | $  610 |
| Net Income | $  58 | $  88 | $  91 | $  116 | $  135 |

189.     RCM's balance sheet was materially overstated in each of these periods because it

failed to account properly for the fraudulently-created RGHI related-party obligation to RCM (a

material portion of the RGHI Receivable). Because RGHI was incapable of fully repaying its

debt to RCM, the receivable was impaired and should have been written off. Had the RGHI

obligation to RCM been properly recorded, RCM's assets, net income and stockholders' wholly

owned equity would have been significantly lower.

190.     The RCM Financial Statements also materially overstated RCM's operating

68

results because, among other things, RCM's operating results were falsely inflated by significant interest income accruing on the debt owed by RGHI to RCM. This was bogus interest income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised that part of the RGHI Receivable that was housed at RCM.

**3.      The RCM Financial Statements Failed To Disclose The Conversion Of RCM Customer Securities**

191.    The RCM Financial Statements, which were made available to RCM customers, including Plaintiffs, were also misleading in failing to disclose that RCM was treating Plaintiffs' and other RCM customers' non-margined securities as its own (by repoing, selling or hypothecating those securities and transferring the proceeds to other Refco entities), rather than safeguarding the customer securities entrusted to it as a faithful custodian in accordance with the representations made to RCM customers. By omitting this key disclosure, the RCM Financial Statements failed to divulge the most basic aspect of RCM's business and allowed the deception of Plaintiffs' and other RCM customers to continue undetected.

192.    Although the RCM Financial Statements disclosed how customer securities pledged as collateral for margin financing transactions were treated, the RCM Financial Statements failed completely to disclose how Plaintiffs' and other RCM customers' non-margined securities entrusted to RCM were treated on RCM's books and records.

193.    For example, the RCM financial statements for the fiscal year ended February 29, 2004 (the "2004 RCM Financial Statements") disclosed in Note D that RCM treated securities purchased in repo transactions as financing transactions and that "[i]t is [RCM's] policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government." Note D further disclosed that "[RCM] retains the

right to repledge collateral received in secured financing transactions" and that "[a]s of February 29, 2004, substantially all of the collateral received had been repledged in connection with these financing activities. The market value of the collateral the Company receives generally exceeds the contract value by 3% to 4%."

194.    In contrast, the 2004 RCM Financial Statements did not disclose how RCM customer non-margined securities (*i.e.*, securities that were ***not*** pledged as collateral for margin financing via repo or other financing transaction) were treated. The RCM Financial Statements did not disclose whether RCM was including those securities on RCM's balance sheet. And critically, the RCM Financial Statements wholly failed to disclose that it was RCM's policy to take possession of ***all*** customer securities – not just those purchased under agreements to resell – and to sell or otherwise hypothecate or pledge any (or all) of those securities for Refco's own use. Nor did any of the other RCM Financial Statements audited by Grant Thornton disclose these practices.

195.    In not disclosing the most fundamental, and irregular, business practices of RCM and the attendant risk to which Plaintiffs' and other RCM customers' non-margined securities were exposed at RCM, the RCM Financial Statements failed to disclose material information required to be disclosed in order to make the RCM Financial Statements not misleading.

**4.    The RCM Financial Statements Failed to Disclose the Amount and the Nature of RCM's Intercompany Loans to Refco Affiliates**

196.    The RCM Financial Statements were misleading and failed to provide customers with notice that RCM was "lending" billions of dollars to RCM affiliates including RGF, RCC, Refco LLC and RGL (the "Intercompany Loans"). Instead, as VR subsequently discovered in the course of the Bankruptcy Cases, the RCM Financial Statements misleadingly included the Intercompany Loans within the "receivable from customers" line item on RCM's balance sheet.

70

197.    The RCM Financial Statements not only failed to disclose clearly the amount of the Intercompany Loans, they also failed to disclose that the Intercompany Loans were largely, if not wholly, uncollectible.  The RCM Financial Statements did not disclose that the Refco affiliates borrowing funds from RCM:  provided no assurances of their ability, intent, or obligation to repay the funds on demand or otherwise; provided no security for the funds; and lacked the financial wherewithal to repay the funds on demand or otherwise.

198.    The Bennett Co-Conspirators and the Officer Defendants, each owing duties to RCM customers, knew, or were reckless in not knowing, that Refco affiliates indebted to RCM through the Intercompany Loans lacked the intent and wherewithal to repay those loans on demand or otherwise for a variety of reasons.  Certain of the Refco affiliates receiving Intercompany Loans from RCM did not have sufficient liquidity to repay the loans because, for example, as regulated entities, their liquid assets were subject to net capital requirements.  Other Refco entities receiving these Intercompany Loans were subject to various credit agreements that subordinated such obligations even though RCM was not a guarantor of the credit facilities.

199.    In addition, some of the Refco entities receiving Intercompany Loans were using the funds to finance business acquisitions to further improve the appearance of Refco's overall financial position and to show additional growth necessary for the Officer Defendants to cash out some of their interests.  As described in more detail herein, however, the Defendants utilized poor processes and procedures and performed inadequate financial analyses in relation to those acquisitions.  For example, at least one acquisition was entered into notwithstanding the THL Defendants' strong misgivings about the process and procedures used for that deal and their knowledge that the acquisition was being rushed.  In addition, certain other Refco entities used

71

Intercompany Loans to finance questionable investments such as RGL's investment in PlusFunds through Suffolk as described herein.

200.    Further, many Refco affiliates lacked the ability to repay the Intercompany Loans to RCM as a result of the RGHI Scheme. The RGHI Scheme affected certain Refco affiliates' financial position – and their ability to repay the Intercompany Loans – in at least three ways.

201.    First, due to the RGHI Receivable, certain Refco entities' financial positions were not in fact as strong as they appeared to be. The financial positions of those entities were artificially buoyed when the Bennett Co-Conspirators sloughed off onto RGHI's books customer and trading losses, expenses, and other items that were incurred by Refco entities and that should have been properly charged to Refco entities. Rather than recording the related expense, Refco transferred the amounts to RGHI thereby increasing the size of the RGHI Receivable. Had those losses, expenses, and other items been properly recorded, the reported financial position and operating results of those Refco entities (whose results were effectively being subsidized) would have been less robust and Refco's inability to repay the Intercompany Loans would have been revealed.

202.    Second, RGHI's inability to repay the RGHI Receivable had a flow-on effect to other Refco entities. RGHI's principal asset was its investment in Refco and it did not have the ability – absent a liquidity event – to repay the RGHI Receivable to Refco. And, to improve the prospects of a liquidity event, further financial statement manipulation and additional Intercompany Loans to fund new acquisitions were required to give the appearance of strong earnings and growth. RGHI's inability to repay its ever-increasing obligations to Refco left those Refco entities to which it owed money incapable of repaying their ever-increasing obligations to RCM.

72

203.    Third, the undisclosed RGHI Scheme compromised Refco's goodwill, and the

goodwill of a number of Refco entities that were indebted to RCM pursuant to Intercompany

Loans. As was seen in the days following the disclosure of the RGHI Scheme, many of the

Refco entities – including some indebted to RCM – filed for bankruptcy protection when they

were unable to meet their obligations as they came due.

204.    In his opinion at the conversion trial, Judge Drain agreed that the disclosure

concerning the Intercompany Loans was misleading and failed to provide customers with any

notice that there was a massive "hole" of customer funds that were upstreamed and never

returned to RCM:

> [B]ased on my review of the financial statement disclosure that's relied upon by
> the objectors here, I conclude that that disclosure was at best ambiguous and
> would not have alerted customers to a problem that would rise to the level of
> leading them reasonably to believe that their orders would not be executed and
> RCM could not be relied on to return their securities. In particular, the description
> of intercompany transactions does not suggest the type of receivable that would
> have caused someone to panic. Indeed, I think it's acknowledged by all that that
> customer fund "hole" …was, as is evident by the fact it is still a mystery today,
> unknown I think prior to the bankruptcy.

205.    In the RCM financial statements dated as of February 28, 2001, Note 3, entitled

"Receivables from and Payable to Brokers, Dealers, Financial Institutions and Customers," states

that:

> These balances primarily pertain to margin and open contractual commitments
> related to foreign currencies and securities transactions. These receivables are
> generally secured or collateralized. For certain receivables that are not fully
> secured, and where the Company deems appropriate, the Company pursues
> collection of these receivables through various means, including legal action, and
> provides reserves when, in the opinion of management, such reserves are
> appropriate.

A similar footnote was contained in each of RCM's financial statements from 2002-2005.

206.    Note 8, entitled "Related Party Transactions", to the RCM financial statements as

of February 28, 2001, states that "[i]n the normal course of business, the Company executes

73

various securities and other financial instrument transactions with affiliated companies.
Amounts included in the consolidated balance sheet in connection with these transactions are as
follows . . . Receivable from customers [$22.4 million] . . . Loans receivable [$455 million]."
Nowhere do the RCM Financial Statements define what the "various securities and other
financial instrument transactions" were, nor do they define what is meant by "affiliated
companies."

207.    Similar, if not identical, statements are made in the notes of each of the RCM
Financial Statements under the heading "Related Party Transactions." As Judge Drain found in
his opinion, a reasonable investor would not have reason to believe that these disclosures were
purporting to represent massive Intercompany Loans between RCM and its Refco affiliates, nor
that these loans were uncollateralized and that a great many of these loans were uncollectible
(which the Bennett Co-Conspirators knew or were reckless in not knowing) for the reasons stated
above.

**B.    Refco's False 2005 10-K Annual Report**

208.    In February 2005, Refco used more than $345 million in RTLs to mask a portion
of its receivable from RGHI. Thus, the 2005 financial statements (for the period ended February
28, 2005) contained false and misleading information regarding Refco's receivables.

209.    In July of 2005, Refco filed its annual report for the year ended February 28, 2005
with the SEC in the form of a 10-K (July 1, 2005) and an amended 10-K (July 20, 2005). The
financial statements contained in the Annual Report distinguished the results prior to and after a
series of transactions wherein THL Refco Acquisition Partners acquired a 56.7% interest in New
Refco, the new parent of Refco.

NY2:#4755710

210.    The Refco 2005 Annual Report contained many untrue statements of material facts and omissions of material facts required or necessary to make the statements therein not misleading.

211.    Refco's 2005 Consolidated Balance Sheets stated that it and its subsidiaries had receivables from customers in the amounts of $2.1 billion and $1.6 billion for fiscal years 2005 and 2004, respectively; total assets of $48.8 billion and $33.3 billion for fiscal years 2005 and 2004, respectively; and members' equity of $152.8 million and $616.1 million and for fiscal years 2005 and 2004, respectively.

212.    Refco's 2005 Consolidated Statements of Income stated that Refco and its subsidiaries incurred general, administrative and other expenses in the amounts of $243.6 million ($97.6 million for the period March 1, 2004 through August 5, 2004, and $146 million for the period August 6, 2004 through February 28, 2005) and $170.4 million for fiscal years 2005 and 2004, respectively; and earned net income of $176.3 million ($98 million for the period March 1, 2004 through August 5, 2004, and $78.3 million for the period August 6, 2004 through February 28, 2005) and $187.2 million for fiscal years 2005 and 2004, respectively.

213.    Based on the Company's selected, consolidated financial data, for fiscal years 2001, 2002 and 2003 the Refco Annual Report reported:

    (a)    general, administrative and other expenses in the amounts of $140 million, $149 million and $143 million for the fiscal years ended February 28, 2001 ("fiscal year 2001"), February 28, 2002 ("fiscal year 2002") and February 28, 2003 ("fiscal year 2003"), respectively;

    (b)    net income of $72 million, $93 million and $140 million for fiscal years 2001, 2002 and 2003, respectively;

    (c)    total assets of $18.3 billion, $22.6 billion and $19.2 billion for fiscal years 2001, 2002 and 2003, respectively; and

    (d)    members' equity of $500 million, $515 million and $566 million for fiscal years 2001, 2002 and 2003, respectively.

75

NY2:#4755710

214.    The textual portions of the Annual Report also included a significant amount of

financial information.  For example, the MD&A section contains the following statements:

(a)    "General, administrative and other expenses on a consolidated basis for
the year ended February 28, 2005 increased $73.2 million, or 43.0%, to
$243.5 million from $170.3 million for the year ended February 29,
2004."

(b)    "General, administrative and other expenses for the year ended
February 28, 2005 increased $14.8 million, or 8.7%, due in part to
expenses associated with acquisitions during the year ended February 28,
2005, including $9.8 million of expenses associated with the physical
integration of acquired businesses and the recognition of a legal reserve of
$5.0 million."

(c)    "Operating profit for the year ended February 28, 2005 decreased
$38.9 million, or 20.5%, to $150.6 million from $189.5 million for the
year ended February 29, 2004."

(d)    "Net revenues on a consolidated basis for the year ended February 28,
2005 increased $324.2 million, or 32.2%, to $1,331.9 million from
$1,007.7 million for the year ended February 29, 2004."

(e)    "Our cash flows from operations were $528.9 million and $391.2 million
for the period from March 1, 2004 through August 5, 2004 and the period
from August 6, 2004 through February 28, 2005, respectively, as
compared to $727.9 million for the year ended February 29, 2004 as
earnings and operating assets and liabilities exceeded cash and cash
equivalents utilized in secured financing activities."

215.    The statements in paragraphs 211 through 214 (above) were important because

they gave the impression that Refco was a financially stable company and RCM a safe and

honest broker with whom VR could entrust its securities.

216.    The statements in paragraphs 211 through 214 (above) were materially untrue

because Refco failed to disclose the existence of hundreds of millions of dollars of uncollectible

receivables, hidden business expenses, related-party transactions, guarantees, and phantom

income.  Among other things, the reported results for receivables from customers, net assets,

members' equity and net income discussed above were materially overstated, and the reported

76

results for general, administrative and other expenses (which includes allowances for doubtful

accounts) were materially understated. Further, the financial statements were based on the

Company's misstated financial results and, therefore, contained untrue statements of material

facts for the same reasons the Company's financial results contained untrue statements of

material facts.

     217.    The Refco 2005 Annual Report falsely stated that:

> As of February 29, 2004, the Group had a deposit with BAWAG
> Overseas, Inc., a third party financial institution who was a
> member, of $210.2 million. This balance was also included in
> "Receivables from equity members" and was liquidated shortly
> after year-end.

     218.    In fact, the Annual Report failed to disclose that the "deposit" was actually

collateral provided by Refco to BAWAG in exchange for BAWAG's end of the year "loan" to

RGHI that allowed RGHI to temporarily pay down part of the RGHI Receivable.

     219.    Once again, to address the potential risks involved with customer default, Refco

touted its conservative approach with the following disclosure in its 2005 Annual Report:

> Our current system provides the ability to project the impact of
> market volatility on price movement. We perform frequent stress
> tests of our customer positions, including intra-day trading
> analysis, daily equity change analysis, concentration risk analysis
> and premium seller analysis. Adjustments of margin or collateral
> requirements are made in anticipation of unusual adverse market
> developments. These tests have resulted in minimal losses due to
> counterparty exposures. We continue to upgrade our risk
> management procedures and systems to improve our ability to
> monitor actual and projected risk associated with customer
> operations. Our risk management department is responsible for the
> systematic review of customer exposure in both regulated and
> unregulated markets.

     220.    Refco's 2005 Annual Report contained untrue statements and omissions of

material facts because, contrary to Refco's espoused commitment to safeguarding itself against

customer defaults, Refco had experienced significant customer defaults that were not disclosed

NY2:#4755710

to the investing public, and that materially impaired Refco's working capital. Further, Refco's financial statements contained untrue material statements and material omissions concerning the hundreds of millions of dollars in uncollectible debt and operating expenses that were hidden in the RGHI Receivable, which in turn was inaccurately reflected on Refco's books as a "customer receivable." If properly disclosed, the existence of the RGHI Receivable would have jeopardized the Company's credit rating and been a material fact in VR's decision whether or not to keep its securities with Refco.

221.    Refco has publicly admitted that its reported financial information for fiscal years 2002, 2003, 2004 and 2005, as contained in its Annual Report, should not be relied upon. Specifically, on October 10, 2005, Refco announced that the Company's financial statements for fiscal years 2002, 2003, 2004 and 2005 among other periods - taken as a whole - could no longer be relied upon.

**C.    Refco's Violations of GAAP**

222.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

NY2:#4755710

223.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not prepared in accordance with GAAP will be presumed to be false or misleading, despite footnote or other disclosures.

224.    The financial statements issued by Refco and RCM for fiscal years 2002, 2003, 2004, and 2005, and the financial statements for the fiscal quarters therein, did not fairly and accurately represent each Company's financial position or the results of its operations because the financial statements violated key provisions of GAAP.

225.    By failing to disclose recurring, significant related-party transactions between RGHI on the one hand, and RCC, RCM, RGL, and RGF on the other, the Company violated SFAS No. 57, Related Party Transactions, which states in relevant part:

Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. The disclosures shall include:

(a)    The nature of the relationship(s) involved;

(b)    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

(c)    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]

(d)    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

226.    SFAS No. 57 requires the disclosure of relationships between companies under common ownership or management control, when "the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous." Among other persons

79

and entities, Bennett, as the CEO, Chairman of the Board, and significant owner of Refco prior to the August 2005 IPO, exercised control over Refco. Bennett also controlled RGHI, as its sole stockholder. Because Refco and RGHI were clearly under common control, GAAP required full disclosure of all the transactions that took place between these entities.

227.    In violation of GAAP, Refco did not disclose the nature and amounts of the RGHI Receivable. Refco's obligation to disclose the related-party transactions was not alleviated when the outstanding balance was paid temporarily or otherwise; it was still a related-party transaction that should have been disclosed to Refco's creditors and investors. Further, Refco's receivable from RGHI was outstanding on Refco's books for all but the first and last few days of each relevant year end and quarterly financial reporting period.

228.    Refco also violated SFAS No. 5, Accounting for Contingencies, by failing to take a charge for the uncollectible customer receivables described herein. SFAS No. 5 establishes standards for reporting loss contingencies and requires that an estimated loss from a loss contingency be accrued as a charge to income if a liability has been incurred at the date of the financial statement and the amount of loss can be reasonably estimated. The trading and other losses were known since at least 2001, if not earlier, and a charge should have been taken by 2001 at the latest.

229.    Refco also failed to disclose that it guaranteed the multi-hundreds of millions of dollars in sham loans made by BAWAG or unrelated third parties to RGHI in the RTLs. This material omission violated FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others. Even if the likelihood that Refco might have to make payment pursuant to the guarantee was remote, Refco was still required to disclose the details of such a material transaction, including the nature of the

80

guarantee, the term of the guarantee, how the guarantee arose, and any circumstances that would require Refco to perform under the guarantee. Refco failed to disclose even the existence of the transaction that led to the guarantee, making its financial disclosures non-compliant with GAAP.

230.    Refco also violated APB Opinion No. 22, Disclosure of Accounting Policies, which instructs companies to report changes in accounting policies. Accounting policies adopted by a company significantly affect the presentation of the company's financial position and results of operations. Accordingly, the usefulness of financial statements for purposes of making investment decisions depends significantly upon the investor's understanding of the accounting policies utilized by the company.

231.    Refco devoted several pages of its SEC filings to "Significant Accounting Policies" and "Critical Accounting Policies," yet failed to disclose that it did not comply with those policies. Instead of following these policies, the Company repeatedly concealed uncollectible receivables through undisclosed related-party transactions. These recurring transactions, in effect, became Refco's accounting policy. However, Refco did not report this substantially varied accounting policy because it would have revealed the untruths in its financial statements.

232.    Refco's financial statements also violated several general principles of GAAP, including:

- FASCON No. 1 ¶ 34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1 ¶ 40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1 ¶ 50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources

NY2:#4755710

entrusted to it .... To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2 ¶ 58-59: "That information should be reliable as well as relevant is a notion that is central to accounting .... The reliability of a measure rests on the faithfulness with which it represents what it purports to represent ...."

- FASCON No. 2 ¶ 79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

- FASCON No. 2 ¶ 95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6 ¶ 145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities-including matching of costs and revenues, allocation, and amortization-is the essence of using accrual accounting to measure performance of entities."

233. Refco's financial statements were not prepared in accordance with these general principles of GAAP because, among other reasons, Refco had not recognized losses or disclosed additional business expenses that should have been recognized and disclosed; its financial statements mischaracterized related-party transactions and uncollectible receivables as legitimate customer receivables; and its financial statements did not disclose all material information necessary for creditors and investors to make informed investment decisions.

234. Not one of the financial statements prepared by Refco or RCM between 2001 and 2005 was prepared in accordance with GAAP. However, each set of financial statements included a claim by Refco that the statements had been prepared in accordance with GAAP. Refco included this claim so that entities such as VR would rely on the accuracy of the numbers contained therein. For this reason, each of the financial statements prepared by Refco from 2001 through 2005 contained false and misleading statements of material facts.

235.    Further, the true financial condition of Refco and RCM was materially misrepresented in the financial statements through the use of the RTLs to bolster Refco's balance sheet and overall financial picture, upon which VR relied in depositing their cash and securities. Throughout the period when VR entrusted its cash and securities to RCM, and each time it engaged in a securities transaction with RCM, VR was relying upon its belief that Refco and RCM were in sound financial health. VR reasonably based this belief upon Refco's public statements and financial statements that Refco provided to VR from 2001 through 2005.

## VI.    THE FRAUDULENT SCHEMES ARE REVEALED

236.    On October 10, 2005, just two months after Refco's IPO, Refco publicly announced that, through an internal review, it had discovered a receivable in the amount of $430 million owed to Refco by RGHI, the entity then owned and controlled by Bennett. As a result of this "undisclosed affiliate transaction," Refco announced that its financial statements for fiscal years 2002, 2003, 2004 and 2005 could no longer be relied upon.

237.    In response to these disclosures, many RCM customers, including VR, sought to withdraw securities and funds that they entrusted to RCM. On October 13, 2005, Refco announced that it was unilaterally imposing a 15-day moratorium on all trading activities of RCM.

238.    Four days later, on October 17, 2005, Refco (including RCM, RGL, Refco Global Finance, RCC and Refco LLC) filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Court") in the United States Bankruptcy Court for the Southern District of New York, (Case No. 05-60006).

239.    On October 27, 2005, RCM customers, including VR, received a letter from Sexton, as acting President and CEO of Refco, informing them that a timetable for returning funds to customers would be determined by the Bankruptcy Court. Sexton's letter failed to

83

inform RCM customers that their securities had, in many cases, already been sold by RCM with the proceeds being used to sustain Refco's business operations and acquisitions.

240.    It was not until December 5, 2005, that, under Court order, RCM disclosed that it no longer possessed sufficient customer property to return to RCM customers more than two billion dollars worth of securities that customers entrusted to RCM to hold on their behalf.  The December 5, 2005 disclosure also revealed that the majority of RCM's customer property had been transferred to other Refco entities, including Refco Global Finance and RGL through a series of intercompany "loans".  Neither Refco Global Finance nor RGL are operating entities or have significant assets.  Against customer claims of approximately $3.675 billion, RCM held approximately $1.905 billion in assets.

241.    On December 30, 2005, RCM disclosed in a bankruptcy filing that it in fact owed customers approximately $4.16 billion – some $486 million more than previously estimated in Refco's December 5 disclosure.

**VII.    THE SCHEMES AND FALSE FINANCIAL STATEMENTS CAUSED PLAINTIFFS' DAMAGE**

242.    Plaintiffs and other RCM customers were directly damaged by Defendants' schemes and by RCM's and Refco's false and misleading financial statements.

243.    As a direct result of the RCM Securities Scheme, Plaintiffs' fully- owned securities were repoed, sold or hypothecated by RCM, with the proceeds being used to finance Refco's other business activities, when those securities instead should have been held in custody and safekeeping by RCM as it was obligated to do in accordance with the Customer Agreement, RCM's course of dealings with Plaintiffs, as well as applicable state and federal law.  As a direct result of both the RCM Securities Scheme and the RGHI Scheme, RCM become insolvent and was left in a position where it was unable to return customer securities after Refco's bankruptcy

84

filing. Moreover, VR was induced to leave its securities (which were then repoed, sold or

hypothecated without VR's knowledge) with RCM for safekeeping by the false statements and

deceptions detailed in this complaint.

244.    The Defendants' fraudulent conversion of Plaintiffs' securities meant that,

although Plaintiffs received account statements indicating that the securities were in safekeeping

in their accounts, they actually were holding nothing more than an "IOU" from RCM equal to

the value of the customer securities that they delivered to RCM.  By fraudulently converting

Plaintiffs' own securities and deceiving Plaintiffs, Defendants directly exposed Plaintiffs to

RCM's credit risk, *i.e.*, the risk that RCM was not sufficiently creditworthy to make good on its

"IOUs." Thus, when RCM filed for bankruptcy and proved unable to repay the IOUs, Plaintiffs

were left with massive losses resulting directly from the fraudulent conversion of their securities.

245.    In a factual hearing in the Refco Bankruptcy Cases, Judge Drain found that RCM

was a stockbroker, and accordingly, would be subject to liquidation under subchapter 3 of

chapter 7 of the Bankruptcy Code (the "Stockbroker Liquidation Rules").  Under the Stockbroker

Liquidation Rules, customer property (which includes securities entrusted to brokers for

investment purposes), is liquidated and the proceeds pooled.  The customers are then entitled to

share ratably in the pooled proceeds that, after payment of the expenses of the bankruptcy case,

are dedicated exclusively to the satisfaction of customer claims. As a result of the fraudulent

conversion of customer securities, RCM did not have sufficient securities on hand at the time of

the bankruptcy to pay its customers in full.  Accordingly, Plaintiffs were directly and forseeably

damaged when Defendants fraudulently converted RCM customers' securities.  Defendants' theft

of customers' property directly reduced the pool of customer property in which Plaintiffs would

share ratably and effectively guaranteed that there would be insufficient funds from the proceeds

NY2:#4755710

of the liquidation of that property for Plaintiffs to recover the value of the securities that

Defendants had caused RCM fraudulently to convert for use by Refco.

246.    In addition, Plaintiffs were directly damaged by their reliance on the false and

misleading financial statements because, as a direct result of the schemes and the misleading

financial statements, VR was induced to deposit securities with RCM for safekeeping, but,

unbeknownst to VR, due to the Defendants' schemes, those securities were put at risk (and

repoed, sold or hypothecated) from the moment VR made the deposit. Rather than having its

securities kept in safekeeping in accordance with its agreement with RCM, as a direct result of

the fraudulent schemes, VR was unknowingly left with a mere "IOU" from RCM equal to the

face amount of those securities. Despite appearances to the contrary, because RCM was, in

reality, not as financially sound as it represented and had misappropriated and dissipated vast

amounts of its customers' property, VR's "IOU" became a claim against the estates of RCM and

other Refco entities on which there remains a massive shortfall. Had Refco and RCM been in

reality as they were represented in the financial statements, VR's securities would not have been

repoed, sold or hypothecated and Refco and RCM would have been stable, financially successful

entities that were able to make good on any obligations owed to their customers, including

Plaintiffs. Indeed, had Refco's and RCM's financial condition been as they were represented in

their financial statements, Refco and RCM never would have had to file for bankruptcy in the

first instance.

NY2:#4755710

## VIII.   DEFENDANTS' INVOLVEMENT AND KNOWLEDGE OF THE FRAUDULENT CONDUCT

### A.   The RCM Securities Scheme Was Known, Or Recklessly Disregarded, By All Defendants

247.   The RCM Securities Scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each Defendant. The sheer magnitude and size of the transfers raise a very strong inference that the Defendants participated in, and knew of, the RCM Securities Scheme. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each day, ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did. By the time Refco filed for bankruptcy, the net uncollectible transfers exceeded $2 billion, while RGL claimed, respectively, at each fiscal year end, only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $153 million in 2005.

248.   Not surprisingly, given the size of the funds generated for Refco through the fraudulent conversion of customer securities, each of the Defendants was well aware that RCM customer funds were not being protected and segregated in accordance with the relevant state law and federal regulatory requirements. While Refco Board papers in the relevant period monitored segregation and net capital requirements for other Refco entities, those same Refco Board papers made clear that no such segregation requirements were observed in relation to RCM. Refco management also kept careful track of the intercompany transactions and of the customer assets that were held at RCM at any given time. Refco's treasury operations were managed by the treasury department of another Refco entity. Regular reports were generated for Refco management showing the amount of customer assets that could be fraudulently converted

87

and used to sustain Refco's business operations and acquisitions. Defendants had access to these reports during the relevant period. On information and belief, it was by examining reports such as these that Refco management, including the THL Defendants, ascertained that Refco was experiencing severe liquidity problems and thus decided to impose a moratorium on RCM customer withdrawals in October 2005.

249.    Refco management tracked, in regularly produced financial reports, the amount of customer assets available at RCM and the amount required to repurchase customer securities that had been sold by RCM. The THL Defendants had access to such reports throughout the relevant period.

250.    Refco management went so far as to implement a bonus incentive compensation structure that encouraged the conversion of RCM customer assets to support Refco's otherwise unsustainable business operations. During the relevant period, Yorke and other employees working on behalf of RCM and RSL who were responsible for carrying out the sales and transfer transactions in question received bonuses that were determined based on, among other things, the aggregate amount of interest imputed to the intercompany indebtedness to RCM. On February 28, 2006, Yorke testified at a hearing in the Bankruptcy Cases that he and the other RSL employees responsible for carrying out the sales and transfer transactions "were paid for raising money for the firm. That was part of our job."

251.    This compensation structure was overseen and approved by Refco senior management, including the Officer Defendants and the THL Defendants, who, as alleged above, had a representative, defendant Schoen, on the compensation committee. As alleged above, the compensation committee, including Schoen, oversaw Refco's compensation and employee benefit plans and practices, and produced a report on executive compensation as required by

88

SEC rules. On information and belief, the compensation committee including Schoen knew about and approved the bonus structure described above with the understanding that it would incentivize theft of RCM customer assets.

252. As noted, RCM received no margin, collateral, or security and RCM's loans to other Refco entities were improperly and fraudulently documented. Nor did RCM receive any security interests in any of the assets purchased with the transferred funds. The monies were simply transferred and dissipated. The up-stream and side-stream transactions constituted huge red flags of potential irregularities that were known by all Defendants.

**B.    Knowledge And Involvement Of The Officer Defendants**

253. The positions of the Officer Defendants with respect to Refco, and their access to inside information, raise a strong inference that the Officer Defendants knew of both fraudulent schemes alleged herein. The Officer Defendants were responsible for Refco's operations and played a critical role in its management. Refco's IPO registration statement, for example, highlighted the critical role played by Refco's management in Refco's operations, stating that Refco's "success depends to a significant degree upon the continued contributions of our management team, particularly our President and Chief Executive Officer, Philip Bennett."

254. The Officer Defendants each acted with scienter with respect to the fraudulent schemes alleged herein in that they knew, or were reckless in not knowing, that the fraudulent schemes were occurring. The scienter of these Defendants is demonstrated by both direct and circumstantial evidence, as well as by the fact that these Defendants had motive and the opportunity to commit securities fraud. Each of the Officer Defendants was part of a small group of senior executives who conducted and oversaw the day-to-day operations of Refco. Based on their respective roles and their seniority within Refco, each of them individually and as a group

89

had the power and opportunity to control or influence the specific actions that constituted the fraudulent scheme.

255.    As alleged above, defendant Bennett, as President, CEO and Chairman of RGL, conceived the frauds at Refco in order to keep Refco alive long enough to enable him to liquidate his investment in Refco.  Bennett directly participated in and supervised the fraudulent conversion and subsequent transfer of RCM customer assets and the RGHI Scheme.

256.    Defendant Sexton served as Executive Vice President and COO of RGL.  Sexton's responsibilities at Refco included overall responsibility for accounting and finance.  From July 2001 until August 2004, Sexton also served as Executive Vice President and COO of Refco LLC, an RGL subsidiary that received illegal transfers of the proceeds from the fraudulently converted RCM customer assets.  As a result of these high-level executive positions and responsibilities not just within RGL but within Refco LLC, a company in direct receipt of illegally transferred customer assets, Sexton knew, or was reckless in not knowing, that the fraudulent schemes were occurring.

257.    From 1991, Defendant Maggio was Executive Vice President of RGL and President and CEO of RSL.  Maggio was also President and senior risk officer of RCM and sat on RCM's board of directors.  Maggio ran the brokerage operations of RSL and RCM and directly participated in, orchestrated and supervised the fraudulent conversion of RCM customer assets and the RGHI Scheme alleged herein.  Yorke and the other RSL employees who improperly sold, loaned, pledged, hypothecated or converted customer securities frequently did so on Maggio's instructions.  In instigating and overseeing the fraudulent conversion and subsequent transfer of customer assets and the RGHI Scheme, Maggio was a critical player in the fraudulent schemes.

NY2:#4755710

258.    Defendant Murphy was Executive Vice President of RGL, and was President of various up-streaming Refco subsidiaries, including Refco LLC, that were direct beneficiaries of the fraudulent conversion of RCM customer assets during the same period.  He was also President of Refco Global Futures, LLC.  Refco LLC improperly received transfers of the proceeds from sales of RCM customer assets pursuant to the RCM Securities Scheme described herein.  As a result of Murphy's high-level executive positions and responsibilities not just within RGL but within other Refco companies in direct receipt of illegally transferred customer assets, Murphy knew, or was reckless in not knowing, that the fraudulent schemes were occurring.

259.    Defendant Silverman began serving as Secretary of RGL in 1997, and held numerous high-level executive positions within Refco, including Controller of RGL.  As Controller, Silverman was directly responsible for overseeing intercompany and related-party transactions (including transactions between RCM and RCC and RCM and Refco Global Finance), the closing of Refco's books and its internal audits, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for Refco.  A CPA and a close confidant of Bennett, Silverman was also Controller of RGHI and Secretary of numerous Refco subsidiaries.   As Controller of RGHI, Silverman would have had intricate knowledge of the key elements of the RGHI Scheme.  As a result of his high-level executive positions and responsibilities within Refco, in particular in relation to supervising Refco's finances, including intercompany and related-party transactions and accounting policies, Silverman either knew, or was reckless in not knowing, that the fraudulent schemes were occurring.  Silverman resigned at or about the same time as Bennett and Maggio.

91

260.    As CFO of Refco through October 2004, Defendant Trosten was in a unique position to access inside information concerning the fraudulent schemes. Trosten's responsibilities included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level. Trosten was ultimately responsible for Refco's finances and played a critical role in its management. Trosten directly participated in, orchestrated and supervised the RGHI Scheme alleged herein. Trosten's opportunity and obligation to monitor Refco's financial status raise a strong inference of scienter with regard to the RCM Securities Scheme. Given the size of the transfers from RCM to the other Refco entities, and the extent to which those transfers were essential to those entities' continued operation, it is inconceivable that Refco's CFO could have been unaware of the manner in which RCM was raising such funds.

261.    Upon the closing of the THL Entities' LBO in August 2004, Trosten received two payments totaling approximately $48 million. Shortly thereafter, in October 2004, Trosten resigned as CFO, having served in that position for only three years. The Defendants did not disclose the $48 million payment to Trosten, and it became public only after Trosten was forced to admit receiving it during testimony in an arbitration proceeding in the summer of 2005. Notably, Trosten's resignation and the large payment occurred at the same time he knew that Grant Thornton was conducting a re-audit of Refco's fiscal year 2002 financial statements.

262.    The size of the payment at the LBO and the timing of Trosten's resignation – just as the IPO planning had begun – are very suspicious, and raise a strong inference that the payment was an effort to buy Trosten's silence. The approximately $48 million payment was exponentially greater than Trosten's annual compensation of $6 million in salary and bonuses for year 2004 and was grossly disproportionate to his level of experience and expertise. These

92

circumstances raise a strong inference that Trosten knew about each of the fraudulent schemes alleged herein, and that the Officer Defendants, who were aware of and approved the $48 million payment, paid him off to buy his silence. The THL Defendants either knew, or should have known, of these payments to Trosten before Refco's IPO.

263.    As CFO of RCM, Defendant Outridge was primarily responsible for RCM's financial affairs, including RCM's adoption of, and compliance with, appropriate accounting policies, and RCM's maintenance of adequate internal financial controls. In his role as CFO of RCM, Outridge presented details of RCM's finances to members of the Audit Committee. A qualified member of the Association of Chartered Certified Accountants, Outridge was directly involved in the day-to-day management of RCM from 2001 when he was appointed as Vice President and Controller of RCM. Throughout his time at Refco, Outridge was also heavily involved in the preparation of RCM's Financial Statements. Outridge directly participated in, orchestrated and supervised the RCM Securities Scheme alleged herein. As CFO of RCM and a close confident of Maggio, Outridge played a critical role in the financial management of RCM and oversaw the massive transfers from RCM to other Refco entities of the proceeds of the unauthorized conversion of customer securities. As a result of his detailed knowledge of RCM's finances and his obligation as CFO to monitor RCM's financial status, Outridge was aware of key details of the RGHI Scheme and the related financial manipulations at Refco, including that part of the RGHI Receivable that was housed at RCM and the substantial cash and book transfers that were made in and out of RCM pursuant to the RGHI Scheme. Grant Thornton's audit workpapers and related notes also evidence Outridge's knowledge of the details of a number of the RTLs.

93

264.    From 1997 through 1998, Grant was President and CEO of RGL.  It was during his time as President and CEO of RGL, that the fraudulent RGHI Scheme was first devised by Refco as a method to cover up Refco's true financial situation.  As described above, the RGHI Scheme alleged herein had its genesis in the Asian financial crisis of 1997-98, when certain Refco customers suffered large trading losses and were unable to pay their debts to Refco.

265.    Grant deliberately misled the marketplace in the wake of the Asian crisis by publicly issuing a statement denying that there were any serious customer losses and insisting that "there is no problem at Refco."  Grant's public statements were false and intended to mislead.  Refco had suffered heavy losses when customers to whom Refco extended sustained hundreds of millions of dollars in market losses and defaulted on their Refco financing.

266.    To cover up these huge losses, Bennett devised the RGHI Scheme to hide and avoid public disclosure of these uncollectible debts and thereby preserve, and ultimately monetize, the value of their equity interests in Refco.  Prior to the leveraged buyout by the THL Entities and Refco's 2004 Bond offering, Grant owned 45% of Refco.  Grant was a direct beneficiary of the LBO.  Grant cashed out of his interest in RGHI at the time of the Bond offering, pursuant to which Refco was recapitalized in connection with the LBO.  This left Bennett as the sole owner of RGHI.

267.    According to the Grand Jury's Indictment of Grant and others,[7] Grant was a direct participant in the RGHI Scheme and was fully briefed on the various frauds at Refco.  During the period from 1999 to 2004, Grant maintained his indirect interest in Refco (through RGHI) and was regularly briefed by Bennett and Maggio on the status of Refco's ongoing economic

---

[7]    Third Superseding Indictment in *U.S. v Phillip R. Bennett, et al.*, No. S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan 16, 2007).

NY2:#4755710

troubles, including the status of the massive RGHI Receivable. During this period Grant regularly discussed with Maggio the continued financial problems at Refco, including continued "rolling fails", where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors. Moreover, as late as May 2004, Bennett and Grant met at a hotel in lower Manhattan to discuss their plan to repay the massive debt that RGHI owed to Refco. [8] At this time, Bennett and Grant also discussed the structure and progress of the LBO and Bennett updated Grant in detail on the current size of the RGHI Receivable. After the meeting, Bennett told Maggio that Grant was not being realistic about the money that was coming out of the LBO. Upon information and belief, Grant's stake in the fraudulent schemes included a cash payout of $16 million and the right to half of the future proceeds of Bennett's sale of Refco stock, up to $275 million.

268.    The Officer Defendants also knowingly participated in the issuance of false financial statements, including the false RGL financial statements for 2001-2005, the false RCM financial statements for 2001-2005, and the false 2005 10-K Annual Report.

## C.    Knowledge and Involvement Of The THL Defendants

269.    Upon taking control of Refco after the LBO, the THL Defendants must have become aware of the RCM Securities Scheme. Although the RCM Securities Scheme began even prior to the THL Entities' August 2004 investment in Refco it continued – and substantially increased in size – after the LBO, when the THL Defendants were at Refco's helm. Further, the THL Defendants were reckless in not learning of the existence of the RGHI Scheme.

270.    Rather than put an end to the RCM Securities Scheme, the THL Defendants allowed the fraud to flourish. The primary focus of the THL Defendants' interest in Refco was

---

[8]      *See id.*

always the financial benefits associated with taking Refco public. Indeed, on October 19, 2004, just ten weeks after the LBO, THL held a key IPO planning meeting with its professionals and set the gears in motion for the IPO.

271.   In addition to their single-minded pursuit of the profit to be made from taking Refco public, the THL Defendants were also readying themselves to raise a new multi-billion dollar private equity fund with which to grow their business. The THL Defendants' ability to mark their Refco investment to market at a significant profit through a seemingly successful IPO was a critical ingredient in their plan to create the appearance of a favorable track record that they could draw upon to market their new fund.

272.   Because of their desire for a substantial payday and favorable publicity that would allow them to raise billions of dollars to fuel their own investment activities, the THL Defendants, upon learning of the fraudulent RCM Securities Scheme, chose to allow it to continue and grow under their control.

**1.     The Leveraged Buyout**

> **(a)     The THL Defendants Undertake Due Diligence, Putting Them On Notice of Refco's Management Problems**

273.   THL was contacted by Credit Suisse First Boston ("CSFB") in October 2003 regarding an investment opportunity in Refco. At this early stage, THL already viewed Refco as a candidate for a THL-led IPO. THL analyzed Refco to determine whether it could make a substantial investment in Refco and then quickly turn around and sell Refco or its equity to a third party or the public.

274.   THL expressed interest in purchasing Refco, and received a detailed "Confidential Information Memorandum" prepared by CSFB. By mid-November 2003, THL was in talks with CSFB regarding THL's intent to submit an indication of its interest to acquire Refco.

NY2:#4755710

275.     In connection with their leveraged buyout of Refco, the THL Defendants undertook due diligence.  THL hired outside professionals to assist in its due diligence as it prepared to acquire Refco.  These professionals included Weil, Gotshal & Manges LLP ("Weil"), to conduct legal due diligence; KPMG, to review Refco's financial statements; and McKinsey & Co., which analyzed financial market structures and trends.  After the consummation of the LBO, Refco (rather than THL) paid approximately $10 million in professional fees generated by these due diligence efforts.  Had the THL Defendants determined not to go forward with the LBO, THL would have been required to pay those professional fees with its own funds.

276.     The THL Defendants were tantalized by the prospect of a profitable IPO of Refco and were not motivated to undertake a complete and thorough review of Refco's operations prior to the LBO.   Had THL undertaken a thorough and complete review of Refco's operations at that time, it would, undoubtedly, have been on notice of the true state of Refco's problematic financial situation prior to taking control of Refco.  As Federal District Court Judge Gerard Lynch recently stated in another proceeding concerning the fraud at Refco, the problems at Refco were "glaringly suggestive of fraud…[T]here was certainly a monster under the bed…".[9]

(b)     **THL's Knowledge Of Regulatory And Legal Problems**

277.     In connection with their due diligence, the THL Defendants did learn of numerous issues concerning Refco, including what THL later described as "past regulatory, ethical and accounting issues," that put the THL Defendants on notice of irregularities and financial manipulations within Refco and of the need to examine closely the financial information to which they had access upon taking control of Refco.  The THL Defendants ignored those clear warning signs.

---

[9]     *In re Refco Inc. Sec. Litig.*, 05 Civ. 8626, at 57 (S.D.N.Y., April 30, 2007).

NY2:#4755710

278.    For example, the THL Defendants learned that Refco had a long record of regulatory infringements, including fines for filing false trading reports and inadequate record keeping.  Refco had a highly publicized history of serious regulatory and legal problems, including repeated fines imposed by the Commodity Futures Trading Commission ("CFTC"), among other regulators.  Refco paid millions of dollars to the CFTC as penalties for Refco's improper pooling of and misuse of customer funds.

279.    The THL Defendants learned of this checkered past prior to the LBO.  In a March 12, 2004 email, Jaeckel informed THL executives that Refco was a company that played "fast and loose [with] compliance issues."  Likewise, in a May 31, 2004 email to his THL colleagues, Schoen noted that "the old operation [Refco] was in fact fined heavily for activities such as mixing with client funds and parceling winnings out selectively between Refco and clients . . . ."

280.    Another internal THL email in March 2004 informed Schoen that Lee had spoken to Arthur Levitt, former head of the SEC, regarding THL's impending acquisition of Refco.  The email stated: "Arthur [Levitt] said it (Refco) had been known as a 'pump and dump' operation."

281.    The THL Defendants knew that disciplinary actions brought by Refco's regulators ensnared even the most senior Refco executives.  For example, the SEC investigated Refco and Maggio in connection with an investigation into inappropriate short selling of stock in the Sedona Corporation.

282.    In July 2005, RGL publicly announced that Maggio was near a settlement with the SEC that would result in his 1-year suspension from any supervisory duties as a result of his actions with respect to the Sedona manipulation.  RGL also noted the likelihood of a "substantial civil penalty," for which it had set aside $5 million.

98

283.    The THL Defendants also knew that Refco had a history of nondisclosure of uncollectible losses incurred by its customers.  One such instance came to light in litigation related to Eastern Trading Company ("Eastern"), a client of what was then Refco Inc. (and later Refco LLC).

284.    In the late 1990s, Eastern experienced large trading losses that resulted in a deficit of $28 million in its account at Refco.  During Refco's lawsuit to recover this sum, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit said: "for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco [Inc.] did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate [RCC] . . . ."[10]

285.    As discussed below, the Officer Defendants' concealment of customer losses continued during THL's period of majority ownership of Refco and it was the public disclosure of such concealment that precipitated Refco's bankruptcy.

286.    These and other well-known legal and regulatory problems put the THL Defendants on clear notice of Refco's checkered past and the THL Defendants' need, upon taking control of the company, to be especially vigilant in investigating and remedying the deficiencies that caused Refco's serious and widespread previous violations.

287.    Throughout its diligence, THL knew that its professionals repeatedly were stonewalled when they tried to obtain key information from the Officer Defendants.  As a result, the THL Defendants were placed on notice of the possibility of irregularities and financial manipulations within Refco and were well aware of the need to examine closely the financial information to which they had access following the LBO.

---

[10]    *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000).

NY2:#4755710