288.    For example, in March 2004, KPMG reported on at least three separate occasions regarding roadblocks in KPMG's diligence effort thrown up by the Officer Defendants. KPMG reported the following to the THL Defendants:

- The Officer Defendants had not provided KPMG with key financial information, including information regarding the nature of receivables owed to Refco;

- Trosten, RGL's CFO, was unwilling to provide data underlying certain Refco financial figures; and

- KPMG attempted to engage some of the Officer Defendants in a discussion regarding the company's financial information, but those persons restricted the conversation to anecdotal, high-level information.

289.    Initially, THL grew so frustrated with the Officer Defendants that it called off its due diligence. A THL memo dated March 29, 2004 made the point clearly: "we have been disappointed by management's ability to answer diligence questions and respond to data requests." On March 24, 2004, THL's Jaeckel emailed KPMG: "please do not spend time & $ on Refco until further notice - we are struggling on diligence." Indeed the THL Defendants were repeatedly warned by their due diligence professionals that they were not receiving the information necessary to conduct competent due diligence.

290.    On May 10, 2004, Ram Menon of KPMG emailed Jaeckel, George Taylor ("Taylor," a Vice President at THL), and Max Strasburg, an Analyst at THL, ("Strasburg"), alerting them to additional due diligence difficulties. Menon's email attached a document summarizing KPMG's discussion with Mark Ramler of Grant Thornton, Refco's outside auditor. This document indicated that Grant Thornton had not provided KPMG with workpapers regarding "credit risk loss reserves," among other things.

291.    KPMG also informed THL of the Officer Defendants' questionable tax treatment of the liquidation of the former Refco, Inc. into its successor Refco LLC. KPMG stated: "We have requested the [relevant documents] in case they describe the basis for management's

opinion that no gain was recognized as a result of the conversion…We have not received this information."

292.    KPMG further informed THL that Grant Thornton "did not provide us with access to their audit planning memoranda, work programs, test work papers, schedule of audit adjustments and audit conclusion memoranda…[Grant Thornton's] audit conclusions on the fair value or [sic] [Refco's] proprietary investments were not also made available."

293.    Nevertheless, the THL Defendants determined to move ahead with the acquisition with full knowledge that they could not expect cooperation or candor from the Officer Defendants.

(c)    **THL's Reckless Failure to Learn of the Related-Party Receivables**

294.    The THL Defendants also failed to insist upon competent documentation of related-party receivable balances at Refco during its due diligence.

295.    On April 16, 2004 - barely three weeks after it called off its due diligence before restarting - THL sent a letter confirming its proposal to purchase Refco and discussing the structure for a "Potential Future Initial Public Offering" for Refco, (the "Proposal Letter").

296.    The Proposal Letter shows the THL Defendants knowledge of related-party receivables held by RGHI and BAWAG at Refco and the significance of those receivables to Refco's future.  The following were given as preconditions to THL's purchase of Refco:

> [A]ny existing shareholder loans will be terminated prior to Closing and funded with cash otherwise payable to the Sellers [RGHI and BAWAG Overseas], and all existing agreements, contracts or arrangements between the Company and the Sellers or their affiliates will be terminated…[T]he Company may distribute the $120 million amount that was accrued for distribution as of February 29, 2004, provided, however, that no more than $12 million of such distribution will be in cash and the remainder will be made solely through the reduction of amounts payable to the Company from Sellers [*i.e.*, related-party receivables held by RGHI].

101

297.    On May 17, 2004, KPMG issued a draft report to THL summarizing its due diligence findings.  In the section titled "Receivables: risk concentration," the report stated as follows: "Loans at February 28, 2003 included $105 million of receivables from members, affiliated companies and related parties."  Reflecting KPMG's limited access to information, its report provided no analysis of the makeup of this $105 million or any explanation of how the receivable grew so large.

298.    Had the THL Defendants followed-up regarding related-party receivables, they would have uncovered the fraudulent RGHI Scheme and would not have allowed Refco to incur hundreds of millions of dollars in additional liabilities it could not afford.

(d)    **THL's Reckless Failure to Obtain Documentation Regarding RGHI**

299.    The THL Defendants knew that the Officer Defendants refused to provide key corporate documents regarding the relationship between Refco and its CEO's holding company; RGHI.  THL's due diligence professionals repeatedly stressed the need for such documents.

300.    A document titled "Open Diligence Issues" dated February 26, 2004 and prepared by Weil listed RGHI's organizational documents as an "open item." The document also listed this troubling "Open Question": "Relationship of P. Bennett and T. Grant to entities owning Refco Group Ltd., LLC."

301.    Similarly, a May 13, 2004 Weil memo titled "Outstanding Legal Due Diligence Items" stated that Weil still needed to obtain "Voting agreements, stockholders agreements or any other material agreements relating to the relationships between RGHI, Refco Group Holdings LLC, BAWAG Overseas, Inc. and Refco Group Ltd., LLC." Notwithstanding these open issues, and the myriad unanswered questions, the THL Defendants pushed forward without ever receiving the materials.

(e)    **THL Learns Of "Deep Throat" And Allegations Of Internal Fraud**

302.    More than seven months into THL's diligence process, the head of investment banking at a major Wall Street firm, who had heard that THL was about to invest in Refco, called Scott Schoen and warned him of shady practices at Refco, including allegations that Refco was "sloughing off trading losses into a Refco subsidiary" in the 1990s. This senior banker's information came from his cousin, Bradley Reifler (called "Deep Throat" by KPMG), who previously managed Refco's Institutional Sales Desk and is the grandson of Refco's late founder Ray E. Friedman.

303.    KPMG compiled a list of additional diligence items to investigate Deep Throat's report and KPMG's John Berndsen sent this list to Schoen on May 28, 2004. The highest-priority diligence item was to obtain RGHI's financial statements and recent tax returns, tie them to Refco's books, and "[i]solate and investigate all items not flowing through from [Refco]." Had the THL Defendants accepted KPMG's advice and obtained and analyzed the relevant RGHI documents, they would likely have uncovered the fraud being perpetrated by the Officer Defendants. The THL Defendants recklessly failed to do so.

304.    Another high-priority item identified by KPMG was to "[o]btain details and understand the nature of intercompany financing arrangements, both on- and off-balance sheet." These intercompany financing arrangements were crucial to understand the fraud at Refco. Again, the THL Defendants rejected KPMG's advice.

305.    Instead of conducting the recommended due diligence, THL merely discussed the "Deep Throat" issues with Bennett. On the question of "application of proceeds in the Sub S [RGHI], historical distributions, and handling of taxes," Schoen wrote in an email: "I would not say that [Bennett] has yet committed to actually show us tax returns or Sub S [RGHI] underlying organizational and ownership documents, but the issue is on the table and we will have the

NY2:#4755710

opportunity to press on until we develop comfort." In connection with THL's request for a

meeting with THL and Ernst & Young, LLP - which had served as tax advisor to the Refco

entities, but resigned from handling Refco's tax returns in 2003 after (among other things) Refco

refused to make what Ernst & Young deemed to be appropriate disclosures regarding the amount

of RGHI's receivable balances - Bennett refused to permit THL's request for a meeting. The

THL Defendants chose not to press the issue.

306.    On June 2, 2004, Jaeckel sent an email to other THL executives to summarize his

meeting with Bennett regarding "Deep Throat." According to Jaeckel, Bennett stated that in the

1990s, customers of Refco had incurred losses, and these losses were run through certain

unconsolidated overseas affiliates of Refco in order to offset their foreign tax charges. Bennett

represented to THL that RGHI never had accounts at Refco and never would have such accounts

in the future; these words, wholly false, were accepted by the THL Defendants, without any

corroboration, as adequate assurance that the Bennett Co-Conspirators were not hiding any

trading losses. The THL Defendants never obtained appropriate documentation or other

evidence from anyone at Refco other than Bennett.

307.    On June 2, 2004, Schoen sent an email to other THL executives summarizing this

same meeting with Bennett. Schoen stated:

> Phil [Bennett] met with me and Scott Jaeckel to discuss tax
> liabilities and payments by the S Corp [RGHI]. I also pressed him
> that we really needed at least the Reader's Digest version of who is
> getting the proceeds from the deal, in particular how much is he
> putting in his pocket versus his rollover. He agreed that we need to
> be taken through all of it, but deferred the entire discussion until
> tomorrow morning. He says he needs to close the loop with Tone
> Grant before opening up these details. We will have to see where
> this discussion goes tomorrow.

NY2:#4755710

308.    On June 3, 2004, Harkins of THL responded to Schoen's email regarding Bennett's refusal to disclose who was getting the proceeds of the deal.  Harkins wrote: "Good luck.  He just will not come clean easily on this one."

    (f)    **THL Learns Of Facts Hidden By Certain Members of Refco's Management**

309.    As noted, the THL Defendants were fully aware that they could not expect candor from the Officer Defendants.  This became particularly apparent late in THL's due diligence process, when the THL Defendants learned that the Officer Defendants had repeatedly failed to be forthright with them.

310.    Shortly before the LBO, the THL Defendants learned that a Refco executive attempted to hide from THL a significant legal obligation that Refco may have owed to Edward McElwreath, who demanded a commission for introducing Refco to THL.  By letters dated May 6, 2004, McElwreath's attorney made his demand known to Bennett and to THL's Schoen.  The letter to THL stated that Peter McCarthy, Executive Vice President of RSL, suggested that McElwreath wait until the close of the THL Recapitalization to make his demand, in order to "keep the contract's existence from [Thomas H. Lee Partners]."  This surprise disclosure did not deter THL from going forward.

311.    The THL Defendants also were aware that the Officer Defendants failed to share key information regarding a litigation between Tradewinds Financial and RSL.  On or around June 17, 2004, just six weeks before the LBO, a jury in New York returned a verdict in favor of Tradewinds and against Refco.  Tradewinds had sued Refco for $45 million.  Although the THL Defendants had been generally aware of a litigation involving Tradewinds and Refco, they were not told by the Officer Defendants that the matter either was on the verge of trial or that the trial had been lost.

312.    After THL and/or Weil raised their concern about the Officer Defendants' failure to voluntarily disclose the current status of the Tradewinds litigation, Schoen discussed this topic with Bennett.  On June 19, 2004, Schoen sent an email to THL executives including Jaeckel and Jay Tabor, an attorney at Weil, stating:

> Phil [Bennett] and I spoke for about an hour.  He obviously went to great lengths to try to reassure me that there was no deliberate attempt on Dennis [Klejna's (Refco's General Counsel)] part to mislead us.  I focused on the need to have the kind of open communication and transparency that we need as partners, and that he and we need as Directors on an ongoing basis.  I referred to the discussion on the SEC matter [Sedona] as a similar experience, and he understood exactly what I was talking about.  While I do not have satisfaction as to how this miscommunication/misunderstanding occurred, we have at least raised the bar on disclosure.  Phil also understands that this cuts at our credibility with the lenders…

313.    Although Schoen recognized that the THL Defendants required "open communication and transparency" in order to fulfill their duties, the THL Defendants knew they were not receiving this from the Officer Defendants.  Collectively, these examples of a lack of transparency and co-operation from Refco and the Officer Defendants throughout the LBO due diligence put the THL Defendants on clear notice of the possibility of financial manipulations and fraud within Refco and the need to examine very closely all the financial and other information to which, following the LBO, the THL Defendants had unfettered access.

314.    After the LBO, when the THL Entities became Refco's majority owner and the THL Defendants assumed direct oversight and management of Refco, the THL Defendants could obtain, and indeed had fiduciary obligations to obtain, answers to questions that had been raised but not answered in the course of their due diligence.  In obtaining answers to these previously unanswered questions, the THL Defendants would have learned of the fraudulent schemes operating within Refco.

106

**2.    THL Buys 57% Stake In Refco For $507 Million**

315.    Had the THL Defendants pressed for information with respect to any of the leads provided by Deep Throat, rather then failing to do so as set forth above, the THL Defendants almost certainly would have uncovered the fraudulent RGHI Scheme.

316.    Despite the unanswered questions and risks associated with an acquisition of Refco, THL, one of the world's most sophisticated leveraged buyout firms, forged ahead and entered into an agreement with various Refco entities. The THL Entities and their affiliates agreed to purchase 57% of RGL, a company purportedly valued at $2.25 billion.

317.    To facilitate and fund the LBO, THL created two new entities: New Refco and Refco Finance Holdings LLC ("Refco Finance"). THL arranged for $1.4 billion in debt financing at Refco Finance. As part of the transactions, Refco Finance borrowed a total of approximately $1.4 billion: $800 million pursuant to a senior secured credit facility, and $600 million from the issuance by Refco Finance of unsecured subordinated notes. As part of the same series of transactions, Refco Finance merged with and into RGL with RGL as the surviving entity.

318.    RGL then purportedly distributed $500 million, supposedly representing excess cash held on RGL's books, to New Refco, which in turn purportedly distributed those funds to RGHI. As Refco and THL agreed, RGL also distributed certain businesses valued at over $238 million, referred to as the Asset Management entities, to New Refco, which in turn distributed those businesses to RGHI. These distributions to RGHI, and its sole owner, Bennett, had been endorsed by THL prior to the LBO.

319.    Subsequently, RGHI, and the THL Entities contributed their ownership interests in RGL to New Refco in exchange for the following consideration:

107

- Bennett, sole owner of RGHI, monetized a portion of his ownership in RGL in the amount of $875 million, and exchanged the remainder of his interest in RGL, with a stated value of $382.5 million, for an approximate 43% interest in New Refco.

- The THL Entities and affiliates received an aggregate of 283 Class A Common Units of New Refco, which amounted to approximately 57% ownership interest.

320.    As a result of these transactions, New Refco owned 100% of RGL and became its sole member.

### 3.    THL Executives Join Refco's Board

321.    As part of the LBO, the THL Entities gained significant control over Refco, notably including the power to appoint board members. The THL Entities designated four THL executives to New Refco's board. In addition, certain THL executives became officers of New Refco: Schoen, Jaeckel, and Taylor became President, Treasurer, and Secretary, respectively. As a result of their positions as Board members and officers of New Refco, these THL executives formally assumed fiduciary duties to New Refco.

322.    The THL Defendants derived their control from their ownership position in Refco, as well as the Amended and Restated Limited Liability Company Agreement (the "New Refco LLC Agreement"). The New Refco LLC Agreement stated that "The business and affairs of the Company shall be managed and controlled by or under the direction of a Board of Managers...The initial Board of Managers shall be comprised of the individuals set forth on Schedule D." Schedule D listed the following Managers: David V. Harkins (THL); Scott L. Jaeckel (THL); Thomas H. Lee (THL); Scott A. Schoen (THL); Phillip R. Bennett; Robert C. Trosten; and Phillip Silverman.

323.    The New Refco LLC Agreement included a section titled "Duties" that stated: "The Managers, in the performance of their duties, shall owe to the Company and the Members

NY2:#4755710

duties of loyalty and due care of the type owed by the directors of a corporation to such corporation and its stockholders under the laws of the State of Delaware."

324.    Lee, Harkins, Jaeckel and Schoen also owed fiduciary duties to RGL. A Fifth Amended and Restated Limited Liability Company Agreement of RGL (the "RGL LLC Agreement") was entered into by New Refco (the sole member of RGL) on August 5, 2004. The RGL LLC Agreement included a section titled "Management" that stated:

> The business and affairs of the Company [RGL] shall be managed by the Member [New Refco]…Member shall have complete and absolute control of the affairs and business of the Company, and shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

## 4.    THL's Lucrative Management Agreement

325.    As part of the LBO, THL Managers V agreed that it would serve in an oversight and managerial capacity for Refco in return for tens of millions of dollars in fees. This Management Agreement was entered into on August 5, 2004 by New Refco (the "Company" for purposes of the Management Agreement), RGL, and THL Managers V (the "Sponsor").

326.    The Management Agreement was entered into after the THL Entities and their affiliates had made their $507 million investment in the LBO, for which they received a controlling 57% ownership share of New Refco.

327.    The preamble to the Management Agreement reads in part as follows:

> WHEREAS, the Sponsor has staff specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services.
>
> WHEREAS, the Company will require the Sponsor's special skills and management advisory services in connection with its business operations and execution of its strategic plan.

WHEREAS, the Sponsor is willing to provide such skills and services to the Company.

328.    The Management Agreement provided that THL Managers V would provide advisory services to Refco under the following circumstances:

The Sponsor hereby agrees that if…[New Refco or RGL] reasonably and specifically requests that the Sponsor provide the services set forth below and the Sponsor agrees to provide such services, the Sponsor or one of its affiliates will provide the following services to the Company and its subsidiaries:

(a)    advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to the Company's or any of its subsidiaries' finances or relationships with banks or other financial institutions; or

(b)    advice with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of the Company and , and [sic] other senior management matters related to the business, administration and policies of the Company and its subsidiaries.

329.    New Refco and RGL agreed to pay THL Managers V's fees "[i]n exchange for the Sponsor's arrangement of the equity financing and agreement to provide the services set forth" in the Management Agreement.

330.    The first fee to be paid by New Refco and RGL to THL Managers V was an initial lump sum payment of $31.6 million (the "Initial Management Fee"). The second fee was a recurring management fee (the "Annual Management Fee") payable semi-annually and was to be the greater of (a) $2.5 million per year or (b) 1% of Refco's EBITDA.[11]

---

[11]    "EBITDA" was defined in the Securityholders Agreement between the parties to the Management Agreement as consolidated earnings for a given fiscal year of New Refco and its subsidiaries before interest, taxes, depreciation, and amortization.

NY2:#4755710

331.   The Management Agreement was to continue in effect until one of three events took place:

- termination by THL Managers V;

- automatic termination on the date that THL Managers V and its affiliates no longer owned at least 25% of the equity of New Refco; or

- termination by THL Managers V upon the consummation of an initial public offering by New Refco or any successor entity.

332.   If the Management Agreement were terminated upon an IPO (as was foreseen all along), New Refco and RGL were to pay THL Managers V a buyout fee (the "Management Agreement Buyout Fee"). The Management Agreement Buyout Fee was to be equal to the net present value of the fees payable for five years from the termination of the Management Agreement. In August 2005, a termination fee of $12.9 million was paid to THL as a result of the IPO.

333.   The Management Agreement was signed by Bennett on behalf of New Refco and RGL. Signing on behalf of THL Managers V were other members of the THL Entities - THL (as its Managing Member) and Equity Advisors V (as its General Partner) - and Schoen (as Managing Director of THL Managers V).

**5.   THL's Awareness Of Financial Deficiencies At Refco Post-LBO**

334.   After the leveraged buyout, the THL Entities became Refco's majority owner and the THL Defendants assumed direct oversight, management and control of Refco. Moreover, after the leveraged buyout, the THL Defendants had unfettered access to all information regarding Refco's internal functioning.

335.   Once on board and at the helm, the THL Defendants learned that Refco's accounting and auditing function, both internal and external, was a disaster. The THL

Defendants knew and discussed the fact that Refco's accounting function was inadequate for a company seeking to go public, and that Refco needed to hire a "Big Four" accounting firm.

336.    As fiduciaries, the THL Defendants had a duty to put Refco's interests ahead of their own. Moreover, to justify the tens of millions of dollars they reaped in the Management Agreement, the THL Defendants should have, at a minimum, insisted on correcting the problems that they knew to be afflicting Refco. Instead, for the THL Defendants, the choice was simple and had nothing to do with fiduciary duties. Taking Refco public would greatly benefit the THL Defendants, so they pushed ahead without regard for the adverse consequences to Refco. On October 19, 2004, just ten weeks after the LBO, THL held a key IPO planning meeting with its professionals, and set the gears in motion for the IPO.

337.    Aside from the financial gain to be made from a sale of Refco stock, the THL Defendants knew that a successful IPO was critical because they were making preparations to market a new private equity fund, for which THL hoped to raise approximately $7.5 billion from institutional investors. In an email exchange with an investor in March 2005, even as a THL executive was discussing THL's current investments such as Refco, the executive was soliciting interest in "our new fund - Fund VI and hopefully Q1 2006."

338.    In March 2005, during the push toward an IPO, the THL Defendants learned that Refco executives had lied to THL about the existence of a letter to Refco's management from Refco's outside auditors, Grant Thornton (the "Management Letter"), that discussed significant internal accounting deficiencies at Refco. The Management Letter had been prepared by Grant Thornton and dated October 15, 2004, but it was not provided to THL by the Officer Defendants.

339.    When Jaeckel learned of the Management Letter on or about March 31, 2005, he forwarded a copy of the Management Letter internally within THL, and asked: "What does this

112

letter say? I don't recall ever hearing about this letter. you guys?" THL executive Taylor

responded in another internal THL email stating: "I have never seen the [Management] letter

before the email and it is as horrendous as it sounds."

340.    On April 1, 2005, Jaeckel wrote an internal THL email expressing his anger that

the Officer Defendants, with the assistance of Refco's outside auditors, had not provided the

Management Letter to THL:

> when was the letter issued? i can't remember if we sa[w] auditor
> letters during diligence, perhaps we should send it to berndsen [at
> KPMG] to get his views and see if he remembers it. if this letter
> was release[d] in oct and neither mgmt nor gt [Grant Thornton]
> told us about it i am ANGRY at both [.]

341.    On April 1, 2005, Strasburg sent an internal THL email explaining that, at or

about the time that Grant Thornton had provided the Management Letter to Refco management,

management had pressured Grant Thornton to change or retract many of its conclusions in an

effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant

Thornton:

> These are the facts as I've heard them…A draft of the letter was
> first issued in October. Gerry [Sherer, Refco's then Chief
> Financial Officer] received it when he first got there [date] and
> "tore GT a new one" for using the words "significant deficiency"
> with regard to the systems. GT printed a revised version of the
> letter omitting those words and without management's response on
> March 29th and gave to Gerry. Gerry responded in writing two
> days ago with regard to the systems comment.

342.    On April 6, 2005, Jaeckel sent an internal THL email discussing how the

Management Letter had not been provided to THL:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT
> management letter. As we discussed on Monday neither the
> company nor GT shared this letter with us, the audit committee or
> Weil. Weil believes they asked both the company and GT if there
> were management letters and was told no.

343.    The Management Letter listed nine broad and important "Internal Control

Deficiencies" at Refco:

- IT Environment;
- Consolidation Process;
- Formalized Reporting and Closing Process;
- Internal Audit Function;
- Fixed Asset Subsidiary Ledger;
- Accounting Procedures and Policies;
- Accounting Function;
- Refco Capital Markets Ltd. Custody Reconciliations; and
- Audit Coordination.

344.    The identification of these specific deficiencies put the THL Defendants on

further notice of significant financial irregularities within Refco. Of critical importance in light

of the fraudulent conversion of RCM customer securities is Grant Thornton's comment regarding

a "Refco Capital Markets Ltd. Custody Reconciliations" deficiency in the Management Letter,

which read: "The Company could not produce any custody reconciliations at or around year end

for EQ."

345.    Only through the fraudulent "up-streaming" of customer funds in accounts held at

RCM was Refco able to fund its operations. Had the THL Defendants asked for RCM's custody

reconciliations (which were essential to understanding how Refco functioned), they would have

seen that Refco's business model, as directed by the Officer Defendants, was rooted in fraud and

unsustainable. They did not ask for them, either because they already knew about the fraudulent

misappropriation of RCM customer securities or because they were seeking to avoid learning the

truth about those practices.

346.    Grant Thornton's comment regarding Refco's "Internal Audit Function"

deficiency stated that "it has become essential to establish an internal audit function [at Refco]."

347.    Had the THL Defendants acted appropriately in light of this information, they

would have ensured that the internal audit function was staffed and operating properly. A proper

114

internal audit function would have revealed to the THL Defendants, before the IPO, the various accounting improprieties and frauds within Refco.

348.    Grant Thornton's comment regarding Refco's "Accounting Function" deficiency read in relevant part:

> At present, the accounting function does not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer. Although the Company has taken stop gap measures in engaging PWC to fill these gaps, it is not a solution. The Company needs to hire qualified people with the necessary skills and expertise . . . . (emphasis added).

349.    The identification of these specific deficiencies and irregularities within Refco put the THL Defendants, at a minimum, on clear notice of the real possibility of financial manipulation within Refco. Had the THL Defendants acted appropriately in light of this information they would have taken steps to ensure that control deficiencies were remedied and the internal accounting and financial reporting functions were staffed and operating properly. Had they done so, the THL Defendants – purportedly among the most sophisticated financial players on the street – would surely have uncovered the various accounting improprieties and frauds conducted within Refco. Their failure to do so can be explained only by recklessness or actual knowledge of the fraudulent schemes.

## 6.    THL Refuses To Provide Refco Quarterly Financial Statements

350.    Had the THL Defendants undertaken the rudimentary step to analyze Refco's balance sheet and income statement on a quarterly basis for the period leading up to the LBO, the RGHI Scheme would have been apparent to them. Until the LBO, Bennett, together with the Bennett Co-Conspirators, had only effected the RTLs at the end of Refco's fiscal year; as a result, in contrast to Refco's balance sheet at its fiscal year end, a review of the large items on

Refco's balance sheet at the end of each of the three interim quarters in the pre-LBO years would have revealed the large receivables from RGHI.

351.    Incredibly, the THL Defendants went out of their way to avoid doing such a quarterly analysis.  In a January 20, 2005 email, THL's counsel relayed a request from potential IPO underwriters' counsel for quarterly financial information for the previous seven quarters. Underwriters' counsel had explained to Refco's counsel that such quarterly information would have shown "the quarterly effect of both seasonality and the THL transaction", items that it would have been logical for the THL Defendants to want to understand as well.  An analysis of the large balance sheet items on a quarterly basis would likely have revealed the ongoing fraud at Refco.

352.    In response, defendant Jaeckel made clear that Refco would not provide quarterly numbers:  "As for quarterly financials we are not going to do this.  If the bankers have questions they can call me."  Plainly, Jaeckel did not want to be put to the task of having accountants review the historical numbers on a quarterly basis, something that the THL Defendants surely should have reviewed for themselves in connection with the discharge of their fiduciary responsibilities, their obligations under the management agreement, and even minimal due diligence as controlling stockholders.

## 7.    THL's Failure To Ensure A Proper Audit

353.    Soon after the LBO, the THL Defendants realized that Refco needed to replace Grant Thornton.  The THL Defendants were well aware that Grant Thornton had done a substandard job auditing Refco and conceded among themselves that Refco's audited financial statements could well be inaccurate.  Based on, among other things, Grant Thornton's handling of the management's opposition to the Management Letter, the THL Defendants knew that Grant Thornton was not sufficiently independent of the Officer Defendants to discharge its

responsibilities to audit the various financial statements for Refco. In email traffic, THL executives noted that in order to clean up Refco's accounting and financial statements, Grant Thornton should be replaced with one of the "Big Four" accounting firms.

354.    The THL Defendants knew, however, that a new auditor would need time to conduct a proper audit, and therefore would require THL to delay Refco's IPO. The THL Defendants were unwilling to accept such a delay.

355.    The THL Defendants also knew and discussed the fact that, besides the question of delay, there was a "restatement risk" that came with hiring competent outside auditors. This frank admission by the THL Defendants that Refco's audited financial statements had a significant likelihood of being materially inaccurate, coupled with the decision not to hire competent auditors so as not to interfere with their self-serving drive to the IPO, was reckless and constituted a breach of the THL Defendants' fiduciary duties to Refco.

356.    The THL Defendants' conflict was clear. In an October 6, 2004 email to persons at THL and KPMG, Jaeckel highlighted two possible courses of action with respect to Refco's outside auditors. Jaeckel expressed concern about the "restatement risk" as well as a possible delay in THL's planned sale of its equity stake in Refco:

> Auditors. I think we narrowed this down to 2 main options. Option A - file [the IPO] as soon as possible so we are on the road in January. We will have to stay with GT under option A...Frank [Casal of KPMG] cautions that we run 'restatement risk' by switching auditors (we run this risk in either option but it is magnified when you have public equity). He said the big four take a very hard and long look at the books of companies audited by second tier firms. Option B - replace current auditors for fiscal 2005 audit. Big four are currently swamped with year end and SOX work...Likely to mean that we wouldn't be selling equity until summer.

357.    The THL Defendants faced a stark choice: improve the dysfunctional and inadequate audit situation but delay the IPO, or push ahead with the IPO notwithstanding serious

117

audit shortcomings.  Knowing that Refco's audited financial statements could well be in need of a restatement, the THL Defendants chose the latter.  Aware of the poor financial controls that existed at Refco and concerned that a replacement auditing firm in looking closely at Grant Thornton's work would require a restatement of Refco's financial statements, the THL Defendants exercised their control over Refco to retain Grant Thornton as Refco's outside auditor so that their highly profitable IPO could proceed as expeditiously as possible.  The THL Defendants so acted despite their knowledge that Refco's financial statements were not reliable.

358.    The THL Defendants decided to retain Grant Thornton even though it took ten months from Jaeckel's email to consummate the IPO - more than enough time to change auditors and long enough for the fraudulent schemes within Refco to continue and indeed grow in size while Refco was without the safeguard of a capable auditor.  The real reason for the THL Defendant's decision was their recognition that bringing in a new, objective auditor would reveal the "monster under the bed" prior to a successful IPO with disastrous financial and reputational consequences to the THL Defendants.

359.    In addition to raising issues about THL's outside auditors, THL executives repeatedly (and justifiably) expressed concern over Refco's internal accounting staff:

- On March 28, 2005, Jaeckel wrote an internal THL email in which he said that "[t]he staff departures [of two senior Refco accounting personnel] are troubling - [I]'m getting increasingly worried about our audit."

- On March 30, 2005, Strasburg sent an internal THL email regarding an "Auditor call" with Mark Ramler from Grant Thornton.  Strasburg said: "Ramler pulled no punches - essentially calling [Refco's] finance staff ex[cept] Gerry [Sherer] 'lazy.'"

- On April 1, 2005, Taylor sent an internal THL email in which he concurred that "Gerry [Sherer] is clearly a one man band in the short run."

NY2:#4755710

360.    Notwithstanding their well grounded concerns, the THL Defendants did not remedy these internal accounting deficiencies.  To fix the problems at Refco would again have placed THL's much-desired IPO at risk

**8.    THL Becomes Aware of the Profit Sharing Agreement**

361.    Subsequent to the LBO, the THL Defendants learned first-hand that the Officer Defendants had not been honest with them.  One stark example is the THL Defendant's discovery that before and after the LBO multiple Refco executives withheld information from the THL Defendants and others regarding an important and lucrative compensation scheme.

362.    In or around 2001, eight Refco executives, including Officer Defendants Bennett, Murphy, Trosten, Maggio and Sexton, purportedly entered into an arrangement with RGL, pursuant to which they would receive substantial payments from RGL in the event that RGL was sold to a third party for more than $900 million (the "Equity-Like Arrangement").  By January 1, 2002, the Equity-Like Arrangement had been restructured in an effort to provide favorable tax treatment to the participants.  Under the revised scheme, the participants purportedly obtained profit participation interests in RGL pursuant to which they would share in RGL's net annual income equal to their respective equity-like interest in RGL (the "Profit Sharing Agreement" or "PSA").

363.    This arrangement purportedly was implemented by amending the RGL partnership agreement on January 1, 2002 to allow for profits-only members, who were entitled to share in the annual net profits of RGL but were not entitled to vote.

364.    In June 2004, shortly before the consummation of the LBO, Refco agreed to redeem the purported equity-like interests by paying the executives a portion of the proceeds derived from a sale of Refco in amounts ranging from $2 to $25 million.  The participants did

119

not disclose to the THL Defendants their purported equity-like interest in RGL, nor that they were to receive substantial redemption payments upon the LBO.

365.    In the pre-LBO due diligence period, Weil, at THL's behest, had asked Refco to provide its "employment arrangements or arrangements with key employees." Weil sent questionnaires to Refco executives asking them to disclose information concerning their respective backgrounds and regarding Refco's executive compensation structure. The questionnaires specifically asked the Refco executives whether they had any personal financial interest in the LBO. None of the eight participating directors or officers disclosed their participation in the PSA. Thus, none of the eight participating directors or officers disclosed that they would gain substantially from a high-priced sale of Refco.

366.    Immediately after the closing of the LBO, the THL Defendants began preparing for the IPO. Weil, again at THL's behest, sent identical questionnaires to Refco executives again asking whether they had any personal financial interest in the contemplated transaction.

367.    This time around, two Officer Defendants decided to come clean. Having already been paid millions of dollars, these executives had less to lose by telling the truth. Thus, in March 2005, Murphy contacted Weil to determine whether he had to reveal his participation in the PSA. Murphy informed Weil that he understood that Sexton  planned to disclose his participation in the PSA. On his questionnaire, Sexton disclosed that Refco had agreed to acquire his "outstanding profits participation interest" for a total of $9,043,850.

368.    Following this partial and belated airing of the truth, Refco informed Weil that two other executives  also participated in the PSA. The THL Defendants therefore had knowledge that on August 5, 2004, upon consummation of the LBO, the PSA interests held by these four individuals had been partially redeemed for a total of approximately $26 million,

using RGL funds routed through RGHI. The THL Defendants also knew that the remaining redemption payments for the PSA interests were to be accelerated upon consummation of the IPO. As a result, the THL Defendants knew that certain of the Officer Defendants - particularly Bennett, the 100% owner of RGHI - had yet another reason to take Refco public at a high price and had taken affirmative steps to conceal their equity-like interests in Refco.

369.    Faced with blatant evidence that certain of the Officer Defendants engaged in fraudulent conduct by failing to disclose the existence of their profit participation arrangements, the THL Defendants were on plain notice that at least a substantial part of Refco's management was not fit to be leading a public company. Rather than take appropriate steps to address the issue, the THL Defendants chose to ignore it and move forward with the IPO that was vital to THL's future financial and reputational success. Worse still, the THL Defendants opted to keep hidden from Refco's various constituencies, including securities customers like VR, the fraudulent conduct and character of these Refco executives in order to ensure that the THL Defendants were able to follow through on their plan to go forward with the IPO.

**9.    THL's Knowledge Of Acquisitions Consummated Without Proper Diligence**

**(a) The Cargill Acquisition**

370.    On June 22, 2005, Refco announced the acquisition of Cargill Investor Services for $209 million, a significant transaction for the company. This transaction was funded using converted and upstreamed RCM customer property. The THL Defendants, in their capacity as Board members, were thoroughly involved in the transaction and either knew, or were reckless in not knowing, that the source of financing was stolen RCM customer property. RGL's Balance Sheet, as reported on its Form 10-Q for the period ending May 31, 2005, showed approximately $405 million in cash and equivalents on hand. It is inconceivable that financiers as shrewd and sophisticated as the THL Defendants would allow a cash acquisition amounting to more than

121

50% of the company's cash on hand to go forward without a firm understanding of the sources of funds being used to finance the acquisition.

371.    On June 14, 2005, a Refco employee emailed the Refco board of directors to request a conference call to discuss Project Key, the code name for Refco's acquisition of Cargill Investor Services.  In response to the request, Jaeckel sent an internal THL email:

> Phil [Bennett] has not called me back.  I hope the analysis is
> sufficiently deep/detailed for a discussion.  Since they have never
> accepted our/Max [Strasburg]'s help I'm not sure who is modeling
> the deal and pro forma company.

372.    The same day, THL Vice President Taylor sent another internal THL email discussing his concerns with Project Key:

> Jake [Jaeckel] and I caught up with Gerry [Sherer] regarding his
> request for a Board meeting Thursday (now confirmed for 4:00pm)
> to discuss Project Key (Cargill).  Phil and Gerry plan to present the
> financials for Key and discuss with the Board whether it is an
> interesting acquisition candidate.  When pressed, Gerry did not
> sound as if he had a presentation prepared that laid out the pros and
> cons of the deal...As it stands, what will be presented to the Board
> will be a relatively rudimentary set of financials that are not
> integrated into Refco's financial results.  We offered to help model
> the combination by sending Max [Strasburg] down to assist in
> pulling the necessary data together (an offer we've made several
> times in the past), but did not get much of a response.

373.    On June 15, 2005, Schoen responded to this email with another internal THL email expressing similar concerns:

> I had a 30 minute conversation with Phil [Bennett] on the same
> subject...I gave him a pretty good push on the value we could offer
> in diligence and modeling, the importance of doing thorough due
> diligence and building a financial plan in a levered, soon to be
> public company as compared to their intuitive historical style, and
> my desire to see them present a 10-20 slide deck to the board that
> walks through summary financials, pro formas, accretion/dilution,
> lays out the key executional plan including individual
> responsibilities, deliverables and measurement metrics, and
> balances key opportunities and risks.  He fully acknowledged the
> need to engage with us in such a process, and then explained that

122

these were unusual circumstances and basically blew me off. He
did it with respect, but nonetheless seemed to just be giving lip
service to this approach.

374.    On June 16, 2005, THL analyst Strasburg sent an internal THL email about

Refco's strategy for Project Key. He expressed concern over how this acquisition would be

funded: "No consideration is given to debt costs and Scott Love [from Refco] thinks they are

funding this without borrowing. Not sure how." Jaeckel replied with an internal THL email:

"They r [sic] paying 300mm for this? I wouldn't do that - we have to trade at 10x ebitda for this

to be accretive?" Strasburg's reply was: "$215 upfront. Earnout is additional $67 to $192. Love

could not explain to me how it works."

375.    Also on June 16, 2005, a Board of Managers Meeting for Project Key was held.

A copy of minutes from that meeting are initialed "MS," presumably for Max Strasburg.

Handwritten notes on the minutes state:

> Financing: 500m house cash
>
> 1Q CF: 84m
>
> ~400m unrestricted cash / unreg. customer $ from deal

376.    On June 20, 2005, after receiving an email from Refco Chief Financial Officer

Sherer regarding yet another potential acquisition, Jaeckel sent Sherer an email recommending a

number of due diligence steps that he considered appropriate. These included the use of outside

professionals, which had not been part of the Project Key acquisition

377.    Jaeckel then forwarded the email he had written to Sherer to Schoen, Taylor, and

Strasburg at THL, making clear that he sought to avoid a repeat of Project Key: "Fyi - I didn't

want lack of response to be seen as approval of another disorganized effort."

378.    Schoen responded to this internal THL email:

123

> A good plan. Let's discuss this morning how we can try to force
> the same result in process re Cargill, albeit after the fact since we
> will be signing a binding agreement first! We can at least lay out
> our specific requirements and give them a sample from [redacted]
> to show the level of work, planning and information that we
> require, and that absolutely must be done as a public equity filer.

379.    On June 22, 2005, Schoen expressed his disappointment with the level of Refco's

disclosure and diligence work in connection with the Cargill transaction to date:

> As promised, enclosed is a presentation one of our portfolio
> companies, [redacted], presented to its Board of Directors prior to
> obtaining a Board resolution to complete an approximately $400
> million acquisition of [redacted]. This is an excellent example of
> the level of disclosure and diligence work we would normally
> expect for a substantial acquisition. I recognize that the Cargill
> process had real limitations we had to live with to be successful.
> Hopefully, we can now do the work and prepare materials of
> comparable breadth and depth for our Board meeting. In addition,
> below are a few diligence and reporting points we would like to
> address with you in advance of the board meeting, now that we
> will have greater access to Key management and records... (5.)
> Analysis of capital benefit from transaction – Refco cash position
> before and after deal – required and excess.

380.    The June 22, 2005 letter from Schoen indicates an intention to do further analysis

regarding the cash position of Refco before and after the deal. Any minimal analysis would have

uncovered the massive movement of RCM customer cash used to purchase Cargill. Schoen's

letter also confirms that it was THL's ordinary practice to obtain the details of the financing of

any significant transaction by a THL portfolio company. In the enclosed presentation from a

THL portfolio company, which was presented to Bennett as an "excellent example of the level of

disclosure and diligence work we would normally expect for a substantial acquisition," one slide,

entitled "Transaction Assumptions" detailed the financing of the acquisition:

**Purchase Price:**

- Aggregate purchase price between €373 and €411 million on a debt and cash

  free basis.

124

**Financing:**

- [Portfolio Company Redacted] will finance transaction through a $500 million Term Loan B Add-On as allowed by the "accordian" feature of its credit facility.

- The remaining portion will be funded through [Portfolio Company Redacted's] existing revolver facility.

- Assumed LIBOR rate of 3.25%, 3.75% and 4.25% for 2005, 2006 and 2007, respectively

381.    Lee, Harkins, Jaeckel and Schoen all approved a board resolution granting Refco executives the power to finish the Cargill transaction - notwithstanding their strong misgivings about the procedure used for the deal and their knowledge that the acquisition was being rushed. The THL Defendants knew, or were reckless in not knowing, that the source of the funds used to purchase Cargill were RCM customer funds. As the handwritten notes on the June 16, 2005 meeting minutes indicate, the THL Defendants knew exactly where the funds were coming from: Refco's "unregulated" subsidiary RCM.

382.    In approving the resolution authorizing the Refco executives to complete the Cargill acquisition, the THL Defendants authorized and directed a fraud – *i.e.*, the conversion and upstreaming of RCM customer property and the use of this stolen property to purchase a new business for Refco. Their main concern was to avoid doing anything that would interfere with the IPO.

### (b) The Suffolk Loans

383.    The Cargill acquisition was not the only major transaction approved by the THL Defendants that was funded with stolen customer property. Another example is a series of transactions with the Suffolk entities.

125

384.    In March 2005, RGL, through its subsidiary, RCC, issued a series of loans totaling $204 million (the "Suffolk Loans") to Suffolk, LLC, the controlling shareholder of PlusFunds Group, Inc., and related entities.  Suffolk, LLC, which has now filed for bankruptcy, was controlled principally by Chris Sugrue, a former Refco employee with close ties to Bennett, and Sugrue's brother-in-law, Mark Kavanaugh.  In his time at Refco, Sugrue developed Refco's relationship with BAWAG, which was a participant in the fraud.

385.    The first loan ("the Phase I Loan"), a line of credit of $154 million, was issued to Suffolk to be used to purchase the minority shares of PlusFunds.  The second series of loans ("the Phase II Loans"), totaling $50 million, were issued to entities controlled by the principals of PlusFunds and the proceeds were distributed by Refco to banks in the United States and to Bank Frick, a small private bank in Liechtenstein in which BAWAG and Refco were shareholders.  The principals of PlusFunds thereafter distributed to themselves or for their benefit substantially all of the $50 million in proceeds from the Phase II Loans.

386.    The Suffolk Loans were nothing more than a sham.  In actuality, Bennett and certain other of the Officer Defendants had intended that Suffolk would default on the Suffolk Loans and Refco's sole recourse would be to foreclose on and acquire the majority interest in PlusFunds - at a price far higher than market rate.

387.    In the last full year before the loans were issued, PlusFunds' total net income was less than $2 million according to PlusFunds' certified financial statements.  Nevertheless, the Officer Defendants valued PlusFunds at $250 million, or a multiple of more than 125 times the reported net income.  There was insufficient justification for Refco to make a $208 million loan against illiquid, privately-held stock of a company that generated minimal profits.

NY2:#4755710

388.     At the time of the Suffolk Loans, the THL Defendants exercised control over the Refco parent entities.  The THL Defendants knew that Refco entered into the Suffolk Loans.  By failing to prevent Refco from issuing a loan of $204 million to a company with little or no collateral, the THL Defendants recklessly caused Refco to incur over $200 million in debt effectively to acquire a company that had been wildly overvalued.

389.     As controlling shareholders of, and fiduciaries to, Refco, the THL Defendants had an obligation to understand the transaction with PlusFunds and the source of the over $200 million used to make the loan to PlusFunds.  The THL Defendants knew, or were reckless in not knowing, that Refco's ability to fund the loan was dependent on the existence and continuation of the fraudulent conversion of securities belonging to RCM customers.

**10.     The IPO**

390.     After conducting due diligence pre- and post-LBO, the THL Defendants knew of a myriad of problems at Refco: dishonesty by the Officer Defendants, disastrous internal controls and accounting, inadequate external auditing, and financial statements that were in need of restatement.  Once in control of Refco following the LBO, the THL Defendants were reckless in not knowing of the RGHI Scheme.  The THL Defendants also knew, or were reckless in not knowing, of the massive fraud involving the conversion of RCM customer securities which enabled Refco to continue to operate.  The THL Defendants made a conscious choice to disregard the fraudulent schemes at Refco and to proceed with the singular goal of getting a lucrative payday as quickly as possible.

(a)     **The Reincorporation**

391.     In preparation for the impending IPO, Refco underwent a reincorporation (the "Reincorporation"), whereby Refco Inc.  became the new holding company through which ownership in RGL was held.  As a result, Refco Inc. became the ultimate parent of the Refco

127

entities; New Refco became inoperative except as a subsidiary of Refco Inc. and parent of RGL; and RGL continued to be the main holding company for the Refco businesses.

392.    As part of the Reincorporation, the THL Entities and their affiliates exchanged their 283.24 Class A Common Units of New Refco for 63,122,588 shares of common stock of Refco Inc and thus became majority owner of Refco Inc.

393.    As of August 1, 2005, the following people were directors of Refco Inc.:

- THL Directors: David V. Harkins; Scott L. Jaeckel; Thomas H. Lee;; and Scott A. Schoen;

- Refco Insider: Phillip R. Bennett; and

- Independents: Leo R. Breitman; Nathan Gantcher; Ronald L. O'Kelley.

THL therefore had significant control over the board of Refco Inc.

(b)    **The IPO Registration Statement**

394.    Prior to the IPO, Refco Inc., as Refco's new parent company, filed with the SEC a Form S-1 registration statement dated April 8, 2005, a Form-S-1/A registration statement dated May 27, 2005, a Form S-1/A registration statement dated July 1, 2005, a Form S-1/A registration statement dated July 20, 2005, a Form S70 1/A registration statement dated July 25, 2005, a Form S-1/A registration statement dated August 8, 2005, a Form S-1/A registration statement dated August 10, 2005, and a Form 424B1 prospectus dated August 10, 2005 (the "Prospectus") (collectively, the "IPO Registration Statement").

395.    The Prospectus described the stock sale as follows:

- Common stock offered by [Refco]    12,500,000 shares.

- Common stock offered by the selling stockholders    14,000,000 shares.

- Total offering  26,500,000 shares.

- Common stock to be outstanding after this offering  127,500,000 shares.

128

396.    The IPO Registration Statement was signed by Defendants Bennett, Sherer, Harkins, Jaeckel, Lee, and Schoen. The IPO Registration Statement included Refco's financial statements for fiscal years 2003, 2004, and 2005 as audited by Grant Thornton. As detailed above, these historical financial statements were materially false and misleading. The Plaintiffs received the Prospectus containing Refco's audited financial statements and relied upon the re-affirmation of the misleading audited financial statements contained therein in continuing to entrust their securities to Refco for safekeeping.

397.    As discussed above, the THL Defendants knew that that it would have been prudent to replace Grant Thornton, but in their desire to cash out in the IPO, the THL Defendants caused Refco to consummate the IPO using Grant Thornton's audit opinion, notwithstanding that THL recognized that there was a real risk that a re-audit by a Big Four firm would have required a restatement of Refco's financial statements.

(c)    **Roadshow**

398.    The THL Defendants embarked on a two week IPO roadshow to market Refco to public investors. During the roadshow, the THL Defendants touted the financial viability of Refco - despite their knowledge of Refco's true state. The THL Defendants falsely claimed Refco had an "Exceptional Financial Model" and that its "Disciplined Risk Management" ensured Refco would not suffer sustained losses in the future. In truth, the THL Defendants knew that Refco had suffered grave losses in the past that had been fraudulently masked and that Refco's financial model was beset with significant problems.

399.    Moreover, THL lent its good name to overcome the public's poor perception of Refco's business practices. In the presentation, THL maintained that Refco would use the primary proceeds of the IPO to "buyout [the] THL management agreement." The investors were led to believe that THL's management, pursuant to the Management Agreement, already had

129

fixed many of the problems that plagued Refco. This too was false. The THL Defendants never informed the investors of the truth - that THL had failed to remedy Refco's troubled state.

      (d)    **Stock Sales in the IPO**

400.    After the roadshow, on August 11, 2005, just one year after the LBO, THL led Refco though an initial public offering of its stock. At that time, THL and its affiliates sold approximately 8.625 million shares of Refco common stock, with a total sale price of approximately $189.8 million. After selling this portion of their collective ownership, THL and its affiliates retained approximately 42.7% of ownership of Refco.

401.    Bennett sold 5.375 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $118.3 million.

402.    Refco's proceeds from the IPO totaled approximately $259 million, most of which was used to retire $210 million of the debt taken out to facilitate the LBO, plus a debt prepayment penalty of $18.9 million.

403.    The THL and Officer Defendants agreed among themselves to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt with which the THL and Officer Defendants had saddled Refco in connection with the LBO. Again, the THL Defendants put their own interests ahead of Refco's.

404.    When the fraud at Refco was disclosed, Refco was saddled with hundreds of millions of dollars in liabilities to all of the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus, notwithstanding that the majority of the proceeds of the public offering had been reaped by the THL Defendants and the Officer Defendants (as opposed to Refco itself) through the sale of their stock in Refco. Thus, the sale of stock by the THL Defendants and the Officer Defendants resulted in Refco taking on liabilities to pay back investors who had purchased stock based on

unreliable financial statements. These liabilities would not have been incurred had the THL

Defendants fulfilled their duties to RCM customers like VR.

       (e)    **The Greenshoe**

405.    A greenshoe dividend results from the exercise by IPO underwriters of an option

to purchase shares beyond their initial allotment. The proceeds from such a sale are paid out in

the form of a dividend to certain investors of the company.

406.    The THL Defendants began focusing on creating and obtaining a sizeable

greenshoe dividend at its very first official IPO planning meeting on October 19, 2004. The

planning culminated in a massive payout to THL less than one year later. On August 10, 2005,

the Refco Board agreed to pay a dividend to pre-IPO shareholders, including THL. The Board

self-servingly determined that after the IPO and the exercise of the Underwriters' Option to

purchase additional shares, Refco would have a "sufficient surplus" of funds to permit payment

of the dividend to its shareholders - despite the fact that Refco still held debt exceeding one

billion dollars incurred in the LBO.

407.    One day later, on August 11, 2005, the Underwriters agreed to exercise their over-

allotment option and to purchase 3,975,000 shares of Refco common stock. Accordingly, it was

determined that "an aggregate dividend equal to the net proceeds of the $82,203,000 received

from the exercise of the Underwriters' Option...be paid."

408.    On August 18, 2005, Refco paid the THL Entities and their affiliates $45.1 million

as a result of the greenshoe dividend.

       (f)    **Fraud At Refco**

409.    As noted, by the time of the IPO, the THL Defendants knew, among other things,

the following about Refco:

- Refco's internal accounting function was in disrepair;

131

- Refco's outside auditor was inadequate for a company of Refco's size, giving rise to a "restatement risk" were an appropriate auditor brought in;

- Refco, at the direction of the Officer Defendants, merely had taken "stop gap measures" to deal with the auditing shortcoming;

- The Officer Defendants and Refco's outside auditor had deliberately failed to bring to the THL Defendants' attention the "horrendous" Management Letter;

- Refco played "fast and loose [with] compliance issues," and incurred multiple regulatory sanctions involving the improper handling of customer funds;

- The Officer Defendants had affirmatively lied to the THL Defendants;

- Bennett "just [would] not come clean easily" on the relationship and dealings between Refco and Bennett's holding company, RGHI;

- The Bennett Co-Conspirators refused to respond to THL's questions regarding $105 million in related-party receivables on its books as of February 28, 2003,

- The "Deep Throat" allegations regarding the "sloughing off" of customer losses into a subsidiary, and KPMG's advice to THL that the highest priority should be to gain an understanding of financial transactions between Refco and RGHI; and

- Refco, at the direction of the Officer Defendants, engaged in multi-hundred-million-dollar transactions that the THL Defendants knew or should have know were funded with looted customer property.

410.    Following the LBO, upon taking control of Refco, the THL Defendants learned that the improprieties within Refco were not limited to the list above.  In fact, following the LBO, the THL Defendants discovered, or were reckless in not discovering, that the same Officer Defendants that the THL Defendants knew to be dishonest had carried out the massive and long-running RCM Securities Scheme.

411.    After assuming control of Refco, the THL Defendants knew, or were reckless in not knowing, of the RCM Securities Scheme and were reckless in not knowing of the RGHI Scheme for reasons including:

(a)    the THL Defendants had unfettered access to, and were made aware of, material information concerning RCM and the intercompany transfers of RCM customer assets.  For example, the THL Defendants, through

132

Jaeckel, received presentations on the results of Grant Thornton's audit of Refco's 2005 financial statements. In addition, documents produced by THL Partners in connection with the Bankruptcy Cases demonstrate that the THL Defendants were aware of RCM's practice of selling, through hypothecations and pursuant to Repos, customer securities that were supposed to be held in custody by RCM and that the THL Defendants knew that RCM customer securities were being sold to sustain Refco's business operations and acquisitions;

(b)    the THL Defendants are highly sophisticated about financial matters. With specific skills in corporate finance, the THL Defendants are, and were at all relevant times, in the business of closely examining companies and using large amounts of financing to acquire interests in companies with potential for growth in order to actively manage and prepare those companies to go public;

(c)    the operations of RCM were a substantial element of Refco's overall business model;

(d)    the regular, substantial lending of billions of dollars by RCM to its "upstream" affiliates and corporate parents constituted highly irregular related-party transactions lacking any proper business purpose. This would have been plainly apparent to anyone with access to the level of information that was available to the THL Defendants;

(e)    the THL Defendants had multiple representatives on Refco's Board, including representatives that served on key board committees and held key executive positions within relevant Refco companies. These representatives had access to internal financial documents and records that revealed the fraudulent schemes and had an obligation to understand and monitor the fraudulent transactions in question. Jaeckel, for instance, a director of Refco, served as Treasurer of New Refco, Treasurer of Refco Finance Holdings, LLC, and Treasurer of Refco Finance Inc. Just based on fulfilling these roles, Jaeckel must have known of the fraudulent schemes. Schoen, a director of Refco, served as President of New Refco, President of Refco Finance, Inc., and was the sole director of Refco Finance, Inc. As a result of such executive positions within Refco entities, each of Jaeckel, Schoen, Lee and Harkins knew, or were reckless in not knowing, key details of the fraudulent schemes and their importance to the continued funding of Refco's operations;

(f)    the THL Defendants had complete access to relevant RCM and other Refco personnel, including those charged with direct responsibility for carrying out the unauthorized sales, through hypothecations and pursuant to Repos, of RCM customer assets and the RGHI Scheme;

NY2:#4755710

(g)     the THL Defendants, through THL Managers V, LLC, an entity controlled by THL and the other THL Defendants, received tens of millions of dollars for providing management services to Refco and its affiliates during the period that they were in control of Refco, and in so doing should have become even more familiar with Refco's operations than the typical controlling stockholder;

(h)     while the THL Defendants were in control of Refco the use of RCM customer securities to finance the operations of other Refco Entities was essential to the continued operation and existence of those other entities; and

(i)     while the THL Defendants were in control of Refco, Refco engaged in at least two extraordinary transactions, being the Cargill and Suffolk transactions discussed above, each of which required hundreds of millions of dollars of funding, which was provided for through the sale, through hypothecations or pursuant to Repos, of RCM customer securities and the subsequent misuse of the proceeds.

412.    The THL Defendants became aware of the Officer Defendants' conversion of RCM customers' securities in connection with their control of Refco. Yet, the THL Defendants did nothing to fulfill their fiduciary obligations, their obligations under the Management Agreement, or under applicable state and federal securities laws to prevent the Officer Defendants from misusing RCM customers' assets.

413.    As a direct result of the actions of the THL Defendants, the RCM Securities Scheme and the RGHI Scheme continued unabated, and the THL Defendants pushed Refco into an IPO that saddled it with hundreds of millions of dollars in obligations it could not fulfill.

414.    Further, the THL Defendants knowingly or recklessly participated in the issuance of false financial statements, including the false 2005 10-K Annual Report – which incorporated the false RCM financial statements – which they reviewed, approved and, with respect to the THL Directors, signed.

**D.     Knowledge and Involvement of Grant Thornton**

415.    Grant Thornton was aware of both the RCM Securities Scheme and the RGHI Scheme alleged herein, or, at a minimum, it consciously and recklessly avoided knowledge of them.  By its actions Grant Thornton actively participated and substantially assisted the Officer Defendants, Bennett Co-Conspirators and others acting in active concert or participation with them in carrying out the fraudulent schemes alleged herein.  By issuing clean and unqualified audit opinions on RCM's and Refco's materially flawed financial statements, Grant Thornton made material misrepresentations that VR relied upon in entrusting its securities with Refco.

416.    After it took over the Refco engagement from Arthur Andersen in 2002, Grant Thornton provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005. Grant Thornton served not only as the purportedly independent auditor of Refco, but also as the purportedly independent auditor of RCM.

417.    Refco's financial statements were audited by Grant Thornton on a consolidated basis under RGL's name.  The financial statements of RGHI - RGL's parent company "shell" - were not consolidated with Refco's financial statements.  As a result, as Grant Thornton knew or was reckless in not knowing, the ballooning and uncollectible RGHI Receivable was fraudulently hidden from the public to preserve Refco's appearance in the marketplace as a financially solid institution, which appearance was critical to RCM's continued receipt and retention of the customer property that fueled its operations, which in turn was critical to the Officer Defendants and THL Defendants' plans to cash out.

418.    Grant Thornton's longstanding relationship with Refco through Ramler (the former Arthur Andersen partner who took Refco's business to Grant Thornton in the wake of the Enron scandal) gave it a complete picture of the finances, operations, and business of RCM,

135

RGHI, and the rest of Refco. Given Grant Thornton's exposure as Refco's auditor to a range of Refco's subsidiary businesses, it had access to all material information and a complete picture of Refco's intercompany and related-party transactions. On the "Evaluation of Proposed Client" form that Ramler completed when he brought Refco to Grant Thornton from Arthur Andersen, he checked a box on the form that Refco engaged in "significant related party transactions."

419.    Further, Grant Thornton knew, or was reckless in not knowing, from its review and audit of Refco's financial statements that Bennett caused RGL to guarantee repayment of the obligation to the supposed "third party lenders" on RGHI's behalf. Grant Thornton thus had access to all material information regarding the RGHI Scheme. Given its intimate familiarity with Refco's finances, Grant Thornton knew, or was reckless in not knowing, the details of both fraudulent schemes alleged herein and nevertheless issued false and misleading audit opinions that VR relied upon to its substantial detriment.

420.    Among other things, Grant Thornton:

- ignored red flags that alerted it to the existence of accounting fraud;
- knowingly issued unqualified audit opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004 and 2005 that materially misrepresented Refco's financial condition;
- opined separately on the financial statements of RCM and authorized the delivery of its clean audit opinions on RCM's fraudulent financial statements to RCM's customers; and
- continued to act as Refco's auditor despite its knowledge of the fraudulent schemes.

421.    As Grant Thornton knew, clean audit opinions were essential to Refco's continued functioning. VR relied on those opinions and the integrity of the Refco and RCM financial statements, to which Grant Thornton's opinions attested, in entrusting its securities to RCM. Moreover, because of the nature of Refco's business, clean audit opinions were essential to Refco's existence whether or not individual customers received and reviewed the relevant audit

136

reports before entrusting their money to Refco or one of its affiliates. Had Grant Thornton ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the full scope of the fraud at Refco would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005.

422.    This is not a case of an auditor overlooking a few details. Grant Thornton completely abandoned its obligations of independence, learned first-hand of the fraud, and then perpetrated that fraud by providing clean audit opinions, which it knew to be false in light of Refco's grotesque accounting manipulations. Grant Thornton was aware, or was reckless in failing to be aware, of the RCM Securities Scheme to prop up Refco by looting RCM customer securities, including VR's securities. Grant Thornton's sham audits enabled Refco to hide the RGHI Receivable, inflate Refco's income and misappropriate RCM customer cash and securities.

### 1.    Knowledge of the RGHI Receivable

423.    Grant Thornton was well aware of the RGHI Receivable, yet it never blew the whistle and alerted customers of the fraud, as it was required to do. Before 2002, Arthur Andersen served as Refco's purportedly independent auditor. In fact, the lead partner on the engagement for Andersen, Mark Ramler, had abandoned any pretense of independence and objectivity. While at Andersen, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his thoughts and advice. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

424.    After Arthur Andersen collapsed under the weight of the Enron debacle, Ramler moved to Grant Thornton, taking the Refco engagement with him. Refco became a marquee client for Grant Thornton and stood to become an even more lucrative client for Grant Thornton

137

if, as Grant Thornton anticipated, Refco went public. During the course of the Refco

engagement, Grant Thornton earned approximately $10 million in fees, a substantial amount for

a non-Big Four accounting firm that had total revenues of $565 million in fiscal 2004, $458

million in fiscal 2003, and approximately $366 million in fiscal 2002. With Ramler heading the

engagement, Grant Thornton continued Arthur Andersen's practice of turning a blind eye to

billions of dollars of questionable accounting transactions in Refco's consolidated financial

statements.

      425.   Based on his long experience with Refco, when Ramler joined Grant Thornton, he

brought with him knowledge of the following facts:

      (a)   As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

      (b)   Refco's internal accounting controls were deficient, and readily capable of being overridden by members of Refco's management.

      (c)   As of February 28, 2002, RGHI was a shell entity with no operations that owed Refco approximately $170 million,[12] and whose financial results were not included in RGL's consolidated financial statements.

      (d)   Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

      (e)   Bennett had promised Arthur Andersen that the RGHI Receivable would no longer increase, would be paid down over seven years, and that $35 million of the receivable would be paid off in fiscal year 2003.

      (f)   In 2001, Bennett improperly charged to RGHI a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

      426.   Grant Thornton was thus aware from the outset of the Refco engagement that

Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible

---

[12]   At the time, the RGHI Receivable was in fact significantly larger than $170 million, a fact that Grant Thornton could easily have, and should have, ascertained.

to manipulation, and that the RGHI Receivable, which was hidden in RGL's consolidated financial statements, was a viable tool for accomplishing such manipulation. Particularly in the post-Enron environment, Grant Thornton was acutely aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable auditing principles of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions when conducting an audit. Accordingly, Grant Thornton internally categorized Refco as a "high risk" client in part because it engaged in significant and complex related-party transactions, lacked an internal audit function, and because certain of its senior executives had an interest in maximizing the apparent financial health of the company.

427. Nevertheless, Grant Thornton turned a blind eye to Refco's related-party transactions. As a result, even though Grant Thornton knew of the RGHI Receivable and learned of the RTLs, it continued to issue clean audit opinions for Refco.

428. For example, in connection with the audit of the fiscal year ended February 28, 2003, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the RGHI Receivable. In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then ostensibly totaling $105 million, by at least $35 million per year, resulting in full payment by February 28, 2006. Grant Thornton made no effort to determine whether those payments actually were made – and indeed, they were not. Nor did Grant Thornton perform any testing to verify composition of the RGHI Receivable, or the accuracy of the $105 million figure. During its 2004 and 2005 audits, Grant Thornton likewise failed to obtain sufficient evidence to provide any reasonable assurance that related-party transactions were properly reflected in the financial statements.

139

429.    Grant Thornton's work papers from the 2003 audit demonstrate that Grant
Thornton contemplated steps to scrutinize related-party transactions, but simply chose not to
implement any of them.  For example, in conducting its audit of RCC in 2003, Grant Thornton
told Refco that it needed to see certain loan receivables owing to RCC on the books of the
affiliate owing the money.  When making this inquiry, Grant Thornton specifically requested the
information about a loan from RCC to RGHI purporting to have a balance of approximately $71
million, including documents to verify the existence and terms of the loan and ensure that RGHI
was actually making payments that were reflected in RCC' s bank statements.  In violation of
Grant Thornton's own practices, as well as GAAS, Grant Thornton never carried out any of these
procedures.  Had Grant Thornton done so, it could have conducted a simple tracing of the
payments for any of the years at issue and would have quickly confronted clear evidence of
fraud.  Aware of the consequences of carrying out these procedures, Grant Thornton never
obtained and scrutinized RGHI's customer statements for its accounts at RCM and RCC.

430.    Furthermore, despite Grant Thornton's knowledge of the high degree of risk
associated with related-party transactions at Refco, it deliberately chose not to take the simple
and obvious step of examining the customer statement for the RGHI account at RCC for the
months of February and March 2003.  Had Grant Thornton done so, it would have seen the
following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco more than $600 million.
- On February 21, 2003, RGHI's account at RCC received $308.5 million from a transaction described in the account statements as "TRANSFER FUNDS," reducing the amount that RGHI owed RCC.
- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.
- By March 4, 2003, (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC

140

ballooned from $71.8 million on February 28, 2003 back up to over $600 million.

431.    Moreover, the 2003 receivable balance in RGHI's account at RCC of more than $70 million represented an approximately $30 million increase over the prior year. Although Grant Thornton inquired as to the reason for the increase, it took at face value the explanation from a Refco insider that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, RCC was extending RGHI additional credit.

432.    Grant Thornton's audit plan for 2003 also called for it to review loan documents concerning the RGHI Receivable at RCC and to perform an assessment of the interest income represented by Refco to have accrued on the RGHI Receivable. Grant Thornton chose not to perform either procedure.

433.    In fact, after the 2003 audit Grant Thornton chose not to perform any procedure whatsoever to test the RGHI Receivable at RCC. One glaring omission in Grant Thornton's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which Grant Thornton obtained and reviewed as part of every Refco audit from 1996 to 2003, purported to detail Refco's related-party receivables. Grant Thornton did not require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even though the account statement for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a massive debt balance in favor of RCC. Grant Thornton intentionally turned a blind eye to this issue.

434.    Similarly, Grant Thornton chose not to examine properly the RGHI balances at RCM. Although Ramler knew that, in the past, RGHI owed substantial sums of money to Refco

through an account at RCM, Grant Thornton did not perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books. Had Grant Thornton looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year end), it would have seen the following:

- A debit balance in the account as of February 1, 2003 of approximately $150 million.
- On February 7, 2003, an adjustment made to credit the account for $147.5 million, leaving a small debit balance on February 28, 2003 of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM over critical reporting periods.

435.    Grant Thornton's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it amounts to willful blindness – an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

**2.    Grant Thornton's Knowledge Of The Round Trip Loans**

436.    During its audits of Refco, Grant Thornton not only knew of, and failed to properly audit, the RGHI Receivable, but it also came face-to-face with the RTLs themselves. Again, Grant Thornton deliberately ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud being perpetrated by the Officer Defendants, and those acting in active concert or participation with them.

437.    The RTLs with Refco customers during the periods audited by Grant Thornton were accomplished by RCM falsely recording the cash loan as a "reverse repo" or "time deposit" in the defendant's customer account. A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and a "time deposit" is a loan extended to a customer

142

for purposes of trading. Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors. Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, not merely their amount.

438.    Grant Thornton ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these large-dollar, end of period transactions and subjected them to no meaningful scrutiny at all. As noted, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions – collateral. Nevertheless, Grant Thornton accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

439.    For example, during its audit of RCM for 2003, Grant Thornton noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Participants (Liberty Corner and Delta Flyer) totaling $650 million. The transactions were timed to span the end of Refco's fiscal year and to be essentially reversed after the end of the fiscal year. On April 16, 2003, Grant Thornton sent simple confirmation requests to these two RTL Participants, which were signed and returned to Grant Thornton. Although Grant Thornton performed additional balance sheet testing on other RCM customer accounts for 2003, Grant Thornton did not conduct additional credit risk testing on these RTL Participants' accounts and Grant Thornton chose not to inquire into the circumstances or purposes of these transactions.

440.    In the 2004 audit, Grant Thornton noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, Grant Thornton sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. That year, however,

143

Grant Thornton took the additional step of reviewing the potential credit risk from the transaction. Grant Thornton noted that the entire amount of Liberty Corner's debit balance – $720 million – was at risk, meaning that no collateral secured it. Grant Thornton did not identify the account as a credit risk, however, and it ignored the fact that a real "reverse repo" transaction should be secured by collateral.

441.    As these examples illustrate, in every analysis and audit that it conducted of Refco, Grant Thornton received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants and RGHI. In each case, Grant Thornton understood that the transactions were in fact unsecured loans of hundreds of millions of dollars rather than collateralized "reverse repo" transactions. Yet, in each case, Grant Thornton declined to investigate further based on information – often merely a representation from management – that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditors, Grant Thornton never alerted Refco's directors and officers or anyone else to the pattern and questioned why Refco entered into these uncollateralized transactions at the end of each and every reporting period. Nor did Grant Thornton ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

442.    Further evidence that Grant Thornton understood that the RTLs were being used to hide the RGHI Receivable from Refco's books comes from Ramler's handwritten notes. In these notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Participants). Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts." During the quarter ended

144

May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a

"reverse repo" that was used to "clean up" Refco's intercompany accounts. This is a connection

Ramler would not have made unless he, and thus Grant Thornton, had actual knowledge of the

fraud.

**3.    Grant Thornton's Knowledge of Refco's Fraudulent Business Model**

443.    Each year, Grant Thornton issued, among other things, unqualified audit opinions

claiming that, after applying GAAS, the financial statements of RCM presented fairly in

accordance with GAAP RCM's financial condition and its results of operations. In addition,

Grant Thornton knew that the RCM Financial Statements would be disseminated to, and relied

upon, by, among others, RCM's customers who had entrusted billions of dollars of securities to

RCM.

444.    The RCM Financial Statements were false and misleading and failed to state

material information necessary for the statements contained therein to not be misleading. The

RCM financial statements were false and misleading by omitting to disclose that RCM routinely

converted customer securities to generate cash so it could upstream through Intercompany Loans

the proceeds for use by other Refco affiliates. As stated above, the fraudulent conversion of

customer securities and corresponding Intercompany Loans were so large (in excess of $2

billion) and fundamental to Refco's business operations that Grant Thornton must have been

aware, or was reckless in not knowing, of the practice.

445.    Auditors have an obligation to know and understand the general operations and

practices of any business they are auditing and to ensure that the financial statements adequately

disclose material business operations and practices to the users of those financial statements.

RCM's unauthorized conversion of securities entrusted to it by RCM customers for safekeeping

was a fundamental, yet undisclosed, aspect of RCM's and Refco's operations.

446.    According to the *Accounting and Audit Guide for Broker Dealers* (the "Audit Guide"), in order to gain an understanding of a business for the purpose of conducting an audit, an auditor should consider important factors that affect the broker-dealer's business.  Appropriate procedures would normally include discussions with key personnel, visits to principal locations, and reviews of internal and published material.  The Audit Guide also states that consideration should be given to external factors such as those that are political, economic, and industry-related (including the use of outside service bureaus) and important internal factors such as the structure of the organization, management's strategies, the company's arrangement for clearing and safeguarding customer securities, and factors affecting the broker-dealer's operations, finances, sales, trading, and personnel.  The nature and extent of the required information should be determined in light of the particular circumstances of each audit. (Section 5.13)

447.    The Audit Guide also states that the auditor should normally confirm account positions and balances. Sampling techniques may be suitable if there are many accounts.  In selecting customers' accounts for confirmation, the auditor needs to consider the value of the security positions in such accounts, as well as the ledger (money) balances; the auditor should also consider confirming some accounts with zero balances. AU section 330, *The Confirmation Process,* also provides guidance to the auditor on using confirmations.

448.    Upon information and belief, Grant Thornton either did not adequately understand or evaluate the nature of RCM's business or improperly relied on the Officer Defendants' representations about the business operations and practices at RCM.  As a result, Grant Thornton's audit failed to ensure that the RCM Financial Statements disclosed those operations and practices to the Plaintiffs and other users of the financial statements.  Nor did Grant Thornton apply appropriate audit procedures to satisfy themselves that RCM was complying

146

with the most fundamental practices and its material contracts – specifically, whether RCM was complying with the terms of its Customer Agreements. Grant Thornton's audit procedures did not ensure that RCM customers' fully-paid securities were being held for customers as was required under the Customer Agreements. Had Grant Thornton taken the rudimentary steps of evaluating or analyzing RCM's standard Customer Agreement and comparing the securities that RCM had on hand against the securities that its customer accounts statements and other information identified as being held in custody for its customers, the fraudulent conversion scheme would have been apparent. Having failed to take such steps, Grant Thornton gave clean audit opinions on RCM's Financial Statements notwithstanding that those financial statements failed to disclose to Plaintiffs and other RCM customers that RCM was improperly using RCM customers' fully-paid securities in violation of its Customer Agreements and its representations to those customers.

449. Further, as auditors of the stand-alone financial statements of other Refco entities such as RSL, Grant Thornton knew that customer securities at some Refco entities were required to be maintained in segregated accounts and were subject to minimum capital requirements and other regulations. Grant Thornton should have, but failed to, satisfy themselves that RCM was not similarly required to segregate customer assets.

450. The RCM Financial Statements also were false because they failed to disclose adequately that some, if not all, of the Intercompany Loans that RCM had made to Refco affiliates were uncollectible – and should have been written off, or appropriate reserves established for – either of which actions would have shown that RCM's true financial position was not as strong as it appeared to be.

451.    In each case, the Grant Thornton-audited RCM Financial Statements ambiguously suggest that a portion of the "receivable[s] from customers" was attributable to "transactions with affiliated companies."  The Grant Thornton-audited RCM Financial Statements falsely mischaracterize RCM's transactions with affiliates as consisting of "securities and other financial instrument transactions," which transactions the RCM Financial Statements claim were done "in the normal course of business."  In fact, as Grant Thornton was aware, or was reckless in not knowing, RCM's transactions with affiliates – the Intercompany Loans – were neither "in the normal course of business" nor were they "securities and other financial instrument transactions."  Rather, the Intercompany Loans to Refco affiliates were large transfers of cash from RCM to Refco affiliates through RCC, recorded on RCM's books as Intercompany Loans, with no supporting collateral, and with no assessment of the affiliates' ability to pay.  Indeed, certain recipients of the Intercompany Loans were limited in their ability to repay those loans because they were subject to various credit agreements that subordinated their obligations to RCM even though RCM was not a guarantor of the credit facilities.

452.    Grant Thornton knew, or was reckless in not knowing, that the assertions in the RCM Financial Statements about RCM's transactions with affiliates were false and misleading because Grant Thornton not only had access to, but actually audited and reviewed material information concerning RCM and the Intercompany Loans.  Grant Thornton knowingly failed to take the required audit steps and recklessly disregarded any resulting audit evidence Grant Thornton did receive.  At all relevant times, many of the affiliated companies that received the Intercompany Loans from RCM lacked the financial wherewithal to repay RCM on demand or otherwise, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were not documented, the loans were falsely included in RCM's Financial

148

Statements as part of "customer" receivables, RCM's board of directors never approved the Intercompany Loan transactions, and no collateral or security for the Intercompany Loans was provided by the affiliates receiving funds. Any proper audit examination would have revealed these facts and uncovered the RCM Securities Scheme alleged herein.

453. Moreover, had Grant Thornton properly audited the RCM Financial Statements, it would have recognized the need to disclose as a material related-party transaction that part of the RGHI Receivable that was owed to RCM. Had Grant Thornton adhered to GAAS, Grant Thornton also would have tested the RGHI Receivable owed to RCM and discovered that it was not collectible and that it should have been written off.

**4.    Grant Thornton's Failure to Follow Generally Accepted Practices and Standards**

454. Public companies rely on independent registered audit firms, such as Grant Thornton, to audit financial statements and review other public disclosures, assess internal controls, and gain the trust of the creditors and investors who will rely on the auditors' reports when deciding whether to invest in a company. The Public Company Accounting Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing standards that all auditors for public companies are required to follow. The PCAOB initially adopted as its Interim Professional Auditing Standards all the auditing standards that had previously been issued by the AICPA. The auditing standards issued or adopted by the PCAOB, together with the auditing standards issued by the AICPA, are herein encompassed by the term GAAS. The AICPA has codified the professional auditing standards (represented herein as "AU") to ensure that audits are conducted in accordance with GAAS. <u>See</u> AU § 150.

455. There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor training, maintaining independence