from the client, and exercising due professional care; (2) standards of fieldwork, which provide

guidelines for audit planning, collecting evidential verification for audit findings, and the proper

evaluation of internal controls; and (3) standards of reporting, which are primarily concerned

with ensuring that financial statements are presented in accordance with GAAP. As explained in

detail below, Grant Thornton violated almost every one of these provisions during its tenure as

the Company's purportedly independent auditor, allowing the Bennett Co-Conspirators to

perpetuate the frauds and mask Refco's true condition and fraudulent business practices from its

customers and other creditors.

456.    At a minimum, it is clear that Grant Thornton deliberately ignored the minimum

professional standards of care in discharging its audit duties, and that without this professional

failure, the fraudulent schemes alleged herein could not have wrought massive damage to the

assets of VR and other unwittingly victimized customers.

(a)    <strong>Violations of General Standards</strong>

457.    GAAS General Standard No. 3 states: "Due professional care is to be exercised in

the performance of the audit and the preparation of the report." Grant Thornton audited the

Company's financial statements and provided audit reports thereon for the years ended

February 28, 2003, February 29, 2004, and February 28, 2005. Grant Thornton failed to exercise

due professional care in the performance of its audits and in the preparation of its audit reports.

Among other things, Grant Thornton repeatedly failed to detect huge, nine-figure sham

transactions whereby the Company avoided disclosing related-party transactions and

uncollectible receivables in its financial statements.

458.    GAAS General Standard No. 2 states that "[i]n all matters relating to the

assignment, an independence in mental attitude is to be maintained by the auditor or auditors."

Lead partner Ramler's relationship with the company and its management dated back to his

150

NY2:#4755710

tenure at Arthur Anderson and continued while he was at Grant Thornton.  At Grant Thornton,

Ramler remained the lead partner assigned to the Refco account.  Ramler's longstanding

relationship with the Company and its management prevented him from maintaining the requisite

degree of independence.

        (b)     **Violations of Standards of Fieldwork**

           **(1) Grant Thornton Failed to Audit Related-Party Transactions in Accordance with GAAS**

459.    GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned,"

and provides that particular attention should be paid to matters that, if inaccurately reported in a

financial statement, could materially alter a company's financial situation.

460.    GAAS requires that auditors pay significant attention to related-party transactions

due to the inherent conflict of interest of such transactions.  As noted above, SFAS No. 57,

Related Party Disclosures, requires that all related-party transactions be disclosed in the

company's financial reports, including the nature of the relationship, a description of the

transaction, and the amount of the transaction.  SFAS No. 57 warns that "[t]ransactions involving

related parties cannot be presumed to be carried out on an arm's-length basis," and therefore

require auditor substantiation.

461.    Similarly, AU § 334, Related Parties, sets forth the requirements for auditing

related-party transactions.  The auditor should view related-party transactions within the

framework of existing pronouncements, placing primary emphasis on the adequacy of disclosure.

In addition, the auditor should be aware that the substance of a particular transaction could be

significantly different from its form and that financial statements should recognize the substance

of particular transactions rather than merely their legal form.[13] Arm's length transactions with

outside parties are usually subjected to less detailed scrutiny than related-party transactions or

transactions with officers and employees, where the same degree of disinterested dealing cannot

be assumed.[14] Indeed,

> During the course of his audit, the auditor should be aware of the
> possible existence of material related party transactions that could
> affect the financial statements and of common ownership or
> management control relationships for FASB Statement No. 57
> requires disclosure even though there are no transactions.[15]

462.    The auditor's procedures for examining related-party transactions should provide

reasonable assurance that identified related-party transactions do not contain misstatements that,

when aggregated with misstatements in other balances or classes of transactions, could be

material to the financial statements taken as a whole.[16] As in examining other material account

balances, the auditor needs to consider the audit risk posed by related-party transactions and then

design and apply appropriate substantive tests to evaluate management's assertions.[17]

463.    Notably, the risk associated with management's assertions about related-party

transactions is often assessed as higher than for many other types of transactions because of the

---

[13]    AU § 334.02.

[14]    AU § 150.05, SAS 43 (effective November 1972)

[15]    AU § 334.04.

[16]    AU § 9334.17: Related Parties - Auditing Interpretations of Section 334. "Interpretations" are
recommendations, issued under the authority of the AICPA Accounting Standards Board, on how
to apply the SAS in specific circumstances. For example, AU § 9334 provides guidance on how
to apply the requirements of AU § 334. Interpretations are not auditing standards; however,
auditors should be aware of and consider them and be prepared to explain how they complied
with the relevant SAS requirements addressed by such guidance. AU § 150.05, as amended by
SAS 95 in December 2001. Grant Thornton's internal guidance appears to be consistent with AU
§ 9334.

[17]    *Id.*

possibility that the parties to the transaction are motivated by reasons other than those that exist

for most business transactions:

> The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be. For example, the auditor's tests regarding valuation of a receivable from an entity under common control might be more extensive than for a trade receivable of the same size because the common parent may be motivated to obscure the substance of the transaction.[18]

464.    To identify material transactions with known related parties, AU § 334 requires

the auditor to employ, among others, the following procedures:

> *f.* Consider whether transactions are occurring, but are not
>
> being given accounting recognition, such as receiving or providing
>
> accounting, management or other services at no charge or a major
>
> stockholder absorbing corporate expenses.
>
> *g.* Review accounting records for large, unusual, or
>
> nonrecurring transactions or balances, paying particular attention to
>
> transactions recognized at or near the end of the reporting period.
>
> * * *
>
> *i.* Review invoices from law firms that have performed
>
> regular or special services for the company for indications of the existence
>
> of related party transactions.[19]

---

[18]    AU § 9334.19.

[19]    AU § 334.08.

NY2:#4755710

465.    Further, if the auditor assigns a high degree of risk to related-party transactions, he or she might respond by, among other things, engaging in discussions with tax preparers regarding their knowledge of related parties.[20]

466.    After identifying related-party transactions, the auditor should apply the procedures he or she considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. Such procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management.[21] For each material related-party transaction (or aggregation of similar transactions) or common ownership or management control relationship for which SFAS Statement No. 57 requires disclosure, the auditor should consider whether he or she has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related-party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available concerning the related-party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements.[22]

---

[20]    Accounting and Auditing for Related Parties and Related Party Transactions, A Toolkit for Accountants and Auditors, prepared by the staff of the AICPA, December 2001. This Toolkit was not intended by staff to "break any new ground," but rather to "provide accountants and auditors with an overview of selected authoritative accounting and auditing literature, SEC requirements and nonauthoritive best practice guidance concerning related parties and related parry transactions." *Id.* The Toolkit is an "other auditing publication" as defined in SAS 95 and it has no authoritative status. Nonetheless, other auditing publications are intended to help auditors understand and apply the SAS. Had the auditors consulted Refco's tax preparers, they would likely have learned facts that ultimately would have led to the disclosure of the fraud.

[21]    AU § 334.09.

[22]    AU § 334.11.

154

467.    Grant Thornton violated the foregoing GAAS provisions by failing to implement procedures for identifying and ensuring disclosure of the Company's related-party transactions, such as:

- Procedures for obtaining the names of all related parties, such as requesting the names from management personnel, reviewing the Company's filings with the SEC and other regulatory agencies, and identifying guarantors for large receivables;

- Procedures for determining the trustworthiness of related-party transactions, such as assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions, and evaluating the probability of repayment of uncollected balances; and/or

- Procedures for reviewing the Company's accounting process for the large and unusual transactions that were taking place at the end of each reporting period.

468.    As the Examiner found, rather than obtaining and reviewing loan documentation and other source documents, the extent of Grant Thornton's (and previously Arthur Andersen's) review of related-party receivables — aside from simply accepting the balances as reflected on the various Refco-provided financial statements — was apparently to send a confirmation request to related parties seeking to have the related-party confirm the balance of its customer account, or confirm its loan balances and accrued interest.[23]

469.    From 1998 to 2001, Arthur Andersen not only sent these confirmation requests to third party customers, but also to any related parties having accounts with RCM, RCC or Refco, Inc.  For RGHI, Arthur Andersen simply sent confirmation requests annually asking it to confirm its RCM account balances.[24]  Similarly, Arthur Andersen sent confirmation requests to RGHI annually asking it to confirm its unsecured loan balances with RCC.[25]  Even this de minimis

---

[23]    Ex. Rep. at 94, 124-25.

[24]    *Id.* at 95.

[25]    *Id.*

procedure involving a confirmation request to a related-party ceased in 2002 when Ramler and

Arthur Andersen manager Dara Moore Schneider determined it was a useless exercise.

Schneider explained to the Examiner during her interview that the practice of sending a

confirmation to a related-party was not worth doing because it did not provide the level of

assurance that would be obtained when confirming a balance due from an unrelated-party.[26]

According to Schneider, it made little sense having Phil Silverman, the Controller of RCC, send

an audit confirmation to himself as Controller of RGHI.[27]  Schneider discussed the lack of

effectiveness of such a confirmation process with Ramler, and he agreed there was no reason to

continue to send confirmation requests to RGHI.[28]

470.    When Ramler moved to Grant Thornton, he did not improve the quality or depth

of the auditing of RCC's transactions with RGHI.  Grant Thornton failed to obtain sufficient

evidentiary matter to satisfy itself as to the purpose, nature and extent of the transactions leading

to RGHI's loan balance.  Grant Thornton did not review loan documents, payments, or the

customer statements for RGHI's account.  Grant Thornton improperly issued an unqualified

audit opinion after having done nothing more than take Bennett at his word that the RGHI debit

balance had been repaid in full and that all related-party transactions had been properly recorded

or disclosed.  This amounted to such a complete abdication of Grant Thornton's role as

independent auditor as to constitute no audit at all.

471.    Grant Thornton's complete audit failure enabled the Bennett Co-Conspirators to

implement and continue the RGHI Scheme to offload uncollectible receivables to RGHI, a

---

[26]    *Id.*

[27]    *Id.*

[28]    *Id.*

related-party, and to hide the existence of these related-party transactions from VR and the investing public.

### (2) Grant Thornton Failed to Adequately Assess Internal Controls in Accordance with GAAS

472.    AU § 319 and GAAS Standards of Fieldwork No. 2 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."[29]

473.    "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."[30] For financial statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

474.    Grant Thornton failed adequately or effectively to assess Refco's internal controls in accordance with GAAS.

### (3) Grant Thornton Failed to Identify Risk Factors in accordance with GAAS

475.    GAAS also required Grant Thornton to identify "fraud risk factors," or circumstances that could lend themselves to fraudulent and/or illegal activities, as part of the audit planning process. AU § 316, Consideration of Fraud in a Financial Statement Audit, serves as a roadmap for uncovering accounting fraud by providing examples of "risk factors relating to

---

[29]    AU § 312. 02, Audit Risk and Materiality in Conducting an Audit.

[30]    AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control.

misstatements arising from fraudulent financial reporting," and requires that independent

auditors utilize professional skepticism.  Grant Thornton either consciously ignored or failed to

identify numerous red flags at the Company that AU § 316 identifies as "fraud risk factors,"

including:

- "significant related-party transactions," including frequent loans of hundreds of millions of dollars to RGHI at disproportionately high interest rates that, for a period of several years, appeared on the Company's books just after the beginning of each accounting period and then disappeared just before the end of each period, which should have been serious red flags that the Company was manipulating its books to avoid disclosing these loans on its financial statements;

- "journal entries used on a recurring basis ... [that were] subject to the entity's internal controls," including the repeated journal entries made at every quarter-end and year-end over a period of several years to reflect loans being made to the customer and other entities to conceal the related-party loans to RGHI, and which were then reversed as the loans to the customer were "paid off" just after the end of the quarter;

- "pressure to perpetrate fraud," including significant pressure to avoid write-offs of bad debts which would have wiped out the Company's profits and members' equity and rendered the Company unable to satisfy its minimum regulatory capital requirements and reduced the Officer Defendants' and the THL Defendants' ability to effect a cash-out;

- "unusual or unexpected analytical relationships," specifically that the Company's financial statements indicated significant increases in receivable balances without corresponding increases in uncollectible receivables reserves;

- "weaknesses in internal control," including an ineffective accounting and internal audit staff and the lack of formal procedures for closing the books;

- the Company's "history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations," including that the Company had been under SEC investigation for stock short sales and aiding money managers in cheating municipalities, that the Company was fined approximately $7 million in a proceeding before the CFTC concerning inadequate record keeping, and that Maggio was under SEC investigation for stock manipulation;

- the resignation of Trosten as the Company's CFO shortly after the Bond Offering, and his receipt of a remarkably rich $48 million payment;

- the Company's high debt-to-equity ratio, with long-term debt being eight times greater than its reported members' equity; and

- "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables, and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

476. GAAS Standard of Fieldwork No. 3 states that "[s]ufficent competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU § 326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is central to a proper audit and serves as the foundation for the auditor's opinion report. Thus, Grant Thornton was required to investigate and obtain supporting evidential documentation for the assertions made by the Company in its financial statements and could not merely take the word of the Company's management about the accuracy of their financial statements.

477. As described above, however, Grant Thornton sent only one request for information to the third party customers that participated in the numerous RTL's. Notably, Grant Thornton did not follow up on that request, despite the fact that it showed a multi-hundred million dollar loan made only a few days before the end of the period. Moreover, Grant Thornton did not ask for any supporting evidential matter to back up the transaction, nor did it seek an explanation of the circumstances or purposes of any of the period-end transactions.

478. AU § 342, Auditing Accounting Estimates, explains that an "auditor's objective when evaluating accounting estimates is to obtain sufficient competent evidential matter to provide reasonable assurance that ... [a]ll accounting estimates that could be material to the

NY2:#4755710

financial statements have been developed."[31]  Grant Thornton did not obtain competent

evidential matter to provide reasonable assurance of the reasonableness of the Company's

estimate of its uncollectible receivables, which had a material effect on the Company's financial

statements.

479.    Additionally, Grant Thornton did not obtain evidential support for the claims in

the Company's public filings and statements concerning the Company's internal controls, risk

management procedures, and accounting policies.  Obtaining documentation to support these

claims would have revealed that Refco had not implemented sufficient internal controls or

accounting policies.

480.    Had Grant Thornton conducted its audit in accordance with GAAS, it would have

discovered these defects, as well as the massive misstatement of the Company's financial

statements over many years.  Grant Thornton deliberately ignored the auditing standards

mandated by GAAS so as to avoid revealing the fraudulent schemes alleged herein.

(c)    **Violations of Reporting Standards**

481.    GAAS Standard of Reporting No. 1 states: "The [audit] report shall state whether

the financial statements are presented in accordance with [GAAP]." Grant Thornton issued

unqualified audit reports stating that the Company's financial statements were presented fairly

and in accordance with GAAP.  In reality, however, the Company's financial statements violated

GAAP, as the Bennett Co-Conspirators were improperly inflating Refco's assets and earnings by

concealing trading losses, improperly reducing Refco's operating and other expenses, and

improperly accruing phantom income through the RGHI Receivable and then concealing this

---

[31]    *See* AU § 342.07.

related-party receivable through round-tripping loans with the RTL Participants, BAWAG, and RGHI.

482.    GAAS Standard of Reporting No. 4 and AU § 508, Reports on Audited Financial Statements, provide that an auditor can give an unqualified audit report only if the company's "financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]," and the audit was conducted in accordance with GAAS. Section 508 further provides that if an auditor cannot give an unqualified audit report, the circumstances may require the auditor to give the company a qualified opinion, an adverse opinion, or to include explanatory language in the audit opinion report to explain non-conformities.

483.    In violation of the foregoing provisions, Grant Thornton issued unqualified audit opinions for each of the years ended February 28, 2003, February 29, 2004, and February 28, 2005, indicating that the Company's financial statements complied with GAAP, when in fact they did not. Rather than issuing unqualified audit reports, Grant Thornton should have issued either adverse audit reports noting the Company's non-compliance with GAAP, issued qualified audit reports highlighting the fact that Refco's financial statements contained untrue statements of material fact and omitted facts necessary to make the statements contained therein not misleading, or rendered no opinion. Grant Thornton did none of these things.

484.    GAAS Standard of Reporting No. 3 states: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Thus, if the auditor does not qualify its audit report with details of non-compliance or inaccuracies in the financial statements' informative disclosures, investors and creditors will assume that those disclosures are accurate. As alleged herein, the disclosures in the Company's

financial statements were not adequate, and were materially untrue, because, among other

reasons, they failed to disclose the Company's fraudulent conversion of customer securities, the

nature, size, and composition of the uncollectible RGHI Receivable, that the Company's

financial statements were inflated by the RGHI Receivable, or that the RTLs were being used to

temporarily conceal this related-party receivable.

485.    Despite the Company's internal control problems, untrue statements of financial

results, and non-disclosure of related-party transactions, Grant Thornton continued to issue

unqualified audit reports, which wrongly signified to VR and other RCM customers, as well as

Refco's creditors and non-insider investors, that Grant Thornton had confirmed that the

Company's financial statements were prepared in accordance with GAAP, that Grant Thornton

had confirmed via evidential matter the claims made in the Company's financial statements, and

that the Company's financial statements did not contain any materially untrue statements.

**5.    Grant Thornton Knew Or Was Reckless In Not Knowing Of The Fraudulent Schemes**

486.    Records of internal communications within Grant Thornton's management show

that Grant Thornton knew that Refco was not an appropriate candidate for an IPO and that Grant

Thornton could be subject to liability for its conduct with respect to Refco.  In late December

2004, Ramler had a conversation with a member of Grant Thornton's Professional Standards

Group regarding Refco's response to an SEC inquiry regarding the IPO.  The note states, in part:

"Atty called – also this AM – Refco makes Firm uncomfortable ... issue is sig. def.... Issue is no

CFO.  Probably had weak one before.  We might not want to participate in IPO once this S-4 is

done." The note goes on to demonstrate Grant Thornton' s concerns about Refco and the

upcoming IPO: "They are moving very fast - too fast for comfort ... what to do – we would be

sued."

487.    The only reasonable conclusion based on all the evidence is that Grant Thornton knew, or was reckless in not knowing, that the Officer Defendants and others were misappropriating RCM customer assets and using them for other Refco purposes. Grant Thornton also knew or recklessly disregarded that the Bennett Co-Conspirators were causing Refco to engage in the RTLs in order to hide the magnitude and related-party nature of the RGHI Receivable, and that RGL was being saddled with guarantees for the RTLs. In sum, Grant Thornton knew or recklessly disregarded that the Bennett Co-Conspirators and Officer Defendants were fraudulently "dressing up" Refco using these schemes in order to cash out their own Refco interests and effectively pay themselves with stolen customer property. Grant Thornton was a sophisticated auditor and accountant that, when faced with knowledge of these fraudulent schemes, chose to look the other way – apparently to keep a marquee customer happy. Grant Thornton's failure to adhere to fundamental GAAS standards was so gross – including their failure to obtain *any* evidentiary matter regarding end of period transactions in the hundreds of millions of dollars – and their purported independence was so completely compromised, that their "independent audit" amounted to no audit at all. Consequently, Grant Thornton perpetrated a fraud by issuing false audit opinions – a fraud that ultimately cost VR and other securities customers hundreds of millions, if not billions, of dollars in losses. Grant Thornton is liable for the damages that were incurred as a result of its fraudulent conduct and breach of its professional obligations.

## IX.    DEFENDANTS REAPED SUBSTANTIAL PROCEEDS FROM THE SCHEMES

488.    In addition to the facts set out above giving rise to a strong inference that each of the Defendants knew and consciously engaged in acts constituting the fraudulent schemes, the Defendants also had both the motive and opportunity to commit fraud. Indeed, the fraudulent

NY2:#4755710

schemes were designed to enrich the Defendants at the expense of the Refco entities and their customers.

489.    Unique factors motivated the Defendants to conduct the fraudulent schemes alleged herein. In particular, the misappropriated RCM customer assets were used to fund Refco's otherwise financially unsustainable operations and thus to project a false appearance of growth and success on the part of Refco that allowed the Officer and THL Defendants to enrich themselves. The false appearance of growth and success created by the RCM Securities Scheme and the RGHI Scheme enabled the Officer Defendants successfully to complete Refco's Bond offering in July 2004. It also enabled the Officer Defendants to complete the THL LBO in August 2004, and enabled the Officer Defendants and the THL Defendants successfully to complete Refco's IPO in August 2005. The Officer Defendants and the THL Defendants reaped tremendous monetary benefit from each of these transactions. None of the transactions would have been possible without the fraudulent schemes alleged herein because without the RCM Securities Scheme and the RGHI Scheme, Refco would not have been able to project the appearance of financial health and prosperity necessary in order for the Officer and THL Defendants to cash out their interests in Refco for more than they were worth.

490.    In the year leading up to the IPO and the subsequent collapse of Refco, the Officer Defendants, the THL Defendants and others stripped in excess of $1 billion from Refco. As alleged below, they did so through sales of equity interests in the LBO; enormous outright grants of Refco common stock; the "green shoe" oversubscription option on the IPO, the proceeds of which were used to enrich personally certain Officer Defendants; further grants in the form of "Restricted Stock Units" ("RSUs") – awards of large blocks of stock that vest over time on certain conditions – to Officer Defendants, the lucrative management fees paid to THL

Manager V's under the Management Agreement, and several other bonus and compensation plans.

491.    As part of the series of transactions in the LBO, RGL's predecessor in interest, Refco Finance, transferred $825 million to RGHI, the entity then wholly owned and controlled by Bennett. RGL also transferred to RGHI all of its equity interests in Forstmann-Leff International Associates, LLC ("Forstmann-Leff") (valued at approximately $238 million).

492.    Officer Defendants Murphy, Sexton and Maggio also realized significant financial windfalls from the LBO. In connection with the THL Defendants' investments, these executives had their interests in a Refco-endorsed profit-sharing agreement liquidated, allowing them to share in substantial payments in August 2004 and September 2005, with Murphy receiving approximately $13.1 million, Sexton receiving approximately $8.1 million, and Maggio receiving approximately $13.5 million. These payments were in addition to the multi-million dollar salaries and bonuses received by these executives over the period of 2003 to 2005 and the generous stock option awards they received in advance of the IPO. These large payments underscore the Defendants' motivation and intent to use the LBO and the IPO to extract large personal payments, raising a strong inference of scienter.

493.    In the lead-up to the IPO, certain Officer Defendants received substantial grants of Refco common stock. The benefits of these grants could only be realized through an IPO, which created a public trading market for the stock and substantially increased its trading value, thereby greatly increasing these Defendants' personal wealth. These grants of stock therefore provided these Officer Defendants with further motive both to continue and conceal the fraudulent schemes by which Refco's otherwise financially unsustainable operations were able to project a

NY2:#4755710

false appearance of growth and success. This false appearance in turn greatly increased public interest in the IPO from which the Officer Defendants stood to benefit directly and substantially.

494.    The following chart sets forth Officer Defendants Bennett, Sexton, Murphy and Maggio's respective Refco stock holdings on the eve of the IPO, and the value thereof at the offering price, as set forth in the prospectus:

| Defendant | Stock Held at IPO | Value at IPO Price |
|---|---|---|
| Bennett | 48,427,000 shares | $1,065,394,000 |
| Sexton | 596,000 shares | $13,112,000 |
| Murphy | 534,000 shares | $11,748,000 |
| Maggio | 503,000 shares | $11,066,000 |

495.    The substantial pecuniary benefits that these Defendants received, and could only have received, through an IPO raises a strong inference that they acted with scienter. Indeed, defendant Bennett (through RGHI) sold 5.375 million shares in the IPO, netting over $111.2 million in cash while retaining a 33.8% stake in Refco. Significantly, a "lock-up" agreement with the IPO underwriters was the only impediment preventing other Officer Defendants from similarly cashing in all or a portion of their equity interests in the IPO. That "lock-up" agreement prevented other Officer Defendants from selling their shares for 180 days after the IPO – a date that was ultimately preceded by Refco's collapse. Nevertheless, at all times, other Officer Defendants expected to reap large windfalls from their shares. Thus, the Officer Defendants' clear motivation to conduct an IPO and soon thereafter sell registered shares raises a strong inference of scienter.

496.    Certain Officer Defendants also received huge grants of Restricted Stock Units ("RSUs") in advance of the IPO, and were consequently motivated to conduct the fraudulent schemes alleged herein. Under the terms of the Restricted Stock Unit agreements, 50% of a grant would vest ratably over four fiscal years, and the other 50% would vest upon the

166

achievements of undisclosed EBIDTA targets. As set forth in the IPO registration statement,

Bennett received 1,203,365 RSUs, and Murphy, Sexton and Maggio each received 701,963

RSUs. These large grants of RSUs motivated these Officer Defendants to conduct the fraudulent

schemes alleged herein in order to ensure that the IPO was successful because the RSUs were

worthless without a public market for the underlying shares.

497.    By early 2005, the ground work had been laid for the Officer Defendants and the

THL Defendants to sell a huge stake of Refco to the investing public through an IPO. An IPO

was extremely attractive to the Officer and THL Defendants because it would allow them to reap

huge financial rewards from their ownership stake in Refco. An IPO had other benefits as well.

For example, it would (i) create a public trading market that would allow the Officer and THL

Defendants to sell their stock for huge profits or, at a minimum, use their Refco stock as

collateral for personal loans; (ii) create a significant capital infusion that would increase the book

value of the millions of shares that these Defendants would retain after an IPO; and (iii) result in

a huge one-time "special dividend" payment that would be used to line the pockets of Officer

Defendants and other corporate insiders.

498.    The Officer and THL Defendants also stood to benefit substantially from the use

of the green shoe option in case of oversubscription on the IPO. Pursuant to the terms of the

IPO, the Refco board granted the Underwriters of Refco's IPO an option to purchase at $20.68

per share, 3,975,000 additional shares beyond their initial allotment. When the Underwriters

exercised this option, Refco registered nearly four million additional shares for sale in the IPO in

case the 26.5 million shares planned for sale in the IPO were oversubscribed.

499.    As described above, the THL Defendants began focusing on creating and

obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October

NY2:#4755710

19, 2004, and secured a massive payout for themselves less than one year later. Despite the fact that Refco held in excess of one billion dollars in debt, the Board determined that Refco would have a "sufficient surplus of funds" to permit payment of the dividend to its shareholders. Thus, by conducting, or recklessly disregarding, the fraudulent schemes and thereby creating sufficient demand for Refco stock at the time of the IPO, certain Officer Defendants and the THL Defendants received an extra cash payment in the form of the greenshoe dividend (the "Greenshoe Dividend").

500.    On August 18, 2005, Refco paid the Greenshoe Dividend to its pre-IPO shareholders as follows:

| Defendant | Pre-IPO Interest | Greenshoe Dividend |
|---|---|---|
| Bennett (through RGHI) | 42.1% | $34,616,153 |
| Sexton | 0.52% | $426,052 |
| Murphy | 0.46% | $381,558 |
| Maggio | 0.44% | $359,311 |
| THL Entities & affiliates | 57% | $45,120,576 |

501.    The prospect of these cash payments alone gives rise to a strong inference of motive on the part of the Officer Defendants and the THL Defendants to conduct and conceal the fraudulent schemes alleged herein. As a direct result of the RCM Securities Scheme and the RGHI Scheme, these defendants were able to drive up demand for Refco shares, resulting in share purchases from which they would benefit directly. Thus, the Officer Defendants and the THL Defendants stood to benefit directly and substantially from the fraud at Refco.

502.    As noted above, the IPO offered additional financial benefits to the THL Defendants. They and their affiliates were paid approximately $223.5 million as a result of the IPO, while still maintaining a controlling ownership stake of 42.7% of Refco and having a liquid market in which to sell shares in the future.

168

NY2:#4755710

503.    A successful IPO would also provide additional benefits to the THL Defendants because they were in the process of marketing a new private equity fund that required them to raise approximately $7.5 billion from institutional investors.  The THL Defendants could "leverage" the publicity provided by a high-profile IPO of Refco by touting the quick profits they and their affiliates had realized through their involvement with Refco, and thereby market their new fund and raise billions of dollars of additional capital from institutional investors.  By demonstrating a quick and significant return on the Refco IPO, the THL Defendants increased their ability to raise the capital to form a new fund in the hyper-competitive leveraged buyout community.  The THL Defendants stood to make huge fees and profits from such a new private equity fund.

## X.    THE OFFICER DEFENDANTS HAD CONTROL OVER REFCO

504.    The Officer Defendants had control of Refco and its relevant subsidiaries, including RCM, RSL, RGL, Refco Global Finance, RCC and Refco LLC, by virtue of their executive positions with Refco, the key roles each played in Refco's management, and their direct involvement in its day-to-day operations, including its finance and accounting functions.

505.    Defendant Bennett controlled Refco by virtue of being one of Refco's largest shareholders.  From August 2004, Bennett owned approximately 43% of the equity interests of Refco through RGHI.  Following the August 2005 IPO, Bennett owned 33.8% of Refco's outstanding common stock through RGHI and the Bennett Trust.

506.    Refco's SEC filings –Refco's Offering Memorandum for the Bonds, Bond Registration Statement and IPO Registration Statement – were each prepared, approved and signed by one or more of the Officer Defendants. Each of the Officer Defendants held top management positions within Refco and, thereby, individually and collectively controlled Refco

169

including the relevant subsidiaries RCM, RSL, RGL, Refco Global Finance, RCC and Refco

LLC.

507.    Refco's SEC filings, including the Offering Memorandum for the Bonds, the

Bond Registration Statement, and the IPO Registration Statement, touted the key roles played by

the Officer Defendants in Refco's operations and purported success.  For example, the Bond

Registration Statement discussed the potential departure of the Officer Defendants in a risk

disclosure, emphasizing that:

> "Our business operations could be significantly disrupted if we lost the members
> of our management team.  Our future success depends to a significant degree
> upon the continued contributions of our management team.  Our future
> performance will be substantially dependent on our ability to retain and motivate
> them. . . . The loss of the services of any member of our management team . . .
> could adversely affect our ability to manage our business effectively or to execute
> our business strategy."

508.    The Offering Memorandum for the Bonds and the IPO Registration Statement

each contained substantially similar descriptions of the Officer Defendants' importance to

Refco's affairs.  In connection with the risk disclosure, the registration statement for the Bonds

further assured investors that Officer Defendants Bennett, Murphy, Sexton, and Maggio were all

subject to non-compete agreements with Refco in the event of their departure.

509.    The Executive Employment and Non-Competition Agreements pursuant to which

Officer Defendants Bennett, Maggio, Sexton, and Murphy were employed gave each of those

Defendants substantial authority over the day-to-day management and operation of Refco.  Each

of their agreements explicitly stated that they were employed "in a key capacity with the

Company," and that they had access to "confidential information regarding the organization,

business and finances of the Company."  Each of their employment agreements also placed non-

competition, non-solicitation and no-hire restrictions on these defendants.

170

NY2:#4755710

510.    Additional facts demonstrate Defendant Grant's control.  Until late 1998, Grant was CEO of Refco, owned 45% of Refco's shares and exercised control over RGL and its operating subsidiaries as CEO and through his stock ownership.  As Refco was then a private company, Grant's role as CEO and 45% equity stake vested him with control over Refco and its subsidiaries.

511.    During the next seven years, Bennett, together with the Bennett Co-Conspirators and the other Officer Defendants, and with Grant's knowledge, continued the various fraudulent schemes alleged herein.

512.    Grant effected his control of Refco through his ownership of 45% of its equity and his continuing role as a "principal" of Refco Group.  In 2001, in connection with his membership in the Russian-American Business Leaders Forum of the National Security Research Division of the Rand Corporation, Grant identified himself as a "principal" of Refco Group.  He did so again in 2003.

513.    Grant's control is also demonstrated by the fact that he was an indirect party to the agreements pursuant to which the LBO sale to the THL Defendants took place.  Indeed, as a signatory to these agreements, Grant made certain representations and guaranties with respect to the financial condition of the Refco entities.  Grant would only have done so because, as a principal and 45% equity holder, he was intimately involved in the business and affairs of Refco and was able to attest to the financial condition of Refco and guarantee its accuracy.  Moreover, Grant along with Bennett first devised the use of the RTLs to hide Refco customer losses and benefited from the ongoing fraudulent schemes alleged herein.

514.    Grant's control is also shown by the fact that he was until the LBO the CEO of Refco's money management business, Forstmann-Leff.  The LBO required his direct

171

involvement as CEO of Forstmann-Leff because RGL transferred to RGHI all of its equity

interests in Forstmann-Leff. Thus Grant, as a major shareholder and CEO of Forstmann-Leff,

was able, and required, to be involved in the negotiation of the financial terms of the LBO and

benefited directly as a result.

515.    As a result of the foregoing, each of the Officer Defendants, both individually and

collectively, controlled Refco and its relevant subsidiaries including RCM, RSL, RGL, Refco

Global Finance, RCC and Refco LLC.

## XI.    THE THL DEFENDANTS HAD CONTROL OVER REFCO

516.    At all relevant times after the LBO, the THL Defendants were the controlling

stockholder of Refco. As a result of the 2004 LBO, the THL Defendants and their affiliates

owned a 57% equity stake in Refco. That stake remained at 42.7% following Refco's IPO in

August 2005, pursuant to which the THL Defendants and their affiliates received approximately

$223.5 million as selling stock holders and otherwise. At all times after the LBO, the THL

Defendants owed contractual and fiduciary duties to one another requiring them to act in concert

and share all material information with each other with respect to their investment in Refco.

517.    The THL Defendants can hardly dispute their control of Refco and its affiliates.

The Offering Memorandum for Refco's Bonds that was issued concurrently with the LBO

acknowledged that, upon consummation of the LBO, the THL Defendants would "have the

ability to control all aspects of [Refco's] business." Similarly, Refco's IPO Prospectus, filed with

the SEC on August 10, 2005, disclosed to potential investors that upon completion of the

offering, the THL Defendants and Bennett would control Refco.

518.    Refco has also characterized itself as a "controlled company" within the meaning

of NYSE rules by virtue of the THL Entities' and RGHI's collective post-August 2005 IPO

position in Refco stock, which consisted of an approximate 42.7% interest of the THL Entities and their affiliates and RGHI's 33.8% interest in Refco's outstanding shares.

519.    Under the terms of the Securityholders Agreement of August 5, 2004, between Refco and various members of the THL Defendants and their affiliates (the "Securityholders Agreement"), the THL Defendants were entitled to designate four of the eight members of the board of managers of New Refco. In addition, the THL Defendants were entitled to designate a fifth member jointly with RGHI. Pursuant to these provisions, the THL Defendants designated Defendants Lee, Schoen, Harkins and Jaeckel to serve on the board. The THL Defendants' substantial board presence continued after the August 2005 IPO. Under an Amended and Restated Stockholders Agreement of August 10, 2005 (the "Amended Stockholders Agreement"), the THL Defendants were entitled to designate three of eight members of Refco Inc's board of directors, with an additional fourth member to be designated jointly with RGHI.

520.    The Securityholders Agreement also entitled the THL Defendants to "reasonable representation" on the board's key committees, including the audit committee, nominating and governance committee and compensation committee. Pursuant to this provision, the THL Defendants designated Schoen to serve on the compensation committee and Harkins and Schoen to serve on the nominating and governance committee. The THL Defendants also designated Jaeckel to attend meetings of the audit committee.

521.    The compensation committee oversaw Refco's compensation and employee benefit plans and practices and produced a report on executive compensation as required by SEC rules. On information and belief, the compensation committee including Schoen thus reviewed and approved the incentive compensation structure that was designed to incentivize the theft of RCM customer assets alleged herein. As noted above, the RSL employees responsible for

173

carrying out the sales and transfer transactions in question, including Yorke, earned hundreds of thousands of dollars in bonuses that were determined in part based on the interest imputedly earned by RCM from the intercompany receivables generated once the customer securities were "monetized", "upstreamed" and "side-streamed" to other Refco entities.

522.    The THL Defendants' positions on the nominating and governance committee, filled by Harkins and Schoen, also gave them significant power and control. That committee's role was to identify and to recommend to the board individuals qualified to serve as directors of Refco and on committees of the board, advise the board with respect to the board composition, procedures and committees, develop and recommend to the board a set of corporate governance principles and guidelines, and oversee the evaluation of the board and Refco management.

523.    The THL Defendants designated Jaeckel to attend meetings of the audit committee. The audit committee selected an independent auditor, determined the auditor's functions, developed and implemented an independent reporting system, reviewed audits, and regularly reported to Refco's Board of Managers. Jaeckel attended audit committee meetings and reviewed and approved audited financial statements.

524.    The THL Defendants' control over Refco is also demonstrated by its insistence that Trosten be removed as CFO of RGL upon the completion of the LBO. During the course of their pre-LBO due diligence into Refco, the THL Defendants determined that Trosten would not be an effective CFO of a public company and would be replaced following the LBO. Following the THL Entities' acquisition of their controlling interest in Refco, Trosten was made aware of the THL Defendants' view and promptly resigned.

525.    The THL Defendants also exercised control over Refco through the hiring of a new chief financial officer, controller and tax director for Refco after the LBO, each of whom the

THL Defendants designated and controlled. At all times, the THL Defendants had access to these newly hired executives, as well as other Refco employees, who had knowledge about the manner in which securities held in RCM customer accounts were being used to finance the business operations and acquisitions of RCM's affiliate companies.

526.    Furthermore, pursuant to a Management Agreement, dated August 5, 2004, between Refco and various of the THL Defendants (the "Management Agreement"), defendant THL Managers V was specifically obligated to know and understand the Refco business in order to provide it with advice. Under the Management Agreement, THL Managers V was, upon the request of New Refco or RGL (each of which, as stated above, was controlled by the THL Defendants, thereby putting the THL Defendants in the position of having to make requests of themselves), to provide management and advisory services to Refco in connection with Refco's business operations and the execution of its "strategic plan." As alleged herein, that "strategic plan" depended on the improper theft of RCM customer assets. THL Managers V received a fee of $30 million in addition to annual payments amounting to the greater of $2.5 million per year or 1% of EBITDA for the provision of these advisory services. As a result of their control of New Refco and RGL, therefore, the THL Defendants were themselves able to control both the requests for advice and the advice subsequently given pursuant to the Management Agreement.

527.    The Management Agreement stated that the reason for the retention of THL Managers V was that the THL Defendants were "specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services." The Management Agreement also stated that THL Managers V was retained to advise Refco "in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to [Refco's] or any of its subsidiaries finances or relationships with banks or

other financial institutions," and "with respect to the development and implementation of

strategies for improving the operating, marketing and financial performance of [Refco] and other

senior management matters related to the business, administration and policies of [Refco] and its

subsidiaries."

528.    Thus, THL Managers V, an entity controlled by THL and the other THL

Defendants, was both obligated and authorized by the Management Agreement to become deeply

involved in the day-to-day management of Refco and its subsidiaries, including RCM.  Similarly,

pursuant to the Management Agreement, Defendants Lee, Harkins, Jaeckel and Schoen were

obligated to provide management services to Refco and thus to become individually involved in

the day-to-day affairs of Refco and its subsidiaries, including RCM.

529.    The Securityholders Agreement also provided the THL Defendants with a number

of additional mechanisms by which they exerted control over Refco.  The Securityholders

Agreement effectively conferred on the THL Defendants veto power over a wide range of

corporate activities including the right to merge or sell any of Refco's assets or to effect a public

offering.  In particular, the Securityholders Agreement required the approval of 65% of the

outstanding shares (57% of which were owned by the THL Defendants) to take any of the

following actions:

(a)    "enter into, or agree to enter into, or permit Old Refco to enter into or agree to enter into, any merger or consolidation with any Person";

(b)    "offer for sale or sell, or permit Old Refco to offer for sale or sell, directly or indirectly, all or substantially all of the assets of the Company";

(c)    "effectuate the first Public Offering of the Company or any successor entity";

(d)    "pass a resolution of managers commencing the voluntary dissolution or liquidation of the Company or any Subsidiary or voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code as now constituted or hereafter amended, or any other

176

federal, state or foreign bankruptcy, reorganization, insolvency or similar law with respect to the Company or any Subsidiary";

(e)    "make an election to be taxed as other than a partnership for U.S. federal income tax purposes, except in connection with a Public Offering of the Company or any successor entity";

(f)    "permit Old Refco to elect to terminate Bennett's employment under the Bennett Employment Agreement or elect not to renew such agreement, except in a case where 'Cause' (as defined in the Bennett Employment Agreement) exists for the termination of employment under such agreement";

(g)    "amend the LLC Agreement or the Certificate of Formation of the Company, except in connection with a Public Offering of the Company or any successor entity";

(h)    "amend the Management Agreement, except in connection with a Public Offering of the Company or any successor entity or otherwise in a manner not adverse to the Company or Old Refco"; or

(i)    "grant any Persons the right to request the Company to register any equity securities of the Company, or any securities convertible or exchangeable into or exercisable for such securities; provided, that the Company may grant rights to other Persons to participate in Incidental Registrations so long as such rights are subordinate to the rights of the holders of Registrable Securities with respect to such Incidental Registrations".

530.    By virtue of this wide-ranging provision, the THL Defendants were assured control over Refco.

531.    The Securityholders Agreement also enumerated a wide range of corporate activities that required board approval, *i.e.*, the approval of the THL Defendants' designees. These included the "Acquisitions of assets or stock of another business", "Dispositions of assets of the Company or any subsidiary (outside the ordinary course of business)", "Annual budgets (including any investment and capital expenditures budgets)", "Distributions on equity of the Company", "Setting of performance targets for incentive plans", "Incurrence of any debt in excess of $5,000,000 outside of the ordinary course of business", "Hiring, firing and compensation of key executives", "Issuance of units, options, SARs, warrants or other equity or

177

debt securities", "Approval of any new incentive plan", "Selection of auditors", "Entry into joint

venture or partnership agreements", "Change in lines of business: decision to enter/quit a line of

business", "Actions to settle or resolve litigation or regulatory matters involving $50,000 or more

or that would reasonably be expected to materially impact the Company's and its subsidiaries'

operations or regulatory relationships", "Contracts requiring annual expenditures over $500,000

that are not included in the annual budget", "Any action requiring a supermajority approval

pursuant to Section 2.2(b) of the Securityholders Agreement", and "Any action relating to Taxes

or actions reserved for the Board pursuant to the LLC Agreement".

532.    The THL Defendants exercised day-to-day control over Refco through its Board

control over the foregoing key corporate issues, especially budgetary control and control over

hiring and firing employees. The THL Defendants' control over Refco is also demonstrated by

the fact that its members both had and exercised the authority on behalf of Refco to sign material

documents and SEC filings. By virtue of exercising such authority, the THL Defendants

indicated that they were aware of the terms and conditions of and the financial conditions

underlying the statements made in such documents. Thus, Jaeckel executed the trust indenture

dated August 5, 2004 and the registration rights agreements in connection with the Bond offering

as treasurer of Refco Finance Inc. Jaeckel also participated in the road show conducted by Refco

to market the Bonds to institutional investors. Defendants Lee, Harkins, Jaeckel and Schoen also

executed Refco's August 10, 2005 IPO Registration Statement filed with the SEC and each

approved of the Offering Memorandum for the Bonds and the Bond Registration Statement.

533.    As a result of the above, THL Defendants Lee, Harkin, Jaeckel and Schoen each

also individually and collectively controlled Refco through their high level executive positions

within Thomas H. Lee Partners, their board membership of Refco, the services they provided

NY2:#4755710

pursuant to the Management Agreement and their extensive involvement in the day-to day management of Refco.  Defendants Lee, Harkin, Jaeckel and Schoen were members of a narrowly defined group, which included Defendants Bennett, Grant,  Maggio, Sexton, Silverman, Trosten, Murphy and Outridge, who were charged with the day-to-day operations of Refco.  As a direct result of their seniority within Refco, each of them individually and as a group had the power and opportunity to control or influence each of the specific actions of the various Refco entities that constituted the fraudulent schemes alleged herein.

534.    From the time of the LBO, Defendant Lee was a member of Refco's Board of Directors.  Lee was the Chairman, CEO, and founder of Thomas H. Lee Partners, which itself controlled Refco.  Lee also provided services to Refco pursuant to the Management Agreement.  As a result, Lee was deeply involved in the day-to-day management of Refco.  Lee was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

535.    From the time of the LBO, Defendant Harkins was a member of Refco's Board of Directors.  Harkins was the Vice Chairman and Managing Director of Thomas H. Lee Partners, which itself controlled Refco.  Harkins provided services to Refco pursuant to the Management Agreement, and was deeply involved in the day-to-day management of Refco.  Harkins was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

536.    From the time of the LBO, Defendant Jaeckel was a member of Refco's Board of Directors and Treasurer of New Refco.  Jaeckel also served as Treasurer of Refco Finance Holdings, LLC., and Treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of August 2004.  Jaeckel was a Managing Director of Thomas H. Lee Partners, which itself controlled Refco.  Jaeckel provided services to Refco pursuant to the Management Agreement

179

and was deeply involved in the day-to-day management of Refco. Jaeckel was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

537.    From the time of the LBO, Defendant Schoen was a member of Refco's Board of Directors and President of New Refco. Schoen also served as President of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of August 2004, and sole director of Refco Finance, Inc. Schoen was a Co-President of Thomas H. Lee Partners, which itself controlled Refco. Schoen provided services to Refco pursuant to the Management Agreement and was deeply involved in the day-to-day management of Refco. Schoen was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

538.    As a result of the foregoing, the THL Defendants were able to exercise control over the affairs of Refco and all material aspects of Refco's operations including those related to the fraudulent schemes alleged. All incentive compensation arrangements (including those that provided incentive for theft of RCM customer assets described above), all business acquisitions (including the purchase of Cargill and the loan to Suffolk with the proceeds of misappropriated RCM customer assets as described above) and all annual budgeting (presumably including the amount of misappropriated RCM customer assets that each subsidiary was entitled to spend) during the relevant period were subject to the express consent of the THL Defendants.

539.    The THL Defendants also had access to all material facts concerning the fraudulent schemes alleged herein. Given this level of access, the sheer size and number of the transfers made in furtherance of the RCM Securities Scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Defendants would not have known about the use of the RCM customer funds over the course of the sixteen months they controlled

180

Refco prior to the bankruptcy. To the extent the THL Defendants were unaware of the RGHI

Scheme after taking control of Refco following the LBO, they were reckless in not learning of

that fraud. As a result, at all times after the LBO, the THL Defendants knew, or were reckless in

not knowing, of the fraudulent schemes being perpetrated at Refco under their control.

## COUNT I - VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 (AGAINST ALL DEFENDANTS)

540.    Plaintiffs repeat each and every allegation contained above.

541.    Defendants together with RCM and Refco carried out plans, schemes and courses

of conduct that were intended to and did: (i)  fraudulently sell securities held by RCM on behalf

of Plaintiffs without Plaintiffs' knowledge, authorization or consent; (ii) misappropriate the

proceeds of such unauthorized securities sales as alleged herein; and (iii) deceptively cause

Plaintiffs to place and hold securities for safe-keeping with RCM.  In furtherance of these

unlawful schemes, plans and courses of conduct, Defendants together with RCM, Refco and the

RTL Participants, as a group and individually, took the actions set forth herein.  As a result,

Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of its

securities and the misappropriation of the proceeds thereof, as alleged above.

542.    Defendants together with RCM and Refco (a) employed devices, schemes, and

artifices to defraud; (b) made untrue statements of material fact and omitted to state material

facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a

course of business that operated as a fraud and deceit upon Plaintiffs, who placed and held

securities with RCM, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

543.    Defendants together with RCM and Refco individually and in concert, directly

and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in this continuous course of conduct, in connection with the purchase

181

NY2:#4755710

and sale of securities, to misappropriate funds that constituted the proceeds of sales of securities

(or the securities themselves) held by RCM as custodian and broker for Plaintiffs.

544.    As part of and in furtherance of this conduct, Defendants together with RCM and

Refco engaged in an ongoing fraudulent scheme to sell RCM customer securities and

misappropriate funds that constituted the proceeds of the sales, as alleged above.

545.    Further, the Defendants together with RCM and Refco defrauded Plaintiffs into

entrusting their cash and securities with RSL and RCM, and relying on RSL and RCM as their

prime brokers to execute and clear securities transactions for Plaintiffs, by presenting Plaintiffs

with false financial statements, upon which Plaintiffs relied to their detriment.

546.    Grant Thornton knowingly or recklessly (a) employed devices, schemes, and

artifices to defraud; (b) made untrue statements of material fact and omitted to state material

facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a

course of business that operated as a fraud and deceit upon Plaintiffs, who placed and held

securities with RCM and RSL, by rendering false audit opinions for the years 2002-2005 in

violation of Section 10(b) of the Exchange Act and Rule 10b-5.

547.    As a direct and proximate result of the deceptive and fraudulent schemes, and the

dissemination of the materially false and misleading information as set forth above, Plaintiffs

suffered injury in that, among other things: (1) the securities that they placed and held with RCM

and RSL for safe-keeping as custodian and broker were sold and misappropriated without

Plaintiffs' knowledge, authorization or consent, (2) the securities of other customers that had

been placed with and held by RCM and RSL for safe-keeping as custodian and broker were sold

and misappropriated without such customers' knowledge, authorization or consent, (3) the

proceeds of such sold and misappropriated RCM customer securities were upstreamed to other

NY2:#4755710

Refco entities, (4) when Refco (including RCM) filed for bankruptcy protection and RCM's chapter 11 case was converted into a chapter 7, subchapter three stockbroker liquidation, which provides for a pro rata distribution of customer property among securities customers, there was a shortfall in customer property approaching $2 billion, (5) Plaintiffs have suffered a concomitant shortfall in their pro rata recovery from the Refco estates and (6) during the pendency of the Bankruptcy Cases and the claims distribution process, which is now going on nearly two years, Plaintiffs have lost the use of almost $800 million in capital, which they would have invested and grown substantially as Plaintiffs' historic track record demonstrates.

548.    Had Plaintiffs known the truth regarding the undisclosed, deceptive and fraudulent schemes and materially false statements alleged above, Plaintiffs would not have placed and held securities with RCM or have continued to do so.

549.    By virtue of the foregoing, Defendants together with RCM and Refco have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Plaintiffs have thereby been damaged.

## COUNT II - VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-16 (AGAINST THE OFFICER DEFENDANTS)

550.    Plaintiffs repeat each and every allegation contained above.

551.    The Officer Defendants together with RCM and Refco extended credit, directly or indirectly, to Plaintiffs, in connection with securities transactions without having established procedures to assure that Plaintiffs were given, or sent at the time of opening their accounts, written statements disclosing the nature of any interest or lien retained by RCM in the security or other property held as collateral and the conditions under which additional collateral could be required.

NY2:#4755710

552.    The non-disclosure by the Officer Defendants together with RCM and Refco of the matters listed in paragraph 551 (above) was done knowingly and with an intention to deceive Plaintiffs as to RCM's intentions with respect to customer property entrusted to it.

553.    Had the Officer Defendants together with RCM and Refco made the disclosures required by Rule 10b-16, it would have been disclosed to Plaintiffs that RCM routinely converted customer securities to its own use and those of its corporate affiliates. Had such truthful disclosure been made, Plaintiffs would not have held their securities at RCM and would have obtained credit, to the extent that they did so, from other available sources.

554.    As a direct and proximate result of the wrongful conduct of the Officer Defendants together with RCM and Refco, Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of their securities and the misappropriation of the proceeds thereof, as alleged above.

555.    By virtue of the foregoing, the Officer Defendants together with RCM and Refco have violated Section 10(b) of the Exchange Act, and Rule 10b-16 promulgated thereunder, and Plaintiffs have thereby been damaged.

## COUNT III – VIOLATION OF SECTION 20(A) OF EXCHANGE ACT (AGAINST OFFICER DEFENDANTS AND THL DEFENDANTS)

556.    Plaintiffs repeat each and every allegation contained above.

557.    The Officer Defendants and THL Defendants acted as controlling persons of RCM and Refco within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Refco's operations and/or intimate knowledge of the deceptive and manipulative conduct alleged herein, the Officer Defendants and the THL Defendants had the

184

power to influence and control and did influence and control, directly or indirectly, the decision-making of RCM and Refco, including the manipulative and deceptive conduct alleged herein.

558.    The Officer Defendants and the THL Defendants were provided with, and had unlimited access to, information concerning the operations of RCM and Refco including the undisclosed and unauthorized securities sales by RCM and the improper and undisclosed intercompany transactions alleged herein, and had the ability to prevent the schemes alleged herein from occurring.

559.    As set forth above, RCM and Refco violated Section 10(b) of the Exchange Act and Rules 10b-5 and 10b-16 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants and the THL Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' and the THL Defendants' wrongful conduct, Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of their securities and the misappropriation of the proceeds thereof, as alleged above.

## XII.    PRAYER FOR RELIEF

560.    Accordingly, Plaintiffs pray for relief and judgment, as follows:

    (a)    Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an aggregate amount to be proven at trial being not less than hundreds of millions of dollars;

    (b)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    (c)    Such other and further relief as the Court may deem just and proper.

185

## XIII.   JURY DEMAND

561.   Plaintiffs demand a trial by jury on all issues triable by a jury.


Dated: New York, NY

October 9, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

186