**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VR GLOBAL PARTNERS, L.P., PATON HOLDINGS LTD., VR CAPITAL GROUP LTD., AND VR ARGENTINA RECOVERY FUND, LTD., | ELECTRONICALLY FILED |
| Plaintiffs, | |
| -against- | MASTER FILE NO. |
| PHILLIP R. BENNETT, WILLIAM M. SEXTON, SANTO C. MAGGIO, JOSEPH J. MURPHY, PHILIP SILVERMAN, ROBERT C. TROSTEN, RICHARD N. OUTRIDGE, TONE GRANT, REFCO GROUP HOLDINGS, INC., THOMAS H. LEE PARTNERS, L.P., THOMAS H. LEE ADVISORS LLC., THL MANAGERS V, LLC., THL EQUITY ADVISORS V, LLP., THOMAS H. LEE EQUITY FUND V, L.P., THOMAS H. LEE PARALLEL FUND V, L.P., THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P., THOMAS H. LEE INVESTORS LIMITED PARTNERSHIP, 1997 THOMAS H. LEE NOMINEE TRUST, THOMAS H. LEE, DAVID V. HARKINS, SCOTT L. JAECKEL, SCOTT A. SCHOEN, AND GRANT THORNTON LLP, | 07 Civ. 8686 (GEL) |
| | Hon. Gerard E. Lynch |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## GRANT THORNTON LLP'S MOTION TO DISMISS

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant*
*Grant Thornton LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 4

POINT ONE

    VR Global lacks standing under Section 10(b) because it did not
    "purchase or sell" any securities .................................................................................. 8

POINT TWO

    VR Global also lacks standing because its injury is derivative of
    RCM's own injury, which RCM's estate has asserted in a separate lawsuit .................... 10

POINT THREE

    The claim against Grant Thornton should be dismissed for failure
    to plead fraud or deception under the appropriate pleading standards ............................ 13

POINT FOUR

    VR Global has failed to allege a strong inference of scienter ........................................... 18

POINT FIVE

    VR Global cannot demonstrate that Grant Thornton proximately
    caused any of its losses ................................................................................................. 20

    A.    Grant Thornton's audit opinions did not proximately cause VR Global's loss ..... 21

    B.    VR Global cannot rescue its claim by relying on "scheme liability" ................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)...................................................................................21

*Bell Atlantic Corp. v. Twombly,*
  127 S. Ct. 1955 (2007)........................................................................................14

*Birnbaum v. Newport Steel Corp.,*
  193 F.2d 461 (2d Cir. 1952)..................................................................................8

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,*
  754 F.2d 57 (2d Cir. 1985)..............................................................................23, 24

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975)..............................................................................1, 8, 9, 25

*Citibank, N.A. v. K-H Corp.,*
  968 F.2d 1489 (2d Cir. 1992)..............................................................................24

*Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath,*
  516 F.2d 811 (2d Cir. 1975)..............................................................................24-25

*Davidoff v. Farina,*
  No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ...........................17

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005)............................................................................................21

*First Nationwide Bank v. Gelt Funding Corp.,*
  27 F.3d 763 (2d Cir. 1994)..............................................................................21, 22

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)................................................................................18

*Honigman v. Comerica Bank,*
  128 F.3d 945 (6th Cir. 1997) ..............................................................................12

*In re Global Crossing, Ltd. Sec. Litig.,*
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................................................................9

*In re Initial Pub. Offering Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................13

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................20

*Jackson Nat'l Life Ins. Co. v. Ligator*,
   949 F. Supp. 200 (S.D.N.Y. 1996)......................................................................12

*Lawrence v. Cohn*,
   325 F.3d 141 (2d Cir. 2003)..................................................................................9

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)..........................................................................21, 24

*Manson v. Stacescu*,
   11 F.3d 1127 (2d Cir. 1993)............................................................................11-12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006)............................................................................................8, 9

*Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*,
   369 F.3d 27 (2d Cir. 2004)................................................................................8, 9

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)............................................................................17-18

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)..................................................................................18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   128 S. Ct. 761 (2008)................................................................................. *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)............................................................................3, 18, 20

*Union Bank v. Wolas*,
   502 U.S. 151 (1991)...........................................................................................12

*United States v. Reifler*,
   446 F.3d 65 (2d Cir. 2006)...................................................................................9

## STATUTES AND RULES

15 U.S.C. § 78u-4(b)(1) ....................................................................................13

15 U.S.C. § 78u-4(b)(2) ....................................................................................18

15 U.S.C. § 78u-4(b)(4) ....................................................................................21

Fed. R. Civ. P. 9(b) ...........................................................................................................13


**OTHER AUTHORITIES**

AU § 316.10 .......................................................................................................................17

AU § 316.12 .......................................................................................................................17

## PRELIMINARY STATEMENT

In many of the Refco-related cases before this Court, plaintiffs are attempting to foist responsibility on outside auditor Grant Thornton LLP for the calculated financial fraud perpetrated by Refco and its most senior executives.  In fact, Grant Thornton was a ***target*** of this complex financial fraud, which was specifically designed to keep the truth away from outside auditors.  This fraud resulted in the indictment of several executives with a long list of co-conspirators—notably not including anyone from Grant Thornton.  And Refco's former CEO, CFO, and Executive Vice-President have all recently pleaded guilty to criminal charges that include making or conspiring to make material misstatements to Refco's auditors.

The cases involving the customers of Refco Capital Markets ("RCM") are different in an important way:  they are based not on the financial fraud itself but rather on allegations of an outright ***theft***.  This Court has already dismissed a securities fraud suit filed by a putative class of RCM customers, based on a fundamental flaw in their theory.  The Lead Plaintiffs have since filed a new complaint, as have two groups of customers proceeding separately.  Of those three complaints, only one—by a group of customers led by VR Global Partners LP (collectively "VR Global")—even attempts to reassert a claim against Grant Thornton.  Not surprisingly, that claim remains fatally deficient.  Grant Thornton played no role in the alleged theft.  It was not involved in selling the securities that VR Global deposited with RCM, did not upstream or misspend the proceeds, did not make any representations to anyone about the status of VR Global's accounts, and in fact did not know about the alleged scheme at RCM at all.  For a variety of reasons, the remaining claim against Grant Thornton must be dismissed.

VR Global's complaint does nothing to overcome the fundamental standing problem that plagued the original class complaint.  Under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), only "purchasers" or "sellers" of securities have standing to bring claims under the

federal securities laws.  Here, VR Global alleges only that it "placed" securities with RCM—not that it relied on Grant Thornton's audit opinions to make a purchase or sale.  RCM's alleged misuse of the deposited securities may or may not have been a breach of fiduciary duty or a breach of its agreements, but it is not actionable in a private lawsuit under the securities laws.

VR Global also lacks standing for another, independent reason—because the injury it asserts actually belongs to RCM itself, as it involves alleged losses shared generally by RCM's customers and other creditors.  The complaint alleges that RCM "upstreamed" funds generated when it sold assets deposited by its customers.  That "upstreaming" ultimately left RCM unable to meet its obligations to creditors generally.  VR Global's injury is therefore derivative of losses suffered by RCM itself, which is now the only entity with standing to recover them.  Indeed, the estate of RCM has filed its own lawsuit against many of the same defendants, seeking the same damages.  That too is grounds for dismissal of this complaint.

Standing problems aside, VR Global's claim against Grant Thornton suffers from the same pleading deficiencies as the claims this Court already rejected.  Despite the complexity and length of its complaint, VR Global has not provided any factual support for its allegation that Grant Thornton's audit opinions were deceptive in respect to the alleged scheme at RCM.  In fact, this complaint does not explain how Grant Thornton's audits of RCM were anything other than fully compliant with professional standards.  The practice of moving cash between and among affiliates was not uncommon in the broker/dealer industry.  VR Global's claim, however, is that RCM's intercompany loans were always uncollectible because the affiliates never intended to repay them and (presumably after using the loan proceeds in some way) ultimately could not repay.  But despite this Court's admonitions, VR Global still does not specify who "lacked the intent to repay," nor does it explain exactly why each affiliate lacked the ability to do

so.  RCM Brokerage Slip. Op. at 21-23, attached as Exh. A to the Declaration of Ruth A. Braun ("Braun Decl.").  VR Global also leaves Grant Thornton to guess what audit procedures it should have performed to detect such a calculated fraud.

Further, despite the broad access it and its counsel have had to information about Refco's inner workings,[1] VR Global is unable to allege that Grant Thornton knew or should have known about the alleged scheme at RCM.  A securities plaintiff must allege facts sufficient to support a strong inference of scienter—an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2510 (2007).  Here, VR Global's allegations are anything but compelling.  Once again, Grant Thornton was a target of the financial fraud at Refco, not a perpetrator.  Moreover, the supposed "red flags" discussed in the complaint are either hopelessly vague or relate only to Refco's scheme to conceal the RGHI receivable.  VR Global's claim is not based on the RGHI-related financial fraud by itself; it is based on RCM's separate scheme to sell the assets deposited by customers and then "upstream" or loan the proceeds to affiliates that had no intention to repay.  There is no allegation here that Grant Thornton saw and ignored red flags that would have indicated that RCM was mishandling customer accounts or that RCM's affiliates were—at the time of the financial statements—unable or unwilling to repay the loans.

Finally, the facts alleged here make clear that Grant Thornton's statements did not proximately cause VR Global's losses.  Again, this is a case about an alleged theft by Refco and its management.  Even if Grant Thornton's audit opinions were material to VR Global's decision to deposit securities with RCM, VR Global still cannot prove that those audit opinions—rather than corrupt business decisions by Refco and its management—were the reason that decision

---

[1]  VR Global's counsel also served as counsel to the Refco Unsecured Creditors' Committee, which conducted an investigation during the bankruptcy and now is also co-counsel to the Litigation Trustee.

turned out to be a losing proposition.  Nothing about Grant Thornton's audit opinions made it

necessary or inevitable for RCM and its affiliates to convert customer funds with no intention of

making the customers whole.  The customers' losses were caused by alleged misconduct by

RCM, Refco, and its management, not by anything Grant Thornton did or said.  VR Global's

improper attempt to characterize the claim against Grant Thornton as a "scheme" claim under

Rule 10b-5(a) and (c) cannot help it to avoid this critical requirement.  The key question is still

whether the defendant's own conduct or statements induced the plaintiff's reliance and

proximately caused its loss.  VR Global cannot show that its losses were proximately caused by

the audit opinions themselves, so its claim fails as a matter of law.

## BACKGROUND

As an offshore securities and foreign exchange broker, RCM was part of Refco's

business of providing brokerage, execution, and clearing services in the international

commodities and derivatives market.  Compl. ¶¶ 52, 55, 84.  Grant Thornton served as outside

auditor to RCM and Refco and issued audit opinions on their financial statements.

VR Global (a group of four related entities registered in Grand Cayman) is a private

investment fund that bills itself as "one of the top-ranked emerging markets funds in the world

. . . with over 200 individual and institutional investors in its funds."  *Id*. ¶¶ 49, 81-82.  In 2001,

VR Global decided to "place and maintain cash and securities" with RCM as an offshore

"custodian."  *Id*. ¶ 90.  It placed securities at RCM for "safekeeping" as a means of

accommodating its need for "enhanced execution, clearing and custody services" with respect to

its portfolio of securities.  *Id*. ¶ 83.  The relationship was governed by a "Securities Account

Customer Agreement" that allegedly prohibited RCM from dealing with VR Global's "fully-paid

securities" in any manner not in accordance with its instructions.  *Id*. ¶¶ 106-08.

The gravamen of the complaint is that RCM stole these securities as a means of raising capital for the benefit of other Refco affiliates. This scheme was allegedly designed to enable Refco to continue in operation despite huge concealed losses from the Asian financial crisis of the late 1990s and various failed investments. *See id*. ¶¶ 126, 128. Refco had concealed its true financial condition by using a series of sham loans with unrelated parties to systematically remove a large, uncollectible receivable (the "RGHI Receivable") from its books at the end of each financial reporting period. *Id*. ¶ 31. This allowed Refco to hide the losses from the investing public and anyone else who might be reviewing the company's records, including Grant Thornton. *See* Third Superseding Indictment, *U.S. v. Bennett*, No. 05 Cr 1192 (cited in Compl. ¶ 1), at ¶¶ 8, 9, 21, 25, 46, 65 (scheme was designed to hide missing receivable from accountants), Exh. B to Braun Decl.; Indictment, *U.S. v. Collins*, No. 07 Cr 1170, at ¶ 9 (Bennett and others "schemed to hide the true financial health and economic structure of Refco . . . from Refco's banks, counterparties, *auditors*, investors and potential investors") (emphasis added), Exh. C to Braun Decl.

There can no longer be any doubt that what Refco and its insiders did was a crime and was specifically targeted toward concealing the truth from Refco's outside auditors. In fact, former CEO Phillip R. Bennett, former CFO Robert C. Trosten, and former Executive Vice President Santo C. Maggio (who also served as CEO of Refco Securities LLC) have each recently entered a plea of guilty to charges that specifically include making or conspiring to make material misstatements to auditors. *See* 2/15/08 Plea Colloquy, *U.S. v. Bennett*, No. 05 Cr 1192, at 7 (pleading guilty to "material misstatements to auditors"), Exh. D to Braun Decl.; 2/20/08 Plea Colloquy, *U.S. v. Trosten*, No. 05 Cr 1192, at 4, 5, 16, 18, 19 (pleading guilty to conspiracy and admitting an agreement to conceal the truth from auditors), Exh. E to Braun

Decl.; 12/19/07 Plea Colloquy, *U.S. v. Maggio*, No. 07 Cr 1196, at 5, 7, 17 (pleading guilty to conspiracy, one object of which was "material misstatements to auditors"), Exh. F to Braun Decl.

According to the complaint, assets deposited by RCM customers were a significant source of capital for Refco during this period. Refco's senior insiders would inform executives at Refco affiliates of the company's funding needs, and those executives would in turn sell the necessary amount of securities in customer accounts. Compl. ¶ 117. RCM would then transfer the proceeds from these sales to "other Refco entities for any number of purposes." *Id.* ¶¶ 80, 117. The proceeds were disbursed as intercompany loans to wherever they were needed within the Refco organization. *Id.* ¶¶ 116-17, 119. These disbursements were used to fund a number of Refco obligations, including payroll payments, daily operations, margin credit to customers, and corporate acquisitions. *Id.* ¶¶ 119-20. According to VR Global, the intercompany loans were uncollectible from the beginning "because the Refco entities to which the loans were made lacked the financial ability or intention to repay them." *Id.* ¶ 123; *see also id.* ¶ 122.

When the hidden RGHI Receivable was disclosed in October 2005, VR Global and other RCM customers attempted to "withdraw securities and funds that they entrusted to RCM." *Id.* ¶ 237. Refco responded by imposing a moratorium on all RCM withdrawals from customer accounts (*id.*) and days later filed for bankruptcy (*id.* ¶ 238). RCM had assets at the time, but it had $2.26 billion less than what it needed to repay its obligations. *Id.* ¶¶ 240-41. VR Global alleges that the majority of this shortfall arose from intercompany debts owed to RCM by other Refco affiliates. *Id.* ¶ 240.

VR Global asserts that it "relied upon RCM's and Refco's audited financial statements" in deciding to "entrust securities to Refco" for safekeeping. *Id.* ¶¶ 32, 35. The complaint alleges that the financial statements were "false and misleading" for failing to disclose, among other

things, the RGHI Receivable, "the fraudulent conversion of RCM customer securities," and the

fact that the insiders caused RCM to upstream the proceeds to affiliates that (i) gave no specific

assurance of their ability to repay their affiliate; (ii) did not provide collateral; and (iii) lacked the

ability or intention to repay the loans. *Id*. ¶¶ 33, 122-23. Notably absent, however, is any factual

allegation that Grant Thornton knew that assets deposited by RCM's customers were being

converted and loaned to affiliates with no intention of repayment.

The existence of the intercompany loans themselves was no secret; in fact, as VR Global

acknowledges, the loans were disclosed in RCM's financial statements. *Id.* ¶ 451. In 2004, for

example, RCM's financial statements included a footnote explaining that "in the normal course

of business," it executes various "securities and other financial instrument transactions" "with

affiliated companies." *Id.* Although these transactions were recorded in the financial statements

in a line item identified as "receivable[s] from customers," the purpose of this footnote was to

explain and quantify the portion of the amount in that line item that was, in fact, attributable to

affiliated-company transactions. *See id*. Neither the line item nor the footnote made any

statement about whether the affiliated companies were subject to the same credit check or

collateral requirements that might apply to an ordinary loan, and, by its nature, the footnote did

not report one way or the other on the extent to which these funds were later returned to RCM.

VR Global filed this lawsuit shortly after this Court dismissed similar claims brought on

behalf of a putative class. Grant Thornton is the subject of a single claim arising under Section

10(b) of the 1934 Act and Rule 10b-5 (Count I). VR Global's claim against Grant Thornton rests

solely on the theory that it issued false and misleading audit opinions on RCM's and Refco's

financial statements—opinions that VR Global supposedly relied on "in determining, and

continuing, to place and entrust securities for safekeeping with RCM." Compl. ¶ 32.

## POINT ONE

**VR Global lacks standing under Section 10(b) because
it did not "purchase or sell" any securities.**

As the Supreme Court has recognized repeatedly, the scope of the implied cause of action under Section 10(b) is limited. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S. Ct. 761, 774 (2008) (recognizing the "narrow dimensions" the Court must give the implied right of action under Section 10(b)); *Merrill Lynch*, *Pierce*, *Fenner & Smith*, *Inc. v. Dabit*, 547 U.S. 71, 80 (2006) (Supreme Court has "cabin[ed]" the "private remedy" based on policy considerations "appropriate in explicating a judicially crafted remedy"); *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004) (courts have been "quick to set limits on" the implied cause of action under Section 10(b)).

Consistent with that view, more than fifty years ago the Second Circuit limited the class of parties that may pursue a federal securities claim to those ***who purchase or sell securities***. In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), shareholders sued a corporate director who had broken off potentially lucrative merger talks and instead sold his 40% share in the company to a different suitor. *Id*. at 462. The shareholders sued under Section 10(b), alleging that the director misrepresented the true reason for calling off the sale. *Id*. The Second Circuit held that the plaintiffs lacked standing to lodge a securities fraud claim because the implied private right of action is "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities." *Id*. at 464.

Years later, the Supreme Court embraced the Second Circuit's restrictive view of standing under Section 10(b). In *Blue Chip Stamps*, the Court expressly limited the implied right of action under Section 10(b) to those harmed in their purchase or sale of securities. 421 U.S. at 749. The plaintiffs in *Blue Chip Stamps* had declined an offer to purchase shares in a company.

*Id*. at 725-26.  They later sued under Section 10(b), arguing that the company's prospectus was overly pessimistic in order to dissuade them from buying and to allow the rejected shares to be sold publicly later at a higher price.  *Id*. at 726-27.  The Court concluded that the plaintiffs lacked standing because they did not actually purchase or sell securities.  *Id*. at 754-55.  In so holding, the Court relied largely on public policy concerns, including a fear that expanding the litigant class any further would promote vexatious litigation.  *Id*. at 739-45; *accord Dabit*, 547 U.S. at 80 (reaffirming that the *Blue Chip Stamps* standing requirement is distinct from—and narrower than—the statutory "in connection with" requirement for establishing violations of Section 10(b), and noting that the rule in *Blue Chip Stamps* stemmed from policy considerations rather than statutory language).

Courts applying the *Blue Chip Stamps* standing requirement have emphasized time and again that a plaintiff may sue only as a purchaser or seller of a security.  *See*, *e.g.*, *Ontario*, 369 F.3d at 31; *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003); *In re Global Crossing*, *Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 337 (S.D.N.Y. 2004) (noting that the purpose of Section 10(b) is to "'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted . . . estimates of the underlying economic value of securities traded'") (citation omitted).  Those who "place" or "hold" securities with a particular brokerage based on alleged misrepresentations about that brokerage's finances cannot possibly satisfy *Blue Chip Stamps*.  421 U.S. at 737-38; *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006) ("holder" does not have standing); *Ontario*, 369 F.3d at 32 (limiting standing to purchasers or sellers of securities issued by the company about which misrepresentations were made).

Under this bedrock principle, VR Global does not have standing to bring this case.  It is plainly not suing Grant Thornton based on losses it suffered as a "purchaser or seller" of a

security. Indeed, it does not allege that it bought or sold any securities at all in reliance on Grant Thornton's statements about Refco and RCM. Instead, VR Global merely "place[d] securities in customer accounts with RCM" for "safekeeping," after which RCM and its agents allegedly "misappropriated" and "converted" those securities for Refco's own use. Compl. ¶¶ 32, 119; *see also id*. ¶ 8 (VR Global "routinely deposited and held securities in RCM accounts"), ¶ 13 ("[H]ad [Defendants] disclosed RCM's practices, customers would have entrusted their securities to other financial institutions"), ¶ 125 ("Refco fraudulently induced VR [Global] to deposit cash and securities"), ¶ 243 ("VR [Global] was induced to leave its securities . . . with RCM"), ¶ 246 ("VR [Global] was induced to deposit securities with RCM for safekeeping"). Thus again and again, VR Global makes clear that Grant Thornton's statements did not induce it to purchase or sell anything; it relied on the fraud only in choosing RCM to "hold" its securities. That is insufficient as a basis for standing.

In short, this is not a proper securities fraud case. As the Supreme Court has instructed repeatedly, Section 10(b) does not reach all fraudulent conduct that involves securities. *Stoneridge*, 128 S. Ct. at 771 (securities laws should not be extended so far as to "invite litigation beyond the immediate sphere of securities litigation and in areas already governed by functioning and effective state-law guarantees"). Whatever merit there may be to VR Global's argument that RCM converted its assets and breached its customer agreement, it does not have standing to sue under Section 10(b).

## POINT TWO

### VR Global also lacks standing because its injury is derivative of RCM's own injury, which RCM's estate has asserted in a separate lawsuit.

VR Global also lacks standing for another, independent reason: its injury belongs to RCM, which has filed its own lawsuit to recover the same damages. According to the complaint,

VR Global was injured when RCM sold the securities it had deposited and then "upstreamed" the proceeds in the form of intercompany loans that the affiliates neither intended nor were able to repay. Compl. ¶¶ 116-17, 119. If this were true, however, all losses suffered by RCM customers would be entirely derivative of losses suffered by RCM itself. Claims for these damages therefore belong to RCM's estate—not to its customers—and only the estate has standing to bring them.

As VR Global freely admits, it was not the only victim of RCM's alleged fraudulent conversion scheme. *See, e.g.,* Compl. ¶ 5 (officer defendants regularly directed the sale of "securities owned by Plaintiffs and other RCM customers that had been entrusted to RCM"), ¶ 242 ("VR [Global] and other RCM customers were directly damaged by Defendants' schemes"). VR Global has not identified any specific security or asset it lost and instead makes clear that its assets were commingled with those of hundreds of other customers. *E.g.*, *id.* ¶ 171. Nor has it alleged that its assets or securities were placed in a constructive trust; indeed, the bankruptcy court has rejected such claims. *Kirschner v. Bencorp Casa de Bolsa, C.A. (In re Refco, Inc.)*, Adv. Proc. No. 06-01745 (RDD), Judgment Ex. A at 129-30 (Bankr. S.D.N.Y. Dec. 29, 2006), Exh. G to Braun Decl. VR Global also does not allege that its own particular securities were transferred to other Refco entities. Instead, it contends that its securities were sold—along with those of other customers—and then the ***proceeds*** were pooled and transferred "out of RCM and used to make 'loans' to other Refco entities." Compl. ¶ 21. The alleged injury—the lack of repayment—was suffered by RCM and visited equally on all of RCM's customers and creditors.

Because VR Global has not alleged a special injury distinct from the injury to RCM or any other creditor, it does not have standing to sue. *See Manson v. Stacescu*, 11 F.3d 1127,

1130-31 (2d Cir. 1993) (no individual standing where plaintiff's injuries would be cured through a recovery by the company for the losses it sustained); *Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 203-07 (S.D.N.Y. 1996) (creditor retains an individual right to sue only "where the plaintiff sustains a direct injury that is separate and distinct from the injury suffered by the corporation"); *see also Honigman v. Comerica Bank*, 128 F.3d 945, 948 (6th Cir. 1997) ("the estates' recovery here against [defendant] makes [plaintiff] whole in terms of the loss caused by [defendant]").  Indeed, to allow VR Global to proceed under these circumstances would threaten a fundamental purpose of bankruptcy, which is to ensure an equitable distribution of assets among ***all*** creditors of the debtor.  *See Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).

Moreover, allowing these claims to proceed would also create a significant risk of double recovery, particularly in light of the lawsuit currently pending in this Court on behalf of the Litigation Trustee.  *Jackson,* 949 F. Supp. at 203-07 (citing danger of double recovery in dismissing derivative claim seeking same damages as direct claim); *Honigman*, 128 F.3d at 949 (where only one recovery can be had, "[t]he estates' recovery takes precedence over [the creditor's]").  The Litigation Trustee has sued many of the same defendants, asserting fifteen separate claims based on the very same damages that VR Global seeks to recover here.  *See* Compl. ¶¶ 349-444, *Kirschner v. Grant Thornton LLP, et al.*, No. 07 Civ. 11604 (GEL) (transferred by the MDL Panel to this Court from the Northern District of Illinois) (asserting claims for breach of fiduciary duty, fraud, negligence, malpractice, and aiding and abetting based on the intercompany loans from RCM to other affiliates, which allegedly "did not have the financial wherewithal or intent to repay RCM").  The fact that the bankruptcy estate of RCM is already pursuing claims based on the intercompany loans underscores the urgency of ensuring

that no individual customer or group of customers is allowed to seize a preferential and duplicative recovery.  For this reason as well, VR Global's claims must be dismissed.

## POINT THREE

### The claim against Grant Thornton should be dismissed
### for failure to plead fraud or deception under the appropriate pleading standards.

Despite the length and complexity of its complaint—and despite being on notice for some time of the deficiencies Grant Thornton identified and this Court found in the original class complaint—VR Global has still failed to provide adequate notice about the nature of its fraud claims as required by the Federal Rules.  To plead a claim under Section 10(b), VR Global must identify each misleading statement and explain **why** it is misleading.  Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Generalized allegations of fraud do not suffice; VR Global must instead set forth specific facts.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (Rule 9(b) requires that the pleadings set forth the alleged fraud with particularity, including "the who, what, when, where, and how [of the fraud]").  The complaint fails to meet this standard, as it does not explain how Grant Thornton's audits were insufficient and how its audit opinions were false based on information available to it at the time.

Like the original class complaint, VR Global's complaint contends that RCM made intercompany loans and booked "worthless receivables in return" (Compl. ¶ 8), when in fact the loans "were uncollectible because the Refco entities to which the loans were made lacked the financial ability or intention to repay them" (*id*. ¶ 123).  This Court admonished the Lead Plaintiffs for their failure to provide "supporting allegations that would 'nudge [their] claims across the line from conceivable to plausible,'" thus noting that they had failed to satisfy even

13

the most basic pleading standards. Slip Op., Exh. A at 20 (quoting *Bell Atlantic Corp. v.*
*Twombly,* 127 S. Ct. 1955, 1974 (2007)). VR Global's allegations—while lengthier—are no
more specific or factually supported than what the Court already rejected.

In the first place, VR Global simply repeats the allegation that Refco's affiliates lacked
the "intention to repay" the loans. Compl. ¶ 123; *see also, e.g., id.* ¶¶ 122, 197-98. As this Court
has explained, this vague allegation "could mean any number of things." For example:

> [I]t might mean that Refco officers devised a scheme pursuant to which the RCM
> customer assets would be "borrowed" from a pool of RCM customer assets, used
> for Refco affiliates' own business purposes, and never replaced. . . . On the other
> hand, the complaint might be read to mean that Refco officers allowed the loans
> to take place knowing that Refco was in such financial trouble that any debt it
> incurred might become uncollectible. This would be quite a different matter from
> taking out a loan with the specific intent never to repay it.
>
> Importantly, the complaint also fails to explain which of the defendants in
> this case, if any, knew that the affiliates were insolvent or lacked the intent to
> repay. Nor does it identify the specific officers at the borrower affiliates who
> lacked the intent to repay. Thus, plaintiffs have identified neither the party who
> deceived them nor the act by which they were deceived nor the circumstances that
> made it deceptive.

Slip Op., Exh. A at 21-22. Despite this clear statement in the Court's opinion, VR Global's
complaint still does not flesh out this theory. It still does not identify any specific officer or
affiliate who lacked the intent to repay, and it still does not explain whether, when, or how Grant
Thornton should have uncovered that specific intention.

This Court also took issue with the allegation that the affiliates "lacked the financial
ability to repay" and said it was not specific enough to be plausible. As the Court explained:

> The complaint never allege[d] that all Refco affiliates were rendered insolvent by
> the round-robin fraud; nor does it allege any basis for the broad, unqualified
> contention that the Refco affiliates were unable to pay the RCM loans. If
> plaintiffs really mean that all of the RCM loans were uncollectible, they have
> failed to support their claim with sufficient supporting allegations; if, on the other
> hand, they mean that some of the loans at issue were uncollectible, their failure to
> specify which loans makes it impossible for defendants or the Court to tell which
> transactions are alleged to be fraudulent.

*Id*. at 21.  While VR Global attempts to give more explanation on these points, its new and cursory allegations make no sense.  VR Global still does not explain which affiliates were insolvent and which could not repay for other reasons.  And again, it also fails to plead any facts suggesting when—if at all—the uncollectibility of the loans should have been evident to Grant Thornton in the performance of its audits.

It is not enough simply to point to the hidden RGHI Receivable.  VR Global contends that RCM's affiliates "were unable to repay those loans in whole or in part because, *inter alia*, those debts were backed by the RGHI Receivable that Refco could not collect from RGHI, and Refco entities' own financial positions were artificially inflated by the RGHI Scheme."  Compl. ¶ 34; *see also id*. ¶¶ 200-03 (describing the impact of the RGHI Receivable on Refco's finances generally).  As a matter of logic, however, the RGHI Receivable itself cannot have rendered the loans uncollectible as soon as they were made.  When a particular affiliate received the proceeds of a particular loan, it *did*—by definition—have the ability to repay, simply by giving back what it had just received.  The loans did not become uncollectible until their proceeds were dissipated somehow—either through spending on illiquid assets (like an acquisition, for example) or on operations or something else.

Further, VR Global cannot support its claim by asserting that certain unnamed affiliates were unable to repay because the funds were dissipated through misuse, mismanagement, and unwise business decisions.  For example, it alleges that some unspecified Refco entities "were using the funds to finance business acquisitions to further improve the appearance of Refco's overall financial position and to show additional growth," but they used "poor processes and procedures and performed inadequate financial analyses in relation to those acquisitions." Compl. ¶ 199.  Other affiliates, in contrast, used the loans "to finance questionable investments."

*Id*. Of course, the complaint does not identify exactly which loans and affiliates it is referring to, nor does it explain when, if ever, it would have become evident to an outside auditor that the acquisitions or investments had turned out badly, making the underlying loans uncollectible.

The allegations about a "loss of goodwill" also cannot explain the supposed worthlessness of the intercompany receivables on RCM's books. VR Global argues that certain affiliates' financial positions were impaired because of a loss of goodwill due to the scheme to hide the RGHI Receivable. *Id.* ¶ 203. But any "loss of goodwill" occurred only *after* the receivable came to light, which was long after Grant Thornton issued its audit opinions. Indeed, the RGHI scheme was designed to *preserve* goodwill, and it succeeded in doing so for some time. Thus this allegation too does not explain why the loans were uncollectible when booked.

VR Global does allege generally that Grant Thornton's audit opinions were false—that it falsely stated that its audits conformed with GAAS and that, in its opinion, the financial statements fairly presented the company's financial condition in accordance with GAAP. Compl. ¶¶ 38, 39. But in respect to the RCM Securities Scheme—the only scheme with which VR Global actually connects its losses—the complaint does not supply any factual basis for concluding that the audits performed by Grant Thornton were, in fact, deficient.

There is simply no factual allegation explaining what audit steps Grant Thornton should have performed that would have uncovered the supposed "lack of financial ability or intention to repay" the various intercompany loans. *Id*. ¶ 123. Instead, the complaint simply recites general provisions of GAAP and GAAS and then asserts that Grant Thornton's failure to detect the fraud at RCM and Refco means that the audits must have been deficient. *See*, *e.g.*, *id.* ¶ 457 (alleging that Grant Thornton violated GAAS General Standard No. 3 in that it "failed to exercise due professional care in the performance of its audits and in the preparation of its audit reports," as

16

supposedly shown by its failure "to detect huge, nine-figure sham transactions"), ¶ 474 (alleging that "Grant Thornton failed adequately or effectively to assess Refco's internal controls in accordance with GAAS"). Of course, the mere fact that a client has committed a fraud does not establish that the audits were faulty or that the auditor should have arrived at a different conclusion. To the contrary, "even a properly planned and performed audit may not detect a material misstatement resulting from fraud," in part because "audit procedures that are effective for detecting an error may be ineffective for detecting fraud." AU § 316.12; *see also* AU § 316.10 ("Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false.").

VR Global has failed to link its general platitudes regarding GAAS with specific allegations of particular violations by Grant Thornton that might have made a difference here. The best VR Global can do is allege that Grant Thornton failed to "implement procedures" (*e.g.*, *id.* ¶ 467) or to "obtain sufficient evidentiary matter" (*id.* ¶ 470). But it does not allege with particularity what audit procedures Grant Thornton should have undertaken to uncover the deliberate fraud that was supposedly being perpetrated at RCM. *See Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *12 (S.D.N.Y. Aug. 22, 2005) ("[W]here improper accounting under GAAP is alleged, moreover, plaintiffs 'must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase.'") (citation omitted). And this failure of pleading leaves Grant Thornton in the impossible position of trying to divine VR Global's allegations and underscores the value of the particularity requirement—namely, to provide fair notice of the claim, to protect a defendant's reputation from "improvident charges of wrongdoing," and to protect against the institution of a strike suit. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.

2004).  Without alleging how Grant Thornton's audits were insufficient and its audit opinions misleading, VR Global cannot proceed with its claim.

## POINT FOUR

### VR Global has failed to allege a strong inference of scienter.

For similar reasons, the complaint fails to allege that Grant Thornton acted with the required state of mind with respect to the one scheme that truly matters here:  the alleged theft of VR Global's securities by RCM and Refco.  There is no allegation that Grant Thornton knew about RCM's plans for the securities deposited by its customers, much less that it knew the beneficiaries of the intercompany loans presently lacked the intention and ability to repay them.

To state a claim under Section 10(b), VR Global must allege specific facts supporting a strong inference that Grant Thornton acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").  A plaintiff must allege facts that strongly indicate that the defendant intended to "deceive, manipulate or defraud."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citations and quotation marks omitted).  In an auditor case, the auditor's conduct must "approximate an actual intent to aid in the fraud being perpetrated by the audited company."  *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (citation omitted).  As the Supreme Court recently explained, a complaint can survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).  Courts must consider plausible opposing inferences in applying this standard.  *Id.* at 2502.

Here, the inference that Grant Thornton did ***not*** know about the fraud is at least as plausible—if not more so—than the inference that it did.  Grant Thornton was a target of Refco's

fraud—which was designed specifically to hide the truth from auditors, regulators, or anyone else who was looking. *See supra* at 5-6 (principal architect of the Refco fraud and other senior officers have pleaded guilty to making or conspiring to make misrepresentations to auditors).

Moreover, VR Global has not alleged any facts sufficient to support a strong inference that Grant Thornton knew how the securities deposited with RCM were being used and how the loans to other affiliates were, in fact, "uncollectible"—whether because the affiliates lacked the intention to repay, or because they were unable to at some point in time, or both. The subjective intentions of Refco's officers and affiliates to steal and never return securities and funds deposited by customers is not information that Grant Thornton (or any other auditor) could reasonably have uncovered during the audit process, and VR Global does not allege otherwise. The gist of VR Global's allegations is simply that Grant Thornton should have educated itself about RCM's business to the point that it would have discovered the intercompany loan scheme or the alleged lack of a legitimate business purpose underlying the loans. *E.g.*, *id*. ¶¶ 114-15, 119, 445-46, 448. But even this vague allegation does not address the other side of VR Global's equation—namely, the alleged fact that the affiliates receiving the loans had no intention or present ability to repay them.

Although the complaint refers generally to "innumerable red flags" that supposedly should have "triggered a high degree of skepticism" (*id*. ¶ 26), none of those alleged "red flags" relate to the RCM Securities Scheme at all. *See id*. ¶ 2 (complaint refers to two different schemes—the "RCM Securities Scheme" and the "RGHI Scheme"), ¶ 420 (referring generally to "red flags" that allegedly alerted Grant Thornton "to the existence of accounting fraud"), ¶ 475 (listing "risk factors"). Whether or not these facts are sufficient to support an inference that

Grant Thornton knew about the RGHI Scheme,[2] they certainly do not support the inference that it had scienter in respect to the misuse of assets deposited by RCM customers.

The leap in VR Global's logic is most evident in Paragraphs 486 and 487 of the complaint. Under the heading "Grant Thornton Knew Or Was Reckless In Not Knowing of the Fraudulent Schemes," VR Global cites a single piece of evidence: a note by someone within Grant Thornton that reports a concern based on the speed with which Refco was moving toward an IPO and its lack of a CFO at the time. *Id.* ¶ 486. VR Global goes on to say: "[t]he only reasonable conclusion based on all the evidence is that Grant Thornton knew, or was reckless in not knowing, that the Officer Defendants and others were misappropriating RCM customer assets and using them for other Refco purposes." *Id.* ¶ 487. This is a breathtaking non sequitur. It is unclear how a note about Refco's IPO—alone or in combination with the complaint's other allegations—could support even a ***plausible*** inference of scienter, much less a ***strong*** inference that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2510. For this reason as well, the claim against Grant Thornton must be dismissed.

## POINT FIVE

### VR Global cannot demonstrate that Grant Thornton proximately caused any of its losses.

Finally, under the law of this Circuit, VR Global has failed to allege that Grant Thornton proximately caused its losses. VR Global contends that it relied on Grant Thornton's audit

---

[2]  In light of this Court's previous rulings, this motion will not argue the inadequacy of the factual allegations of scienter in respect to the RGHI Receivable. Grant Thornton notes, however, that one basis for the Court's previous ruling on scienter was a factual allegation that has proven to be false and is no longer asserted here. The original complaint in the Refco securities litigation alleged that Grant Thornton made no effort to confirm any of the third-party loans that formed part of what plaintiffs now call the "round trip" transactions. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007). VR Global does not make that allegation—and indeed admits that Grant Thornton in fact sent at least one request for confirmation. Compl. ¶¶ 468-70, 477. As Grant Thornton will argue in motion practice later in the Refco litigation, the fact that it ***did*** send requests for confirmation for the third-party loans, actually received confirmation, and then observed that the loans were, in fact, repaid is powerful proof that Grant Thornton ***lacked*** scienter and performed audits that complied with GAAS in all respects.

reports in deciding whether RCM and Refco were "secure and creditworthy" to serve as its prime broker. Compl. ¶ 89. But it does not contend it suffered losses simply because RCM and Refco were not, in fact, "secure and creditworthy." Instead, as the complaint makes clear, VR Global's principal claim is that it suffered losses because RCM *stole its assets*—converting them for Refco's own use and upstreaming the proceeds to affiliates who lacked the intention or ability to repay. That alleged *theft* was the cause of VR Global's damages, not any statement by Grant Thornton. For this reason as well, the claim against Grant Thornton should be dismissed.

A.    **Grant Thornton's audit opinions did not proximately cause VR Global's loss.**

Under the PSLRA and longstanding case law in this Circuit, plaintiffs in Section 10(b) cases must prove that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Thus a securities fraud complaint must be dismissed if it fails to allege plausible facts demonstrating a causal connection between a misstatement and the harm actually suffered. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005). As the Supreme Court recently explained, this element requires that the loss be the "necessary or inevitable" result of the defendant's wrongdoing. *See Stoneridge*, 128 S. Ct. at 770.

"Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (citation omitted). This fundamental requirement is wholly separate from the concept of "transaction" causation, which requires showing that "but for" the misrepresentation, the plaintiff would not have entered into the transaction. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

VR Global has failed to allege a plausible theory of loss causation. Indeed, the complaint establishes as matter of law that the losses suffered by VR Global were ***not*** proximately caused by any conduct by Grant Thornton. According to the complaint, Grant Thornton did not direct the conversion of VR Global's securities, nor did it take part in their misappropriation; Refco and its insiders did. And the only conduct that Grant Thornton ***is*** accused of—issuing audit opinions—is far too remote from the injury to satisfy the requirement of proximate cause.

At best, VR Global alleges transaction causation—that "but for" Grant Thornton's audit opinions, VR Global would not have entrusted securities for safekeeping with RCM. *E.g.*, Compl. ¶ 32 (VR Global "relied on RCM's and Refco's audited financial statements for the years 2001 to 2005 in determining . . . to place and entrust their securities for safekeeping with RCM"), ¶ 37 (had Grant Thornton discovered the uncollectible receivable or the intercompany loans, VR Global "would not have entrusted securities to Refco for safekeeping"). But even if these allegations could be proven, they do nothing to link Grant Thornton's representations to the reasons that the transaction turned out to be a losing one—the critical issue for loss causation. *First Nationwide*, 27 F.3d at 769.

The complaint affirmatively demonstrates that any harm suffered by VR Global was caused by the alleged pilfering of assets through the misuse of intercompany loans—not by any financial instability concealed by the financial statements. *E.g.*, Compl. ¶ 117 ("Refco senior management . . . would direct Refco employees . . . to sell, or cause to be sold" VR Global's securities), ¶ 119 (VR Global's securities "were fraudulently converted by RCM"), ¶ 122 ("[T]he Officer Defendants, who had clear conflicts of interest and divided loyalties, caused customer securities to be converted fraudulently and the proceeds to be 'upstreamed'"), ¶ 124 ("The practice [of converting VR Global's securities] was approved and executed by senior

management of Refco and was known to, or recklessly disregarded by, the THL Defendants and each of the Officer Defendants"). Even VR Global's own statement of causation rests on the alleged theft as a critical link in the chain: VR Global argues (implausibly) that "[h]ad Refco and RCM been in reality as they were represented in the financial statements, *VR's securities would not have been repoed, sold or hypothecated* and Refco and RCM would have been stable, financially successful entities that were able to make good on any obligations." *Id.* ¶ 246 (emphasis added). Thus even VR Global agrees that it was the intentional theft by Refco and its management—rather than a hidden financial weakness—that was the instrumentality of the customers' loss. Nothing that Grant Thornton did "made it necessary or inevitable" for RCM and Refco to convert the securities deposited by VR Global and misspend the proceeds. *Stoneridge*, 128 S. Ct. at 770.

The Second Circuit has long recognized that loss causation does not exist where the losses were caused by a supervening event such as the fraudulent conduct of management. For example, in *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985), the bankruptcy trustee of a defunct company sued a law firm in connection with its preparation of the company's SEC filings and other documents, which allegedly misrepresented the company's financial condition. The trustee claimed that these misrepresentations allowed the company to raise large amounts of capital, which was then looted as part of the ongoing fraud at the company. *Id.* at 60. Rejecting this argument, the Second Circuit concluded that the trustee had merely described transaction causation, not loss causation, because the losses were actually caused by theft or mismanagement of corporate funds, not by the raising of the funds that occurred with the defendant's help. *Id.* at 61-62. The Second Circuit further explained that "the failure of the corporation to use proceeds wisely or the theft of corporate funds by officers was

23

hardly a reasonably foreseeable result, let alone the direct result, of any of [the law firm's] alleged actions." *Id*. at 62; *see also Citibank*, *N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (loss causation not properly alleged where plaintiff bank merely stated that it would not have extended uncollectible loan had it known of undisclosed side agreement that reduced value of collateral; bank did not allege "a causal connection between the fraud alleged and the subsequent loss that it suffered").

As in *Bloor*, Grant Thornton's alleged misrepresentations were not the proximate cause of VR Global's losses. Rather, it was the actions of Refco's and RCM's managers who allegedly converted VR Global's property—and of the other Refco entities, which allegedly misspent the proceeds of the loans—that directly caused VR Global's losses. And, as discussed above, VR Global alleges no facts to support its bare assertion that Grant Thornton knew about the alleged scheme all along. Thus Grant Thornton could not reasonably foresee, based on its audit work, that RCM would convert customer-deposited securities with no intention of paying them back. *See Bloor*, 754 F.2d at 61-62; *Citibank*, 968 F.2d at 1495. As the Supreme Court has recently explained, deceptive acts that are "too remote" to the plaintiff's injury—such as those attributed to Grant Thornton here—cannot serve as a basis for liability. *Stoneridge*, 128 S. Ct. at 769.

**B.     VR Global cannot rescue its claim by relying on "scheme liability."**

VR Global purports to assert claims against Grant Thornton under Rule 10b-5(a) and (c) as well as 10b-5(b), presumably in an effort to gloss over the strict pleading and proof requirements for a pure misrepresentation claim. Compl. ¶¶ 542, 546. This is futile. In this Circuit, if the sole basis for a Section 10(b) claim is an alleged misrepresentation or omission, the plaintiff cannot state a claim for market manipulation under Rule 10b-5(a) and (c). *Lentell*, 396 F.3d at 177. Instead, true scheme claims under Rule 10b-5(a) and (c) require "substantial collateral conduct" in addition to misrepresentations or omissions. *See Competitive Assocs.*, *Inc.*

*v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 814 (2d Cir. 1975). The claim against Grant Thornton here is a misrepresentation claim, pure and simple, and it cannot be asserted under Rule 10b-5(a) and (c).

In any case, an assertion of "scheme liability" does not lessen a plaintiff's burden to plead its claim under Section 10(b). As the Supreme Court recently reaffirmed, a party cannot be liable under the securities laws for aiding and abetting another party's deception or for participating behind the scenes in a scheme to defraud. *Stoneridge*, 128 S. Ct. at 770. To the contrary, the fundamental question in any Rule 10b-5 action is whether the defendant's own conduct both induced reliance and proximately caused the plaintiff's losses. *See id.* (rejecting claims of participation in a deceptive scheme under Rule 10b-5(a) and (c) on the ground that the conduct and statements by those particular defendants were never disclosed to the public and could not have induced its reliance). Thus any attempt to avoid these requirements through a purported theory of scheme liability cannot succeed.

## CONCLUSION

Each of the flaws identified in this motion—the lack of standing under *Blue Chip Stamps*, the lack of standing to claim injury to RCM, the failure to plead fraud with particularity, the failure to plead scienter, and the lack of proximate cause—provides an independent basis for dismissing the claim against Grant Thornton in this case. VR Global has had ample opportunity to state its claim, with the benefit of this Court's previous decisions and the many pleadings that have already been filed in the consolidated Refco litigation. For all these reasons, Grant Thornton respectfully urges this Court to dismiss the claim against it with prejudice.

Dated:  February 21, 2008                              Respectfully submitted,
        New York, New York

                                        By:    _____/s/_____
                                               David E. Mollón (dmollon@winston.com)
                                               WINSTON & STRAWN LLP
                                               200 Park Avenue
                                               New York, New York 10166-4193

*Of Counsel:*
Margaret Maxwell Zagel                   Bradley E. Lerman (blerman@winston.com)
Kenneth Cunningham                       Catherine W. Joyce (cjoyce@winston.com)
GRANT THORNTON LLP                       Linda T. Coberly (lcoberly@winston.com)
175 West Jackson, 20th Floor             WINSTON & STRAWN LLP
Chicago, Illinois 60604                  35 W. Wacker Drive
Ph: 312-856-0001                         Chicago, Illinois 60601
Fax: 312-565-347                         Ph: 312-558-5600
                                         Fax: 312-558-5700

26