UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | 06 Civ. 643 (GEL) |
| VR GLOBAL PARTNERS, L.P., et al., <br><br>                    Plaintiffs, <br><br> v. <br><br> PHILIP R. BENNETT, et al., <br><br>                    Defendants. | 07 Civ. 8686 |
| CAPITAL MANAGEMENT SELECT FUND, LTD., et al., <br><br>                    Plaintiffs, <br><br> v. <br><br> PHILIP R. BENNETT, et al., <br><br>                    Defendants. | 07 Civ. 8688 |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE THL DEFENDANTS' MOTION TO DISMISS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Attorneys for Thomas H. Lee Partners, L.P., Thomas H. Lee
Advisors LLC, THL Managers V, LLC, THL Equity Advisors
V, LLP, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee
Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund
V, L.P., Thomas H. Lee Investors Limited Partnership, 1997
Thomas H. Lee Nominee Trust, Thomas H. Lee, David V.
Harkins, Scott L. Jaeckel, and Scott A. Schoen

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ..................................................................................... i

PRELIMINARY STATEMENT ................................................................... 5

STATEMENT OF FACTS ............................................................................ 8

     A.    The Parties .................................................................... 9

     B.    The Origins of the Suits ............................................... 10

     C.    Procedural History ....................................................... 11

          1.    The first RCM class-action complaint ......................... 11

          2.    This Court's opinion dismissing the First Amended Complaint .. 12

          3.    The *VR* and *Capital* Complaints and the Second Amended Class Action Complaint ................................................ 13

     D.    The Allegedly Fraudulent Scheme .......................................... 13

ARGUMENT ............................................................................................ 15

I.    Plaintiffs Fail to identify any Deceptive Conduct or Misleading Statements....... 15

     A.    Plaintiffs Do Not Allege that RCM or Anyone Else Ever Represented to Plaintiffs that RCM Would Not Sell or Otherwise Use Customer Securities. ................................................................ 16

     B.    RCM Disclosed to Plaintiffs That It Could Use Customer Securities. ...... 17

          1.    RCM's standard-form trade confirmations expressly permitted RCM to sell, hypothecate, pledge, assign, invest and use customers' assets. ................................................... 18

          2.    RCM's standard-form customer agreement disclosed that RCM could sell or otherwise use customer securities. .......................... 18

     C.    There Was No Deception in the Alleged Oral Representations to Plaintiffs by Refco Brokers, Plaintiffs' Monthly Customer Account Statements, or Otherwise....................................................... 21

          1.    Plaintiffs have failed to identify any oral misrepresentations....... 21

2.      Plaintiffs' monthly account statements accurately reflected the securities to which Plaintiffs were entitled. .................................. 23

3.      Plaintiffs' allegations of Rule 10b-16 violations do not establish deceptive conduct. ..................................................................... 24

(a)    RCM's customer agreements with Plaintiffs disclosed the nature of the liens or interests that RCM asserted over customer collateral. ........................................................... 26

(b)    Plaintiffs' monthly account statements accurately reflected credits and debits in Plaintiffs' accounts. ........................... 26

II.     Plaintiffs Do Not Allege that the THL Defendants Committed a Primary 10b-5 Violation ............................................................................................................. 28

III.    RCM's Use of Customer Securities Breached No Fiduciary Duties to Plaintiffs. 30

A.    The THL Defendants Did Not Owe RCM Customers a Fiduciary Duty. . 31

B.    RCM Did Not Breach Any Fiduciary Duties to Plaintiffs. ..................... 32

IV.    Plaintiffs Fail to Establish a "Strong Inference" of Scienter as to the THL Defendants ........................................................................................................... 34

A.    The Most Compelling Inference from Plaintiffs' Allegations is that the THL Defendants Had No Reason to Think That a Fraud at RCM Was Afoot. ................................................................................................. 35

B.    Plaintiffs Have not Pled That the THL Defendants Knew of or Consciously Ignored a Fraud. ................................................................ 37

1.      Plaintiffs fail to plead facts showing that the THL Defendants knew or were reckless in not knowing that the use of RCM customer assets was improper. ..................................................... 39

2.      Plaintiffs cannot plead scienter through allegations that the fraud was large, that certain THL Defendants were Refco directors or officers, or that the THL Defendants were negligent. .................. 41

C.    Plaintiffs Have Not Sufficiently Pled That the THL Defendants Had the Motive and Opportunity to Commit Fraud. ............................................ 46

V.     Class Plaintiffs Have Not Sufficiently Alleged They Relied on Allegedly Misleading Statements In RCM's Financial Reports. .......................................... 48

VI.     Plaintiffs Lack Standing to Bring a 10b-5 Claim Arising out of Misstatements in
        RCM or Refco Financials .................................................................................. 49

VII.    Plaintiffs Fail to State a Claim under Section 20(a). ......................................... 52

        A.      Plaintiffs Fail to Plead an Underlying Primary Violation. ...................... 52

        B.      Plaintiffs Fail to Plead Culpable Participation by the THL Defendants... 53

CONCLUSION ....................................................................................................... 55

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978 (LMM), 1999 WL
47223 (S.D.N.Y. Feb. 3, 1999) ................................................................31

*Abbad v. Amman*, 285 F. Supp. 2d 411 (S.D.N.Y. 2003) .........................................45

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................ 41, 47, 48

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529
(LMM), 2007 WL 2615928, at *3 (S.D.N.Y. 2007) ........................... 36, 47, 54

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...........................................................25

*Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988 (GEL), 2007 WL
1732427 (S.D.N.Y. June 14, 2007) ............................................................31

*Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505 (S.D.N.Y. 1990)................36

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................34

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...................................................8

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007)....................................25

*Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)................................50

*Bissell v. Merrill Lynch & Co., Inc.*, 937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157
F.3d 138 (2d Cir. 1998) ........................................................................ 32, 33

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)...........................50, 52

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir. 1993) ............................23

*BRS Assoc., L.P. v. Dansker*, No. 95 Civ. 3691 (DAB), 2000 WL 257129
(S.D.N.Y. Mar. 8, 2000) ...........................................................................15

*Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ......................41

*In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000) .....................38, 44

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ........................................*passim*

*De Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293 (2d Cir. 2002) ............33

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982)................................39

*Eickhorst v. E.F. Hutton Group, Inc.*, 763 F. Supp. 1196 (S.D.N.Y. 1990) ........................... 31, 32

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) .................................................... 42

*Geiger v. Solomon-Page Group, Ltd*, 933 F. Supp. 1180 (S.D.N.Y. 1996)..................... 34, 40, 47

*In re General Electric Sec. Litig.*, No. 94 Civ. 4024 (JFK), 1995 WL 590639
    (S.D.N.Y. 1995) ...................................................................................... 45

*In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646
    (S.D.N.Y. Nov. 7, 2005)............................................................................... 54

*Goldman v. A.G. Becker Inc.*, No. 81 Civ. 6748 1983 WL 1302 (S.D.N.Y. Apr.
    20, 1983) ............................................................................................... 51

*Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352 (11th Cir. 1985) ......................... 25

*In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865(HB), 1998 WL
    283286 (S.D.N.Y. June 1, 1998) ..................................................................... 42

*In re Hyperion Sec. Litig.*, No. 93 Civ. 7179 (MBM), 1995 WL 422480 (S.D.N.Y.
    July 14, 1995).................................................................................... 23, 24

*In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333 (S.D.N.Y. 2005)................................. 50

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)..................................................*passim*

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999) ........................................... 38

*Klein v. Goetzmann*, 745 F. Supp. 107 (N.D.N.Y. 1990) ....................................... 31-32

*Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848 (S.D.N.Y. 1995)................................ 26

*Lattanzio v. Deloitte & Touche LLP*, 476 F. 3d 147 (2d. Cir. 2007) ..................................... 29, 49

*Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998) ........................................*passim*

*In re Light Mgmt. Group, Inc.*, No. 02 Civ. 3345(RO), 2003 WL 22990062
    (S.D.N.Y. Dec. 19, 2003) ............................................................................. 45

*MBIA Ins. Corp. v. Spiegel Holdings, Inc.*, No. 03 Civ. 10097 (GEL), 2004 WL
    1944452 (S.D.N.Y. Aug. 31, 2004)............................................................. 51, 52

*Mechigian v. Art Capital Corp*, 612 F. Supp. 1421 (S.D.N.Y. 1985) ................................. 32

*In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003)................................ 8, 16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416
    (S.D.N.Y. 2003) ................................................................................... 47, 48

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208
(RO), 2006 WL 1008138 (S.D.N.Y. 2006) ...................................................40

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).................................................21, 47

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..................42

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ...........45

*Olmstead v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002) .....................25

*Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks
Corp.*, 369 F.3d 27 (2d Cir. 2004), *cert. denied*, 543 U.S. 1050 (2005) ..................50, 52

*In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616 (S.D.N.Y. 2005) ...............16

*Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't 1976) ......32

*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999) ...................33

*In re Refco Capital Mkts. Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643
(GEL), 2007 WL 2694469 (S.D.N.Y. Jan. 26, 2006) ..............................*passim*

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................52, 53

*In re Salomon Analyst AT & T Litig.*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004)........................28, 29

*SEC v. Zandford*, 535 U.S. 813 (2002) ..........................................................51, 52

*Sedaghatpour v. DoubleClick, Inc.*, 213 F. Supp. 2d 367 (S.D.N.Y. 2002) ...........................48-49

*In re Serologicals Sec. Litig.*, No. 00 Civ. 1025 (CAP), 2003 WL 24033694 (N.D.
Ga. 2003) .........................................................................................................41

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...........................44, 45

*Simon v. Castello,* 172 F.R.D 103 (S.D.N.Y. 1997) ......................................15

*In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601
(S.D.N.Y. Aug. 31, 2000)...............................................................................42

*Stander v. Fin. Cleaning & Servs. Corp.*, 718 F. Supp. 1204 (S.D.N.Y. 1989)...........................16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ................*passim*

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
No. 05 Civ. 1898(SAS), 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)............................42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...................................*passim*

*Thacker v. Medaphis Corp.*, No. 97 Civ. 2849 (DAB), 1998 WL 684595
(S.D.N.Y. Sept. 30, 1998)............................................................................................15

*Ward v. UBS PaineWebber*, No. 02 Civ. 3878 (JAP), 2003 WL 22340565
(D.N.J. 2003)..............................................................................................................48

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990) ......................................34

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b) (2006).......................................................................................15, 34

28 U.S.C. 1658(b)(2) (2006) .............................................................................................25

Securities Exchange Act § 10(b), 15 U.S.C. 78j(b) (2006)..................................*passim*

Securities Exchange Act § 20(a), 15 U.S.C. 78t(a) (2006) ..................................*passim*

## RULES

Fed. R. Civ. P. 9(b) ...........................................................................................................15

SEC Rule 10b-5, 17 CFR § 240.10b-5...................................................................*passim*

SEC Rule 10b-16, 17 CFR § 240.10b-16...............................................................*passim*

## OTHER AUTHORITIES

Thomas Lee Hazen, *Treatise on the Laws of Securities Regulation*, § 12.7[1], at
230-32 (5th ed. 2005) ................................................................................................51

The THL Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the complaints in the above-captioned actions.

## PRELIMINARY STATEMENT

The three sets of Plaintiffs[2] here, each trying to allege claims for securities fraud, have filed nearly identical complaints. None of their complaints states a claim. The complaint by the Class Plaintiffs is their second amended complaint; this Court dismissed their first amended complaint because they had failed to allege, as they must to plead securities fraud, any deceptive conduct. The Court's opinion dismissing this first complaint gave all Plaintiffs instructions describing the nature of the factual allegations Plaintiffs were required to make in order to allege deception. Even with this guidance, however, both the *VR* and *Capital* Plaintiffs subsequently filed complaints that suffer from the same defect that this Court identified in Class Plaintiffs' first amended complaint. Class Plaintiffs' second amendment fares no better. Each of Plaintiffs' complaints fails to plead the deceptive conduct necessary to sustain their claims for securities fraud against the THL Defendants.

---

[1]  The THL Defendants are Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors LLC, THL Managers V, LLC, THL Equity Advisors V, LLP, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

[2]  Plaintiffs in *VR Global Partners, L.P.* v. *Bennett*, No. 07 Civ. 8686 (GEL) (S.D.N.Y. filed Oct. 9, 2007), are referred to herein as the *VR* Plaintiffs. Plaintiffs in *Capital Mgmt. Select Fund Ltd.* v. *Bennett*, No. 07 Civ. 8688 (GEL) (S.D.N.Y. filed Oct. 9, 2007), are referred to herein as the *Capital* Plaintiffs. Plaintiffs in *In re Refco Capital Mkts. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL) (S.D.N.Y. Jan. 26, 2006), are referred to herein as the Class Plaintiffs.

Plaintiffs were customers of Refco Capital Markets, Ltd. ("RCM"), an unregulated offshore brokerage that offered customers the ability to trade on margin. The THL Defendants held a large stake in Refco, Inc. ("Refco"), RCM's parent company. When Refco filed for bankruptcy in October of 2005, Plaintiffs were unable to recover the value of all of the securities that they had deposited with RCM. These actions followed. Plaintiffs now claim RCM improperly sold, pledged, hypothecated, or otherwise used customer securities and transferred the resulting proceeds to other Refco entities.

The complaints fail for several reasons. First, and most fundamentally, Plaintiffs have not identified any statement, representation, agreement, or document in which Refco, RCM, or the THL Defendants represented that RCM would not handle customer securities, including Plaintiffs', the way that RCM allegedly did.

Second, Plaintiffs do not allege that the THL Defendants ever sold or used any RCM customer securities or made representations to RCM customers about how RCM would handle customer assets. As a result, Plaintiffs have failed to allege that the THL Defendants committed primary violations of Rule 10b-5 by participating in any fraudulent use of Plaintiffs' securities. As the Supreme Court recently reaffirmed in *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008), there is no 10b-5 liability for defendants who are not primary violators.

Third, Plaintiffs have failed to allege facts demonstrating that the THL Defendants acted with scienter. Plaintiffs' theory that these Defendants knew of or recklessly disregarded a fraud is wholly implausible in light of, among many other facts, THL's decision to retain a 42.7% equity interest in Refco after Refco's IPO. It makes no

6

sense at all to think that a sophisticated private-equity firm like THL would ignore a fraud and allow its investment to sink into bankruptcy. Rather, the more compelling inference—and *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), instructs courts to consider such opposing inferences—is that the THL Defendants did not know and were not reckless in not knowing that anything improper was afoot.

Fourth, Plaintiffs cannot state claims under Rule 10b-5 arising out of the misstatements in Refco and RCM financials that these Plaintiffs allege. A plaintiff has standing under Rule 10b-5 only if the alleged deception relates to securities sold or purchased by that plaintiff. Any misstatements in Refco and RCM financials, of course, would relate to Refco and RCM securities, but Plaintiffs do not contend that they ever purchased or sold any securities issued by RCM or Refco. Class Plaintiffs' 10b-5 claims arising out of misstatements in the RCM financials also fail because Class Plaintiffs have altogether failed to plead reliance.

Fifth, Plaintiffs have failed to state a claim against the THL Defendants for control person liability under Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Most fundamentally, Plaintiffs have not alleged any underlying violation of the securities law that could serve as a basis for control person liability. In addition, Plaintiffs have not alleged, as they must, culpable participation by the THL Defendants in any fraud. Plaintiffs have not even alleged that any fraud was committed when RCM allegedly hypothecated or sold securities in their accounts with RCM, much less that the THL Defendants knew about any such fraud or participated in it.

For all of these reasons, the complaints in this case should be dismissed with prejudice.

## STATEMENT OF FACTS

The facts below are taken primarily from the three complaints that Plaintiffs have filed, the documents that are referred to and incorporated by reference in those complaints, and public disclosure documents filed with the Securities and Exchange Commission (the "SEC").[3] The three relevant complaints are the complaint filed in *VR Global Partners, L.P.* v. *Bennett*, No. 07 Civ. 8686 (GEL) (S.D.N.Y. filed Oct. 9, 2007) (the "*VR* Complaint" or "*VR* Compl."), the complaint filed in *Capital Mgmt. Select Fund Ltd.* v. *Bennett*, No. 07 Civ. 8688 (GEL) (S.D.N.Y. filed Oct. 9, 2007) (the "*Capital* Complaint" or "*Capital* Compl."), and the Second Amended Class Action Complaint filed in *In re Refco Capital Mkts. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL) (S.D.N.Y. Jan. 26, 2006) (the "Class Complaint," "Second Amended Complaint," or "Class Compl."). Solely for the purposes of this motion, Defendants necessarily accept as true the well-pleaded allegations in the complaints. *See Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1975 (2007).

---

[3]   Copies of all documents cited in this memorandum are submitted herewith as exhibits to the Declaration of Richard A. Rosen, dated Feb. 21, 2008 (the "Rosen Declaration" or "Rosen Decl."). The Court may consider all of these documents on this motion without converting it into a motion for summary judgment. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) ("In deciding a Rule 12(b)(6) motion, the Court may consider the following materials: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.").

**A.      The Parties**

         The THL Defendants are entities or individuals affiliated with defendant Thomas H. Lee Partners, L.P. ("THLP"), a private-equity firm.  (*See VR* Compl. ¶¶ 69-77; *Capital* Compl. ¶¶ 51-59; Class Compl. ¶¶ 54-62.)

         The Complaints also name as defendants ten entities affiliated with THLP:

> (i)      Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and  Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"), and THL Equity Advisors V, LLC, general partner of each of the three funds (*VR* Compl. ¶ 71; *Capital* Compl. ¶ 53; Class Compl. ¶ 56);
>
> (ii)      Thomas H. Lee Investors Limited Partnership, which is a Massachusetts limited partnership controlled by Defendant Thomas H. Lee (*VR* Compl. ¶ 71; *Capital* Compl. ¶ 53; Class Compl. ¶ 56);
>
> (iii)      The 1997 Thomas H. Lee Nominee Trust, which is a trust over which Defendant Thomas H. Lee has voting and investment control (*VR* Compl. ¶ 71; *Capital* Compl. ¶ 53; Class Compl. ¶ 56); and
>
> (iv)      THL Managers V, LLC, a Delaware limited liability company of which at all times THLP was the Managing Member (*VR* Compl. ¶ 71; *Capital* Compl. ¶ 53; Class Compl. ¶ 56).

In August of 2004, the THL Funds made a 57% equity investment in Refco.

         The Complaints further name as defendants four individuals affiliated with THLP:  Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.  (*VR* Compl. ¶¶ 73-76; *Capital* Compl. ¶¶ 55-58; Class Compl. ¶¶ 58-61.)  These individuals sat on Refco's Board of Managers from August of 2004 to October of 2005.  None of these individuals, nor any of the THL Defendants, was an officer or director of RCM.

         Plaintiffs are former customers of RCM.  (*See VR* Compl. ¶ 106; *Capital* Compl. ¶ 100; Class Compl. ¶ 95.)  The three consolidated actions have three different sets of Plaintiffs:

In the *VR* action, plaintiffs are VR Global Partners, L.P., Paton Holdings Ltd., VR Capital Group Ltd., and VR Argentina Recovery Fund, Ltd. (*See* VR Compl. ¶ 1.) The *VR* Plaintiffs are Cayman entities with principal offices in Moscow, Russia. (*VR* Compl. ¶¶ 1, 82.) They describe themselves as "one of the top-ranked emerging markets funds in the world, achieving a 43% annual compound return for its investors, net of fees, over its six-year existence," and state that during these six years they achieved an increase in assets under management from $11 million to $1 billion. (*VR* Compl. ¶¶ 1, 82.)

In the *Capital* action, plaintiffs are Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial, S.A. (*See Capital* Compl. ¶1.) The *Capital* Plaintiffs are offshore investment funds incorporated in the Bahamas, British Virgin Islands, and Panama. (*See Capital* Compl. ¶¶ 31-33.)

In the class action, plaintiffs are Global Management Worldwide Limited, Arbat Equity Arbitrage Fund Limited, and Russian Investors Securities Limited. (*See* Class Compl. ¶ 34.) These Class Plaintiffs represent a putative class of RCM customers who deposited securities with RCM at any time from October 17, 2000 to October 17, 2005 and elected to contribute the proceeds of their claims to the Refco Private Action Trust. (Class Compl. ¶¶ 34-38.)

**B.     The Origins of the Suits**

These consolidated actions arise out of Refco's implosion into bankruptcy in October of 2005. This Court is by now familiar with the details of Refco's story, so we review here only allegations pertinent to these actions and the instant motion.

In August 2005, Refco made an initial public offering of its stock. Approximately two months later, on October 10, 2005, Refco issued a press release

disclosing the existence of a previously undisclosed $430 million receivable.   In connection with the disclosure of this receivable, Refco also stated that investors, customers, and other members of the public should no longer rely on its previously issued financial statements.  (*VR* Compl. ¶ 236; *Capital* Compl. ¶ 155; Class Compl. ¶ 152.)

Over the next week, Refco's customers engaged in a classic "run on the bank" resulting in a decline in customer deposits from approximately $7.5 billion on October 10, to approximately $5.7 billion by October 17.   While Refco's regulated affiliate maintained sufficient capital to satisfy customer demands, Refco's unregulated business, particularly RCM, did not have enough cash for all of its customers to withdraw all of their deposits at once.   On October 13, 2005, Refco declared a moratorium on further customer withdrawals and, on October 17, 2007, it filed a petition seeking protection under the bankruptcy laws and informed RCM customers that it lacked sufficient assets to provide them with cash or securities in amounts equal to their account balances.  (*VR* Compl. ¶¶ 238-41; *Capital* Compl. ¶¶ 157-60; Class Compl. ¶¶ 154-57.) These actions followed.

## C.    Procedural History

### 1.    The first RCM class-action complaint

In January 2006, certain RCM customers, seeking to recover the losses that they suffered in connection with Refco's bankruptcy filing, filed putative class actions for securities fraud in the Southern District of New York.   On July 10, 2006 the Court appointed Global Management Worldwide Limited, Arbat Equity Arbitrage Fund Limited, and Russian Investors Securities Limited as lead plaintiffs for a putative class of all RCM customers who had held or placed securities with RCM from October 17, 2000

until October 17, 2005. On September 5, 2006, Class Plaintiffs filed a consolidated amended complaint (the "First Amended Complaint").

In the First Amended Complaint, Class Plaintiffs alleged that RCM customer funds were used as part of a scheme to make Refco appear more profitable than it actually was. They also alleged that RCM should have complied with federal securities laws and other regulations, including segregation and margin requirements, and that RCM's noncompliance with those laws and regulations was the reason RCM was unable to meet the demand for customer withdrawals.

### 2.    This Court's Opinion dismissing the First Amended Complaint

On January 19, 2007, defendants named in the putative class action, including the THL Defendants, moved to dismiss. This Court granted those motions on September 13, 2007. The Court held that "[t]he complaint must be dismissed because it fails sufficiently to allege deceptive conduct." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.* ("*RCM I*"), No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *5, 7 (S.D.N.Y. Sept. 13, 2007). The Court noted that the complaint did not "describe the understanding pursuant to which RCM held customer assets." *Id.* at *8. Plaintiffs had, therefore, failed to allege any deception in RCM's sale, hypothecation, and loans of customer assets. *Id.* As the Court stated, Plaintiffs could not state a claim simply by alleging bad conduct; they needed to allege that the conduct at issue was deceptive. *See id.*

The Court further explained that "[w]hether RCM was actually permitted by U.S. regulations to engage in that conduct [the hypothecation of customer assets] is beside the point; what matters is that plaintiffs were well aware it intended to do so. Plaintiffs never identify any requirement to which RCM claimed it would adhere that

prohibited brokerages from using customer assets for loans to affiliated companies." *Id.* "[W]hether RCM was actually allowed by law to engage in the activities in question has nothing to do with whether those activities were deceptive. Authorized bad conduct is not fraud." *Id.* at 9 n.7. Further, because RCM held itself out as an unregulated broker, customers were on notice that RCM might manage customer funds in "unconventional ways . . . that would ordinarily be unlawful under U.S. regulations if RCM were a U.S. broker." *Id.* at *9. "In short, the complaint fail[ed] to make sufficient allegations as to deception, the most basic element of fraud." *Id.* at *12. The Court granted Class Plaintiffs leave to amend. *See id.* at *13.

### 3. The *VR* and *Capital* Complaints and the Second Amended Class Action Complaint

Following dismissal of the Class Plaintiffs' First Amended Complaint, the VR Plaintiffs and Capital Plaintiffs filed individual actions seeking to recover losses arising from RCM's inability to provide them with cash or securities equal to their account balances. These individual customer actions were based on allegations and claims similar to those in Class Plaintiffs' First Amended Complaint. On November 20, 2007, this Court consolidated, for pretrial purposes, the individual customer actions with the putative class action; an amended consolidation order followed on November 30. The Class Plaintiffs then filed, on December 21, 2007, their Second Amended Complaint.

### D. The Allegedly Fraudulent Scheme

The three customer complaints—the complaints filed by the *VR*, *Capital*, and Class Plaintiffs—are nearly identical. Each of the three complaints tracks the allegations in the other complaints nearly word for word; the only substantive difference is the addition of allegations concerning Grant Thornton LLP in the *VR* Complaint.

In each of the customer complaints, Plaintiffs allege that RCM improperly sold, hypothecated, or pledged customer securities—which Plaintiffs say had been deposited for safekeeping with RCM—and that RCM then loaned the resulting proceeds to other Refco entities.  (*See VR* Compl. ¶¶ 126-48; *Capital* Compl. ¶ 63; Class Compl. ¶ 73.)

According to Plaintiffs, any sale or hypothecation of the securities they had deposited with RCM constituted a violation of their customer agreements with RCM. Plaintiffs contend that the customer agreements allowed such sales only with customer authorization, which, they say, they did not give.  (*See VR* Compl. ¶ 10; *Capital* Compl. ¶ 9; Class Compl. ¶ 10.)  Plaintiffs also claim that the sales were contrary to representations made by Refco representatives that RCM would hold Plaintiffs' securities in safekeeping. (*See VR* Compl. ¶ 8; *Capital* Compl. ¶ 7; Class Compl. ¶ 8.)   RCM issued monthly account statements.  These account statements, according to Plaintiffs, hid RCM's sales of customer securities, because the account statements did not reflect that the securities had been sold or hypothecated by RCM.  (*See VR* Compl. ¶ 11; *Capital* Compl. ¶ 10; Class Compl. ¶ 11.)   Finally, Plaintiffs try to allege that RCM owed some type of fiduciary duty to its customers.  They suggest that any sale or hypothecation of customer securities was a breach of this alleged duty.  (*See VR* Compl. ¶ 9; *Capital* Compl. ¶ 8; Class Compl. ¶ 9.)

In sum, Plaintiffs allege that their property was misappropriated in violation of Section 10(b) and Section 20(a) of the Exchange Act, and that these misappropriations resulted in a $2 billion loss to RCM customers.  (*See VR* Compl. ¶ 124;

*Capital* Compl. ¶ 115; Class Compl. ¶ 119.)  Plaintiffs have purported to  assert claims for violations of Rule 10b-5, Rule 10b-16, and Section 20(a).

## ARGUMENT

### I.
### PLAINTIFFS FAIL TO IDENTIFY ANY
### DECEPTIVE CONDUCT OR MISLEADING STATEMENTS

Class Plaintiffs' Second Amended Complaint does not remedy the most glaring defect in their claims, a defect that is shared by the other Complaints.  As this Court noted in its order of dismissal, Class Plaintiffs' First Amended Complaint failed to sufficiently allege deceptive conduct, the most basic element of fraud.  *RCM I*, 2007 WL 2694469, at *7.  Their second try fares no better.  Nowhere in the 129-page Second Amended Complaint do Class Plaintiffs identify any representation that RCM would not sell or otherwise use customer assets, which is what Plaintiffs now complain of.  The *VR* and *Capital* Complaints suffer from the same defect.

To state a claim under Rule 10b-5, the plaintiff "must allege conduct that is manipulative or deceptive."  *Id.*  As such a claim sounds in fraud, the claim is subject to the stringent pleading requirements of  Federal Rule of Civil Procedure  9(b).  *See, e.g., BRS Assoc., L.P.* v. *Dansker*, No. 95 Civ. 3691 (DAB), 2000 WL 257129, at *10 (S.D.N.Y. Mar. 8, 2000) ("[W]hen evaluating a claim of fraud, the Court must first look to whether the claim has been pled sufficiently under Fed. R. Civ. P. 9(b)."); *Thacker* v. *Medaphis Corp.*, No. 97 Civ. 2849 (DAB), 1998 WL 684595, at *2 (S.D.N.Y. Sept. 30, 1998) (Rule 9(b) "applies to claims arising under Section 10(b) of the 1934 Act"); *Simon* v. *Castello,* 172 F.R.D 103, 105 (S.D.N.Y. 1997) (same).  The heightened pleading standard of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. 78u-4, also applies.  Under that standard, "all private securities class action

complaints alleging material misrepresentations or omissions 'shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356 (S.D.N.Y. 2003) (quoting 15 U.S.C. 78u-4).

Thus, to allege deceptive conduct, a plaintiff must identify with particularity "what deceptive acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *RCM I*, 2007 WL 2694469, at *7 (citing *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005)). Where, as here, multiple defendants are involved, the complaint must detail the specific nature of each defendant's involvement in the alleged fraud. *Stander* v. *Fin. Cleaning & Servs. Corp.*, 718 F. Supp. 1204, 1210 (S.D.N.Y. 1989).

In all respects, Plaintiffs' allegations fail this test. Plaintiffs have not identified "the source of the understanding falsely created by defendants (that is, a fiduciary duty, prior representation or some other reason why they believed Defendants would act otherwise than they did) and the conduct that violated that understanding." *RCM I*, 2007 WL 2694469, at *7.

A.     **Plaintiffs Do Not Allege that RCM or Anyone Else Ever Represented to Plaintiffs that RCM Would Not Sell or Otherwise Use Customer Securities.**

Plaintiffs fail to identify any specific representation to them that RCM would not sell or otherwise use customer assets, including Plaintiffs' securities. Plaintiffs' allegations do, however, suggest that RCM held itself out as an unregulated brokerage. (*See VR* Compl. ¶¶ 20, 79 (describing Refco's three operating subsidiaries and characterizing one as "a registered broker-dealer," another as a "regulated futures

16

commission merchant," but RCM only as "a securities and foreign exchange broker"), 168, 381; *Capital* Compl. ¶¶ 19, 60, 143, 276; Class Compl. ¶¶ 22, 47, 70, 140, 141 ("To the extent that Refco may have represented to some customers that RCM was not subject to U.S. registration requirements. . . .").)

Moreover, as Class Plaintiffs overtly acknowledge in paragraph 72 of their First Amended Complaint, "Refco publicly described RCM . . . as a purportedly 'offshore' securities and foreign exchange broker which was not subject to these [U.S. regulatory] requirements" for broker-dealers.    Class Plaintiffs' Second Amended Complaint is consistent with Class Plaintiffs' prior admission on this point.

In any case, because Plaintiffs do not allege that RCM purported to be regulated, "Plaintiffs never identify any requirement to which RCM claimed it would adhere that prohibited brokerages from using customer assets." *RCM I*, 2007 WL 2694469, at *9.  Nor do Plaintiffs otherwise allege any representation that RCM would not use customer assets.  This alone is fatal to Plaintiffs' case.

**B.    RCM Disclosed to Plaintiffs That It Could Use Customer Securities.**

The infirmity in Plaintiffs' complaints extends further.  In addition to failing to identify any affirmative representation that RCM would not sell or otherwise use customer assets, Plaintiffs rely on two documents—RCM's standard-form trade confirmation and customer agreement—that actually show that RCM *affirmatively disclosed* to Plaintiffs the circumstances under which RCM could sell or otherwise use Plaintiffs' securities.

1.   **RCM's standard-form trade confirmations expressly permitted RCM to sell, hypothecate, pledge, assign, invest and use customers' assets.**

The standard RCM trade confirmation says that "IT IS AGREED BETWEEN YOU AND REFCO CAPITAL MARKETS, LTD. ("RCM") THAT" "RCM does not segregate any collateral or other property deposited with it and RCM shall have the right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it." (Rosen Decl. Ex. A at p. 2, ¶ 1.) RCM therefore disclosed to Plaintiffs that it could "sell, pledge, hypothecate, assign, invest or use, such collateral or property [that Plaintiffs] deposited with it," meaning there was nothing deceptive about RCM's sale or other use of Plaintiffs' securities or other assets.

RCM's practice is analogous to a bank's practice of loaning out or otherwise using customer deposits to make money. *See Levitin* v. *PaineWebber, Inc.*, 159 F.3d 698, 703 (2d Cir. 1998) (comparing a brokerage firm's treatment of customer deposits with a bank's treatment of customer deposits and noting that "the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious," as "[t]hat is precisely how banks make money").

2.   **RCM's standard-form customer agreement disclosed that RCM could sell or otherwise use customer securities.**

Similarly, the standard-form customer agreement that all Plaintiffs are party to with RCM (*see VR* Compl. ¶ 106; *Capital* Compl. ¶ 100; Class Compl. ¶ 95) states in Section B, the section that applies when customers execute margin transactions, the following:

> To secure your obligations under Transactions entered into pursuant to this Agreement, you hereby grant to [RCM][4] and its affiliates (collectively,

---

[4]   The customer agreement refers to RCM as Refco.

18

"Refco Entities") a first priority, perfected security interest in all of your cash, securities and other property (whether held individually or jointly with others) and the proceeds thereof from time-to-time in the possession or under the control of such Refco Entities, whether or not such cash, securities and other property were deposited with such Refco Entities . . . .

2. *Rights and Use of Margin.* [RCM] shall have the right to loan, pledge, hypothecate or otherwise use or dispose of such cash, securities and other property free from any claim or right, until settlement in full of all Transactions entered into pursuant to this Agreement. [RCM's] sole obligation shall be to return to you such cash, like amounts of similar cash, securities and other property . . . to the extent they are not deemed to be collateral to secure Transactions entered into pursuant to this Agreement with any Refco Entities or have not been applied against obligations owing by you to Refco Entities, whether as a result of the liquidation of positions and any Transactions entered into pursuant to this Agreement or otherwise.

(Rosen Decl. Ex. B.)  As to margin customers, then, Section B (1) expansively defines margin, or collateral, and (2) grants RCM an unfettered right to use this collateral (3) with the understanding that RCM's "sole obligation" would be to return the value of the collateral only after a margin customer settles all his or her transactions and debts with RCM.

　　　　The agreement identifies collateral as "all of your cash, securities and other property . . . and the proceeds thereof" in the possession of any Refco entity. Nowhere, contrary to what Plaintiffs claim, does it limit this term to include only those "securities with a value equal to the margin balance."  (*See VR* Compl. ¶ 108; *Capital* Compl. ¶ 100; Class Compl. ¶ 99.)  This broad definition of collateral is consistent with industry practice.  *See Levitin*, 159 F.3d at 701 (noting that, even for a regulated broker, it is permissible to "require particular customers to post collateral in excess of [what regulations require]").

The customer agreement also authorizes RCM to "loan, pledge, hypothecate or otherwise use or dispose of" a customer's margin "until settlement in full" of that customer's margin transactions.  It therefore granted RCM unlimited discretion to use, such as by loaning or selling, any and all property in a margin customer's account. [5] *See also Levitin*, 159 F.3d at 701 ("When a [brokerage] customer posts collateral . . . , the collateral—like the balance in the account—remains part of the broker's general cash reserves and is used by the broker in transactions that it hopes will generate profits.")

The customer agreement also states that it is RCM's "sole obligation" to return sold, hypothecated, or otherwise used customer property only after the margin customer that owns the property settles all of his or her "Transactions" and debts or other "obligations" with RCM.  Thus, the customer agreement, on its face, disclosed that RCM was not obliged to return the assets of a margin customer unless and until that customer settled all of his or her transactions and debts with RCM.  The *VR* and *Capital* Plaintiffs concede that they executed margin transactions at RCM. (*See VR* Compl ¶ 96; *Capital* Compl. ¶¶ 68, 80, 93.) The Class Complaint's class definition includes all RCM customers who traded on margin, and the Complaint acknowledges that class members traded on margin.  (*See* Class Compl. ¶ 99.)

---

[5]  In a trial in the Refco bankruptcy proceedings, *In re Refco, Inc., et al.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y.), on whether to convert RCM's Chapter 11 reorganization into a Chapter 7 stockbroker litigation, Judge Drain reached the same conclusion, interpreting the customer agreement to say that, "where customers have engaged in margin or financing transactions with RCM or its affiliates," "what the customers have given to RCM in those paragraphs [of the customer agreement] is a security interest in their property until those transactions are paid off and the debt satisfied." (Rosen Decl. Ex. C at 253.)  He further noted that "it's more often than not industry practice not to segregate into specific accounts collateral but to permit hypothecation of securities and cash and other property at least when a customer is trading in margin."  (Rosen Decl. Ex. C at 255.)

C.   **There Was No Deception in the Alleged Oral Representations to Plaintiffs by Refco Brokers, Plaintiffs' Monthly Customer Account Statements, or Otherwise.**

Plaintiffs attempt to show deceptive conduct by pointing to alleged oral representations that Refco brokers made, Plaintiffs' monthly account statements, and perhaps supposed violations of Rule 10b-16.  Each of these attempts fails.

### 1.   **Plaintiffs have failed to identify any oral misrepresentations.**

Plaintiffs fail to show deception by alleging that Refco brokers made misleading oral representations to induce Plaintiffs to become RCM customers.  (*See VR* Compl. ¶¶ 84-87; *Capital* Compl. ¶¶ 64-99; Class Compl. ¶¶ 76, 83, 90.)

First, the oral representations to which the Class and *Capital* Plaintiffs do allude are too vague and general to establish a fraud claim.  *See Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) ("[A] complaint making such allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.")

The Class Plaintiffs make only the bare-bones allegation that "Refco represented to [them] that [their] securities were safe at Refco" (Class Compl. ¶¶ 76, 83, 90) and provide no other details. This is simply *not* a representation about whether securities could be loaned or hypothecated.

The *Capital* Plaintiffs, for their part, allege "other representations made in the course of its course of dealings with Refco" (*Capital* Compl. ¶¶ 70, 81, 91) and "dealings and discussions with Refco and its representatives" (*Capital* Compl. ¶ 91). But these Plaintiffs fail to specify the content of these "other representations" or statements by Refco in any "dealings and discussions."   Instead, the *Capital* Plaintiffs make

allegations about what *they* represented *to Refco* (*see, e.g., Capital* Compl. ¶¶ 65 (alleging that Capital Management "stated [to Refco] that . . . it was seeking an efficient broker"); 77 (alleging that *Capital* Plaintiff "IDF explained its conservative, low risk investment philosophy" to Refco)) and even allege internal Refco communications that obviously were not representations of any kind *to the* Capital *Plaintiffs* (*see Capital* Compl. ¶ 66 (discussing an "email communication between representatives of Refco and RCM").)

The oral representations that the *VR* Plaintiffs allege fail for the different reason that they do not concern the use of customer assets by RCM. The *VR* Plaintiffs allege that a Refco broker stated to them that Refco's business model was "riskless," that Refco imposed conservative "haircuts" on customer collateral to protect *itself* against customer default, and that Refco engaged in no proprietary trading. (*See VR* Compl. ¶¶ 85-87.) The statement that Refco's business was "riskless"—whatever that vague and somewhat hyperbolic term may mean—is certainly not a promise that the customers took no risks in dealing with Refco. As for Refco's imposing conservative haircuts to protect itself against *customer* default, that practice has nothing to do with the risk, which materialized, that Plaintiffs complain of: that is, the risk that *RCM*, not a customer, would default. Finally, that the broker said Refco did not engage in proprietary trading does not show that RCM would not make use of customer assets.

In any event, plaintiffs could not have reasonably relied on any of these alleged oral misrepresentations to reach the conclusion that RCM could not and/or would not hypothecate or loan their securities. Plaintiffs were required to view the alleged oral representations in light of the written standard-form customer agreement and trade

confirmation. "[A]ny reasonable investor knows to be somewhat wary of a selling agent's oral representations and to check them against the written materials." *In re Hyperion Sec. Litig.*, No. 93 Civ. 7179 (MBM), 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995); *see also Brown* v. *E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993) ("There is no requirement that written . . . materials counteract the enticements of salesmen by anticipating each sales pitch and rebutting it explicitly."). The written trade confirmation and customer agreement, discussed in Section I.B, *supra*, confirmed that RCM could "loan, pledge, hypothecate or otherwise use or dispose of" customer securities or other assets. These documents provided the Plaintiffs with full and objective disclosure of non-misleading factual material. That is all they were entitled to receive." *Brown*, 991 F.2d at 1033 (rejecting Section 10(b) claim where investors relied on oral representations by brokers that contradicted written offering materials). With the "total mix of information" available to Plaintiffs, the alleged oral representations could not have misled them into thinking RCM would not sell or otherwise use customer securities. *See In re Hyperion*, 1995 WL 422480, at *8. The customer agreement and trade confirmation unambiguously reserved to RCM the right to do just that.

> **2.      Plaintiffs' monthly account statements accurately reflected the securities to which Plaintiffs were entitled.**

Plaintiffs further allege that their monthly account statements were fraudulent because they reflected securities in Plaintiffs' accounts that were not in RCM's physical custody. (*See VR* Compl. ¶¶ 157-60; *Capital* Compl. ¶¶ 125-28; Class Compl. ¶¶ 129-32). The statements, however, accurately reflected the securities to which Plaintiffs were entitled from RCM. Plaintiffs have not claimed otherwise.

Here, the analogy of a brokerage to a bank is useful in understanding why the account statements are not misleading.  As the Second Circuit acknowledged in *Levitin*, the balances in most checking accounts are used by banks to earn money.  *See* 159 F.3d at 703.  In fact, that is precisely how banks make money.  *Id*.  This "practice is neither unknown nor unexpected, much less nefarious."  *Id.*

Thus, it is no surprise that a bank or brokerage does not have, at any given point, enough cash physically on hand to refund one hundred percent of customer deposits.  Nor is it a surprise that a customer's account statements do not reflect that fact.  A customer's account statements do not inform the customer of how much cash the bank or brokerage physically has on hand, but rather the value that the customer is entitled to receive from the financial institution.  This fact is "so basic that any investor could be expected to know it."  *Levitin*, 159 F.3d at 702.

### 3. Plaintiffs' allegations of Rule 10b-16 violations do not establish deceptive conduct.

Plaintiffs allege that certain Defendants, not including the THL Defendants, violated Rule 10b-16 by failing to provide Plaintiffs with (1) a written statement disclosing the nature of any interest or lien that RCM had in collateral posted by Plaintiffs and (2) statements, at least quarterly, showing the debits and credits in Plaintiffs' accounts. [6]  (*See VR* Compl. ¶ 163; *Capital* Compl. ¶ 138; *Class* Compl. ¶

---

[6]  Insofar as Plaintiffs mean to hold the THL Defendants liable under Section 20(a) for any 10b-16 violation, Plaintiffs fail because they do not allege facts demonstrating an actual violation of Rule 10b-16, as Section I.E explains.

135.).  The Court should note that none of these supposed violations constitute deceptive

conduct.[7, 8]

---

[7]   Further, no private right of action exists under Rule 10b-16. Because there is no
express private right of action for 10b-16 violations, any such right of action must be
implied. *See Greenblatt* v. *Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1357 (11th
Cir. 1985).  Recent Supreme Court and Second Circuit precedents have made clear
that courts are not to imply such rights of action unless Congress intends to create the
rights. *See Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive
federal law itself, private rights of action to enforce federal law must be created by
Congress."); *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, No. 06-43,
2008 WL 123801, at *7-8 (Jan. 15, 2008); *Bellikoff* v. *Eaton Vance Corp.*, 481 F.3d
110 (2d Cir. 2007); *Olmstead* v. *Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002).  Of
particular note is the *Stoneridge* decision, which said the "§10(b) private right should
not be extended beyond its present boundaries." *Stoneridge*, 2008 WL 123801, at *7-
8, 10 ("The decision to extend the cause of action is for Congress, not for us.").  Rule
10b-16, of course, is a rule the SEC promulgated pursuant to Section 10(b).  Because
the Second Circuit has never held that there is a private right of action under Rule
10b-16, courts should not now extend the right of action under that section "beyond
its present boundaries" by implying a 10b-16 private right of action.

Insofar as other courts' pre-*Sandoval* decisions have already implied a private right of
action under the Rule, these decisions are no longer good law under *Sandoval*,
*Stoneridge*, *Olmstead*, and *Bellikoff*.  *See, e.g., Olmstead*, 283 F.3d at 434 ("[p]ast
decisions reflecting judicial willingness to 'make effective [statutory] purpose' in the
context of implied rights of action belong to an '*ancien regime*.'").

[8]   Finally, certain of Plaintiffs 10b-16 claims are time-barred. The statute of limitations
for securities-fraud claims requires that plaintiffs bring such claims no later than five
years after the complained of violation. *See* 28 U.S.C. 1658(b)(2) (2006).  For
purported 10b-16 claims arising out of the failure to furnish a written statement
disclosing the nature of any interest or lien that a broker has in customer collateral,
the limitations period begins running at the opening of the account, which is the time
at which a broker is required to furnish such a statement. *See Bissell* v. *Merrill Lynch
& Co., Inc.*, 937 F. Supp. 237, 245 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir.
1998); *Komanoff* v. *Mabon, Nugent & Co.*, 884 F. Supp. 848, 858 (S.D.N.Y. 1995).
The *VR* Plaintiffs opened their accounts with RCM in September 2001, more than six
years before filing their Complaint. (*See VR* Compl. ¶ 83.) *Capital* Plaintiff IDC
opened its accounts in February 1998, nine years ago, and *Capital* Plaintiff IDF
opened its account in October 1996, eleven years ago.  More than five years have
passed before these Plaintiffs commenced their actions against RCM.  Accordingly,
any purported 10b-16 claims arising out of a failure to furnish these Plaintiffs with a
written statement disclosing the nature of any interest or lien that RCM retained in or
on Plaintiffs' collateral are time-barred.

> **(a)**     **RCM's customer agreements with Plaintiffs disclosed the nature of the liens or interests that RCM asserted over customer collateral.**

In plain contradiction to Plaintiffs' assertions, RCM did provide Plaintiffs with a written statement disclosing the nature of the interests or liens RCM claimed in customer collateral.   Part B.1 of the customer agreement reads, in relevant part, as follows:

> To secure your obligations under Transactions entered into pursuant to this Agreement, you hereby grant to [RCM] and its affiliates (collectively, "Refco Entities") a first priority, perfected security interest in all of your cash, securities and other property (whether held individually or jointly with others) and the proceeds thereof from time-to-time in the possession or under the control of such Refco Entities, whether or not such cash, securities and other property were deposited with such Refco Entities. Insofar as a security interest is granted to Refco Entities in any collateral in the possession of any affiliate of [RCM], such affiliate shall act for itself and as agent for [RCM]. Insofar as a security interest is granted under any other agreement to any affiliate of [RCM] in collateral in the possession of [RCM], [RCM] shall act for itself and as agent for such affiliate.

(Rosen Decl. Ex. B.)

Given this disclosure in the customer agreement, there can be no 10b-16 violation arising out of a failure to disclose, in writing, the nature of RCM's liens on or interests in property posted by Plaintiffs as collateral.   There can likewise be no claim that there was a deceptive non-disclosure.

> **(b)**     **Plaintiffs' monthly account statements accurately reflected credits and debits in Plaintiffs' accounts.**

Plaintiffs claim that RCM's account statements violated Rule 10b-16 because they supposedly did not show the debits and credits in Plaintiffs' accounts.   That claim is a repackaged version of their claim that the account statements were misleading for 10b-5 purposes.   *See* Section I.C.2, *supra*.   Plaintiffs' purported claim under Rule

10b-16 merely points out that the RCM account statements reflected securities in Plaintiffs' accounts that were not in RCM's physical possession because RCM had sold or otherwise used them.  (*See VR* Compl. ¶¶ 157-60; *Capital* Compl. ¶¶ 125-28; Class Compl. ¶¶ 129-32.)  The account statements were therefore supposedly misleading in that they did not reflect debits representing RCM's sale of those securities.  (*See VR* Compl. ¶¶ 157-60; *Capital* Compl. ¶¶ 125-28; Class Compl. ¶¶ 129-32.)

As discussed in Section I.C.2, *supra*, it would make little sense to record the sales of customer securities by RCM as debits on customer account statements. Those sales were not debits of the customers' accounts.  It is common, indeed the norm, for financial institutions to use customer funds to earn a return.  *Levitin*, 159 F.3d at 703. This "practice is neither unknown nor unexpected, much less nefarious."  *Id.*  When a bank, for example, loans out or otherwise uses money that a customer has deposited, the bank does not record a debit in that customer's account.  That is because the bank's use of the funds does not affect or reduce the bank's obligation to the customer.  The customer is entitled to and owed the value reflected in his or statement.

RCM's alleged sales and loans of customer securities, then, were not reflected as debits in Plaintiffs' account statements precisely because they were not debits in Plaintiffs' accounts.  Plaintiffs have therefore not sufficiently identified any misrepresentation in the account statements that would allow them to recover under Rule 10b-16 or show deception for 10b-5 purposes.

**II.**

**PLAINTIFFS DO NOT ALLEGE THAT THE THL DEFENDANTS
COMMITTED A PRIMARY 10b-5 VIOLATION**

To be liable under Rule 10b-5, actors must be primary violators.  That is, they must themselves (1) commit a deceptive act (2) upon which a plaintiff relies.  *See Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769-70 (2008) ("The 10(b) implied private right of action does not extend to aiders and abettors.").  Plaintiffs have not met either element of this test with respect to the THL Defendants.

Plaintiffs do not allege that the THL Defendants made *any* representation to customers, let alone a false representation.  Nor do Plaintiffs allege that the THL Defendants knowingly participated in the alleged conversion of customer securities or in "up-streaming and side-streaming" customer securities to other Refco entities that lacked "the intent and/or financial wherewithal to repay those funds."  (*See VR* Compl. ¶ 154; *Capital* Compl. ¶ 121; Class Compl. ¶ 125.)  Plaintiffs' inability to point to any misrepresentation is perhaps explained by their ready admission that the allegedly "fraudulent scheme began even prior to the THL Entities' August 2004 investment in Refco. . . ."  (S*ee VR* Compl. ¶ 269; *Capital* Compl. ¶ 182; Class Compl. ¶ 182.)

What Plaintiffs do allege is that "[r]ather than put an end to the fraudulent scheme, the THL Defendants allowed the fraud to flourish."  (*Capital* Compl. ¶ 183; Class Compl. ¶ 183; *see also VR* Compl. ¶ 270 (same)).  But not "put[ting] an end" to a fraud or even allowing one to "flourish" is the kind of inaction that does not constitute the active participation in a fraud necessary to sustain a 10b-5 claim.  *See In re Salomon Analyst AT & T Litig.*, 350 F. Supp. 2d 455, 473 (S.D.N.Y. 2004) (noting that the Second Circuit has generally found primary 10b-5 violations only as to "actors who actively

28

participated in or orchestrated the fraudulent scheme alleged"); *see also Stoneridge*, 128 S. Ct. at 769 (finding that there is no liability for aiding and abetting 10b-5 violations); *Lattanzio* v. *Deloitte & Touche LLP*, 476 F. 3d 147, 153 (2d. Cir. 2007) (same).  The active participants in the fraud, Plaintiffs allege, were certain Refco employees, not the THL Defendants: "Typically, Refco senior management, including Defendants Maggio and Bennett, and other persons acting on behalf of Refco Global Finance, RCC and RGL, would direct Refco employees, including Executive Vice President Thomas Yorke to sell, or cause to be sold, through hypothecation or pursuant to repos, whatever amount of RCM customers securities was required to raise the required funds."  (*See VR* Compl. ¶ 117; *Capital* Compl. ¶ 108; Class Compl. ¶ 105.)

Plaintiffs do not make similar allegations against the THL Defendants. Their inability to do so is evidenced by one of the few affirmative acts that they allege the THL Defendants to have committed.  Plaintiffs allege, on "information and belief," that THL Defendant Schoen approved employee bonuses, and that these bonuses provided an incentive to those employees for the sale of customer securities.  (*See VR* Compl. ¶ 521; *Capital* Compl. ¶ 169; Class Compl. ¶ 167.)   While Plaintiffs suggest that Schoen employed such bonuses with the intent of encouraging the use of customer securities, they have offered no details to "nudge [this] claim[ ] across the line from conceivable to plausible."  *RCM I*, 2007 WL 2694469, at *7.  They do not allege that the bonuses were of an unusual nature—for example, by being unusually large.  Nor do they allege any other facts suggesting the bonuses were anything other than legitimate compensation. The allegations are clearly outside the bounds of what is required by "active participation."  *In re Salomon*, 350 F. Supp. at 473.

Further, there are no allegations that Plaintiffs relied on, or even knew about, Schoen's approval of the bonuses or even the bonuses' existence. Plaintiffs cannot premise a primary 10b-5 violation on Schoen's alleged conduct without showing that Plaintiffs relied on that conduct. *See Stoneridge*, 128 S. Ct. at 769, at 770 (holding that companies assisting in an accounting fraud had not committed a 10b-5 violation because their "deceptive acts, which were not disclosed to the investing public, [were] too remote to satisfy the requirement of reliance").

Indeed, Plaintiffs' own allegations show that the THL Defendants had substantially nothing to do with the operations of RCM, let alone the alleged fraud there. The THL Defendants were investors in and directors of Refco, not RCM. (*See VR* Compl. ¶¶ 69-77; *Capital* Compl. ¶¶ 51-59; Class Compl. ¶¶ 54-62.) The THL Defendants' relationship with RCM was thus strictly as investors in and directors of its parent company. So rather than demonstrating that the THL Defendants actively participated in the alleged fraud, the Complaints more strongly suggest that these Defendants were removed from that fraud. As Plaintiffs have not pled facts sufficient to show a primary violation by the THL Defendants, their 10b-5 claims against these Defendants must be dismissed.

### III.

### RCM'S USE OF CUSTOMER SECURITIES<br>BREACHED NO FIDUCIARY DUTIES TO PLAINTIFFS

Unable to point to a misleading or deceptive statement, Plaintiffs advance a fraud theory based on RCM's alleged breach of fiduciary duty. Specifically, plaintiffs claim that RCM breached its fiduciary duties by using customer assets and not disclosing

that use.  (*See VR* Compl. ¶ 154; *Capital* Compl. ¶ 121; Class Compl. ¶ 95.)  This theory fails in several respects.

**A.      The THL Defendants Did Not Owe RCM Customers a Fiduciary Duty.**

As a threshold matter, Plaintiffs cannot establish that the THL Defendants owed them any fiduciary duty.  There are no allegations showing "the existence of a fiduciary relationship; the nature of the relationship and when and how it arose; [and] the circumstances surrounding the breach of the relationship." *A.I.A. Holdings, S.A.* v. *Lehman Bros., Inc.*, No. 97 Civ. 4978 (LMM), 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) (citing *Lunsford* v. *Farrell Shipping Lines, Inc.*, No. 83 Civ. 7462 (JFK), 1991 WL 150596, at *8 (S.D.N.Y. July 26, 1991).  Under New York law, no fiduciary duty is owed to the customers of a corporation by a controlling shareholder, officer or director of a corporation.  *A.I.A Holdings*, 1999 WL 47223, at *6 (finding that individual's status as 50% shareholder and officer of investment fund did not create a fiduciary relationship with investors in the fund); *see also Am. Fin. Int'l Group-Asia, L.L.C.* v. *Bennett*, No. 05 Civ. 8988 (GEL), 2007 WL 1732427, at *5 (S.D.N.Y. June 14, 2007) (finding no support for proposition "that a corporation, let alone its officer and employees, owe[] a fiduciary duty to its customers"); *Klein* v. *Goetzmann*, 745 F. Supp. 107, 112-13 (N.D.N.Y. 1990) (concluding that corporate officer or directors did not owe fiduciary duty to general investing public).  To show a fiduciary duty, plaintiffs must allege at least some factors from which a court can determine that a fiduciary relationship existed.  *See Eickhorst* v. *E.F. Hutton Group, Inc.*, 763 F. Supp. 1196, 1203 (S.D.N.Y. 1990).  A fiduciary relationship exists in those circumstances in which influence has been acquired and abused or in which confidence has been reposed and betrayed.  *E.g.*, *Mechigian* v. *Art*

*Capital Corp*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985); *Penato* v. *George*, 52 A.D.2d 939, 904-05, 383 N.Y.S.2d 900 (2d Dep't 1976).

The THL Defendants were investors in and directors of Refco, the corporate parent of RCM. This relationship manifestly does not confer on the THL Defendants a fiduciary duty towards RCM customers. *A.I.A Holdings*, 1999 WL 47223, at *6. Yet Plaintiffs have alleged no more than this in support of such a relationship. Nowhere have they attempted to show that they placed trust in the THL Defendants or that these Defendants acquired, retained, or abused that trust. Nor have they identified a prior or existing relationship between the THL Defendants and Plaintiffs from which a fiduciary relationship could be grounded. *See Eickhorst*, 763 F. Supp. at 1203. Plaintiffs have thus failed to sufficiently plead, as to these Defendants, a fiduciary duty as a predicate to their 10b-5 claim.

## B.    RCM Did Not Breach Any Fiduciary Duties to Plaintiffs.

Plaintiffs fail to establish that RCM breached its fiduciary duties to Plaintiffs. The general relationship between RCM and Plaintiffs was and is a creditor-debtor relationship, not a fiduciary one. *See Levitin*, 159 F.3d at 706 (noting that "customers with margin accounts" have "the status of general creditors"); *Bissell*, 937 F. Supp. 237 at 246 (holding that a broker had no fiduciary obligations to a margin customer because the relationship between the two was "that of debtor and creditor"). At best, Plaintiffs are RCM creditors: They claim that RCM owes them certain securities that it has been unable to pay back. As creditors, Plaintiffs' potential cause of action is one for breach of contract against RCM, not securities fraud against the THL Defendants.

Further, it is well settled that "[i]n the absence of discretionary trading authority delegated by the customer to the broker—and none is alleged in the case at

bar—a broker does not owe a general fiduciary duty to his client." *Bissell* v. *Merrill Lynch & Co., Inc.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998); *see Press* v. *Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (holding that "in the context of an ordinary broker-client relationship, the broker owes no fiduciary duty"). Courts have instead "limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested." *Press*, 166 F.3d at 536; *see De Kwiatkowski* v. *Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1306 (2d Cir. 2002) ("[I]n establishing a nondiscretionary account, the parties ordinarily agree and understand that the broker has narrowly defined duties that begin and end with each transaction.").

Indeed, outside of executing client orders, a broker for a non-discretionary account does not even owe a duty of reasonable care. *See Kwiatkowski*, 306 F.3d at 1306 ("We are aware of no authority for the view that, in the ordinary case, a broker may be held to an open-ended duty of reasonable care, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties.").

Under this legal framework, RCM could not have breached any fiduciary duties to Plaintiffs. It is not disputed that Plaintiffs' accounts were non-discretionary. (*see VR* Compl. ¶ 83; *Capital* Compl. ¶ 3; Class Compl. ¶ 4.) RCM, for this reason, owed no fiduciary duty to Plaintiffs outside of executing transactions that Plaintiffs requested. Plaintiffs do not allege that RCM failed to properly execute any such transactions. In fact, they acknowledge that the customer statements "showed the customers' orders being fulfilled." (*VR* Compl. ¶ 160; *Capital* Compl. ¶ 128; Class Compl. ¶ 132.) Thus, Plaintiffs have failed to plead a breach of fiduciary duties by RCM and cannot show deceptive conduct through such a breach.

**IV.**

## PLAINTIFFS FAIL TO ESTABLISH A "STRONG INFERENCE" OF SCIENTER AS TO THE THL DEFENDANTS

      The heart of Plaintiffs' claim is that the THL Defendants violated Rule 10b-5 first by failing to discover the alleged fraud at RCM and then by failing to stop it. These conclusory assertions do not give rise to a strong inference of fraudulent intent, as required by the PSLRA, 15 U.S.C. § 78u-4(b).

      The PSLRA requires Plaintiff to "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter, or intent to deceive. *Id.*; *see also Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 127 S. Ct. at 2504-05.  Moreover, claims of fraud may not be based on mere speculation and conclusory allegations**.** *Wexner* v. *First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *Geiger* v. *Solomon-Page Group, Ltd*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996).

      In the Second Circuit, to plead a strong inference of scienter, plaintiffs must make out an inference of scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Plaintiffs must also demonstrate that the inference of scienter is at least as compelling as any non-culpable explanation for defendants' actions.  *See ATSI*

*Commc'ns, Inc.,* 493 F.3d at 99, 104.  As detailed below, Plaintiffs make no allegation sufficient to demonstrate scienter as to the THL Defendants.

**A.     The Most Compelling Inference from Plaintiffs' Allegations is that the THL Defendants Had No Reason to Think That a Fraud at RCM Was Afoot.**

The fundamental reason that Plaintiffs have failed to plead scienter is that, by far, the most compelling inference from their own allegations is the competing non-culpable inference, which *Tellabs* makes central to this Court's decision on whether Plaintiffs adequately allege scienter, that the THL Defendants did not know of the alleged fraud and were not reckless in not knowing of it.   Plaintiffs can offer in opposition only the internally inconsistent theory that a sophisticated private-equity firm knowingly or recklessly retained an investment valued in the hundreds of millions of dollars in a company that relied on the theft of customer assets to sustain itself.

According to the Complaints, the THL Defendants were sophisticated investors that chose to maintain a large stake in a company engaging in massive fraud— despite their opportunity to cash out of the company during its IPO.  THL's investment into Refco amounted to $507 million.  (*See VR* Compl. p. 107; *Capital* Compl. p. 73; *Class* Compl. p. 78.)  Through selling about $178 million of shares in the IPO (*see VR* Compl. ¶¶ 500-502; *Capital* Compl. ¶¶ 319-21; *Class* Compl. ¶¶ 324-26) and receiving about $45 million from the greenshoe dividend (*see VR* Compl. ¶ 500; *Capital* Compl. ¶ 319; *Class* Compl. ¶ 324), the THL Defendants were able to recoup $223.5 million (less than half) of this investment.  (*See VR* Compl. ¶ 502; *Capital* Compl. ¶ 321; *Class* Compl. ¶ 326.)  They chose, in the IPO, to retain a large, 42.7% stake in the company. (*See VR* Compl. ¶ 502; *Capital* Compl. ¶ 321; *Class* Compl. ¶ 326.)  Thus, when the company went into bankruptcy, the THL Defendants, who ran "one of the world's most

sophisticated leveraged buyout firms" (*VR* Compl. ¶ 316; *Capital* Compl. ¶ 213; *see also* Class Compl. ¶ 269 (describing THL as "shrewd and sophisticated")), instantly lost over half of their $507 million-dollar investment. This loss came at a time when THL was hoping to raise capital for a new investment fund. (*See VR* Compl. ¶ 503; *Capital* Compl. ¶ 322; Class Compl. ¶ 327.)

When a plaintiff's view of the facts defies logic and economic reason, it does not establish a reasonable inference of fraudulent intent. *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529(LMM), 2007 WL 2615928, at *3 (S.D.N.Y. 2007) (quoting *Kalnit*, 264 F.3d at 140-41) ("[I]llogical motives cannot satisfy the requirements of Rule 10(b)-5."); *Atl. Gypsum Co.* v. *Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). Here, Plaintiffs allege that the THL Defendants retained a 42.7% stake in Refco post-IPO. (*See VR* Compl. ¶ 502; *Capital* Compl. ¶ 321; Class Compl. ¶ 326.) But "it makes little sense for an [investor] to further entangle [itself] with an issuer it knows to be committing fraud." *Adelphia*, 2007 WL 2615928, at *3. For THL to have maintained such a big stake in Refco "in the hope that [its] investment[] could be propped up, profitably, by concealing a massive fraud 'ad infinitum' would be illogical." *Id.* It makes even less sense that THL would do so at a time during which it hoped to attract investors for a new fund and would want to be especially vigilant against anything that could harm its investments and deter such investors. It is also hard to see why, on Plaintiffs' view of the facts, Refco promptly disclosed the accounting fraud that precipitated the company's collapse a day after discovering it, with the Board of Directors, whose members included four of the

THL Defendants, asking Bennett and Maggio to take leaves of absence. (Rosen Decl. Ex. D at Ex. 99.1.)

The more compelling inference from these facts is the non-culpable explanation that the THL Defendants were victims of Refco's financial collapse, not perpetrators of any alleged fraud. On these facts, Plaintiffs fail to show, as they must, that the inference of scienter is "*at least as likely as* any plausible opposing inference" of non-fraudulent intent. *Tellabs*, 127 S. Ct. at 2513.

**B.     Plaintiffs Have not Pled That the THL Defendants Knew of or Consciously Ignored a Fraud.**

Plaintiffs claim that RCM, without authorization, sold or otherwise used customer assets to finance its own operations and had no intention or ability to repay those funds. Nowhere in the complaints have Plaintiffs shown that the THL Defendants knew of this allegedly fraudulent scheme.

Plaintiffs have not alleged that the THL Defendants were aware of any alleged misrepresentation or knew that RCM could not sell, loan, hypothecate, or otherwise use customer securities, which is unsurprising, since RCM could, in fact, use customer securities in these ways, as discussed above. Plaintiffs therefore have not demonstrated that the THL Defendants knew that there was anything fraudulent or improper about how RCM used customer securities. Nor have they pled facts showing that the THL Defendants understood that loans or sale proceeds were given to Refco-affiliated entities that allegedly lacked the intent or ability to repay. Plaintiffs also fail to establish scienter by showing that the THL Defendants were reckless and deliberate in not knowing of any fraud.

Plaintiffs have alleged only that the THL Defendants were aware that Refco was deploying cash derived from customer deposits for the limited purpose of funding the cost of the acquisition of Cargill Investor Services. (*See VR* Compl. ¶¶ 370-82; *Capital* Compl. ¶¶ 265-77; Class Compl. ¶¶ 269-81.)   But Plaintiffs do not allege facts indicating that there was anything wrong or even suspicious about the use of cash on the balance sheet—which is, after all, entirely fungible—to pay for a real asset. Nothing indicates that the THL Defendants knew that this transaction was improper, nor did it put them on notice that customer assets were being used to mask losses in Refco's core business.

There is a significant burden on the plaintiff in stating a fraud claim based on circumstantial evidence of conscious misbehavior or recklessness. *E.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *Kalnit* v. *Eichler*, 85 F. Supp. 2d 232, 245 (S.D.N.Y. 1999) (dismissing plaintiff's 10b-5 claims because he had "failed to plead . . . circumstantial evidence of recklessness").  When attempting to demonstrate a defendant's scienter through a showing of recklessness, plaintiffs must allege facts showing that the alleged reckless conduct by the defendant is (1) at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or (2) so obvious that the defendant must have been aware of it.  *E.g.*, *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 42-43 (2d Cir. 2000) (holding that because plaintiffs "failed adequately to plead reckless behavior on [defendant] Carter-Wallace's part, they . . . failed to allege scienter"); *Kalnit v. Eichler*, 264 F.3d 131, 142-44 (2d Cir. 2001) (dismissing complaint for failure to allege scienter through pleading recklessness).  Recklessness must, in fact,

approximate an actual intent to aid in the fraud being perpetrated.  *Decker* v. *Massey-Ferguson, Ltd*., 681 F.2d 111, 121 (2d Cir. 1982).

>    **1.    Plaintiffs fail to plead facts showing that the THL Defendants knew or were reckless in not knowing that the use of RCM customer assets was improper.**

Far from showing recklessness, the facts Plaintiffs highlight reveal that the THL Defendants had no reason to conclude that RCM's use of customer securities was fraudulent.  For example, Plaintiffs suggest that the THL Defendants' alleged knowledge that funding for a Refco acquisition came from RCM customer funds establishes their awareness of the alleged fraud. (*See VR* Compl. ¶ 380; *Capital* Compl. ¶ 275; Class Compl. ¶ 280).  But  given that RCM's trade confirmation explicitly disclosed that "RCM does not segregate any collateral or other property deposited with it and RCM shall have the right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it" (Rosen Decl. Ex. A at p. 2, ¶ 1), the THL Defendants had no reason to believe that RCM's use of customer funds in this way was inappropriate.

Moreover, Plaintiffs' own allegations suggest that the THL Defendants understood customer funds to be unregulated.  (*See VR* Compl. ¶¶ 375, 380 (citing handwritten notes that identified "unreg. customer $" as a source of financing); *Capital* Compl. ¶¶ 270, 276 (same); Class Compl. ¶¶ 274, 280 (same).)  As customer funds were understood to be unregulated, the THL Defendants were not unreasonable in failing to conclude that RCM was fraudulently converting those funds because Refco used them for an acquisition.  *See RCM I*, 2007 WL 2694469, at *9 (noting that the expectation is for unregulated entities to use customer funds "in unconventional ways").  Nowhere, indeed, do Plaintiffs allege that the THL Defendants believed or held RCM out to be a regulated entity that would adhere to regulations concerning the treatment of customer assets.

Thus, whether or not RCM was actually subject to regulation, the fact that the THL Defendants understood it to be unregulated meant that they had no reason to suspect a fraud just because RCM was treating customer assets the way an unregulated entity might. *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at \*11 (S.D.N.Y. 2006) (finding no scienter where defendants believed they were in compliance with applicable laws); *Geiger* v. *Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1191 (S.D.N.Y. 1996) (finding no scienter where defendants were in compliance with applicable disclosure regulations); *cf. RCM I*, 2007 WL 2694469, at \*9 ("Whether RCM was actually permitted by U.S. regulations to engage in that conduct is besides the point; what matters is that plaintiffs were well aware it intended to do so.").

Indeed, Plaintiffs' supposed scienter allegations about the use of RCM customer funds to effect certain Refco transactions appear to be mere complaints about corporate mismanagement. (*See VR* Compl. ¶¶ 370-89; *Capital* Compl. ¶¶ 265-84; Class Compl. ¶¶ 269-88.) The first of these transactions, the Cargill acquisition, was a transaction the THL Defendants allegedly approved "notwithstanding their strong misgivings about the procedure used for the deal and their knowledge that the acquisition was being rushed." (*See VR* Compl. ¶ 381; *Capital* Compl. ¶ 276; Class Compl. ¶ 280.) As to the second transaction, the Suffolk loans, Plaintiffs allege that "[b]y failing to prevent Refco from issuing a loan of $204 million to a company with little or no collateral, the THL Defendants recklessly caused Refco to incur over $200 million in debt effectively to acquire a company that had been wildly overvalued." (*See VR* Compl. ¶ 388; *Capital* Compl. ¶ 283; Class Compl. ¶ 287.) But unduly rushing an acquisition,

making loans without adequate collateral, or effectively overpaying for "wildly overvalued" companies is corporate mismanagement, not securities fraud. *See Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("It is well settled 'that section 10(b) was not designed to regulate corporate mismanagement.'").

What Plaintiffs fail to allege—and what they must to show scienter—are facts showing that the THL Defendants knew or were reckless in not knowing that the use of RCM customer funds was fraudulent.

> ### 2. Plaintiffs cannot plead scienter through allegations that the fraud was large, that certain THL Defendants were Refco directors or officers, or that the THL Defendants were negligent.

Nor does any other fact that Plaintiffs point to show that the THL Defendants knew of or consciously ignored RCM's allegedly fraudulent use of customer securities. (*See VR* Compl. ¶¶ 247-52, 269-414; *Capital* Compl. ¶¶ 165-70, 182-322; *Class* Compl. ¶¶ 162-68, 181-327). Rather, they rely on allegations that courts have consistently rejected as insufficient. The Complaints assert, for example, that the THL Defendants had to have known about the fraud because of "[t]he sheer magnitude and size of the transfers" of cash from RCM that Plaintiffs say came from the sale of customer securities. (*See VR* Compl. ¶ 247; *Capital* Compl. ¶ 165; *Class* Compl. ¶ 162.) But "[t]he size of the fraud alone does not create an inference of scienter." *Caiafa* v. *Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007); *see also In re Serologicals Sec. Litig.*, No. 00 Civ. 1025 (CAP), 2003 WL 24033694, at *12 (N.D. Ga. 2003) ("To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences.") (internal citations omitted).

Plaintiffs also cite to the mere fact that some of the THL Defendants held executive positions within Refco entities in an attempt to establish recklessness or conscious misbehavior.  Under Plaintiffs' theory, "[j]ust based on fulfilling these roles," these Defendants must have known of the fraud. (*See VR* Compl. ¶ 411(e); *Capital* Compl. ¶ 165; Class Compl. ¶ 162).  But "[i]t is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (citing cases); *see also Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, No. 05 Civ. 1898(SAS), 2005 WL 2148919, at *15 (S.D.N.Y. Sept. 6, 2005) (holding that plaintiff could not rely on a defendant's status as an officer or director to impute knowledge on the defendant that would show scienter); *In re NTL, Inc. Sec. Litig.*,  347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) ("Allegations that they [defendants] should have known about ConsumerCo's financial state based solely on their executive positions are not enough to plead *scienter*."); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865(HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("I find that the fact that four of the individual defendants were on the boards of HMS and HHL is insufficient to establish actual intent or conscious recklessness.").

Finally, Plaintiffs fall back to negligence, which has been flat-out rejected as a basis for establishing fraudulent intent.  *See Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 201 (1976) (Section "10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone.").  In essence, Plaintiffs catalogue THL's decision to invest in Refco and point to "red flags" that should

have alerted them to the alleged fraud.  None of the "red flags" Plaintiffs identify, however, are fairly characterized as a "red flag" about the purported fraud here—RCM's use of customer securities.

For example, Plaintiffs cite to a statement in a letter by Refco auditor Grant Thornton that identified the fact that RCM could not produce "custody reconciliations" at a given time as a deficiency. (*See, e.g.,* Class Compl. ¶ 246).  Yet, this statement is not something that "would necessarily have indicated to [the THL Defendants] that there was misconduct" in the form of a massive scheme to fraudulently convert customer securities.  *See Chill*, 101 F.3d at 270 (finding purported warnings to parent company that its subsidiary was engaging in fraud, even if true, did not add up to circumstantial evidence of conscious misbehavior or recklessness).  The fact that the THL Defendants did not "automatically equate" the failure to produce custody reconciliations with a massive conversion of customer securities cannot be said to be reckless.  *Id.*  RCM could have failed to produce these reconciliations for any number of reasons having nothing to do with the alleged fraud, including simple oversight.

Similarly, Grant Thornton's characterization of Refco's "internal audit function" as deficient (*see, e.g., VR* Compl. ¶ 347) does not establish the THL Defendants' recklessness or conscious misbehavior.  That an auditor opines that a company's internal auditing is deficient does not logically imply that the company is therefore engaging in fraud.  The Plaintiffs do not even allege that the auditors suggested to the THL Defendants that the deficiencies in Refco's procedures were the result of or a mask for fraud. Further, Refco disclosed this deficiency on page 23 of its IPO prospectus. (Rosen Decl. Ex. E.)

Plaintiff also stress that the THL Defendants may have learned that certain members of Refco's management were less than candid with them. (*See VR* Compl. ¶¶ 309-14; *Capital* Compl. ¶¶ 207-212; Class *Compl.* ¶¶ 213-18.) Again, even if true, these facts are not sufficient to establish recklessness or conscious misbehavior. As is clear in Plaintiffs pleadings, the THL Defendants did not ignore perceived communication issues with Refco management—they addressed them head on. (*See VR* Compl. ¶ 312 (citing email in which Schoen recalls his statement to Refco management of the "need to have the kind of open communication and transparency we need as partners" and expresses his belief that a discussion had "raised the bar on disclosure"); *Capital* Compl. ¶¶ 210 (same); Class *Compl.* ¶¶ 216 (same).) Plaintiffs certainly have not pled facts sufficient to show conduct by the THL Defendants that was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d at 39-40. In any case, the fatal defect in all these allegations is that they do not show why the THL defendants should have been suspicious of the fraud that this case is about—the alleged conversion of RCM customer securities—as opposed to any other fraud or wrongdoing.

Moreover, even if a plaintiff points to facts that suggest that a defendant should have been more skeptical, fraud cannot be inferred on this basis alone. *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming lower court's decision that allegations strongly suggesting the defendants should have been more alert or skeptical did not support an inference of fraud); *Chill*, 101 F.3d at 263, 270 ("Fraud cannot be inferred simply because [the defendants] might have been more curious or concerned. . . ."); *In re Light Mgmt. Group, Inc.*, No. 02 Civ. 3345(RO), 2003 WL

22990062, at *3 (S.D.N.Y. Dec. 19, 2003) ("While the allegations [including alleged red flags] in the Amended Complaint do suggest that [defendant] FSC could have been more thorough in its audit, they are insufficient to give rise to a strong inference of conduct that is " 'highly unreasonable….'"); *In re General Electric Sec. Litig.*, No. 94 Civ. 4024 (JFK) 1995 WL 590639, at *4 (S.D.N.Y. 1995) ("Plaintiffs' argument that GE had a motive to turn a blind eye to the red flags in order to reap the benefits of Kidder's reported earnings is not sufficient to establish scienter on the part of GE.").

Plaintiffs have done no more than, with the benefit of hindsight, allege that the THL Defendants should have been more suspicious about RCM's business activities. This is insufficient to state a fraud claim based on recklessness or conscious misbehavior. *Shields*, 25 F.3d  at 1129 ("We have rejected the legitimacy of 'alleging fraud by hindsight.'"); *Olkey* v. *Hyperion 1999 Term Trust, Inc.*,  98 F.3d 2, 8 (2d Cir. 1996) (holding plaintiffs had failed to plead scienter where they attempted to premise fraud on the fact that, in hindsight, the funds in which they had invested underperformed); *see also* *Abbad* v. *Amman*, 285 F. Supp. 2d 411, 420 (S.D.N.Y. 2003) ("[T]he instant case fits squarely into the legion of cases wherein investor plaintiffs, disappointed in the outcome of their investment, conclude that somewhere, sometime in the past, a plan was hatched without their knowledge and that subsequent events and statements were all fraudulent attempts to keep the plaintiffs from uncovering the secret plan.").

The fallacy of the Plaintiffs' approach is most obvious when viewing the Complaints as a whole.  In attempting to demonstrate the THL Defendants' control over Refco, the Plaintiffs outline a number of steps the THL Defendants took after the LBO in an attempt to improve the health of the overall company.  As Plaintiffs recognize, the

THL Defendants hired a new CFO, controller and Tax Director.  (*VR* Compl. ¶ 525; *Capital* Compl. ¶ 339; Class Compl. ¶ 350).  Plaintiffs cannot claim that the THL Defendants' failure to respond to red flags was so reckless as to approximate intent, while simultaneously highlighting the clean-up measures they took once they had the opportunity.

## C. Plaintiffs Have Not Sufficiently Pled That the THL Defendants Had the Motive and Opportunity to Commit Fraud.

Faced with the inability to demonstrate that the THL Defendants know of or recklessly disregarded the alleged fraud at RCM, Plaintiffs advance a theory based on motive and opportunity.  Plaintiffs allege that the THL Defendants were motivated to consciously ignore and/or condone RCM's use of customer-deposited securities in order to (1) profit from the IPO of Refco, by selling shares in the IPO and receiving a greenshoe dividend, and (2) be able to point to the success of the IPO as a reason investors should invest in a new THL investment fund for which the THL Defendants were seeking capital. (*See VR* Compl. ¶¶ 497-503; *Capital* Compl. ¶¶ 318-22; Class Compl. ¶¶ 319-27.)   These kind of generalized motive allegations are particularly insufficient to establish scienter.

Initially, Plaintiffs have not shown how these motives are relevant at all – they have not demonstrated how ignoring RCM's allegedly fraudulent use of customer securities would enable the THL Defendants to profit from the IPO of RCM's corporate parent.  Moreover, Plaintiffs cannot create a strong inference of scienter by simply pleading that the THL Defendants committed fraud out of motives that are common to most market participants.  *See, e.g., Kalnit*, 264 F.3d at 139 (internal quotation marks omitted) ("Sufficient motive allegations entail concrete benefits that could be realized by

[the fraud].  Motives that are generally possessed by most [market participants] do not suffice. . . .”); *Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Nor may Plaintiffs allege only that the THL Defendants were motivated by a desire for profit.  *In re Adelphia*, 2007 WL 2615928, at *3 (the “standard desire for profit, common to all businesses, is insufficient to establish the motive required by Rule 10(b)-5.”); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003) (“If this Court were to accept the plaintiffs' allegations of scienter as adequate, it would essentially read the scienter element out of existence.  All firms in the securities industry want to increase profits and all individuals are assumed to desire to increase their compensation.”); *Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that allegations of “incentive compensation” do not give rise to a strong inference of fraudulent intent).  Rather, Plaintiffs must assert a concrete and personal benefit to the individual THL Defendants resulting from the fraud.  *E.g.*, *Kalnit*, 264 F.3d at 139.

A profitable IPO is not the type of personal and concrete benefit contemplated by the courts.  As the court recognized in *Geiger* v. *Solomon-Page Group, Ltd*, in dismissing the plaintiff's claims for failure to plead scienter:

> [A] company issuing its stock to the public always has a generalized motive to ensure the success of the issue and to raise as much money as possible. Likewise, the officers and directors of the issuing company always have a nonspecific interest in a successful IPO.  Allegations of these interests are not of themselves sufficient allegations from which a strong inference of fraudulent intent may be drawn.

933 F. Supp. at 1189-90.

For the same reasons, Plaintiffs' allegations that the THL Defendants desired to attract investors by advertising the IPO are insufficient to establish an inference of fraudulent intent.  *See In re Merrill*, 289 F. Supp. 2d at 428.  (citing *Ward* v. *UBS PaineWebber*, No. 02 Civ. 3878 (JAP), 2003 WL 22340565, at *9 (D.N.J. 2003) (finding allegations that defendants sought to attract investment banking business insufficient as a matter of law to establish concrete and personal benefits).  The motive to maintain "the appearance of…*the success of an investment*, will naturally involve benefit to a corporation."  *Chill*, 101 F.3d at 268 (emphasis added) (internal quotation marks omitted).  It does not, however, entail concrete benefits.  *Id.*  Obviously the THL Defendants "would want to justify [their] investment in [Refco] and have that investment appear profitable, but such a generalized motive, one which could be imputed to any [private-equity firm] is not sufficiently concrete for purposes of inferring scienter." *Id.*; *see also In re Merrill*, 289 F. Supp. 2d at 428; *Acito*, 47 F.3d at 54.

Plaintiffs had pled no more than the THL Defendants' general desire to capitalize on its investment and profit from a successful IPO and, without explanation, linked this to the THL Defendants' motive to conceal that RCM was converting customer securities.  These are precisely the type of generalized motive allegations that courts have determined insufficient to create a strong inference of scienter.

## V.

### CLASS PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THEY RELIED ON ALLEGEDLY MISLEADING STATEMENTS IN RCM'S FINANCIAL REPORTS.

Reliance is an essential element of a 10b-5 claim.  *E.g.*, *Stoneridge*, 128 S. Ct. at 764; *Lattanzio* v. *Deloitte & Touche LLP*, 476 F. 3d 147, 157 (2d. Cir. 2007). Moreover, that reliance must be reasonable or justifiable.  *Sedaghatpour* v. *DoubleClick,*

*Inc.*, 213 F. Supp. 2d 367, 375 (S.D.N.Y. 2002).  Class Plaintiffs' claims premised on allegedly misleading statements in RCM's financial statements should be dismissed for this reason.

Class Plaintiffs point to alleged misstatements in RCM's 1995 financial statements (Class Compl. ¶¶ 112-18), but make no attempt to establish that they relied on or even saw those statements.  This failure is fatal to any claim premised on alleged misstatements in the financial statements.  *See Stoneridge*, 128 S. Ct. at 769 ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.").

Importantly, Plaintiffs cannot rely on the fraud-on-the-market doctrine for the presumption of reliance.  That doctrine applies only where deception becomes public and "is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *See id.* Plaintiffs do not claim to have bought or sold any security at a market price that efficiently incorporated the alleged misstatements in the RCM financials.  As a result, Class Plaintiffs cannot base any 10b-5 claim on those statements.

## VI.

### PLAINTIFFS LACK STANDING TO BRING A 10b-5 CLAIM ARISING OUT OF MISSTATEMENTS IN RCM OR REFCO FINANCIALS

"While courts were quick to recognize a private right of action under Rule 10b-5, they were equally quick to set limits on it."  *Ontario Pub. Serv. Employees Union Pension Trust Fund* v. *Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004), *cert. denied*, 543 U.S. 1050 (2005).  In particular, they have narrowly construed the

requirement that a plaintiff must be a purchaser or seller of the relevant securities to have standing to assert a Section 10(b) and Rule 10b-5 claim.

In *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723 (1975), the United States Supreme Court adopted a "restrictive view of standing" in Section 10(b) cases, holding that "individuals who failed to purchase a stock due to a company's misrepresentation of the value of its stock did not have standing to sue under Rule 10b-5 because they were not purchasers or sellers of the security." *Ontario Pub. Serv.*, 369 F.3d at 32. In adopting this limitation, the Supreme Court "relied heavily on an analysis of congressional intent," finding that Section 10(b) was designed "to prevent companies from using high pressure sales tactics to intimidate people into buying into their securities . . . The Court reasoned that this intent was not furthered by allowing a cause of action for people who did not buy [such companies'] securities." *Id.*

"The 'purchaser or seller' rule of *Blue Chip Stamps* has been reaffirmed hundreds of times in the nearly twenty years since, and remains the rule in this Circuit and others." *MBIA Ins. Corp.* v. *Spiegel Holdings, Inc.*, No. 03 Civ. 10097 (GEL), 2004 WL 1944452, at *2 (S.D.N.Y. Aug. 31, 2004) (Lynch, J.). This standing requirement applies to claims asserted under all three subsections of Rule 10b-5. *Birnbaum* v. *Newport Steel Corp.*, 193 F.2d 461, 462-64 (2d Cir. 1952); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 349 n.11 (S.D.N.Y. 2005).

This standing requirement is not satisfied by a plaintiff's purchase or sale of *any* security somehow involved in the action. Rather, standing is limited to "the class of plaintiffs . . . who have at least dealt in the security to which the prospectus, representation or omission relates." *Blue Chip Stamps*, 421 U.S. at 747. "It is axiomatic

that in order to have standing, 'a 10b-5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the . . . deceptive conduct.'" *LaBranche*, 405 F. Supp. 2d at 349 n.11 (citation omitted); *see also* Thomas Lee Hazen, *Treatise on the Laws of Securities Regulation*, § 12.7[1], at 230-32 (5th ed. 2005) (Rule "10b-5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the material omission, misstatements or deceptive conduct").

The alleged misrepresentations in Refco financials relate to RCM or Refco (*See, e.g., VR* Compl. ¶¶ 89-90, 545), but there are no allegations that Plaintiffs ever bought or sold any RCM or Refco securities. Accordingly, Plaintiffs have not purchased or sold the relevant security—here, Refco or RCM securities—as is necessary to establish standing.  The only persons with standing to assert alleged federal securities law claims arising out of alleged material misstatements or omissions in RCM's or Refco's financials would be the purchasers or sellers of Refco securities. To allow Plaintiffs to bring 10b-5 claims based on such misstatements, then, would "contraven[e] . . . the Supreme Court's express admonition that a restrictive view of standing under Rule 10b-5 must be applied to avoid abuse of this implied private cause of action." *Goldman* v. *A.G. Becker Inc.*, No. 81 Civ. 6748, 1983 WL 1302, at *4 (S.D.N.Y. Apr. 20, 1983).   In light of the already "rushing torrent" of securities litigation "currently filed in federal courts," the scope of the securities laws should not be expanded in this manner. *MBIA Ins. Co.*, 2004 WL 1944452, at *6.

*SEC* v. *Zandford*, 535 U.S. 813 (2002), is not to the contrary.  There, the Supreme Court held that the SEC could bring an enforcement action against an account

executive who misappropriated his clients' accounts and converted the proceeds.  In *Zandford*, 535 U.S. at 819, the Court interpreted the "in connection with" language of Section 10(b), not the purchaser or seller standing requirement, which does not apply to regulatory enforcement complaints brought by the SEC.  The Court not only did not address the standing requirement for private plaintiffs under *Blue Chip Stamps*, it did not even mention, let alone discuss, *Blue Chip Stamps*.  Standing and the "in connection with requirement" are "two distinct inquiries."  *Ontario Pub. Serv.* 369 F.3d at 34 ("[i]n order for our court to properly reach the merits of the case, including the 'in connection with' requirement, we must first find that the parties involved have met the basic requirements of standing").

## VII.

## <u>PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(A).</u>

Section 20(a) of the Exchange Act holds, under certain circumstances, the controller of a person committing securities fraud liable for that fraud.  To state a prima facie case under this Section a plaintiff must show (1) a primary violation by the controlled person and (2) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) (internal quotation marks omitted).  For the reasons set forth below, Plaintiffs fail to allege facts establishing the THL Defendants' liability under Section 20(a).

**A.     Plaintiffs Fail to Plead an Underlying Primary Violation.**

As outlined above in Section I, Plaintiffs have not sufficiently alleged a primary violation of Section 10(b) or Rule 10b-5.  For the same reasons, Plaintiffs cannot

show the underlying primary violation required to state a 20(a) claim against the THL Defendants arising out of a 10b-5 violation.[9]

## B.    Plaintiffs Fail to Plead Culpable Participation by the THL Defendants.

The "culpable participation requirement" is analogous to the scienter requirement of Section 10(b).  *In re Refco,* 503 F. Supp. 2d at 661.  Plaintiffs must plead with particularity facts that give rise to "a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."  *Id.* at 661 (internal quotation marks omitted).  As discussed in greater detail in Section IV, *supra*, Plaintiffs' have not established the THL Defendants' scienter as to the alleged fraud.  For the same reasons, Plaintiffs have failed to establish these Defendants' culpable participation in the fraud.

Specifically, the Complaints do not allege with particularity facts demonstrating the THL Defendants' motive and opportunity to commit fraud or conscious misbehavior.  *See supra* Section IV.B-C.  Plaintiffs do not allege that the THL Defendants were aware of any alleged misrepresentation or that RCM could not sell, loan, or otherwise use customer securities.  Nor did Plaintiffs demonstrate that the THL Defendants knew that there was anything fraudulent or improper about how RCM used customer securities.  Plaintiffs scienter allegations with respect to the THL Defendants are particularly insufficient given the express disclosures in the trade confirmation and customer agreements that RCM did "not segregate any collateral or other property

---

[9]    Insofar as Plaintiffs assert that the THL Defendants have 20(a) liability for the alleged violations of Rule 10b-16 by other Defendants, those claims fail for the reasons in footnote 6.

deposited with it" and that it had the "right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it."  (Rosen Decl. Ex. A at p. 2, ¶ 1.)

   Moreover, the THL Defendants retained their investment in RCM through the IPO and lost hundred of millions of dollars as a result.  It would make little sense for them to have further "entangle[d]" themselves with an actor that they knew to be committing a fraud in the hope that their massive investment "could be propped up" by concealing the fraud  *See Adelphia*, 2007 WL 2615928, at *3.  As discussed in detail in Section IV.A, *supra*, far from demonstrating that the THL Defendants knew or recklessly disregarded that an alleged primary violator was engaging in fraudulent conduct, the facts suggest that, if there was a fraud at RCM, the THL Defendants were defrauded as well.

   Further, what Plaintiffs do allege—that THL was a stockholder in Refco, appointed board members, and had limited powers under a Stockholders Agreement and other agreements—is insufficient to establish culpable participation. *See In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *9 (S.D.N.Y. Nov. 7, 2005) (holding that "plaintiffs' allegations of stock ownership, appointment of five board members, and possession of a stockholder agreement with limited powers" were insufficient to plead culpable participation).  Accordingly, Plaintiffs have not pled the culpable participation in the alleged fraud that is necessary to sustain the 20(a) claim against the THL Defendants.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims that Plaintiffs have asserted against the THL Defendants.

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By:   /s/ Richard A. Rosen
      Richard A. Rosen
1285 Avenue of the Americas
New York, NY  10019
Tel. (212) 373-3000

WEIL, GOTSHAL & MANGES LLP
Greg A. Danilow (GD-1621)
767 Fifth Avenue
New York, NY  10153
Tel. (212) 310-8000

Attorneys for Thomas H. Lee Partners, L.P.,
Thomas H. Lee Equity Fund V, L.P.,
Thomas H. Lee Parallel Fund V, L.P.,
Thomas H. Lee Equity (Cayman) Fund V.,
L.P., THL Equity Advisors V, LLC, Thomas
H. Lee Investors Limited Partnership, The
1997 Thomas H. Lee Nominee Trust,
Thomas H. Lee, David V. Harkins, Scott L.
Jaeckel and Scott A. Schoen

Dated: New York, New York
      February 21, 2008