Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
Kylie Davidson (KD 0502)
Michael Shepherd (MS 1313)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | 06 Civ. 643 (GEL) |
| VR GLOBAL PARTNERS, L.P., et al, Plaintiffs, <br><br> - against - <br><br> PHILLIP R. BENNETT, et al, Defendants. | 07 Civ. 8686 (GEL) |
| CAPITAL MANAGEMENT SELECT FUND LTD., et al, Plaintiffs, <br><br> - against - <br><br> PHILLIP R. BENNETT, et al, Defendants. | 07 Civ. 8688 (GEL) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR RECONSIDERATION**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT .......................................................................... 1

STANDARD OF REVIEW ................................................................................. 2

ARGUMENT ..................................................................................................... 3

I.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD THE
      ALLEGATIONS OF DECEPTIVE CONDUCT ............................................. 3

      A.    Leave To Replead Is Liberally Granted And Is Almost Automatic
            When A Complaint Is Dismissed Pursuant To Rule 9(b) ...................... 3

      B.    The Pleading Deficiencies That Plaintiffs Seek To Redress Were
            Raised By the Court For The First Time In The Opinion...................... 4

      C.    If Permitted To Replead, Plaintiffs Will Add Allegations That Cure
            The Pleading Deficiencies Noted By The Court ................................... 6

            1.    Allegations That RCM's Use Of Plaintiffs' Securities Was
                  Continuous Until The Bankruptcy Filing, At Which Point In Time
                  Plaintiffs Had No Margin Loans.............................................. 6

            2.    Allegations Demonstrating That RCM's Initial Use Of Plaintiffs'
                  Securities Occurred At Times When They Had No Margin Loans........... 8

            3.    Additional Allegations Explaining How Plaintiffs Were Deceived
                  About RCM's Unauthorized Use Of Their Securities............................ 13

II.   PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD TO
      ADDRESS THE COURT'S RULING THAT THEY DO NOT HAVE
      STANDING ................................................................................................. 18

III.  PLAINTIFFS SHOULD BE PERMITTED LEAVE TO REPLEAD TO
      ASSERT COMMON LAW CLAIMS ............................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.,*
  544 F. Supp. 2d 199 (S.D.N.Y. 2008) .......................................................................4

*Allaire Corp. v. Okumus,*
  433 F.3d 248 (2d Cir. 2006) ...................................................................................7

*Anthony v. City of New York,*
  339 F.3d 129 (2d Cir. 2003) ...................................................................................3

*BCH Interim v. Finantra Capital Inc.,*
  283 F. Supp. 2d 968 (S.D.N.Y. 2003) ....................................................................7

*Bell Atl. Corp. v. Twombly,*
  127 S. Ct. 1955 (2007)..........................................................................................10

*Blakely v. Wells,*
  No. 05-4846-cv, U.S. App. LEXIS 31031 (2d Cir. Dec. 13, 2006) ..................5

*Chem. Bank v. Arthur Andersen & Co.,*
  726 F.2d 930 (2d Cir. 1984) .............................................................................7, 19

*Citibank N.A. v. K-H Corp.,*
  745 F. Supp. 899 (S.D.N.Y. 1990) ........................................................................7

*Devaney v. Chester,*
  709 F. Supp. 1255 (S.D.N.Y. 1989) ......................................................................4

*Fezzani v. Bear, Stearns & Co.,*
  No. 99 Civ. 0793 (RCC), 2004 WL 1781148 (S.D.N.Y. Aug. 10, 2004) ....................3

*First Nat'l Bank of Chicago v. Shearson Lehman Bros., Inc.,*
  No. 85 c4266, 1989 WL 165009 (N.D. Ill. Dec. 20, 1989)...........................19

*Gelles v. TDA Indus. Inc.,*
  No. 90 Civ. 5133 (MBM), 1991 WL 39673 (S.D.N.Y. March 18, 1991) ....................9

*Goldberg v. Meridor,*
  567 F.2d 209 (2d Cir. 1977) ...................................................................................5

*Granite Partners, L.P. v. Bear, Stearns & Co,*
  17 F. Supp. 2d 275 (S.D.N.Y. 1998) ......................................................................7

*In re IPO Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................10

*In re Take-Two Interactive Secs. Litig.,*
  551 F. Supp. 2d 247 (S.D.N.Y.2008) ...................................................................18

*Int'l Motor Sports Group, Inc.,*
  No. 98 Civ. 5611, 1999 WL 619633 (S.D.N.Y. Aug. 16, 1999)....................9

*Kalin v. Xanboo, Inc.,*
    526 F.Supp.2d 392 (S.D.N.Y. 2007) ............................................................9

*Lewis v. Rosenfeld,*
    145 F. Supp. 2d 341 (S.D.N.Y. 2001) ..........................................................3

*Luce v. Edelstein,*
    802 F.2d 49 (2d Cir. 1986) ..........................................................................4

*Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.,*
    801 F.2d 13 (2d Cir. 1986) ..........................................................................7

*Morales v. Gould Investors Trust,*
    445 F. Supp. 1144 (S.D.N.Y. 1977) ............................................................7

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.,*
    85 F. Supp. 2d 282 (S.D.N.Y. 2000) ............................................................4

*Rubin v. United States,*
    449 U.S. 424 (1981) ....................................................................................7

*SEC v. Drysdale,*
    785 F.2d 38 (2d Cir. 1986) ..........................................................................7

*Slayton v. Am. Express Co.,*
    460 F.3d 215 (2d Cir. 2006) ........................................................................3

*Sony Music Entm't Inc. v. Robison,*
    01 Civ. 6415 (LMM), 2002 WL 550967 (S.D.N.Y Apr. 11, 2002) ..............3

*THL v. Grant Thornton, LLP,*
    07 Civ. 8663 (GEL), 2008 WL 3166536 (S.D.N.Y. Aug. 6, 2008) ............10

*Thomas v. United States,*
    No. 02 Civ. 6254, 2005 WL 2104998 (S.D.N.Y. Sep. 1, 2005)...................2

*Yoder v. Orthomolecular Nutrition Inst. Inc.,*
    751 F.2d 555 (2d Cir. 1985) ......................................................................19

## STATUTES

15 U.S.C. § 78bb(f)(5)(B)(ii)............................................................................2

## PRELIMINARY STATEMENT

In an Opinion and Order dated August 28, 2008 (the "Opinion"), the Court granted the motions to dismiss filed by Tone N. Grant, Philip Silverman, Robert C. Trosten, Richard N. Outridge, Joseph J. Murphy, William M. Sexton, Grant Thornton LLP, and the THL Defendants (collectively, the "Defendants") and denied Plaintiffs' request for leave to replead. The Court ruled that (1) Plaintiffs do not have standing to assert their claims because they do not satisfy the purchaser-seller requirement for Rule 10b-5 claims; and (2) Plaintiffs' complaints do not adequately allege deceptive conduct. (Opinion at 3.) Pursuant to Local Rule 6.3 and Federal Rule of Civil Procedure 59(e), Plaintiffs seek reconsideration of that portion of the Court's order that denied leave to replead. Plaintiffs respectfully submit that they should be granted leave to replead to amplify their Complaints with additional factual allegations that would address the bases for the Court's dismissal.[1]

The Capital Management and VR Complaints were both filed on October 9, 2007. None of the Plaintiffs to those Complaints has been allowed to file even a first amended complaint. The amended class action complaint was filed on December 21, 2007. When these three Complaints were filed, none of the Plaintiffs had advance knowledge of the Court's analysis of the Customer Agreement or the Court's analysis of the interplay between RCM's use of customers' securities and margin financing. The Customer Agreement was not even before the Court in its consideration of the initial motion to dismiss. Oral argument was not held with respect to the motions.

---

[1]  At such time as the Court's Order becomes appealable, Plaintiffs intend to address other aspects of the Court's ruling, including but not limited to the Court's finding that neither RCM nor RSL owed fiduciary duties to Plaintiffs.

Accordingly, it was not until the Court issued the Opinion that Plaintiffs became aware of the Court's interpretation of the Customer Agreement or the Court's view that RCM's right to use customers' securities was related to whether they had margin loans. Likewise, the Court had not previously addressed the standing arguments raised by the Defendants, and, as a result, Plaintiffs did not have the benefit of the Court's analysis of that issue.

Plaintiffs believe that, given an opportunity to amend the complaint, they could plead a Section 10(b) claim that would survive consistent with the Court's view -- which Plaintiffs believe is overly restrictive -- of such a claim. Accordingly, Plaintiffs seek reconsideration of that portion of the Opinion that denied them leave to replead.

In addition, in light of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f)(5)(B)(ii), and given the pendency of a class action under the federal securities laws, Plaintiffs have not pleaded common law claims for the damages alleged in their federal securities law claims. To the extent that leave to replead is denied, and the Court's dismissal of the federal securities class actions is upheld in the Second Circuit, SLUSA would no longer be an impediment to such claims; Plaintiffs would not seek to pursue such common law claims as a class action. Accordingly, Plaintiffs seek an amendment of the Court's order to make explicit that in the event that the Court's decision is upheld on appeal, Plaintiffs should be permitted leave to file common law claims in this action.

## STANDARD OF REVIEW

A district court should grant a motion for reconsideration when necessary "to correct a clear error". *Thomas v. United States*, No. 02 Civ. 6254, 2005 WL 2104998, at *2 (S.D.N.Y. Sep. 1, 2005) (internal citations omitted). Reconsideration is appropriate

when the "moving party can point to controlling decisions or data that the court overlooked" and "that might reasonably be expected to alter the conclusion reached by the court". *Lewis v. Rosenfeld*, 145 F. Supp. 2d 341, 343 (S.D.N.Y. 2001) (internal citations omitted).

Courts in this circuit have granted reconsideration to amend a dismissal that originally was with prejudice, so as to allow plaintiff the opportunity to replead. *See Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793 (RCC), 2004 WL 1781148, at * 4 (S.D.N.Y. Aug. 10, 2004) (granting reconsideration and allowing plaintiff to amend its complaint because "it cannot be said that amending the plaintiffs' common-law fraud allegations would be futile"); *Sony Music Entm't Inc. v. Robison*, 01 Civ. 6415 (LMM), 2002 WL 550967, at *1 (S.D.N.Y Apr. 11, 2002) (granting reconsideration and allowing plaintiff to amend their complaint).

## ARGUMENT

## I.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD THE ALLEGATIONS OF DECEPTIVE CONDUCT

### A.    Leave To Replead Is Liberally Granted And Is Almost Automatic When A Complaint Is Dismissed Pursuant To Rule 9(b)

Federal Rule of Civil Procedure 15(a) provides that leave to replead should be "freely given when justice so requires." *See Slayton v. Am. Express Co.*, 460 F.3d 215, 230 (2d Cir. 2006) ("Leave to replead is to be liberally granted."). The Second Circuit has stated that "we have interpreted [Rule 15(a)] "in favor of allowing the amendment absent a showing by the non-moving party of bad faith or undue prejudice." *Anthony v. City of New York*, 339 F.3d 129, 138, n.5 (2d Cir. 2003). Here, there is

neither bad faith on the part of the Plaintiffs in seeking the right to replead, nor would there be undue prejudice to the Defendants.

The Court's dismissal of the deceptive conduct allegations was pursuant to Federal Rule of Civil Procedure 9(b).[2]  Complaints dismissed under Rule 9(b) are "almost always dismissed with leave to amend." *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 235 (S.D.N.Y. 2008); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (same); *see also Devaney v. Chester*, 709 F. Supp. 1255, 1265 (S.D.N.Y. 1989) ("[f]ailure to comply with Rule 9(b) ordinarily results not in outright dismissal, but in an order directing the errant pleader to replead his fraud allegations in conformity with the Rule").

**B.    The Pleading Deficiencies That Plaintiffs Seek To Redress Were Raised By the Court For The First Time In The Opinion**

The Court denied Plaintiffs' request for leave to replead on the ground that the Class Plaintiffs "already had two bites at the apple," because they were permitted to replead following the Court's Opinion and Order dated September 13, 2007 (the "2007 Opinion").  (Opinion at 42 (citing *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 304 n.27 (S.D.N.Y. 2000).)

As discussed below, however, the Court's ruling on the most recent motions to dismiss turned on the determination of issues and the interpretation of agreements that were not even before the Court on the earlier motion to dismiss.  On the most recent motion to dismiss, the Court concluded, based on its interpretation of the Customer Agreement, that Plaintiffs were required to plead that they had no margin

---

[2]    *See* Opinion at 24 ("the Capital complaint still fails to adequately allege deceptive conduct under the heightened pleading requirements of Rule 9(b)"); *id.* at 10, 16, 25 (referring to Rule 9(b) as the basis for dismissal).

balance at the precise time that their securities were used by RCM. (Opinion at 23.) The Court also based its ruling on an interpretation of the account statements, and whether or not those account statements deceived Plaintiffs and other RCM customers. (*Id.* at 25-27.)

Neither of those issues was addressed in the 2007 Opinion or in the briefing that preceded the 2007 Opinion. Indeed, neither the Customer Agreements nor the account statements were even before the Court on the prior motion. And the issue of whether Plaintiffs had a margin balance was discussed for the first time in the reply brief filed by the THL Defendants, dated June 9, 2008. Thus, if Plaintiffs are granted leave to replead to provide facts regarding whether Plaintiffs' securities were used at times when customers had no margin balance and to provide additional details regarding the manner in which account statements deceived Plaintiffs and RCM customers, it will be their first opportunity to do so with the benefit of the Court's views on those issues.

The Second Circuit's decision in *Goldberg v. Meridor*, 567 F.2d 209, 213 (2d Cir. 1977) is instructive. There, the Second Circuit held that the district court erred in refusing to grant leave to amend after the court dismissed the initial complaint on one ground and subsequently dismissed an amended complaint on a different ground. The Second Circuit found that the plaintiff should be entitled to amend the complaint for a third time because the plaintiff did not have notice of the complaint's deficiencies with respect to the new basis for dismissal. *Id.* ("In every real sense when [plaintiff] requested further leave to amend he thus was seeking a second round, not a third."); *see also Blakely v. Wells*, No. 05-4846-cv, U.S. App. LEXIS 31031, at *20-21 (2d Cir. Dec. 13, 2006) (district court erred in dismissing the second amended complaint with prejudice

because the court did not previously notify the plaintiffs of the defects of the first amended complaint).

**C.    If Permitted To Replead, Plaintiffs Will Add Allegations That Cure The Pleading Deficiencies Noted By The Court**

The Court noted that "[w]ithout any idea of what additional facts plaintiffs would allege if permitted to replead, this Court simply cannot determine whether any amendment to their pleadings would be in the interest of justice." (Opinion at 43.)  On this motion for reconsideration, Plaintiffs seek to provide the Court with a better idea of the factual allegations that could cure the pleadings.

**1.    Allegations That RCM's Use Of Plaintiffs' Securities Was Continuous Until The Bankruptcy Filing, At Which Point In Time Plaintiffs Had No Margin Loans**

Plaintiffs in the Capital Management and VR Complaints each alleged that they had no margin loan as of the bankruptcy date.  (CM Compl. ¶¶ 68-69, 80, 93 (alleging that for each of Plaintiffs Capital Management, IDF, and IDC their securities were fully-paid with no margin balance at the time of the bankruptcy); VR Compl. ¶ 110 ("Plaintiffs in this action did not have any margin balance at the point in time when Refco filed for bankruptcy")).  Those Complaints also alleged that, at the time of the bankruptcy filing, RCM was not holding all of its customers' securities because many had been repoed or loaned out by RCM without the customer's knowledge or consent.  (CM Compl. ¶¶ 25-26; VR Compl. ¶¶ 28-29; 239-41.)  The Court held that those allegations were insufficient to establish that RCM used customer securities at times when customers had no margin balance, apparently because the Court read the Complaints as alleging that RCM used customer securities through a single sale, thereby completing the use of the securities upon transacting the sale.  (Opinion at 22-23.)

To the extent that the Complaints were not sufficiently clear on this point, Plaintiffs' amended pleadings would clarify that RCM used fully-paid, non-margined customer securities without the knowledge or consent of the customers on an ongoing basis up to and through the filing for bankruptcy. RCM did not simply sell securities in a traditional sale transaction and pocket the proceeds. Rather, RCM entered into repurchase ("repo") transactions or stock loans.[3] Amended pleadings would contain allegations making clear that RCM used the securities continuously for as long as the

---

[3]    Under the Securities Exchange Act of 1934, a "sale" is broadly defined to include any sale or disposition of any interest in a security. *See* Section 2(3) of the Securities Act ("[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value"). *See also Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) ("The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase"); *Morales v. Gould Investors Trust*, 445 F. Supp. 1144, 1149 (S.D.N.Y. 1977) ("It is apparent that in construing the words 'purchase' and 'sale' Congress intended, and the courts have attempted to effectuate, a liberal interpretation as to what *can* be 'purchase' or 'sale'.") (emphasis in original).

Repos satisfy the definition of "sale" of securities for purposes of Section 10(b) claims. *See SEC v. Drysdale*, 785 F.2d 38 (2d Cir. 1986) (repo transaction constitutes a sale of a security under Section 10(b)); *Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 19-20 (2d Cir. 1986) ("Viewing repos, as we must, from the perspective of their economic significance [], we think that the repos at issue herein fit squarely within the statutory language in the 1934 Act describing 'contract[s] to buy, purchase or otherwise acquire securities.' As such, and consistent with our holding in *Drysdale*, repos are subject to the antifraud provisions of the 1934 Act."); *Granite Partners, L.P. v. Bear, Stearns & Co*, 17 F. Supp. 2d 275, 304 (S.D.N.Y. 1998) ("In contexts such as commercial law and the antifraud provisions of the federal securities law, repos generally are viewed as purchases and sales.").

Stock loan agreements also fall within the definition of a purchase or sale under Section 10(b). Amended pleadings would make clear that, in return for the use of cash consideration, the stock loans in question granted the counterparty important interests in the securities: the right to use, sell and vote those securities as if they were the counterparty's own until the loan was terminated. *See Rubin v. United States*, 449 U.S. 424 (1981) (a pledge of stock is a sale of a security under Section 17(a) of the '33 Act); *BCH Interim v. Finantra Capital Inc.*, 283 F. Supp. 2d 968, 978 (S.D.N.Y. 2003) ("The pledge of a stock as a guarantee for a loan is equivalent to the sale of the stock for the purposes of the federal securities laws."), relying on *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984); *Citibank N.A. v. K-H Corp.*, 745 F. Supp. 899, 902 (S.D.N.Y. 1990) (a pledge of securities is a sale under Section 10(b)).

repo transaction or stock loan remained open. RCM sold or loaned the securities to a counterparty in return for cash and RCM was obligated to pay the counterparty interest computed on a daily basis on that cash with the open transaction being re-marked daily on the basis of the securities' market price for that day. RCM's use of the customer's securities continued until and unless RCM or the counterparty chose to unwind the transaction, at which time the repo or loan was reversed and RCM was obligated to return the cash proceeds of the repo or stock loan transaction to the counterparty and the counterparty was obligated to return the securities to RCM.

As discussed above, the Complaints already allege that Plaintiffs had no margin balance at the time of the bankruptcy filing, and that Plaintiffs' securities remained in use by RCM on loans or repos at the time of the bankruptcy filing. The additional allegations -- which at trial would be verified by the testimony of RCM employees and RCM business records -- would make clear that RCM was using the securities throughout the period up to the bankruptcy filing as the securities remained subject to open repo or stock loan transactions that were being remarked on a daily basis. As RCM and its affiliates sustained further losses and utilized these fully-paid customer securities for acquisitions and business operations, the "hole" in the customer-owned securities portfolio grew to nearly $1 billion.

2.  **Allegations Demonstrating That RCM's Initial Use Of Plaintiffs' Securities Occurred At Times When They Had No Margin Loans**

The Court held that "the only reasonable interpretation of the Customer Agreement and Trade Confirmation is that RCM was authorized to use customer securities only when a margin balance existed in the customer's account." (Opinion at 22, n. 17.) The Court thus agreed with Plaintiffs that the Customer Agreement did not

permit RCM to use Plaintiffs' securities when no margin balance existed in their accounts.[4] The Court held, however, that Plaintiffs did not adequately allege that RCM used their securities at a time when they had no margin balance. (*Id.* at 21.) Plaintiffs respectfully disagree with this conclusion and will argue to the Second Circuit that their Complaints allege with sufficient detail that their securities were used by RCM at times when they had no margin balance.[5] But even if the Second Circuit affirms the Court's

---

[4]    On appeal, Plaintiffs will challenge the Court's conclusion that when a customer had a margin balance the Customer Agreement permitted RCM to use all securities in that customer's account regardless of the amount of financing. Moreover, as discussed below, even assuming, *arguendo*, that RCM had such a contractual right, its account statements and other conduct deceived Plaintiffs and other customers, who had no way of knowing that RCM was using securities beyond the securities that it identified on account statements as being subject to open financing transactions.

[5]    All three of the complaints alleged, based on the testimony of a Refco employee from the Conversion Hearing, that RCM would sell or re-hypothecate "anything held in a Refco account," making clear that RCM made use of all customers' securities -- fully-paid, excess margin, or otherwise. (CM Compl. ¶ 108; Class Action Compl. ¶ 105; VR Compl. ¶ 117.) In addition, the VR and Capital Management complaints allege that they had no margin balance at the time of the bankruptcy, yet their securities were not held in their accounts. (CM Compl. ¶¶ 68-69, 80, 93 (alleging that for each of Plaintiffs Capital Management, IDF, and IDC their securities were fully-paid with no margin balance at the time of the bankruptcy); VR Compl. ¶ 110 ("Plaintiffs in this action did not have any margin balance at the point in time when Refco filed for bankruptcy").) And in the case of Capital Management, the complaint alleges a precise range of dates when the securities in plaintiffs' accounts had no margin balance.

Plaintiffs will argue on appeal that those allegations are more than sufficient to provide Defendants with the details of the fraud and that no more precision is required at the pleadings stage. *See Int'l Motor Sports Group, Inc.*, No. 98 Civ. 5611, 1999 WL 619633, at *3-4 (S.D.N.Y. Aug. 16, 1999) ("[A] plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based. . . . To be sure, the Counterclaim does not identify precisely where these alleged misrepresentations and omissions occurred, and specifies only that they occurred '[i]n an approximate[ly] 60-day period during April-June 1997'. But Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map."); *Kalin v. Xanboo, Inc.*, 526 F.Supp.2d 392 (S.D.N.Y. 2007) ("[A] plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based"); *Gelles v. TDA Indus. Inc.*, No. 90 Civ. 5133 (MBM), 1991 WL 39673 (S.D.N.Y. March 18, 1991) ("Rule 9(b) does not require that a plaintiff set out all evidence for its case in chief, but rather, that a complaint set forth sufficient facts to tell a defendant what conduct he stands accused of.

conclusion regarding the detailed level of pleading that is required for the deceptive

conduct allegations, Plaintiffs are able to file amended complaints with additional

specific and precise allegations demonstrating that their securities were used by RCM at

the same time that they had no margin balance.

### a. Allegations Clarifying That It Was Standard Practice At RCM To Use Customers' Securities Regardless Of Whether The Owners of Those Securities Had Margin Balances

If granted leave to replead, Plaintiffs would add allegations demonstrating

that RCM's use of customers' securities was routine, whether or not customers had any

margin loans. It would be sheer happenstance, of the most unlikely sort, had any

particular customer with no margin balance escaped RCM's improper use of that

customer's securities.

Specifically, Plaintiffs will allege that on a daily basis the financing desk

at RCM was informed of Refco's daily cash needs by RCC, the entity that acted as the

"bank" or treasury for the Refco group of companies. Thomas Yorke and Vera Kraker,

the RCM employees who ran the financing desk, would then examine the stock report to

see what securities were being held by RCM's customers. To raise sufficient cash to

satisfy any cash shortfall, they would then cause RCM to enter into repo or stock loan

---

Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court."). *See also THL v. Grant Thornton, LLP*, 07 Civ. 8663 (GEL), 2008 WL 3166536, at *13 (S.D.N.Y. Aug. 6, 2008) ("At this threshold stage of the litigation, however, a complaint needs only to plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *cf. In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 375, n.137 (S.D.N.Y. 2003) ("Defendants argue that Plaintiffs have not pled loss causation with sufficient particularity because they did not allege 'when the inflation [of the transaction price] began and ended' and 'whether the amount of alleged inflation varied over time'. This argument lacks any merit. So long as Plaintiffs allege a coherent scheme to defraud that accounts directly for their losses, loss causation has been adequately pled." (internal citations omitted)).

transactions using customers' securities with one or more counterparties (usually a large financial institution), either directly or indirectly through Refco Securities LLC. In deciding which customer securities to use to raise cash, they did not seek to determine whether the securities were held by a customer with or without a margin balance. To the contrary, they freely used securities held by customers who had no margin balance.

Those allegations are supported by a declaration from Marc S. Kirschner, the RCM Plan Administrator, Trustee of the Refco Private Actions Trust, and the Trustee of the Refco Litigation Trust, by the testimony of Ms. Kraker and Mr. Yorke at the Conversion Hearing, and by the additional testimony we expect they would offer in these actions. Those allegations are further corroborated by the testimony of Rodrigo Alvarez, a Refco broker who interfaced with the customers, who testified at the Conversion Hearing that RCM would sell or hypothecate customers' securities without their consent even when they had no margin balance.

> **b.    Allegations Of Precise Dates That RCM Used Plaintiffs' Securities When Plaintiffs Had No Margin Loans Outstanding**

In addition, the amended complaints would include specific allegations showing that RCM initiated the use of particular customer securities at points in time when the customer did not have a margin balance.

For example, if permitted to file an amended complaint, Capital Management will allege that it opened an account with RCM on or about June 10, 2004, and that on June 23, 2004 it deposited 500,000 fully-paid Lukoil ADRs (with a market value of approximately $67.7 million) into safekeeping in that account. Capital Management will further allege that it was not until a year later, in June 2005, that it took a margin loan (that was repaid by August 2005), yet, at the latest by March 31, 2005 --

*more than two months before it first took a margin loan* -- at least 370,000 of its 500,000 Lukoil securities had been loaned out by RCM without Capital Management's knowledge or authorization. Furthermore, Capital Management will allege that RCM's unauthorized use of its Lukoil securities was not reflected on its March 2005 customer statement or any other customer statement. Those allegations are supported by an analysis of RCM's stock record and stock loan report in conjunction with the monthly customer statements that Capital Management received from RCM. *See* Galfus Decl., ¶¶ 4-7.

       If granted leave to replead, Plaintiff IDF will make similar allegations in an amended complaint demonstrating that its securities were used by RCM even when it had no margin balance. For example, on March 31, 2005, IDF had no margin balance and was holding two series of fully-paid U.S. Treasury Bills maturing May 2005 (the "May T-bills") and June 2005 (the "June T-bills") respectively in its account number 10001626. Yet, on February 22, 2005, RCM repoed out IDF's May T-bills without IDF's knowledge or authorization and on March 31, 2005, RCM repoed out IDF's June T-bills without IDF's knowledge or authorization. IDF will further allege that RCM's use of its May and June T-bill securities was not reflected on IDFs February or March 2005 monthly customer statements. Those allegations are supported by an analysis of RCM's stock record and stock loan report in conjunction with the monthly customer statements that IDF received from RCM. *See* Galfus Decl., ¶¶ 8-13.

       If the Second Circuit determines that such factually precise details are required to be pleaded at the outset, we expect that most or all of the remaining Plaintiffs will be able to make similar detailed allegations in amended complaints showing with precision that RCM used their securities even at times when they had no margin balance.

Due to the state of RCM's records as they were inherited by the Trustee, and due to RCM's methods of record-keeping while RCM was under the control of many of the Defendants, determining these issues is difficult and may require the Estate's retention of forensic accountants to scrutinize the records that are available. *See* Galfus Decl., ¶ 15. In the event that the Second Circuit determines that such details are required on a plaintiff-by-plaintiff basis (beyond Capital Management and IDF), Plaintiffs are prepared to do the analysis to support a repleading that meets such a standard.

### 3.    Additional Allegations Explaining How Plaintiffs Were Deceived About RCM's Unauthorized Use Of Their Securities

#### a.    Allegations Regarding The Deceptive Nature Of The Account Statements

The Court concluded that "[t]o the extent RCM used plaintiffs' securities when plaintiffs had margin balances, moreover, the account statements accurately reflected the debits and credits to plaintiffs' accounts." (Opinion at 26.) Plaintiffs respectfully submit that the Court should not have made such a determination, as a matter of law, against Plaintiffs based on the pleadings, which alleged that the account statements were deceptive. If permitted to replead, Plaintiffs would add additional allegations to expand on the manner in which the account statements were deceptive with respect to customers who had margin balances.

Plaintiffs will allege in their amended complaints that when they financed a position, and thereby created a margin balance, they received a statement from RCM showing precisely which and how many of the securities in their accounts (typically far less than all of the securities in the accounts) were being held as collateral or used to finance the transaction. Plaintiffs will further allege that they clearly understood from

this account statement presentation that, consistent with industry practice and federal law requirements for broker-dealers operating in the United States (as was the case with RCM), only the securities identified on the account statement as being held as collateral by RCM were then being used by RCM. Plaintiffs will add allegations to their Complaints asserting that the account statements were deceptive because, although the statements presented other securities as "Security Positions In Your Account" and not being held as collateral by RCM or used by RCM to finance the transaction, those securities were in fact also being used by RCM, through repos or stock loans.

On this motion, Plaintiffs place before the Court a sample account statement to illustrate the deceptive nature of those statements. Plaintiff IDC's customer statement for its account number 10010247 for the month of March 2005, lists two securities – a Brazilian bond and a Venezuelan bond – in the "Open Financing Transactions" section of the statement, *i.e.*, indicating to customers that only those two bonds were being used by RCM (in return for financing of $1.9 million). *See* Bak Decl., Ex. 1. IDC's March 2005 customer statement also states that IDC is holding other "Security Positions In Your Account," including 2,000,000 Colombian bonds. *See id.* IDC will allege that an analysis of RCM's stock record and repo report will show that the Colombian bonds, which were not financed by RCM for IDC and were not included in the securities listed under "Open Financing Transactions," were in fact being used by RCM, through repos or stock loans.

Capital Management would also add similar allegations with respect to its customer statements for July 2005. Capital Management will allege that under the heading "Security Positions In Your Account," its July 2005 customer statement shows

that Capital Management had 2,000,000 Lukoil ADRs. *See* Exhibit 2 to the Bak

Declaration. And, under the heading "Open Financing Transactions," the statement

purports to show that Capital Management borrowed approximately $10 million against

800,000 of those 2,000,000 Lukoil ADRs. *See id.* Capital Management will allege that

the customer statements thus showed RCM was using only 800,000 of its Lukoil ADRs

against the $10 million loan, while the other 1,200,000 ADRs were not being used by

RCM as collateral to secure or finance Capital Management's loan.[6] Capital

Management will further allege that, in fact, as of July 29, 2005, contrary to what was

reported to Capital Management on the customer statement, RCM was using at least

1,800,000 of Capital Management's ADRs in stock loans, thus at most, there remained

only 200,000 ADRs in Capital Management's account.

  All of the Plaintiffs will allege that to the extent they utilized margin

financing, they received similar account statements that had a similar, misleading

presentation. Plaintiffs will allege that RCM specifically identified to the customers a

subset of the customers' securities that were being held as collateral to secure or finance

open financing transactions, and that Plaintiffs reasonably understood from this

presentation that only those securities were being used by RCM during the period that the

customer had an open margin balance. This presentation was false and misleading given

that RCM was using securities whether or not they were identified as collateral in the

"Open Financing Transactions" section of the account statements.

---

[6] This reading also makes economic sense given that the 800,000 Lukoil ADRs were worth
approximately $33 million at that time thereby leaving RCM more than adequately
collateralized on its $10 million loan to Capital Management.

Plaintiffs will also add allegations to their amended complaints asserting that they reasonably were led to believe by the presentation of the account statements that, once a margin balance was paid down to zero, the securities were no longer being used and any open repos or stock loans were closed out. For example, the August 2005 Capital Management account statement reflects in the section entitled "Account Activity" that on August 24, 2005, Capital Management repaid the $10 million loan to RCM and also purports to represent that the 800,000 ADRs are being received back into Capital Management's account. *See* Exhibit 3 to the Bak Declaration. The August 2005 customer statement further reports in the "Security Positions In Your Account" section that Capital Management holds 2,000,000 ADRs and no longer reports any "Open Financing Transactions." *See id.* Capital Management will further allege that contrary to what was presented on the customer statement, in fact, RCM had not returned the 800,000 ADRs to its account because, as of August 31, 2005, RCM was using at least 1,600,000 of Capital Management's ADRs.

All of the Plaintiffs will allege that to the extent they repaid margin financing, they received similar account statements that had a similar, misleading presentation. In truth and in fact, contrary to the impression created by the account statements, RCM continued to keep open or "roll" repos and stock loans using customer securities even though the customer statements led customers to believe that their securities were no longer being used to collateralize a margin loan.[7]

---

[7]    Although the Court concluded that the Customer Agreement allowed RCM to use everything in a customer's account whenever that customer engaged in any level of financing (a conclusion that Plaintiffs will challenge on appeal), Plaintiffs would allege in amended complaints that RCM's conduct nevertheless was deceptive because the account statements they received from RCM when they had a margin balance gave them the clear impression that RCM used only some of their securities as collateral, not all of

**b.    Allegations Regarding The Deceptive Nature Of RCM's Failure To Compensate Plaintiffs For Its Use Of Their Securities**

Plaintiffs alleged in their Complaints that they were deceived because no rational customer, aware of the risk to which RCM was exposing its securities, would have entrusted its fully-paid securities, or securities that were not being held as collateral with respect to open financing transactions, to RCM when the customer received no benefit from doing so. The Court rejected that argument by making the factual determination that "broker-dealers often use customer funds without passing on interest to customers." (Opinion at 30.) Plaintiffs respectfully submit that the Court should not have made such a factual determination, as a matter of law, against Plaintiffs based on the pleadings that alleged that the lack of compensation was deceptive.

If permitted to replead, Plaintiffs will amplify their allegations by asserting that it is standard industry practice for institutional investors to enter securities lending agreements with their broker under which they are paid for lending out their securities, thus compensating them for the use of their securities and the risks to which they are being exposed. Indeed, there is an entire securities lending industry that operates on the assumption that the lender of securities is paid a fee by the borrower for the use of its securities. Those amended allegations would be supported by the testimony of an expert in securities-lending arrangements who will confirm based on extensive

---

the securities in their accounts. RCM's course of conduct during the time that Plaintiffs' had accounts with RCM reasonably led Plaintiffs to believe that RCM was not using every last security in their accounts whenever they had any margin balance. Thus, even if, as the Court concluded, the Customer Agreement permitted RCM to use all of the securities in an account when a customer had a margin balance, that does not change the fact that Plaintiffs were deceived by RCM's subsequent course of conduct.

professional experience that institutional investors would not knowingly allow such securities to be used by their brokers without receiving a fee.

## II.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD TO ADDRESS THE COURT'S RULING THAT THEY DO NOT HAVE STANDING

Plaintiffs respectfully disagree with the Court's legal conclusion that they do not satisfy the purchaser-seller requirement of Section 10(b).  We will address that issue on appeal.  However, because the Opinion was the first time that the Court addressed the standing issue, Plaintiffs request leave to replead to include allegations that clarify or amplify why they satisfy Section 10(b)'s standing requirement.  *See In re Take-Two Interactive Secs. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y.2008) (granting leave to amend because "the Court had not evaluated the deficiencies in Lead Plaintiffs' pleadings before the publication of this Opinion").

In concluding that Plaintiffs do not satisfy the purchaser-seller requirement, the Court appeared to interpret the Complaints' allegations as stating that Plaintiffs' securities were first stolen by RCM and then in a subsequent transaction were sold for the benefit of RCM and other Refco affiliates.  (Opinion at 14.)  Plaintiffs' amended allegations will clarify that the "taking" of RCM customers' securities occurred simultaneously with RCM's sale of those securities.  In their amended complaints, Plaintiffs would clarify that when RCM used customers' securities, whether fully-paid or otherwise, no transaction was booked between RCM and the customer and no liability to the customer was recorded on RCM's books and records.  Rather, the RCM financing desk would use customer securities to settle a repo or stock loan transaction in RCM's name with a counterparty.  The amended complaints would thus make clear that RCM's unauthorized use of securities in Plaintiffs' accounts was effected by RCM's sale of the

securities, and that the wrongful use of customer property and the sale were one and the same.

Plaintiffs would also allege in amended complaints that the Court's reading of the Customer Agreement in the Opinion provides an additional reason why they satisfy Rule 10b-5's purchaser-seller requirement.  The Court noted that when Plaintiffs entered into the Customer Agreement they gave RCM a security interest permitting RCM to use all of the securities in their account anytime they had a margin balance.  This transfer of an interest in customer securities to RCM in and of itself is sufficient to establish that Plaintiffs were sellers of securities.  Under the Securities Exchange Act of 1934, a "sale" is broadly defined to include any sale or disposition of any interest in a security.  *See* section 2(3) of the Securities Act ("[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value").  *See Yoder v. Orthomolecular Nutrition Inst. Inc.*, 751 F.2d 555 (2d Cir. 1985) (the sale or disposition of a security interest constitutes a "sale" under the Securities Exchange Act); *First Nat'l Bank of Chicago v. Shearson Lehman Bros., Inc.*, No. 85 c4266, 1989 WL 165009, at *5 (N.D. Ill. Dec. 20, 1989) (plaintiff has standing under Rule 10b-5 where it "entered into a contract whereby it would have acquired an interest in securities"); *cf. Chem. Bank*, 726 F.2d at 939 (a pledge of securities constitutes a sale under Section 10(b)).

## III.    PLAINTIFFS SHOULD BE PERMITTED LEAVE TO REPLEAD TO ASSERT COMMON LAW CLAIMS

SLUSA preempts state law claims based on a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security when another lawsuit is filed or pending in the same court asserting damages on behalf of

more than 50 persons.  Because of the SLUSA preemption, Plaintiffs asserted only

federal securities fraud claims in the Complaints.  If the Court's decision is affirmed on

appeal, Plaintiffs will be unable to assert securities fraud claims; at that point, however,

SLUSA will no longer be an impediment to Plaintiffs' ability to assert their own state law

claims for fraud, aiding and abetting fraud, conversion, aiding and abetting conversion,

and other common law claims.  (*See, e.g.*, Opinion at 14 ("[P]laintiffs' allegations here

establish only a theft and subsequent sale of customer securities by RCM for its own

benefit".)  Plaintiffs request that the Court revise the Opinion so that, in the event that the

Court's dismissal of the securities fraud claims is affirmed on appeal, Plaintiffs will be

granted leave to assert such common law claims in this Court that will relate back to the

date of the original filings for statute of limitations purposes, pursuant to Federal Rule of

Civil Procedure 15(c).  It would be manifestly unfair for Plaintiffs to have to assert those

common law claims in a new action and not get the benefit of the relation back doctrine

when SLUSA was the only reason they did not allege such common law claims at the

outset.[8]

---

[8]    To preserve their rights, out of an excess of caution, Plaintiffs will soon be filing a summons in state court against the Defendants asserting common law claims based on RCM's deceptive use and theft of Plaintiffs' securities.

## CONCLUSION

For the reasons discussed herein, Plaintiffs respectfully request that the Court clarify or amend the Opinion to grant Plaintiffs leave to replead to redress the deficiencies noted by the Court.  Plaintiffs also request that the Court amend the Opinion to grant them leave to assert common law claims in the event that the Court's dismissal of the securities fraud claims is affirmed on appeal.

Dated:  New York, NY
        September 12, 2008

MILBANK, TWEED, HADLEY & McCLOY LLP

/s/  Scott A. Edelman
Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
Kylie Davidson (KD 0502)
Michael Shepherd (MS 1313)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
SEdelman@milbank.com
*Counsel for the Capital Management and VR*
*Plaintiffs; Co-Lead Counsel for Lead Plaintiffs and*
*the Putative Class*

KIRBY McINERNEY & SQUIRE, LLP

/s/  Mark A. Strauss
Richard L. Stone (RS 5324)
Mark A. Strauss (MS 2288)
830 Third Avenue
New York, NY  10022
Tel.: (212) 371-6600
Fax:  (212) 751-2540
mstrauss@kmllp.com
*Co-Lead Counsel for Lead Plaintiffs and the*
*Putative Class*